**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **CORAL RIDGE MINISTRIES MEDIA, INC.** ) | |
| **d/b/a D. James Kennedy Ministries** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | **2:17-cv-566-MHT** |
| **AMAZON.COM, INC.,** ) | |
| **AMAZONSMILE FOUNDATION, INC.** ) | |
| **SOUTHERN POVERTY LAW CENTER, INC.** ) | |
| **And GUIDESTAR USA, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**SOUTHERN POVERTY LAW CENTER, INC.'S MOTION TO DISMISS
AND BRIEF IN SUPPORT THEREOF**</u>

COMES NOW the Southern Poverty Law Center, Inc. (the SPLC) and moves this Court to dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim.  As grounds for the same, the SPLC submits this brief in support of its Motion.

**I.     INTRODUCTION**

Coral Ridge Ministries Media, Inc. (CRM Media), doing business as D. James Kennedy Ministries, has sued the SPLC for common-law defamation (Count I) and for a violation of the Lanham Act, specifically 15 U.S.C. § 1125 (Count III).  The basis for both claims is the SPLC's designation of D. James Kennedy Ministries as an "Anti-LGBT Hate Group."  "LGBT" is an acronym standing for lesbian, gay, bisexual, and transgender.

Specifically CRM Media alleges that:

"the SPLC has placed:
'D. James Kennedy Ministries
(formerly Truth in Action)
Fort Lauderdale, Florida
ANTI-LGBT'

1

"On SPLC's 'HATE MAP' at:

"https://www.splcenter.org/hatemap...."

Complaint ¶ 34.

CRM Media takes further issue with actions allegedly taken by Amazon.com, Inc., AmazonSmile Foundation, Inc., and GuideStar USA, Inc., in connection with the SPLC's designation of D. James Kennedy Ministries as an Anti-LGBT Hate Group. Complaint, ¶¶ 35-38 & Count V.

CRM Media alleges that "[t]he basis for SPLC's declaration that the Ministry is a hate group is that the Ministry espouses and supports Biblical morals and principles concerning human sexuality." Complaint ¶ 40. CRM Media quotes Bible verses in the Complaint that it contends supports its positions on human sexuality. In summary, CRM Media's position as alleged in the Complaint is that LGBT persons' sexuality is an "abomination" and that LGBT persons are ungodly sinners who "will not inherit the kingdom of God." Complaint ¶ 145. (*See* further discussion *infra* regarding the CRM Media's espoused beliefs in § II.A.3.)

CRM Media's defamation claim is due to be dismissed because, as a public figure, it has failed adequately to plead the actual malice standard necessary to prevail on a defamation claim. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). That claim is also due to be dismissed because the SPLC's designation of CRM Media as an Anti-LGBT Hate Group is a matter of opinion protected by the First Amendment and thus not defamation as a matter of law. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 21-22 (1990). Moreover, the SPLC disclosed its basis for the opinion and its basis is not itself false or defamatory. Thus, the Plaintiff's claim also fails as a matter of common law.

CRM Media also alleges that the SPLC violated the Lanham Act, 15 U.S.C. § 1125(a), in connection with its designation of D. James Kennedy Ministries as an Anti-LGBT Hate Group. CRM Media fails to state a Lanham Act claim. First, the First Amendment's "actual malice" standard precludes this claim. In addition, the designation is not, even as described in the Complaint, "commercial speech" which it must be to maintain a Lanham Act claim, and CRM Media has not adequately pled at least two other Lanham Act elements.

## II.   DEFAMATION

### A.   CRM MEDIA HAS NOT ADEQUATELY PLED ACTUAL MALICE

#### 1.   Actual malice must be shown where public figures are involved.

If a court determines that a plaintiff in a defamation action is "a public official, public figure, or limited-purpose public figure," then the plaintiff must establish by clear and convincing evidence "that the defamatory statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard to whether it was false or not." *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 333 (Ala. 2007) (citing *New York Times, Co. v. Sullivan*, 376 U.S. 254, 280 (1964)); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130(1967); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (internal quotation marks omitted). A defendant acts with "reckless disregard" if, at the time of publication, the defendant "'entertained *serious doubts* as to the truth of [its] publication' or acted 'with a *high degree of awareness* of ... [its] probable falsity.'" *McFarlane v. Sheridan Square Press, Inc.,* 91 F.3d 1501, 1508 (D.C. Cir. 1996) (*quoting St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)).

The test is not an objective one and the beliefs or actions of a reasonable person are irrelevant. *St. Amant,* 390 U.S.at 731. Rather, courts ask whether the defendant, instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false. *Id.; Silvester v. Am. Broad. Cos. Inc.,*839

F.2d 1491, 1493 (11th Cir. 1988).  Under this standard, even "[t]he most repulsive speech enjoys immunity provided it falls short of" meeting the actual malice standard.  *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974) (internal quotation marks and citations omitted).  "[E]ven where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood." *Garrison v. Louisiana*, 379 U.S. 64, 73 (1964). And, as noted above, a reckless falsehood is one about which the speaker had a "high degree of awareness of…[its] probable falsity."  *St. Amant,* 390 U.S. at 731.

### 2.  CRM Media is a public figure.

Determining whether an individual is a public figure – and thus subject to the actual malice standard – is a question of law for the court to decide. *See Brewer v. Memphis Pub. Co., Inc.*, 626 F.2d 1238, 1247 (5th Cir. 1980).  A corporation can be a public figure for First Amendment purposes.  *See, e.g.*, *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485 (1984) (applying actual malice standard to Bose Corporation's defamation claim).  Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures...."  *Gertz*, 418 U.S. at 342.  Public figures must prove actual malice to prevail in a defamation action.  *Id.*

CRM Media cannot seriously argue that it is not a public figure.  In describing itself, it explains that the weekly television program of its founder, D. James Kennedy, was "syndicated on numerous … stations with a peak audience of three million viewers in 200 countries" and that Kennedy had a "daily radio program."  Complaint ¶ 9.  It states that it is still broadcasting those programs.  It further alleges that "[t]he Corporation seeks to communicate the Gospel … and a biblically informed view of the world, using all available media, throughout all of the Earth…."

4

Complaint ¶ 10 (quoting corporation bylaws).  CRM Media likewise acknowledges that its mission is to "proclaim the good news of the Gospel throughout the Earth," and to "help believers understand America's Christian heritage…." Complaint ¶ 11(a), (d).   In fact, the entity is not only an international ministry by its own account but also a media corporation.  Coral Ridge Ministries Media, Inc., is its name. Thus, CRM Media, is the ultimate seeker of "the public's attention."  *See Gertz,* 418 U.S. at 323.

Even if CRM Media were not a public figure outright (it is), it would be a limited public figure subject to the same actual malice standard for purposes of the Anti-LGBT designation. Recently, the Federal District Court of the Southern District of Alabama, applying well-established case law, ruled, in connection with a nonprofit corporation, that "a group that has voluntarily injected itself into a public controversy" becomes a public figure for a "limited range of issues," *i.e.,* those issues about which it has injected itself into the public controversy.  *See Southbark, Inc. v. Mobile Cty. Comm'n*, 974 F.Supp. 2d 1372, 1382 (S.D. Ala. 2013).

For many years, there has existed a "public controversy" surrounding LGBT rights. CRM Media has further acknowledged that, as part of its religious teachings, it characterizes any sexuality other than heterosexuality as sinful and an abomination.  *See* Complaint ¶ 145. CRM Media takes the position that "[t]he basis for SPLC's declaration that the Ministry is a hate group is that the Ministry espouses and supports Biblical morals and principles concerning human sexuality." Complaint ¶ 40. And clearly it is communicating those views to the world.  *See e.g.* Complaint ¶ 10.  Thus, CRM Media has voluntarily injected itself into the public controversy over LGBT rights, and is, at the very least, a limited public figure for that purpose.

Whether a public figure or limited public figure, CRM Media must prove that it can provide clear and convincing evidence of actual malice (knowledge of falsity or probable falsity) to prevail. *Gertz,* 418 U.S. at 342.

> ### 3. CRM Media has failed to allege facts "sufficient to give rise to a reasonable inference of actual malice." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

CRM Media failed to adequately plead actual malice, and, as a result, its defamation claim is due to be dismissed. Recently, in *Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016), the Eleventh Circuit held that allegations of actual malice must meet the *Iqbal/Twombly* pleading requirements in defamation lawsuits involving public figures. Pursuant to the *Iqbal/Twombly* pleading requirements, to survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The *Michel* Court's holding is worth setting out here at some length:

> [A]fter *Iqbal* and *Twombly,* every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice. *See Biro v. Conde Nast,* 807 F.3d 541, 544–45 (2d Cir.2015); *McDonald v. Wise,* 769 F.3d 1202, 1220 (10th Cir.2014); *Pippen v. NBCUniversal Media, LLC,* 734 F.3d 610, 614 (7th Cir.2013); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,* 674 F.3d 369, 377 (4th Cir.2012); *Schatz v. Republican State Leadership Comm.,* 669 F.3d 50, 58 (1st Cir.2012). Joining that chorus, we hold that the plausibility pleading standard applies to the actual malice standard in defamation proceedings.
>
> Moreover, application of the plausibility pleading standard makes particular sense when examining public figure defamation suits. In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the "breathing space"

needed to ensure robust reporting on public figures and events. *Sullivan,* 376 U.S. at 271–72, 84 S.Ct. 710. Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. **The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether.** Thus, a public figure bringing a defamation suit must plausibly plead actual malice in accordance with the requirements set forth in *Iqbal* and *Twombly.*

*Michel*, 816 F.3d at 7002 (emphasis added). The reasoning set out in *Michel* applies equally here. Forcing the SPLC to defend this suit "through expensive discovery … would constrict that breathing space [designed to ensure robust reporting on public figures] in exactly the manner the actual malice standard was intended to prevent." *Id.*

The only allegation in the Complaint even arguably relevant to the constitutional "actual malice" standard is the position set out in paragraphs 53 and 75 of the Complaint: "The Ministry is not a hate group. Rather, the Ministry promotes and advances the Gospel of Jesus Christ, which promotes love of all people, including those who hate you." The same position is repeated elsewhere in the Complaint. *See* Complaint ¶ 16 (no "room for Hate" in the purpose of the ministry); ¶ 27 (denying promotion of "intolerance, hate").

In other words, CRM Media seems to allege that the SPLC got the Anti-LGBT Hate Group designation wrong and that the SPLC knew that it got the designation wrong (actual malice) because CRM Media promotes love rather than hate. Such an argument as a basis for constitutional actual malice in this case cannot carry the day. It does not remotely meet the pleading requirements of *Iqbal* or *Twombly*.

CRM Media acknowledges in the Complaint, without hesitation or qualification, that its religious doctrines hold that LGBT people are sinners and that their sexuality is an abomination. Paragraph 145 of the Complaint states: "The Ministry's position on 'LGBT' issues is inextricably

intertwined and connected to the Ministry's religious theology, as shown by the following Bible verses." The quoted verses equate "sodomites" with "the ungodly and sinners." Complaint ¶ 145. The verses quoted speak of "vile passions," which, read in context, is intended to mean any sexuality other than heterosexuality. *Id.* Another quoted verse equates sex between men as "men committing what is shameful, and receiving the penalty of their error which was due." *Id.* The section of quoted verses begins by calling it an "abomination" for a man to "lie with a man as with a woman." Finally, the quoted verses state that neither "homosexuals, nor sodomites … will inherit the kingdom of God." *Id.*

CRM Media clearly reads the verses quoted in the Complaint as central to its teachings. Paragraph 146, following on the heels of the verses discussed above, repeats that the "Ministry's position on 'LGBT' issues is inextricably intertwined and connected to the Ministry's theology …" Complaint ¶ 146. CRM Media goes on to say that the "SPLC and GuideStar have declared the Ministry to be a Hate Group due to the Ministry's stand on LGBT issues …." Complaint ¶ 146.

For the record, CRM Media is incorrect that the Anti-LGBT Hate Group designation is based solely on its interpretation of the Bible as stated in the Complaint. Rather, the SPLC made its determination based on a wide range of publicly available information in which D. James Kennedy Ministries promoted known falsehoods about the LGBT community and because the Ministries' beliefs and practices attack and malign an entire group of people.[1] But, even assuming,

_____

[1]While the SPLC is entitled to prevail on the defamation claim on First Amendment grounds at this motion-to-dismiss stage based on the allegations made within the four corners of this Complaint, it is worth noting that the SPLC did not list D. James Kennedy Ministries as an anti-LGBT hate group merely because of its espoused religious views or in a vacuum. Rather, SPLC's opinion is based on the group's statements and actions that attack and malign LGBT people, and their promotion of known falsehoods. For example, the group's spokespeople have referred to homosexuality as a "deadly lifestyle" to which children are being

as alleged in the Complaint, that CRM Media's espoused positions (that LGBT people are sinners and an abomination) were the only thing on which the SPLC based its Anti-LGBT-Hate-Group designation, one could not say that the SPLC acted with knowledge that its designation was false or with knowledge of probable falsity. *See Cottrell*, 975 So. 2d at 333. CRM Media, by equating LGBT sexuality with sin and calling it an abomination and focusing on these teachings in its ministry, can reasonably be viewed as maligning and denigrating LGBT people. Teachings that malign and demean a particular group can certainly be deemed hateful. Thus, a group that broadly espouses such positions could be deemed a hate group. In short, because CRM Media's own

---

indoctrinated, that homosexuality is "morally repugnant behavior" that "has brought sickness, heartache, and even death to millions."
http://web.archive.org/web/20120509161542/http://www.truthinaction.org/index.php/2012/04/the-no-so-hidden-homosexual-agenda/. The group has likened the "radical homosexual agenda" to an iceberg that is destroying America similar to the iceberg that sunk the Titanic, stating that "the radical homosexual agenda is advancing, dulling our sense of righteousness and undermining the American family." http://web.archive.org/web/20120509161542/http://www.truthinaction.org/index.php/2012/04/the-no-so-hidden-homosexual-agenda/. Other leaders of the group have stated that the homosexual agenda keeps people in bondage and is akin to slavery. Ministry spokesperson Jerry Newcombe published an opposition to the Boy Scouts' potential inclusion of gay scout masters, claiming that children would be more likely to be molested if gay men were allowed to serve as scout masters. http://www.jerrynewcombe.com/seem-sprinting-toward-gomorrah/ He has also stated that "about 75 percent of those who struggle with homosexual or lesbian feelings were molested as children," an assertion that the American Psychiatric Association has consistently dismissed as baseless, noting that sexual abuse is no more prevalent in children who grow up to identify as LGBT than children who identify as heterosexual. http://www.rightwingwatch.org/post/jerry-newcombe-claims-three-out-of-four-gays-were-molested-as-children/. The ministry joined a petition calling on the Mexico City government to refrain from implementing same-sex marriage, claiming that children who are raised by same-sex couples are "psychologically and socially disadvantaged."
https://web.archive.org/web/20111105230820/http://www.petitiononline.com/WCFMex/petition.html; http://www.christiannewswire.com/news/9825813155.html. The ministry has also stated that schools that recognize the rights of transgender students are "falling prey to the manipulation of homosexuals who are making children the pawns of their own debased delusions." https://www.djameskennedy.org/article-detail/children-are-pawns-in-americas-sexual-chaos.

However, the mere fact that the SPLC had *more* upon which it based its opinion does not undermine its arguments relative to dismissal as a matter of law. It is entitled to dismissal on the grounds that the SPLC designation is, even if judged within the four corners of the Complaint, a constitutionally protected opinion or that the Plaintiff has failed to plead actual malice with plausibility.

allegations would support the SPLC's Anti-LGBT Hate Group designation, the SPLC, as a matter of law, cannot be found to have acted with actual malice.

CRM Media may be taking the position that its stance on the LGBT community is that it hates the sin but not the sinner (*i.e.*, we "promote[] love of all people," Complaint, ¶ 53). However, under the facts alleged in the Complaint, SPLC would be entitled to view CRM Media's position – that non-heterosexuality is an abomination and a sin – as actually espousing hate toward LGBT people.[2] Thus, CRM Media's self-serving statements about love and its denial of hate do not, as mentioned earlier, suffice to show actual malice on the part of SPLC. *See, e.g. Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 692 n.37 (1989) ("denials, however vehement…are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.") (internal quotation marks and citations omitted).

Moreover, CRM Media cannot overcome the fact that "[t]he actual malice standard is *subjective;* the plaintiff must prove that the defendant *actually* entertained a serious doubt." *Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 499-500 (Ala. 2004). (emphasis supplied).[3] It cannot

---

[2] While the SPLC relied on other public information in connection with its designation of CRM Media as an Anti-LGBT Hate Group, the four corners of the Complaint, if taken as true as they must be at this stage of the proceedings, fail to state a cause of action for defamation.

[3] CRM Media seems to allege in the Complaint that it can show common-law actual malice. *See* Complaint ¶¶ 75-79. It cannot do so, but, even if it had alleged facts that supported a finding of common-law actual malice, it would also have to show constitutional actual malice to prevail. "[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term. *Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 666 (1989). Rather, as the *Harte-Hanks* court put it "the defendant must have made the false publication with a "high degree of awareness of…probable falsity…." *Id. at 667 See also Greenbelt Co-op Publ'g. Ass'n v. Bresler,* 398 U.S. 6, 9 (1970). The Alabama Supreme Court in *Sanders v. Smitherman,* 776 So. 2d 68 (Ala. 2000), also made it clear that, in Alabama, when public figures are involved both the common-law standard for actual malice and the constitutional actual malice must be shown. More specifically, the Court in *Sanders,* held that: "[a]ctual malice ... may be shown by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of

do so given these alleged facts.  In conclusion, CRM Media has fallen far short of making a plausible factual allegation to support actual malice.  Even though the SPLC relied on additional information informing its opinion, CRM Media's admitted position that LGBT people are sinners and an abomination and its admission that its mission is to spread that message to the world undermine any plausibility that the SPLC acted with actual malice as a constitutional matter.  First Amendment principles therefore require dismissal for failure by CRM Media to plead facts "sufficient to give rise to a reasonable inference of actual malice."  *Michel,* 816 F.3d at 702.

### B. THE ANTI-LGBT DESIGNATION IS NOT DEFAMATORY AS A MATTER OF LAW BECAUSE IT IS AN OPINION PROTECTED BY THE FIRST AMENDMENT.

#### 1. Opinions, such as the one at issue in this case, are protected by the First Amendment from being sanctioned as defamation.

"At the heart of the First Amendment is the recognition of the fundamental importance of free flow of ideas and opinions on matters of public interest and concern. '[T]he freedom to speak one's mind is not only an aspect of individual liberty – and thus a good unto itself – but also is essential to the common quest for truth and the vitality of society as a whole.' *Bose Corp. v. Consumer Union of United States, Inc.*, 466 U.S. 485, 503-504 (1984). We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions…."

*Finebaum v. Coulter*, 854 So. 2d 1120, 1126 (Ala. 2003) (some internal citations omitted).

Based on the above reasoning, the statement of an opinion is protected by the First Amendment, and, therefore, typically cannot serve as the basis for a defamation claim. "The immunity granted to opinions reflects, in part, the First Amendment principle that there can be no

---

publication, and the like. ... However, proof of actual malice in the context of claims against public figures *also requires a showing that the statements were made with actual knowledge of their falsity or with reckless disregard for their truth or falsity. New York Times Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. 710." *Sanders v. Smitherman*, 776 So. 2d at 73 (internal quotation marks omitted) (emphasis added). Reckless disregard is defined, as noted elsewhere, as knowledge of probable falsity.

false ideas. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-340 (1974)." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 695 (11th Cir. 2016).

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21-22 (1990), the United States Supreme Court ruled that an opinion may be actionable as defamation, but only when the assertion "is sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 479 U.S. at 21-22. In that case, the challenged assertion was that the speaker believed the plaintiff had lied under oath, *i.e.*, committed perjury. The Court concluded that such an assertion could be tested for its veracity in, for example, a perjury action. *Id*. The Court contrasted the "objectively verifiable perjury allegation with a 'subjective assertion.'" *Id*. "Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Id*. at 21-22.

By contrast, the allegedly defamatory statement here, that D. James Kennedy Ministries is an Anti-LGBT Hate Group, in the words of the *Milkovich* Court, "is not sufficiently factual to be susceptible of being proved true or false." *Id*. at 21. Unlike perjury, which the *Milkovich* Court recognized could be tried before a Court, and verified in that fashion, there is no methodology by which one could prove that D. James Kennedy Ministries, as a factual matter, is *not* an Anti-LGBT Hate Group. Unlike the allegation of perjury made in *Milkovich*, there are no legally established elements that define what is or is not a Hate Group. Nor did the SPLC accuse D. James Kennedy Ministries of having violated any statute or other objectively established criteria.

The Hate Group designation is the SPLC's constitutionally protected subjective opinion based on its interpretation and review of materials produced, and positions espoused, by D. James Kennedy Ministries with respect to LGBT people. The subjective nature of the SPLC's designation necessitates constitutional protection. The subjectivity of the SPLC's position is akin to various statements that have been deemed constitutionally protected opinions. *See, e.g., Turner*

*v. Wells,* 198 F.Supp.3d 1355 1370-1372 (S.D. Fla. 2016) (whether something constituted "taunting" was not objectively verifiable; whether someone was "unprofessional" was an opinion and as such not subject to attack as defamation); *see also Lewis v. Time, Inc.,* 710 F.2d 548, 554 (8th Cir. 1984), *overruled on other grounds by Unelko Corp. v. Rooney,* 912 F.2d 1048, 1052-53 (9th Cir. 1990) (the following statements were subjective comments for which no liability could be imposed: the plaintiff's "moral or legal abilities were doubtful, or that he was unreliable and disreputable"); *see also Hamze v. Cummings,* 652 Fed. App'x 876, 881 (11th Cir. 2016) (quoting *Milkovich* as holding "that [a] statement of opinion bearing no provably false connotation cannot support a common-law defamation claim.  *See Milkovich…"* and concluding that the statement that the plaintiff had committed "'a brutal, senseless, road rage killing' that showed a 'disregard for human life'" was an opinion that could not support a defamation claim); *compare Bennet v. Hendrix,* 325 Fed. App'x 727, 730-44 (11th Cir. 2009) (campaign literature calling someone a "convicted criminal" deemed a provable factual assertion and actionable); *but see Adventure Outdoors v. Bloomberg,* 519 F.Supp. 2d 1258, 1281-82 (N.D. Ga. 2007), *rev'd on other grounds,* 552 F.3d 1290 (11th Cir. 2008) ("immoral and corrupt dealers," "a scourge on society," "irresponsible gun dealers," deemed statements of opinion; whereas statements "routinely ignore federal regulations," "breaking the Federal laws regulating gun Sales" were deemed defamatory statements of fact capable of being proved false).[4]

---

[4] The SPLC's designation is akin to an expert opinion, like the medical expert opinions at issue in *Marshall v. Planz,* 13 F.-Supp. 2d 1246, 1259–60 (M.D. Ala. 1998).  In that case, the Court twice rejected the plaintiff's argument that an expert's medical quality-of-care opinion (*i.e.*, that Plaintiff's medical care had caused patient deaths) was a verifiable fact. The Court wrote:

> [T]he challenged statements express "an interpretation, a theory, conjecture, or surmise," and do not imply the existence of facts that may be confirmed or discredited on an objective basis. *See Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993). As the court explained in its defamation order, "the validity of Planz's opinion, like virtually all

Whether CRM Media espouses hate toward LGBT persons and this should be deemed a Hate Group is the SPLC's constitutionally protected opinion regarding the nature of hate.

### 2. The context of the designation indicates it is an opinion.

Some Eleventh Circuit cases suggest that in determining whether something is defamatory, the Court must "consider the circumstances in which the statements were expressed." *Bennett v. Hendrix*, 325 Fed. App'x 727, 739 (11th Cir. 2009). However, that language appears to relate largely to determinations as to whether a statement was non-actionable rhetorical hyperbole; context should not necessarily be a factor where the opinion does not state a fact which can be disproven. *See* discussion *supra*.

However, to the extent that the Eleventh Circuit would require an examination of the context here, such an examination, even limited to the allegations in the Complaint, would show that the SPLC Anti-LGBT designation was a constitutionally-protected opinion. Consider the following:

- CRM Media is a media company and Christian ministry with an international presence and millions of followers (*See* Complaint ¶¶ 9-11);

- CRM Media's position is that the United States is a "Christian nation" (Complaint ¶ 14); CRM Media's states that it has a commitment to "defend religious liberty" (Complaint ¶ 15);

- CRM Media asserts that it not only espouses certain morals and principles concerning human sexuality but that it was "on these Biblical principles that this Nation was founded and built" (Complaint ¶ 40);

- CRM Media espouses "religious based opposition to same-sex marriage and the homosexual agenda." (Complaint ¶ 41) (arguing that the Supreme Court indicated that

judgments regarding the adequacy of a physician's treatment of his or her patients, may be debatable among medical experts. However, this quality of the challenged statements highlights their inherently subjective nature, confirming that Planz's opinion is not capable of being verified as true or false, and that it presents or implies no truly objectively verifiable facts that would infuse it with defamatory content."

13 F.Supp. 2d at 1259-60.

such a position may be based on "decent and honorable religious or philosophical premises");

- Pursuant to CRM Media's espoused beliefs LGBT people are sinners and their sexuality is an abomination (*see* Complaint ¶ 145);

- The SPLC is a non-profit corporation that designates certain group as hate groups (Complaint ¶¶ 7 & 40 (stating the CRM Media's belief as to why D. James Kennedy Ministries was designated a hate group by SPLC));

- The SPLC intends that its designations be persuasive in the political arena (*see* Complaint ¶ 54 ("the SPLC was attempting to dissuade people and organizations from donating to the Ministry")); and

- "[T]he Hate Map is seen by a multitude of SPLC's supporters." Complaint ¶ 59.

Taking these allegations and others in the Complaint as true in the context of the current political climate, it is clear that CRM Media's position was espoused, and the Anti-LGBT designation made, within a politically and religiously charged national debate regarding human sexuality.  In that context, one can expect that each side of the politically and religiously charged debate is expressing its opinion on these highly controversial matters.   In other words, we as a nation are in the midst of political change in connection with our views on human sexuality, and civil rights organizations such as the SPLC are weighing in on the debate as are groups like CRM Media.

"'In the realm of religious faith, and in that of political belief, sharp differences arise.  In both fields the tenets of one man may seem the rankest error to his neighbor.'" *Sanders*, 776 So. 2d 67, 74 (Ala. 2000) (*quoting New York Times v. Sullivan*).  Those sharp differences in political discourse are constitutionally protected viewpoints, *i.e.*, constitutionally protected opinions.  Thus, the context in which the allegedly defamatory statement here was made necessitates the conclusion that it is the quintessential constitutionally-protected opinion and that dismissal of the defamation claim on First Amendment grounds is required.

**3. CRM Media's attempt to characterize the SPLC designation as fact lacks legal support.**

CRM Media attempts to characterize the designation as fact for purposes of its defamation claim by alleging that "SPLC's determinations are designed to be treated as fact, and business decisions are made based on those determinations without further evaluation or discussion." Complaint ¶ 45; *see also* ¶ 44 ("not merely opinion, but rather, is intended as factual information"). This self-serving characterization does not convert the SPLC's Hate Group designation into a defamatory statement. Whether another entity relies on the SPLC's opinion does not render that opinion a "verifiable fact" under First Amendment case law. There is no case law that suggests an opinion becomes "verifiable fact" merely because another entity takes some action based on that opinion. In effect, CRM Media is attempting to convert the damages prong of defamation analysis into its definition of defamation itself, *i.e.*, it is defamation if someone acts on the statement at issue. That is not the law. Nor would it be consistent with First Amendment principles.

**4. Because the SPLC has disclosed the basis for its opinion and the disclosed basis is neither false nor defamatory, CRM Media cannot prevail as a matter of law.**

Separate and apart from the requirements of the First Amendment, as articulated by the Supreme Court in *Milkovich,* the Complaint does not state a viable defamation claim because, as a matter of common law – as reflected in the *Restatement (Second) of Torts* – the challenged statement constitutes a non-actionable expression of opinion based on disclosed facts. Section 566 provides that an opinion may be actionable as defamation only when it leads the reader to believe that the defendant had undisclosed defamatory facts that supported that opinion.

Even if that were the controlling law, and the SPLC maintains that it is not under *Milkovich* where the opinion does not include specific facts capable of being proven true or false,[5] the SPLC would still be entitled to dismissal of the defamation claim.  The SPLC disclosed the basis of its opinion to the world on its website on the very Hate Map page that CRM Media is so vehemently opposed to: "All hate groups have beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics."[6]  *See* Ex. A to Ex. 1 attached hereto.

CRM Media does not deny, nor could it based on the four corners of its very Complaint, that it has beliefs that malign LGBT people.  So not only was the basis for the SPLC's opinion disclosed, but CRM Media acknowledges the truth of the disclosed basis for that opinion.  A mere glance at Paragraph 145 of the Complaint summarized previously supports this position.  Focusing its international mission work on biblical verses that call non-heterosexuality an "abomination" and equating LGBT sexuality with sin is to "malign" an entire class of people.  The SPLC also took into consideration publications and documents in which this espoused view was disseminated as well as the manner in which it was disseminated.  *See* n.1 *supra.*  But CRM Media's viewpoint on LGBT people and its admitted dissemination of that position preclude it from denying the truth of SPLC's disclosed basis for its opinion.  CRM Media's teachings do malign an entire class of

---

[5] *See, e.g., Masson v. New York Magazine, Inc.,* 501 U.S. 496, 516 (1991) (describing the *Milkovich* holding as applying where "[t]he so-called expression of opinion could be interpreted as including false assertions as to factual matters" and indicating that the *Milkovich* holding applies to statements of fact merely labeled as opinions).

[6] While the scope of review on Motion to Dismiss must be limited to the four corners of the Complaint, there is an exception in cases in which a plaintiff refers to a document in the Complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss.  *See Fin. Sec. Assur. Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1284 (11th Cir. 2007).  "Undisputed" in this context means the authenticity is not challenged.  *Day v. Taylor,* 400 F. 3d 1272, 1276 (11th Cir. 2005).  In this case, the Hate Map was referenced repeatedly in the Complaint.  *See, e.g.,* ¶ 34 (referencing Hate Map), ¶ 39 (same), ¶ 54.  The document is clearly central to CRM Media's claim and its authenticity cannot reasonably be questioned.

people.  At the very least, this is yet another opinion which CRM Media cannot disprove and so is not defamatory.

Pursuant to the theory of defamation law set out in Section 566 of the Restatement of Torts, if the underlying basis for the opinion is disclosed and is itself not defamatory or is, in fact, true, the Plaintiff cannot prevail in a defamation claim.  Again, in designating D. James Kennedy Ministries as an Anti-LGBT Hate Group the SPLC relied on more than what CRM Media admits is its position with respect to LGBT people in its Complaint (that they are sinners and an abomination). But, looking just at the four corners of the Complaint coupled with the disclosure of the basis for the designation from the SPLC website referenced in the Complaint, it is clear that the Complaint itself does not state a claim for defamation under Restatement of Torts (second) §566.

### 5.  Conclusion

The defamation count against SPLC is due to be dismissed for failure to allege actual malice sufficient to survive a *Twombly/Iqbal* challenge, because the alleged defamatory statement is an opinion rather than a statement that implies any verifiable fact, and because the disclosed basis for the SPLC's opinion is not false and not defamatory.

## III.   LANHAM ACT

CRM Media's Lanham claim is a thinly veiled attempt to avoid the First Amendment protections afforded the SPLC in the defamation context. The Supreme Court, however, has made it clear that First Amendment principles may not be evaded merely by pleading a claim other than defamation based on the same facts.  *See, e.g., Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56 (1988) (applying actual malice standard to intentional infliction of emotional distress claim).  Thus, the Plaintiff's Lanham Act claim should be barred on the same ground that its defamation claim is

barred.  In fact, even in a commercial speech context (which this is not—see *infra*), statements of opinion are not actionable and "cannot form the basis of a Lanham Act liability."  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 496 (5th Cir. 2000), *quoted in Osmose, Inc. v. Viance, LLC,* 612 F.3d 1298 (11th Cir. 2010).  To be a statement of fact, for purposes of the Lanham Act, the statement must be capable of being proven false.  *See General Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F.Supp. 2d 1335, 1356-57 (S.D. Fla. 2002).

Even if the actual malice standard and the fact that the statement at issue is an opinion did not bar the Lanham Act claim, Coral Ridge's claim would fail because CRM Media has failed to allege plausible facts in support of the elements of the Lanham Act.  The Lanham Act prohibits false advertising in connection with "*commercial* advertising or promotion." 15 U.S.C. § 1125(a)(1)(B) (emphasis added). The Eleventh Circuit defines "commercial advertising or promotion" as encompassing four elements:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) the representations ... must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

*Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (internal quotation marks and brackets omitted). The first element, "commercial speech," is a threshold requirement for liability under the Lanham Act. *See Porous Media Corp. v. Pall Corp.,* 173 F.3d 1109, 1120 (8th Cir. 1999).

The concept of commercial speech under the Lanham Act mirrors the commercial speech doctrine under the First Amendment.  *See Proctor & Gamble Co. v. Haugen,* 222 F.3d 1262, 1274 (10th Cir. 2000); *see also Osmose, Inc. v. Viance, LLC,* 612 F.3d 1298, 1323. The "core notion" of commercial speech encompasses "speech that proposes a commercial transaction."  *Edward*

*Lewis Tobinick, MD v. Novella,* 848 F.3d 935, 950.  "In fact, commercial speech is 'expression related solely to the economic interests of the speaker and its audience.' *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)."  *Edward Lewis Tobinick, MD,* 848 F.3d at 950; *see also* Cong. Rec. H1216-17 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier) ("Under this proposed change *only* false or misleading 'advertising or promotion' would be actionable" and indicting that other representations would implicate First Amendment concerns; noting that "section 43(a) should not be read in any way to limit political speech, consumer or editorial comment ....").

CRM Media makes the following allegations presumably as a basis to argue that the speech at issue constitutes commercial speech for purposes of the Lanham Act: "The SPLC uses the website: www.splcenter.org for commercial activity, including fund raising, advertising, and promotion."  Complaint ¶ 99. The Complaint goes on to allege that "immediately above the tab for the SPLC's 'Hate Map,' where the Ministry is listed as a Hate Group, are two tabs titled: 'WAYS TO GIVE' and 'DONATE.'" Complaint ¶ 100.  Notwithstanding this allegation, there is no basis for concluding that the speech at issue is "'expression related solely to the economic interests of the speaker and its audience.'" *Edward Lewis Tobinick, MD*, 848 F.3d at 950.

The fact that SPLC conducts fundraising on the same website where D. James Kennedy Ministries is listed as an Anti-LGBT Hate Group does not render SPLC's speech "commercial speech."  If it did, the entire content of the Republican and Democratic National Committees' websites would constitute "commercial speech." This Court could surely take judicial notice that on each website, above content that is clearly protected non-commercial speech, there is a tab for donations.  One can assume that almost any nonprofit, including virtually all with mission statements in the realm of political discourse, have such a tab.   Similarly, a newspaper's online

content does not become commercial speech merely because there is a tab above an article that permits one to subscribe to the paper, *i.e.*, enter a commercial transaction. In fact, it is "settled or beyond serious dispute" that "[s]peech … is protected even though it is carried in a form that is 'sold' for profit, … and *even though it may involve a solicitation* to purchase or otherwise pay or *contribute money.*" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed. 2d 346 (1976) (emphasis added).

There is no other allegation in the Complaint that could, even arguably, support a finding that the speech challenged here – the Anti-LGBT designation – is commercial speech.  The speech at issue simply does not "propose a commercial transaction" and is not in any sense "an expression related solely to the economic interests of the speaker and its audience."  *See Edward Lewis Tobinick, MD*, 848 F.3d at 950.[7]

---

[7] If a communication falls outside "core" commercial speech, the Supreme Court clarified in *Bolger v. Youngs Drug Prods. Corp.* that the communication may still be considered commercial if: (1) the communication is an advertisement, (2) the communication makes reference to a specific product, and (3) the speaker has an economic motivation for the communication. 463 U.S. 60, 66-67 (1983). The Eleventh Circuit applied the *Bolger* factors to assess whether challenged communications were "commercial speech" for the purposes of a false-advertising claim under the Lanham Act in *Edward Lewis Tobinick, MD*, 848 F.3d at 950-51 (addressing issue at summary judgment). However, the *Bolger* test does not come into play unless the speech at issue is some sort of hybrid, *i.e.*, commercial speech that speaks to some matter of public interest as well as a commercial transaction.  The speech at issue here does not relate in any way to a commercial transaction or any economic interest of the SPLC or its audience as those terms are understood in the Lanham Act context.

In *Bolger*, the speech at issue was a document relating to contraceptive products that the Court ultimately concluded was commercial speech notwithstanding that it *also* spoke to matters of public interest. The speech at issue was clearly an advertisement for a specific product in connection with which the sender had an economic motivation.  Taking all of those factors into consideration, the court concluded that the document was commercial speech subject to a lesser degree of constitutional protection.  *Bolger*, 463 U.S. at 66-67.  In short, the fact pattern was such that the sender was attempting to sell his or her product and the pamphlet was promoting that product.  The Hate Map, by contrast, is not a product that is sold by the SPLC but is something that is free to all who seek to visit the website.  It is far removed from any commercial transaction and does not even fall within the sort of hybrid world of the pamphlets at issue in *Bolger*.  Even if application of the *Bolger* test were required, for the reasons set out here, the challenged Hate Group designation would necessarily fail the *Bolger* test.

21

Likewise, other elements of the Lanham Act claim have not been alleged.  For instance, element four requires that the: "the representations ... must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Edward Lewis Tobinick, MD,* 848 F.3d at 950.  It is hard to conceive of any allegation in the Complaint that would justify calling the SPLC Hate Map advertising or promotion within CRM Media's industry, *i.e.*, Christian ministries or churches that advocate against LGBT people.  In addition, "the plaintiff must allege both (1) who comprises the relevant purchasing public and (2) how many consumers within the relevant purchasing public received the advertisement.  *See Minsurg Int'l, Inc. v. Frontier Devices, Inc.* 2011 WL 1326863 at *4 (M.D. Fla. Apr. 6, 2011)."  *Ameritox, Ltd. v. Millenium Labs, Inc.,* 2012 WL 33155 at *2 (M.D. Fla. Jan. 6, 2012).  CRM Media has not done so here, nor could they.

Element three of the Lanham Act claim requires a showing that the commercial speech be "for the purpose of influencing consumers to buy *defendant's* goods or services." *Edward Lewis Tobinick, MD*, 848 F.3d at 950 (emphasis added).  The CRM Media designation is not even something that could conceivably be characterized as influencing consumers to buy SPLC's goods or services, whatever those might be.  No goods or services are being sold or advertised by the SPLC in connection with the designation.  To conclude that any goods or services were being sold would be tantamount to saying that a newspaper article satisfies this prong of the Lanham Act claim merely because an article criticizing some company's product might be the reason someone subscribed to the newspaper or that a political party's platform regarding an industry's practices might be the reason a person donates to the party.  That clearly was not the intent behind the Lanham Act.  Cong. Rec. H1216-17 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier)

(noting that "section 43(a) should not be read in any way to limit political speech, consumer or editorial comment ….").

In conclusion, CRM Media has not made allegations that state a Lanham Act Claim. Alternatively, the allegations made do not satisfy the pleading requirements set out in *Iqbal/Twombly*.

## CONCLUSION

For the foregoing reasons, the SPLC's Motion to Dismiss is due to be granted in its entirety.

WHEREFORE, based on the positions set out above, the SPLC moves this Court to grant its Motion to Dismiss and to dismiss the Complaint in full with prejudice.

s/Shannon L. Holliday
Shannon L. Holliday (HOL088)
Robert D. Segall  (SEG003)
Copeland Franco Screws & Gill, P.A.
444 South Perry Street (zip 36104)
Post Office Box 347
Montgomery, AL  36101-0347
Phone: (334) 834-1180
Facsimile:  (334) 834-3172
Email: holliday@copelandfranco.com
Email: segall@copelandfranco.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of September, 2017, I filed the foregoing with the Clerk of the Court using the CM/ECF filing system which will electronically notify the following counsel of record:

***Attorneys for Plaintiff***
Charles E. Hall, Jr., Esq.
Post Office Box 7
Dadeville, AL  36853-0007
Email:  chall.law@att.net

David C. Gibbs, III, Esq.
The National Center for Life and Liberty, Inc.
2648 FM 407, Suite 240
Bartonville, TX  76226
Email: dgibbs@gibbsfirm.com

s/Shannon L. Holliday
Of counsel