IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

| | | |
|---|---|---|
| CORAL RIDGE MINISTRIES MEDIA, INC., | ) | |
| d/b/a D. James Kennedy Ministries, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:17-cv-566-MHT-DAB |
| | ) | |
| AMAZON.COM, INC., | ) | |
| AMAZONSMILE FOUNDATION, INC., and | ) | |
| SOUTHERN POVERTY LAW CENTER, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
SOUTHERN POVERTY LAW CENTER'S MOTION TO DISMISS**

## I.   INTRODUCTION

COMES NOW Coral Ridge Ministries Media, Inc., d/b/a D. James Kennedy Ministries ("Ministry"), pursuant to the Federal Rules of Civil Procedure, with its Response to Southern Poverty Law Center's ("SPLC") Motion to Dismiss and Brief in Support Thereof ("Motion to Dismiss"). In support of its Opposition to the Motion to Dismiss, which seeks dismissal of Count I (Defamation – Libel Per Se Against SPLC) and Count III (violation of 15 U.S.C. § 1125 of the Lanham Act Against SPLC), the Ministry states:

**Legal Standard**

A motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2). It is axiomatic that the Court "must accept the well pleaded facts as true and resolve

them in the light most favorable to the plaintiff." *Paradise Divers, Inc. v. Upmal*, 402 F.3d 1087, 1089 (11th Cir. 2005) (internal quotation marks omitted). In reviewing the pleadings, the Court must construe the pleadings broadly and view the allegations of the Complaint "in the light most favorable to the plaintiff." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). The Court should not dismiss a case "unless it appears ***beyond doubt*** that the plaintiff can prove no set of facts in support of his claim." *Beck v. Deloitte & Touche*, 144 F.3d 732, 735-36 (11th Cir. 1998) (emphasis added).

To survive SPLC's Motion to Dismiss and this Court's Rule 12(b)(6) scrutiny, the Complaint must simply "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All that is necessary is for the Ministry to present "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim, and provide "plausible" grounds for recovery. *Twombly*, 550 U.S. at 556. The Ministry's claim should not be dismissed "even if it strikes a savvy judge that actual proof of those facts is improbable." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, at 236 (1974)). This Court has held that in reviewing a motion to dismiss "a court should assume [the allegations'] veracity and then determine whether they plausibly give rise to an entitlement to relief." *Alabama State Conference of NAACP v. State*, 2:16-CV-731-WKW, 2017 WL 3816151, at *1 (M.D. Ala. Aug. 31, 2017) (citing *Ashcroft*, 556 U.S. at 679).

Dismissal is ***highly disfavored*** and only appropriate "where it is certain that no relief could be granted under any set of facts that could be proved." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50 (1989). As the Eleventh Circuit has held, "[t]he threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low . . . ." *Spanish Broad.*

*Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004). The Eleventh Circuit has articulated its strong preference for allowing a plaintiff an opportunity to fully present its case, including factual and expert testimony, and not have the lawsuit short circuited at the first stage of the proceedings. SPLC asserts the Ministry has failed to plead the appropriate standard and/or that its Complaint does not contain sufficient factual allegations, but SPLC cannot meet its high burden of establishing why this matter should be dismissed. It is not even a close call. The Ministry's complaint contains cognizable legal claims, pleads the correct legal standard, and supports these claims with a sufficient factual basis. Therefore, this Honorable Court should permit this case to go forward and deny SPLC's Motion to Dismiss the Complaint.

## II. DEFAMATION

### A. The Ministry has sufficiently pleaded actual malice.

At the outset, the Ministry will not argue against the characterization of the Ministry as a public figure and understands that its Complaint must plead facts that "give rise to a reasonable inference of actual malice," *Michel v. NYP Holdings, Inc.* 816 F.3d 686, 702 (11th Cir. 2016). The Supreme Court of Alabama defines "actual malice" as "'knowledge that it [the statement] was false or with reckless disregard of whether it was false or not.'" *Cottrell v. NCAA*, So.2d 306, 333 (Ala. 2007) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). A statement is made with reckless disregard if, "at the time of publication, the defendant entertained *serious doubts* as to the truth of [its] publication or acted with a *high degree of awareness* of … [its] probable falsity." *Cottrell*, 975 So.2d at 349 (alteration and emphasis in original) (internal quotation marks and citations omitted). One means by which actual malice may be evidenced is by "the mode and extent of publication" of the false statement. *Sanders v. Smitherman*, 776 So. 2d 68, 73 (Ala. 2000) (internal quotation marks omitted).

For the following reasons, Plaintiff has met its burden to plead sufficient facts establishing actual malice on the part of SPLC.

1. **The Ministry has sufficiently alleged that SPLC knew or acted with reckless disregard that its characterization of the Ministry as a "hate group" was false.**

SPLC defines "hate group" on its website as those groups that "have beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics."[1] On the other hand, courts and other organizations generally recognize and define hate groups as those whose primary purpose is to promote animosity and hostility and those that seek to harm and intimidate by means of illegal activities, violence, and crime. *See, e.g.,* Anti-Defamation League website (defining "hate group" as "an organization whose goals and activities are primarily or substantially based on a shared antipathy towards people of one or more other different races, religions, ethnicities/nationalities/national origins, genders, and/or sexual identities....The group itself must have some hate-based orientation/purpose."[2]); *Virginia v. Black*, 538 U.S. 343, 352-357 (2003) (noting that hate groups, such as the KKK, have a "history of violence associated with them" and that "[v]iolence [is] also an elemental part" of a hate group); *Capital Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 770 (1995) (Thomas, J., concurring) (noting that hate groups, such as the KKK, employ "tool[s] for the intimidation and harassment of ... groups hated by the Klan"; *Powers v. Clark*, No. 3:11CV763-HEH, 2014 WL 6982475, *3 n.10 (E.D. Va. Dec. 9, 2014) (quoting Virginia Department of Corrections Operating Procedures §803.2iii's definition of gangs and hate groups as those that "pose a threat to the safety and security of staff" and "engage

---

[1] *Hate Map*, Southern Poverty Law Center, https://www.splcenter.org/hate-map (last visited Sept. 28, 2017)

[2] *Hate Group,* Anti-Defamation League, https://www.adl.org/education/resources/glossary-terms/hate-group (last visited Sept. 28, 2017)

in unauthorized/illegal activities."; *Doe v. Pittsylvania Cnty.*, 844 F.Supp.2d 724, 740 (W.D. Va 2012) (noting that hate groups, such as the KKK, have "a history in this country of brutal violence and instilling fear in its victims through harassment and intimidation" and that such groups are known for their violence).

The difference between SPLC's definition and the definitions recognized by case law and other organizations is an important one. As described in the cases and definitions, *supra*, a "hate group" is a group whose primary purpose is to promote hostility or animosity and those who engage in actual or threatened physical violence towards those they oppose—groups such as the KKK and the American Nazi Party. This is how the law, other organizations, and the common man understand a "hate group" in America—groups that not just hate and malign based on certain characteristics, but those that have long-held reputations for violent, criminal, explosive hatred towards entire classes or groups of people and whose primary purpose for existence is to perpetuate hatred and to instigate and participate in acts of violence against those people. However, the bar that SPLC sets for an organization to be included within *its* definition of a "hate group" is far different. According to SPLC, if a group merely has certain beliefs that are contrary to SPLC's beliefs, that is enough to meet SPLC's criteria for defining that group as a "hate group." Not only that, but it is obvious that a group does not even have to truly fit SPLC's own definition of "hate group" to be included on its Hate Map—it is enough if a group simply holds beliefs on marriage and sexuality that differ from SPLC's views.

The Ministry has never attacked or maligned any group of people, including those whose sexual orientation deviates from the Ministry's values. Yes, the Ministry has been vocal about its position on homosexuality because it believes the Bible speaks clearly about God's intent for marriage and sexuality, and speaking out on these issues is necessary to fulfill the Ministry's stated

purpose of "lovingly engag[ing] the culture with the heart and mind of Christ" (Compl. ¶ 11(d)). But to characterize the Ministry as a "hate group" based solely on this one position it takes on homosexuality and same-sex marriage—a position that is based on Biblical truth and has been the accepted cultural understanding of homosexual behavior for millennia—is so far outside of how hate groups are legally and culturally understood that it is simply and patently false—and it is a falsity knowingly and intentionally perpetuated by SPLC for the purpose of harming the Ministry's reputation and dissuading people and organizations from donating to the Ministry. (Compl. ¶ 54).

SPLC has taken the term "hate group" and has redefined it for its own monetary and agenda-driven purposes. SPLC has preyed upon the American public by intentionally ignoring the difference between a real hate group and a Bible-believing organization that has been long-recognized as a beacon of light and truth in American culture. SPLC does this simply on the basis of the organization's religious beliefs about homosexuality and marriage, and based on the Ministry's conduct.

In the alternative, SPLC's attempt to redefine "hate group" in this manner and then include the Ministry within this definition is, at the very least, a "reckless disregard" of the truth. As stated previously, a statement is made with "reckless disregard" if, "at the time of publication, the defendant entertained *serious doubts* as to the truth of its publication or acted with a *high degree of awareness* of . . . [its] probable falsity." *Cottrell,* 975 So. 2d at 349. Just by virtue of the fact that SPLC chose to define "hate group" much differently than how that term is generally understood shows that SPLC knew, or at a minimum, was acting with a high degree of awareness that many of the groups that it wished to label as hate groups, including the Ministry, could not have accurately fallen within the generally accepted definition of a hate group. Yet, it chose a term that has a very specific negative connotation in American culture, and characterized those groups

in that way, knowing full well how the American public would perceive these organizations. This would be akin to the Ministry publicly declaring that SPLC is a child abusing organization and then when the Ministry is challenged about that designation, explaining that the Ministry's definition of "child abusing organization" is one that does not tell children about Jesus. The Ministry would not expect to get away with that kind of dishonest characterization and neither should SPLC.

Furthermore, based on the SPLC's conduct (and to the Ministry's knowledge), it is reasonable to infer that SPLC never read the Ministry's bylaws or any other document that would explain the purpose, message, and vision of the Ministry, which are explained in the Complaint at paragraphs 10 - 16. If SPLC had requested or viewed them, SPLC would know that the Ministry's primary purpose for existence—its mission—is the following:

(a)   To proclaim the good news of the Gospel throughout the Earth, introducing people to the Person and the redeeming work of Jesus Christ;

(b)   To teach and nurture His followers, helping them to grow in grace and in service to Christ and His church;

(c)   To equip and encourage believers to live out their faith, making a difference in the world around them; and

(d)   To defend religious liberty, by helping believers understand America's Christian heritage and by motivating them to lovingly engage the culture with the heart and mind of Christ.

(Compl. ¶ 11). As the Ministry pleaded in its Complaint at paragraphs 53 - 75, it is not a hate group, and nowhere in the purpose or action of the Ministry is there hate or any room for hate. (Compl. ¶ 16). The Ministry advances the Gospel of Jesus Christ, and encourages Christians to love all people, including homosexuals. The message, vision, and purpose of the Ministry have not changed in its more than 40 years of existence. (Compl. ¶ 9-12). The Complaint lists several scripture references supporting its religious beliefs that God does not approve of homosexual

behavior (Compl. ¶ 145); however, never has the Ministry advocated hostility towards or promoted animosity or violence targeting any group of people. The SPLC does not have, and never has had, any basis to claim that it does. Because the allegations in the Complaint must be viewed in the light most favorable to the plaintiff on a motion to dismiss, *Michel,* 816 F.3d at 694, this Court must view the tremendous discrepancy between what the Ministry does and what the SPLC says and "draw the reasonable inference," *Id.,* that either the SPLC likely never has read or understood the Ministry's corporate documents wherein its purposes are stated, or that SPLC has read and understood the Ministry's purpose but willfully chose to lie or else act with utterly reckless disregard as to the veracity of its characterization of the Ministry as a "hate group."

## 2.   The extent of SPLC's publication of its false statements shows actual malice.

The Alabama Supreme Court has held that "[a]ctual malice may be shown by ... the mode and extent of publication . . ." of the false statement. *Sanders,* 776 So. 2d at 73. The reason that the Ministry brought this case is not simply because SPLC falsely deems the Ministry a "hate group"; rather, it is also because SPLC has published that false characterization of fact in countless outlets (Compl. ¶ 59) coupled with the fact that organizations and individuals are relying on that information as if it were fact (Compl. ¶55). Given SPLC's large donor base as well as their own admission claiming to be the "premier U.S. non-profit organization monitoring the activities of domestic hate groups and other extremists"[3] and its use of the Hate Map information to "publish investigative reports, train law enforcement officers and share key intelligence, and offer expert analysis to the media and public,"[4] it is beyond question that the extent of SPLC's publication of its false statements about the Ministry is nothing short of vast. Clearly, SPLC uses its Hate Map

---

[3] *Fighting Hate*, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate (last visited Sept. 28, 2017)
[4] *Id.*

with the intention of spreading its information far and wide, to reach as many people and potential donors as possible.

The facts pleaded in paragraphs 54 - 59 and 66 of the Complaint sufficiently allege the extent to which SPLC has published its false and defamatory statements. Further, SPLC's providing this false information to the media, government agencies, and actual and potential donors shows SPLC's intention to allow it to be used, republished, and acted upon by individuals and entities in all sectors of society, including but not limited to law enforcement, nonprofit watchdogs (like GuideStar), and nonprofit donation programs like AmazonSmile, who rely upon and give credence to SPLC's information. For the foregoing reasons, the Ministry has sufficiently pleaded actual malice and has included "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

### B.   SPLC's "hate group" designation is not a First-Amendment protected opinion; it is a false and actionable statement of fact.

SPLC's reliance on the *Milkovich* case in support of its position that the "hate group" designation is a First Amendment-protected opinion is completely misguided. Self-described opinions are not entitled to First Amendment protection just because they are opinions—even assuming that's all they really are. Only "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co*, 497 U.S. 1, 20 (1990). Even a matter of so-called "opinion" on a public matter containing defamatory material about a public figure is not entitled to First Amendment protection if "such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Id*. Thus, despite what SPLC would like this Court to believe, the U.S. Supreme Court has concluded, in no uncertain terms, that the "freedom

of expression guaranteed by the First Amendment" does not require a categorical "constitutional privilege for 'opinion.'" *Id.* at 21.

SPLC claims their statements labeling the Ministry as a "hate group" do not contain provably false information because "there are no legally established elements that define what is or is not a Hate Group" and "there is no methodology by which one could prove that D. James Kennedy Ministries, as a factual matter, is *not* an Anti-LGBT Hate Group" (Mot. to Dismiss 12.) (emphasis in original). Because of this alleged lack of any standard to go by, SPLC claims their designation of the Ministry as a hate group is simply a protected subjective opinion. However, as discussed at length *supra*, there *are* standards by which the term "hate group" is defined and understood: those whose primary purpose is to promote animosity and hostility and those that commit violent acts and seek to intimidate people with illegal activities, violence, and crime. Virtually every court that has discussed and described hate groups includes within its description a reference to the violent nature of these groups. *See, supra,* p. 4 - 5 (citing cases and definitions).

Simply stated, SPLC's argument that there is no means by which to measure whether or not the Ministry falls within any legally recognized definition of "hate group" is erroneous, as that term has very clear connotations and definitions in both law and in the common understanding of Americans. Had it ever reviewed the Ministry's bylaws or articles of incorporation to see what the Ministry's stated purposes really are (*See* Compl. ¶ 10 – 11.), SPLC could easily have verified that the primary purpose of the Ministry is not, and never has been in all of its years of existence, to engage in acts of violence or to promote hostility, animosity, or violence against any person—and SPLC has no evidence supporting any allegation of such conduct (and even if SPLC were to claim that it does have such evidence, this would be a question for the finder of fact). Furthermore, the examples SPLC provides in its Motion to Dismiss that purportedly prove the so-called hatefulness

of the Ministry are just statements of the Ministry's religious beliefs and, in some cases, its beliefs about the results of violating God's Word on those issues. Interestingly enough, these are many of the same positions that the U.S. Supreme Court has labeled "decent and honorable" in *Obergefell v. Hodges*, 135 S.Ct. 2584 2602 (2015). (Compl. ¶ 10.)

In addition, SPLC's assertion that its statements about the Ministry are just "opinion" clearly contradicts one of SPLC's self-declared descriptions of its purpose, which is to monitor the activities of domestic hate groups and other extremists and then to use that information to "publish investigative reports" (UNESCO describes "investigative journalism" as "the unveiling of matters . . . behind a chaotic mass of facts and circumstances—and the analysis and exposure of all relevant *facts* to the public"[5] (emphasis added)), to "train law enforcement officers and share key intelligence," and to "offer expert analysis to the media and public."[6] It is hard to imagine a world in which law enforcement is being trained based on someone's "opinion," or that any military personnel, Congress,[7] and law enforcement agencies would accept SPLC's information and make strategic security decisions based on it if these entities considered the information being obtained from SPLC as merely SPLC's "opinion." SPLC cannot, out of one side of its mouth, claim to have

---

[5] *Communication and Information: Investigative Journalism,* United Nations Educational, Scientific, and Cultural Organization (UNESCO), http://www.unesco.org/new/en/communication-and-information/feedom-of-expression/investigative-journalism/ (last visited Sept. 26, 2017)

[6] *Fighting Hate*, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate (last visited Sept. 21, 2017).

[7] *See Postponed: World Wide Threats: Keeping America Secure in the New Age of Terror,* Homeland Security Committee (last updated September 12, 2017), https://homeland.house.gov/hearing/world-wide-threats-keeping-america-secure-new-age-terror/. The current SPLC president, Richard Cohen, was scheduled to testify before the House Homeland Security Committee on Sept. 12, 2017 on the topic of "World-wide Threats: Keeping America Safe in the New Age of Terror." However, given the impact of Hurricane Irma, these hearings have been postponed. According to the information about the panel on which Mr. Cohen is scheduled to speak, he and the other panel speakers "will discuss the threat and challenges posed by domestic extremist groups."

actionable intelligence and information worthy of training law enforcement and other governmental entities while at the same time say that same information is just its "opinion." Such a double standard is absurd. In SPLC's view, the differences between SPLC and the Ministry are not simply differences of opinion; they are not just ideological difference between two groups of people. Rather, SPLC's intention is to scream "Warning!" about every group on its list, not just to "dissuade people and organizations from donating to" these groups (Compl. ¶ 54) but also to completely destroy these groups.[8] And it does this by ensuring that law enforcement and other government officials and agencies, the media, their current donors and potential donors, and the American people perceive their false and defamatory information as fact.

Every case that SPLC attempts to analogize to the instant case in favor of its argument that the hate group designation is an "opinion" is distinguishable from the facts before this Court. Each of those cases includes facts in which the courts determined that the statements at issue were opinions and not objectively verifiable (Mot. to Dismiss 12 – 13.) As previously argued, the SPLC's designation of the Ministry as a hate group (as that term is recognized by courts and understood by Americans) *is* objectively verifiable—it is verifiably *false*, and according to *Hamze v. Cummings*, 652 Fed. App'x 876, 881 (11th Cir. 2016), a statement that has a "provably false connotation" supports a common-law defamation claim. Thus, for all the reasons stated previously—most importantly, that there is an accepted and legal definition of "hate group" in this country and that the Ministry does not fit within that definition as pleaded in the Complaint— SPLC's designation of the Ministry as a hate group is a "provably false" assertion and is thus not a constitutionally protected opinion.

## C. Defamation Count Conclusion

---

[8] See Conclusion, *infra,* for discussion of quote and link to speech by SPLC Fellow Mark Potok.

A few years ago, a long-time SPLC fellow and spokesman gave a speech at the MIAAHC Hate Crimes conference at which he stated the following: "Sometimes the press will describe us as monitoring hate groups. I want to say plainly that our aim in life is to destroy these groups—completely destroy them."[9] This statement from a highly influential figure who spent 20 years as a senior fellow at the SPLC indicates the real purpose behind the Hate Map designation—to annihilate every group on this list, regardless of whether a particular group is recognized as a legitimate 501(c)(3) tax-exempt organization. The vast majority of the groups listed on SPLC's Hate Map could never obtain or retain federal tax-exempt status because their violent and destructive purposes violate public policy.[10] Yet SPLC lumps the Ministry and a number of other organizations in right alongside of those who are truly hate groups, with absolutely no distinction between them, while ironically, its own spokesperson is advocating for the destruction of groups with which SPLC does not agree.

Words have meaning. Once you place a label on a group, that label means something. When SPLC labels a group a "hate group," SPLC has every intention of the American public becoming suspicious, distrustful, and wary of that group. By doing so, SPLC is essentially engaging in a sort of "reputational terrorism." For legitimate Bible-believing religious groups to be marginalized, ostracized, demonized, and labeled the same as groups that commit and perpetuate gross acts of violence against individuals and groups of people based on their characteristics is classic defamation. Because SPLC's Motion clearly failed to meet its burden to

---

[9] *Mark Potok Speech 1*, YouTube, https://youtu.be/fnTz2ylJo_8 (beginning at 1:37) (last visited Sept. 21, 2017).
[10] *See* Internal Revenue Service, *Activities That Are Illegal or Contrary to Public Policy* (1985), *available at* https://www.irs.gov/pub/irs-tege/eotopicj85.pdf (last visited Sept. 21, 2017).

show that it is *beyond doubt* that the Ministry can prove no set of facts in support of its claim, the Motion to Dismiss must be denied. *Beck*, 144 F.3d at 735-36.

In addition, SPCL has joined with the other Defendants in this matter in filing a Motion to Stay Discovery pending the outcome of the Motions to Dismiss. Each of the Defendants' motions include attached evidentiary exhibits that reference material outside the Complaint, which is improper at the Motion to Dismiss stage. Defendant are acting as if their Motions to Dismiss are motions for summary judgment, while at the same time attempting to deny the Ministry's ability to conduct discovery with Defendant's latest Motion to Stay Discovery. It would be unconscionable to allow a summary judgment motion in favor of the Defendants based on their Motions that include evidentiary exhibits without any ability by the Ministry to obtain evidence in support of its positions.

**III. LANHAM ACT**

15 U.S.C § 1125(a) of the Lanham Act "creates two distinct bases of liability: false association, §1125(a)(1)(A), and false advertising, §1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014). In its Complaint, the Ministry alleged both types of liability against SPLC (false association claim in Compl. ¶¶ 104-107; false advertising claim in Compl. ¶¶ 108 – 114). Although "registration [of a trademark] is not a prerequisite to an action under section 43(a) [of the Lanham Act," (§ 15 U.S.C. §1125]," *Montgomery v. Noga*, 168 F.3d 1282, 1297 1 (11th Cir. 1999), D. James Kennedy Ministries, the name listed on SPLC's Hate Map, is a registered trademark of the Ministry. (Compl. ¶ 96.)

SPLC's claim that the same First Amendment protections that apply to defamation claims also apply to Lanham Act claims (Mot. to Dismiss 18.) is false as a matter of law. In support of its false assertion, SPLC cites an inapplicable infliction of emotional distress case, not a Lanham Act

trademark case. (Mot. to Dismiss 19.) The inapplicability of the First Amendment protections is true for both false association and false advertising claims. The protections offered to trademarks under the Lanham Act are not just limited to protection from defamation but are actually broader in scope. The Lanham Act "has been employed successfully to combat a wide variety of deceptive commercial practices." *Id.* (internal quotations omitted). Unlike defamation claims where falsity or reckless disregard for truth must be proven, under this section of the Lanham Act, "liability . . . is not restricted solely to descriptions and representations that are literally false. Relief may be granted if the actions of the defendant[] create a false impression." *Geisel v. Poynter Prods.,* 283 F. Supp. 261, 267 (S.D.N.Y. 1968). *See also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 467 F. Supp. 366, 374 (S.D.N.Y.), *aff'd,* 604 F.2d 200 (2d Cir. 1979) ("Literal falsity of a description is not required for violation of Section 43(a). Innuendoes, indirect intimations, ambiguous statements are all covered by the statute.").

SPLC also argues that the Complaint should be dismissed based on its claims that the Ministry's hate group designation is a matter of opinion and not "capable of being proven false" (Mot. to Dismiss 19.); however, "it is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the [speech] is deceptive." *Merck Consumer Pharmaceuticals Co., v. Smithkline Beecham Corp.,* 960 F.2d 294, 297-298 (2d. Cir. 1992). "Instead, deceptiveness is usually determined through an evidentiary hearing..." *Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. of Physics,* 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994). Thus, it is not appropriate for the Court to determine, as a matter of law, that the Ministry's claim fail particularly on the legal issues regarding SPLC's misleading and deceptive declaration that the Ministry is a hate group without an evidentiary hearing. This is especially true in light Defendants' attempts to avoid discovery at all costs with their recently filed Motion to Stay Discovery.

**A. <u>Since SPLC has not raised any defense to the Ministry's 15 U.S.C. 1125(a)(1)(A)
false association claim, that claim must stand.</u>**

In its Motion to Dismiss, SPLC does not raise any arguments with respect to the 15 U.S.C.
1125(a)(1)(A), false association, portion of Count III. (Mot. to Dismiss 18 – 23.) (Compl. ¶¶ 104
– 107.) SPLC's Motion therefore clearly failed to meet its burden to show that it is *beyond doubt*
that the Ministry can prove no set of facts in support of its claim pursuant to 15 U.S.C.
1125(a)(1)(A). *Beck*, 144 F.3d at 735-36. **For this reason, the 15 U.S.C. 1125(a)(1)(A) portion
of Count III against SPLC must stand as unopposed.** However, in the event the issue is raised
in future pleadings or proceedings in this case, the following is offered.

The run-of-the-mill false association claim is either one involving "palming off" (also
known as "passing off") or else one involving "reverse palming off" (also known as "reverse
passing off"). Palming occurs where one party attempts to pass off its goods as those of the
trademark owners. *Debs*, 1991 U.S. Dist. LEXIS 19864, at *19. "Reverse palming" occurs where
a party attempts to pass off the trademark owner's goods as his own. *Id.* at 20.

"While the intent of the Lanham Act is to regulate commerce by making actionable the
deceptive and misleading use of trademarks, it is also designed '. . . to protect persons engaged in
such [interstate] commerce against unfair competition . . .', 15 U.S.C. § 1127, and accordingly the
scope of Section 43(a) extends beyond the protection of trademarks." *Ames Publ'g. Co. v. Walker-
Davis Publ'n, Inc.*, 372 F. Supp. 1, 11 (E.D. Penn. 1974). Therefore, a claim under the false
association portion of the Lanham Act does not require facts that include the use of two similar
trademarks, as one would see in a typical palming case, or even the use of a single registered
trademark. Additionally, with respect to false designation of origin claims, "'false designation of
origin' is not limited to geographic origin. Rather, this statutory language '**covers any
representation** with respect to the originator of a product . . .'" *Geisel*, 283 F.Supp. at 267,

(emphasis added). Thus, any false representation regarding the origin of a plaintiff's registered (or registerable) trademark is potentially actionable.

While palming claims and reverse palming claims involving two trademarked or potentially trademarkable items are the most common types of claims under 15 U.S.C. § 1125(a)(1)(A), they are not the only type of false association claims. The type of claim that the Ministry presents in this case is not a palming claim. Rather, it is a claim involving the false description of the Ministry's trademark and the resulting false association of that trademark with actual hate groups. In the for-profit world, it is almost unheard of for one company to declare that its competitor is a "hate group," (Compl. ¶ 34.), or to publicly state: "our aim in life is to destroy [our competitor], completely destroy them."[11] Because this type of conduct is unusual in the for-profit arena, it is unusual to have the type of Lanham Act claims that arise in the instant case. These are not the run-of-the-mill false association claims. One of the leading false association cases that did not involve palming or reverse palming is *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F. Supp. 366 (S.D.N.Y. 1979). This case was cited by the Northern District of Georgia in *Debs*, and since *Debs* was affirmed by the Eleventh Circuit, *Dallas Cowboys Cheerleaders, Inc.* is worth setting out at length:

> Section 43(a) of the Lanham Act makes illegal the use of 'a false designation of origin' with respect to goods or services, 'or any false description or representation, including words or other symbols tending falsely to describe or represent' the goods or services. The statute is not limited to false designations of origin, but **is directed also to any other false or misleading description regarding the character or nature of the goods or services.** 1 R. Callman, Unfair Competition, Trademarks and Monopolies, § 18.2(b), at 622-23 (3d ed. 1967).
>
> In order to obtain a remedy under Section 43(a), it is not necessary to show that anyone has actually been deceived. The courts have interpreted the statute as applying to situations where the misleading description or designation has a tendency to deceive, or is likely to cause confusion. *American Home Products*

---

[11] *See Mark Potok Speech*, supra, note 9

*Corp. v. Johnson & Johnson*, 577 F.2d 160 (2d Cir. 1978); *Mortellito v. Nina of California, Inc.*, 335 F. Supp. 1288 (S.D.N.Y.1972).

There is no requirement that the defendant's service or product be in direct competition with, or be of the same type as, the product or service of the plaintiff. **The owner of a service mark or trademark basically has the right, as far as commercial exploitation is concerned, to have that mark associated with his services and goods, rather than with the services or goods of another person. This is true whether or not the party who misappropriates the mark deals in competing or non-competing services or goods.** *Professional Golfers Association of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 669-70 (5th Cir. 1975). **Occasionally the misappropriation of a mark is used in connection with goods or services which the customers of the true owner of the mark would find repugnant. This presents a special threat to the good name and goodwill of the true owner.** *Benson v. Paul Winley Record Sales Corp.*, 452 F. Supp. 516 (S.D.N.Y.1978); *Coca Cola Co. v. Gemini Rising, Inc.*, 346 F. Supp. 1183 (E.D.N.Y.1972).

**Literal falsity of a description is not required for violation of Section 43(a). Innuendoes, indirect intimations, ambiguous suggestions are all covered by the statute.** *American Home Products Corp. v. Johnson & Johnson, supra* at 165.

In considering the question of whether there is a tendency to deceive or a likelihood of confusion within the purview of the statute, it must be realized that the buying public includes the unthinking and the credulous. The public cannot be expected to analyze or carefully weigh what is presented to them in promotion and advertisements. The question is what is the likely ultimate impression, upon customers and potential customers of the relevant services and products which will be created by what is said and what is reasonably implied. *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674-75 (2d Cir. 1963); *Coca Cola Co. v. Gemini Rising, Inc.*, *supra* at 1190.

The rule has been applied in numerous Section 43(a) cases that where the evidence shows 'that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.' *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S. Ct. 1870, 10 L. Ed. 2d 1053 (1963); *Mortellito v. Nina of California, Inc.*, *supra* at 1294. This reasoning coincides closely with a statement of Judge Learned Hand, explaining why the owner of a trademark should have a remedy against misappropriation in connection with non-competing goods:

'Therefore it was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold . . . . However, it has of recent years been recognized that a merchant may have a sufficient economic

interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful.' *Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir. 1928).

It would appear obvious that Section 43(a) of the Lanham Act applies to a motion picture. A misuse of trademarks or service marks, and deception or confusion of the kind prohibited by the statute, may occur in connection with the title of a movie, its advertising **or in the content of the movie itself.**"

*Dallas Cowboys Cheerleaders, Inc.,* 467 F. Supp. at 374-75 (emphasis added).

Just as Pussycat Cinema Ltd.'s unauthorized use of the Dallas Cowboys Cheerleaders' uniform in its pornographic movie was actionable pursuant to 15 U.S.C. 1125(a)(1)(A), here the SPLC's unauthorized use of the Ministry's trademark "D. James Kennedy Ministries" on its Hate Map is also actionable. The inclusion on the Hate Map falsely associates the Ministry with the Neo-Nazis, skin heads, and the other actual terrorist organizations that are listed on the map. As the Second Circuit stated in its review of *Dallas Cowboys Cheerleaders, Inc.,* "[i]ndeed, it is hard to believe that anyone who had seen defendants' sexually depraved film could ever thereafter disassociate it from plaintiff's cheerleaders." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2nd Cir. 1979). Similarly, here, after seeing the Ministry listed as a "hate group" on the SPLC's Hate Map, many members of the public would have difficulty disassociating the Ministry from the true hate groups with whom SPLC has falsely associated it. Pursuant to 15 U.S.C. 1125(a)(1)(A), the Ministry has the right to control the use of its trademark, just as the Dallas Cowboys Cheerleaders had the right to control the use of their unregistered (but trademarkable) uniform in the actual movie, not just in the advertising for the movie.

While SPLC spent approximately four and one-half pages addressing its position that the Lanham Act Claim against it should be dismissed, its entire argument addresses the issue of false advertising claims pursuant to 15 U.S.C. 1125(a)(1)(B). As stated previously, nowhere in its Motion to does SPLC raise any arguments supporting its Motion to Dismiss with respect to the 15 U.S.C. 1125(a)(1)(A), false association, portion of Count III. (Mot. to Dismiss 18 – 23.) (Compl. ¶¶ 104 – 107.) Therefore, SPLC's Motion clearly failed to prove that it is *beyond doubt* that the Ministry can prove no set of facts in support of its claim pursuant to 15 U.S.C. 1125(a)(1)(A). *Beck*, 144 F.3d at 735-36.

**B.   The Ministry has sufficiently pleaded a Lanham Act claim for false advertising pursuant to 15 U.S.C. § 1125(a)(1)(B).**

SPLC cites *Tobinick v. Novella,* 848 F.3d 935, 950 (11th Cir. 2017) for the elements of a commercial advertising or promotion claim pursuant to 15 U.S.C. 1125(a)(1)(B). (Mot. to Dismiss 19). These elements include:

1.      Commercial Speech,

2.      By a defendant who is in commercial competition with plaintiff,

3.      For the purpose of influencing consumers to buy defendant's goods or services, and

4.      The representation . . . must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

(Mot. to Dismiss 19); *Tobinick* 848 F.3d at 950.

**1.   The Ministry sufficiently pleaded the commercial speech element.**

While SPLC branches off to different cases to define the meaning of commercial speech, the *Tobinick* case (that SPLC cited for the elements of a false advertising claim) quoted those elements from *Gordon & Breach Sci. Publrs. S.A.,* 859 F. Supp. at 1535-36. In *Gordon,* addressing

the issue of whether the speech of a nonprofit organization could constitute commercial speech, the Court stated:

> [T]he meaning of "commercial advertising or promotion" . . . [is] broader than merely the "classic advertising campaign" to which defendants would confine it, and it covers misrepresentations by non-profit and for-profit organizations alike. *See National Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1232 (S.D.N.Y. 1991) (citing legislative history for proposition that Section 43(a) applies to non-profit organizations).

*Gordon & Breach Sci. Publrs. S.A.*, 859 F. Supp. at 1534-1535. "Furthermore, statements provided in fundraising letters about the services provided by a nonprofit organization represent a promotion of those services;" *Birthright v. Birthright, Inc.,* 827 F. Supp. 1114, 1138 (D.N.J. 1993); and thus bring fundraising activities by a nonprofit within the scope of 15 U.S.C. §1125(a)(1)(B).

SPLC's Motion spends a little more than a page analyzing the patently incorrect assumption that the Ministry believes the hate group designation is commercial speech solely because of the two tabs on SPLC's website entitled "Ways to Give" and "Donate." (Mot. to Dismiss 20.) They further claim that "[t]here is no other allegation in the Complaint that could, even arguably, support a finding that the speech challenged here – the Anti-LGTB designation – is commercial speech." (Mot. to Dismiss 20 - 21.) Of course, SPLC is simply wrong, as its argument is based on a wrong assumption. The allegations at paragraphs 99 and 101 of the Complaint are much broader than the fundraising tabs on its website. (Compl. ¶ 99, 101.) The allegations contained in the Complaint include all of the various forms of fundraising that SPLC conducts. Numerous media sources report that SPLC is virtually nothing but a fundraising machine[12]. In fact, Morris S. Dees, Jr., Chief Trial Counsel and Chairman of the Executive

---

[12] *The Hate Machine: How the Southern Poverty Law Center is Cashing in by Bashing Christians*, CBN News, http://www1.cbn.com/cbnnews/us/2017/september/southern-poverty-law-center-when-hate-is-good-for-business-nbsp (last visited Sept. 28, 17); *12 Ways the Southern Poverty Law Center is a Scam to Profit from Hate-Mongering,* The Federalist,

Committee of the SPLC, was named to the Direct Marketing Association's Hall of Fame, in part for his skill in turning the SPLC into a moneymaking machine.[13] As a result of the millions of dollars that SPLC raises through its Hate Map and other similar schemes, while spending virtually no money on legal services, the legality and propriety of SPLC's operations have been called into question by multiple parties.[14] SPLC has victimized the Ministry and the other organizations it has placed on the Hate Map because of the biblical positions that they take on homosexuality and marriage. It has used the designation of many of these groups as a tool to raise money. As a result of communication with the defendants, new facts have been learned that were not incorporated into the original Complaint, and in a forthcoming amendment complaint, the Ministry intends to plead new information regarding SPLC's fundraising activities that made use of the Hate Map and hate group designations.

At a minimum, whether the fundraising activities constitute "commercial speech" is a question for the trier of fact after SPLC has been required, through discovery, to disclose all fundraising methods and materials that made use of the Hate Map. In *Gordon*, the court struggled

---

http://thefederalist.com/2017/05/17/12-ways-southern-poverty-law-center-scam-profit-hate-mongering/ (last visited Sept. 28, 2017); *SPLC Shamelessly Fundraising off Hate That it Does Nothing About,* PJ Media, https://pjmedia.com/trending/2017/08/22/splc-shamelessly-fundraising-off-hate/ (last visited Sept. 28, 2017); *The SPLC Exposed—the Southern Poverty Law Center- Morris Dees and Hate Crimes,* The Social Contract Press, https://www.thesocialcontract.com/answering_our_critics/southern_poverty_law_center_splc_inf o.html (last visited Sept. 28, 2017)

[13] *See DMA Names 4 to Hall of Fame,* DMN, http://www.dmnews.com/agency/dma-names-4-to-hall-of-fame/article/59534/ (last visited Sept. 28, 2017)

[14] *See Southern Poverty Law Center Transfers Millions in Cash to Offshore Entities,* The Washington Free Beacon, http://freebeacon.com/issues/southern-poverty-law-center-transfers-millions-in-cash-to-offshore-entities/ (last visited Sept. 28, 2017); *Millions in International Accounts Linked to Far-Left Lobbying Group,* The Daily Caller, http://dailycaller.com/2017/08/31/millions-in-international-accounts-linked-to-far-left-lobbying-group/ (last visited Sept. 28, 2017)

to make a determination regarding whether the articles before it should be classified as commercial speech subject to a Lanham Claim. *Gordon & Breach Sci. Publrs. S.A.*, 859 F. Supp. at 1534-43. *Gordon* makes it clear that the Court cannot reach a conclusion concerning SPLC's fundraising materials and efforts without reviewing the relevant materials. *Id.* Of course, such a review would necessarily be conducted post discovery, not at the motion to dismiss stage.

### 2. **SPLC has not raised any objections to the facts establishing the commercial competition element.**

SPLC has not raised any objections to the commercial competition element of commercial speech, either because they concede that adequate competition between the parties was pleaded or it concedes that the element is no longer required. However, in the event that the issue is raised in future proceedings in this case, it is clear that the Ministry has sufficiently pleaded this element. The U.S. Supreme Court has held that "to come within the zone of interests in a suit for false advertising under §1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 134 S.Ct. 1377, 1390 (2014).* The Ministry has alleged such injury in paragraphs 47, 48, 105, 106, 108, 110, 112, 113, and 114 of the Complaint. Even if SPLC were to argue this point, "[t]here [actually] is no requirement that the defendant's service or product be in direct competition with, or be of the same type as, the product or service of the plaintiff." *Dallas Cowboys Cheerleaders, Inc.*, 467 F. Supp. at 374.

### 3. **The Ministry has sufficiently pleaded the third element, which requires the Plaintiff to show the Defendant's speech was for the purpose of influencing consumers to buy defendant's goods or services.**

With respect to the pleading requirement to show that the advertisement was "for the purpose [of] influencing consumers to buy defendant's goods or services," the Ministry believes the Complaint adequately pleads this element in the introductory paragraph and paragraphs 34, 37,

38, 39, and 109. However, SPLC explicitly denies even offering any goods or services. SPLC states: "The [Ministry's] designation is not even something that could conceivably be characterized as influencing consumers to buy SPLC's goods or services, whatever those might be." (Mot. to Dismiss 22.) SPLC is simply attempting to deceive the Court with this statement. It is well established that SPLC offers goods and services that flow from its "hate group" designations and what it labels as "HATE & EXTREMISM." SPLC's own website states:

> The SPLC is the premier U.S. organization monitoring the activities of **domestic hate groups** and other extremists – including the Ku Klux Klan, white nationalists, the neo-Nazi movement, antigovernment militias and others.
>
> We track more than 1,600 extremist groups operating across the country. **We publish investigative reports, train law enforcement officers and share key intelligence, and offer expert analysis to the media and public** . . . . (Emphasis added.)[15]

While SPLC is attempting to deceive the Court by implying that it offers no goods or services, this paragraph from its website clearly establishes that SPLC offers investigative reports, training for law enforcement, "key intelligence," and "expert" analysis. In the paragraph immediately before the one promoting its services, SPLC clearly states that the subject matter of these goods and services includes: "domestic hate groups." SPLC publicly designated the Ministry to be one of those domestic "hate groups" on the same website where the goods and services that are based on the Hate Map are promoted. While SPLC protests that the "designation is not even something that could conceivably be characterized as influencing consumers to buy SPLC's goods or services," (Mot. to Dismiss 22.) SPLC's website makes it clear that its designation of the Ministry as a hate group is part of the very substance and contents of its goods and services. In essence, SPLC is saying in its website promotion: "these groups (including the Ministry) are hate

---

[15] *Hate and Extremism*, Southern Poverty Law Center, https://www.splcenter.org/issues/hate-and-extremism (last visited Sept. 28, 2017)

groups that you need to know about and we provide this information through our investigative reports; we are experts, so let us train your law enforcement officers; use our intelligence; make use of our expert analysis; publish us in your print media; interview us on your broadcast stations; and most importantly, donate to us so we can continue providing all these services to you!" SPLC's statement that it is "inconceivable" that the hate group designation influences consumers to buy SPLC's goods and services is laughable as that cuts against SPLC's entire purpose for producing that information in the first place. If anything, it is inconceivable that this designation *would not* be influencing consumers.

SPLC's claim that "No goods or services are being sold or advertised by the SPLC in connection with the designation" (Mot. to Dismiss 22.) is patently false, as the organization's own website shows and which the Ministry alleges in paragraphs 105 and 109-110 of the Complaint. SPLC's effort to deceive the Court makes clear that the representations it makes in its Motion to Dismiss are not to be trusted. These allegations by SPLC do not pass the "straight face test" and furthermore, may not be even be considered since the Court "must accept the allegations set forth in the [C]omplaint as true for purposes of a motion to dismiss." *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236 (11th Cir. 1999).

Recently, after the events in Charlottesville, Virginia, SPLC has been pumping the media full of its Hate Map-related goods, services, and rhetoric. Rather than SPLC's efforts to deceive the Court, what is necessary at this juncture is to proceed to discovery and for SPLC to be compelled to disclose all advertising, promotional, and training materials that it has been using that are based on or that reference the Hate Map, hate groups, and/or the Ministry. SPLC's Hate Map promotions have garnered millions of dollars in donations, including the recent donation from

Apple CEO Tim Cook. The Ministry intends to amend its Complaint to include additional information in this area.

### 4. <u>The Ministry has sufficiently pleaded that SPLC's representations have been disseminated sufficiently to the relevant purchasing public.</u>

SPCL contends that the Ministry has not established that the Hate Map designation was "sufficiently [disseminated] to the relevant purchasing public to constitute advertising or promotion within that industry." (Mot. to Dismiss 22.) SPLC defines the relevant purchasing public as "Christian ministries or churches that advocate against LGBT people." (Mot. to Dismiss 22.) SPLC's attempt to define the relevant purchasing public is incorrect. The relevant purchasing public for purposes of the instant case includes all people and organizations engaged in charitable giving to tax-exempt organizations.

As stated previously, SPLC's website clearly promotes investigative reports, law enforcement training, intelligence, and expert analysis for the media and public. All of these advertised goods and services are based on the Hate Map on which the Ministry languishes at SPLC's direction and control. The exact extent of the views this promotion receives is currently unknown. However, because SPLC claims it "is the premier U.S. organization monitoring the activities of domestic hate groups and other extremists – including the Ku Klux Klan, white nationalists, the neo-Nazi movement, antigovernment militias and others," it is believed the website promoting this material receives an extremely large number of views. Only SPLC would be able to accurately disclosure the number of views the site receives. On information and belief, SPLC uses the Hate Map, including the Ministry, in direct mail campaigns. Since Morris Dees has been named to the Direct Marketing Association's Hall of Fame, it would be illogical to assume that SPLC has not taken advantage of his skills for the promotion of its goods and services related to the Hate Map. These are matters that SPLC must be compelled to disclose in discovery.

With respect to the content of the current Complaint, the Ministry believes this fourth element to establish a Lanham Act Claim for false advertising is adequately pleaded in the following paragraphs: 38, 39, 42, 43, 45, 46, 47, 49, and 59. Having recently obtained additional information, it is the Ministry's intent to amend its Complaint with additional allegations.

## CONCLUSION

For the reasons stated above, SPLC's Motion to Dismiss with respect to Count I, Defamation – Libel Per Se, must be denied. Further, all of the required elements of a false association claim, pursuant §1125(a)(1)(A) of the Lanham Act, and a false advertising claim, pursuant to §1125(a)(1)(B) of the Lanham Act, have been adequately pleaded. Because SPLC's Motion entirely failed to meet its burden to show that it is *beyond doubt* that the Ministry can prove no set of facts in support of its claim, the Motion must be denied as to all Counts. As previously described, the Ministry intends to amend its Complaint with additional allegations.

Respectfully submitted,

/s/ David C. Gibbs III
David C. Gibbs III, Esq.
Fla. Bar No. 0992062
The National Center for
Life and Liberty, Inc.
2648 FM 407, Suite 240
Bartonville, TX 76226
Telephone: (727) 362-3700
Facsimile: (727) 398-3907
Email: dgibbs@gibbsfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing (NEF) to all counsel of record.

/s/ David C. Gibbs III    .
David C. Gibbs III, Esq.
Fla. Bar No. 0992062
The National Center for
Life and Liberty, Inc.
2648 FM 407, Suite 240
Bartonville, TX 76226
Telephone: (727) 362-3700
Facsimile: (727) 398-3907
Email: dgibbs@gibbsfirm.com