IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

| | |
|---|---|
| CORAL RIDGE MINISTRIES MEDIA, INC., ) | |
| d/b/a D. James Kennedy Ministries, ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 2:17-cv-566- |
| ) | MHT-DAB |
| ) | |
| v. ) | |
| ) | |
| AMAZON.COM, INC., ) | JURY TRIAL REQUESTED |
| AMAZONSMILE FOUNDATION, and ) | |
| SOUTHERN POVERTY LAW CENTER, INC., ) | |
| ) | |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT

CORAL RIDGE MINISTRIES MEDIA, INC., d/b/a D. James Kennedy Ministries (the

"Ministry"), a Florida not for profit corporation, by and through its attorneys, the National Center

for Life and Liberty, pursuant to Rule 15 of the Federal Rules of Civil Procedure, files its First

Amended Complaint against Amazon.com, Inc., AmazonSmile Foundation, and Southern Poverty

Law Center, Inc.  For its First Amended Complaint, the Ministry states as follows:

## INTRODUCTION

This is a civil action pursuant to Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a,

for religious discrimination against the Ministry by a place of  public accommodation; pursuant to

the Lanham Act, specifically Title 15 U.S.C. § 1125, for advertising, promoting, and trafficking in

false or misleading descriptions of the services offered under the Ministry's trademarked name;

and, pursuant to Alabama common law, for defamation and negligence arising from the

dissemination, distribution, and promotion of information that libels the Ministry's reputation,

subjects the Ministry to disgrace, ridicule, odium, and contempt in the estimation of the public, and for negligence in the supervision and management of the AmazonSmile program.

## JURISDICTION

1. This action arises under federal law, particularly Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, and the Lanham Act, 15 U.S.C. § 1051, et seq. This action also contains counts originating in the common law of the State of Alabama concerning defamation and negligence. This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the defamation and negligence claims pursuant to 28 U.S.C. § 1367. Additionally, the Defendants are all citizens of different states than the Plaintiff, and the amount in controversy exceeds $75,000. Therefore, jurisdiction also exists pursuant to 28 U.S.C. § 1332.

2. Venue in this action is proper in the Montgomery Division of the Middle District of Alabama pursuant to 28 U.S.C. § 1391(b), because Defendant SPLC's primary place of business and registered office are located in Montgomery, Alabama. Further, on information and belief, a substantial part of the events or omissions giving rise to these claims arose in Montgomery, Alabama.

## THE PARTIES

3. This suit is brought by Plaintiff, the Ministry, a Florida not for profit corporation, with its primary place of business at 5555 North Federal Highway, Suite 1, Fort Lauderdale, Florida 33308. The Ministry may be served at 5555 North Federal Highway, Suite 1, Fort Lauderdale, Florida 33308.

4. Defendant Amazon.com, Inc. ("Amazon.com") is a Delaware corporation. On information and belief, Amazon.com's principal place of business is 410 Terry Avenue North, Seattle,

Washington 98109. Amazon.com's registered agent for service in Delaware is Corporation Service Company at 251 Little Farms Drive, Wilmington, Delaware 19808.

5. Amazon.com is an American electronic commerce and cloud computing company, and is the largest Internet-based retailer in the world by total sales and market capitalization. Amazon.com's business includes video downloads/streaming, MP3 downloads/streaming, audiobook downloads/streaming, hardcopy books, CD and DVD sales, and, among many other retail items, sales of Whole Foods-branded items.

6. Amazon recently acquired Whole Foods Market, Inc. ("Whole Foods"), as a wholly owned subsidiary, including WholeFoods.com. Whole Foods is a high-end grocery store and eat-in establishment chain located around the United States, with at least four locations in Alabama, including one in Montgomery, Alabama.

7. Amazon's Whole Foods retail grocery stores have eat-in dining areas at which patrons are encouraged to stay and eat food they have purchased from the selection of prepared foods available in the store, many of which have been prepared in-store. Whole Food's website announces: "If you haven't sat down to a meal in one of our stores lately, you're in for a treat." Customers of WholeFoods.com are able to order online and either have orders delivered or else pick them up in store; items that are ordered online and picked up could then be eaten in the store at its dining facility.

8. Whole Foods' eat-in dining facilities constitute public accommodations under Title II, 42 U.S.C. § 2000a as a "restaurant, cafeteria, lunchroom, lunch counter, soda fountain . . ."

9. Amazon's business now also includes physical brick and mortar bookstores wherein customers are invited to "discover [their] next great read, and . . . learn about and explore

Amazon devices." Many of the physical books for sale at Amazon's bookstores are displayed along with their corresponding Amazon.com customer ratings.

10. Amazon's physical bookstores constitute brick and mortar "places of exhibition or entertainment."

11. Virtually every aspect of Amazon.com's business moves in interstate commerce.

12. Defendant AmazonSmile Foundation ("AmazonSmile") is a Delaware tax-exempt corporation. On information and belief, AmazonSmile's principal place of business is 410 Terry Avenue North, Seattle, Washington 98109. AmazonSmile's registered agent for service in Delaware is Corporation Service Company and can be served at 251 Little Farms Drive, Wilmington, Delaware 19808.

13. Both Amazon.com and AmazonSmile maintain active websites from which goods and services can be and are ordered from within Alabama.

14. Title II, 42 U.S.C. 2000a prohibits discrimination on the basis of religion in the "full and equal enjoyment of the … services… privileges, [and] advantages" of any place of public accommodation." Participation in the AmazonSmile program is a service, privilege, and advantage of using Amazon.com.

15. On information and belief, the vast majority of the millions of items that are available for purchase through Amazon.com are also available for purchase through AmazonSmile at smile.amazon.com.

16. AmazonSmile's business therefore also includes video downloads/streaming, MP3 downloads/streaming, audiobook downloads/ streaming, and hardcopy book sales. AmazonSmile's business also includes selling Whole Foods-branded items through its website.

17. AmazonSmile is engaged in all of the same public accommodation activities as its parent company, Amazon.com.

18. The Amazon Defendants' online presence and their connections to their physical brick and mortar stores are not just filling market needs that have traditionally been met solely by brick and mortar business; rather, they are and have replaced businesses and are encroaching on entire industries in which brick and mortar businesses have thrived, including businesses traditionally covered by the provisions of Title II of the Civil Rights Act of 1964.

19. For example, Amazon's online book sales as well as their e-reader devices and downloads are replacing brick and mortar bookstores that once were prevalent in shopping malls— venues that are typically subject to Title II as public accommodations. Amazon's "Just Walk Out" technology, as it is currently being beta-tested, already poses serious competition to the fast food and convenience store industries by allowing patrons to simply walk into an AmazonGo grocery store, swipe the appropriate app, choose their items, and walk out of the store without the traditional check-out process. In addition, Amazon's new "Amazon Restaurant" delivery service makes it easier for customers to order from restaurants through Amazon's website, enabling customers of otherwise-covered Title II establishments to still enjoy the goods and services of the restaurants without ever stepping foot into the establishment.

20. Defendant Southern Poverty Law Center, Inc. ("SPLC") is an Alabama non-profit corporation with its principal place of business at 400 Washington Avenue, Montgomery, Alabama 36104. SPLC can be served at 400 Washington Avenue, Montgomery, Alabama 36104.

21. Defendant SPLC disseminates, trains with, promotes, and markets a list it refers to as its "HATE MAP." Through its Hate Map, SPLC has designated a number of groups operating in the U.S. (currently 917) to be "hate groups." Among the groups SPLC lists as hate groups are several IRS recognized § 501(c)(3) tax-exempt charities, including the Ministry. On the other hand, some of the organizations designated as "hate groups" are those that would legally and traditionally be viewed as hate groups, including organizations like the Ku Klux Klan, white nationalists, the neo-Nazi movement, and skinheads. SPLC disseminates, distributes, and promotes the Hate Map and the resulting hate group designations on its website, in its fundraising, and integrates the hate group designation into many of SPLC's goods and services.

22. On information and belief, the Amazon Defendants entered into an ongoing agreement with SPLC in Montgomery, Alabama to make use of SPLC's Hate Map and the hate group designations contained therein, including the hate group designation of the Ministry.

23. Amazon adopts SPLC's judgment regarding the hate group designations, with no independent review or standards of its own, as part of its criteria for its AmazonSmile program. Entities that are designated by SPLC as hate groups are automatically ineligible for participation in the AmazonSmile program.

24. Despite the fact that SPLC has caused the Ministry to be denied access to the AmazonSmile program by declaring it to be a hate group on the basis of its religion, the Amazon Defendants have allowed SPLC to participate in the AmazonSmile program as a benefiting charity. Because SPLC is a participant in the AmazonSmile program, it has an inherent conflict of interest in determining which other charities may be admitted to the program.

25. Recently, reports from numerous media outlets indicated that SPLC raises millions of dollars through the use of its hate group designations. Additionally, it is reported that this nonprofit organization is sheltering millions of dollars in off-shore bank accounts. It is negligent for AmazonSmile to rely on a nonprofit organization that engages in questionable financial dealings of this type as a primary source of information for its public accommodation activities.

26. Morris S. Dees, Jr., Chief Trial Counsel and Chairman of the Executive Committee of SPLC, was named to the Direct Marketing Association's Hall of Fame, in part for his prolific skill in raising large sums of money for SPLC.

27. SPLC has raised millions of dollars through its hate group designations and other similar schemes.

28. On information and belief, SPLC has used the hate group designations to raise money through direct mail, email, and other fundraising methods.

29. On information and belief, SPLC has integrated the hate group designations, including the Ministry's hate group designation, into SPLC's goods and services that include "investigative reports," training services and materials (which have been used by U.S. law enforcement, including the F.B.I., the Department of Defense, Department of Homeland Security, and private groups), "key intelligence," and "expert" analysis.

30. On information and belief, the Department of Defense and the F.B.I. stopped making use of SPLC's hate group training materials and services, due to the factual inaccuracy of the designations. However, it is believed that the Department of Homeland Security and other government agencies are still be using SPLC's hate group designation-based training materials and services.

## GENERAL FACTUAL STATEMENTS
## BACKGROUND

31. Dennis James Kennedy was an American pastor, evangelist, and Christian broadcaster. He founded the Coral Ridge Presbyterian Church in Fort Lauderdale, Florida, where he was senior pastor from 1960 until his death on September 5, 2007. Dr. Kennedy also founded Evangelism Explosion International, Coral Ridge Ministries (known as D. James Kennedy Ministries since 2009), the Westminster Academy in Fort Lauderdale, the Knox Theological Seminary, and the Center for Reclaiming America for Christ.

32. In 1974, Dr. Kennedy founded Coral Ridge Ministries, which produced his weekly television program, *The Coral Ridge Hour* (now "Truths that Transform"), which was carried on television networks and was syndicated on numerous other stations with a peak audience of three million viewers in 200 countries. Dr. Kennedy also had a daily radio program, *Truths That Transform*, from 1984 until 2012.

33. The Ministry's bylaws declare its vision statement: "The corporation seeks to communicate the Gospel of Jesus Christ, the supremacy of His Lordship, and a biblically informed view of the world, using all available media, so that Jesus Christ would be known throughout all of the Earth and that everywhere He might be trusted, loved, and served."

34. The Ministry's bylaws also declare the Ministry's mission: "The mission of the corporation is:

    a. To proclaim the good news of the Gospel throughout the Earth, introducing people to the Person and the redeeming work of Jesus Christ;
    b. To teach and nurture His followers, helping them to grow in grace and in service to Christ and His church;
    c. To equip and encourage believers to live out their faith, making a difference in the world around them; and
    d. To defend religious liberty, by helping believers understand America's Christian heritage and by motivating them to lovingly engage the culture with the heart and mind of Christ.

35. The message, vision, and purpose of the Ministry have not changed since the death of Dr. Kennedy on September 5, 2007. In fact, much of the Ministry's message cannot have changed since Dr. Kennedy's death because much of the Ministry's current function is to continue broadcasting the messages contained in Dr. Kennedy's *Truths That Transform* television programs.

36. More than the fact that the Ministry's message has not changed since the time of Dr. Kennedy's death, the fundamental rock upon which the Ministry is built, the Gospel of Jesus Christ, has remained unchanged for almost two thousand years.

37. It is this Gospel of Jesus Christ that was a fundamental building block of the United States. In fact, if one views "American life as expressed by its laws, its business, its customs and its society, we find everywhere a clear recognition of the same truth. Among other matters note the following: The form of oath universally prevailing, concluding with an appeal to the Almighty; the custom of opening sessions of all deliberative bodies and most conventions with prayer; the prefatory words of all wills, 'In the name of God, amen;' the laws respecting the observance of the Sabbath, with the general cessation of all secular business, and the closing of courts, legislatures, and other similar public assemblies on that day; the churches and church organizations which abound in every city, town and hamlet; the multitude of charitable organizations existing every where under Christian auspices; the gigantic missionary associations, with general support, and aiming to establish Christian missions in every quarter of the globe. These, and many other matters which might be noticed, add a volume of unofficial declarations to the mass of organic utterances that **this is a Christian nation**." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 471 (U.S. Feb. 29, 1892) (emphasis added).

38. The mission of the Ministry is to proclaim the Gospel upon which this Nation was founded, to teach and nurture the followers of Jesus, to equip and encourage believers, and to defend religious liberty.

## DEFAMATION AND DISCRIMINATION AGAINST THE MINISTRY ON THE BASIS OF ITS RELIGIOUS BELIEFS

39. As previously stated, fundamental to the operation of the Ministry is the broadcast of Dr. Kennedy's *Truths that Transform* programs. Since the purchase of broadcast television time is expensive, fundraising is also fundamental to the operation of the Ministry.

40. Because fundraising is important to the continuing operation of the Ministry, its leadership is always receptive to appropriate new fundraising opportunities.

41. In late 2016, the Ministry's leadership became aware of a program called the AmazonSmile program, which is sponsored by Defendant Amazon.com and its affiliate, AmazonSmile.

42. The website for the AmazonSmile program, https://org.amazon.com, describes the AmazonSmile program as follows:

"Customers shop. Amazon gives.

Amazon donates 0.5% of the price of eligible AmazonSmile purchases to the charitable organizations selected by our customers. Register to receive donations generated by your organization's AmazonSmile supporters."

43. AmazonSmile is further described on its website, https://org.amazon.com, in the section titled, "About AmazonSmile":

**"What is AmazonSmile?**
AmazonSmile is a website operated by Amazon that lets customers enjoy the same wide selection of products, low prices, and convenient shopping features as on Amazon.com. The difference is that when customers shop on AmazonSmile (smile.amazon.com), the AmazonSmile Foundation will donate 0.5% of the price of eligible purchases to the charitable organizations selected by customers."

44. The eligibility requirements for the AmazonSmile program are also described in this section of the website:

**What are the eligibility requirements for charitable organizations to participate?**

Organizations must be registered and in good standing with the IRS as a § 501(c)(3) to be eligible to participate. Organizations must be public charitable organizations (not private foundations) and may not be supporting organizations, unless identified specifically as a Type I, Type II, or functionally integrated Type III supporting organization. Eligible charitable organizations must also be located in one of the 50 U.S. states or the District of Columbia. Organizations that engage in, support, encourage, or promote intolerance, hate, terrorism, violence, money laundering, or other illegal activities are not eligible to participate. **Amazon relies on** the US Office of Foreign Assets Control and **the Southern Poverty Law Center to determine which registered charities fall into these groups**. Charitable organizations must also adhere to the AmazonSmile Participation Agreement to maintain eligibility. Charitable organizations may choose not to participate in AmazonSmile at any time. Although we aim to include only charitable organizations that are in good standing and do not engage in any of the activities described above, we cannot guarantee the good standing and/or conduct of any charitable organization. For complete details, see the AmazonSmile Participation Agreement. (emphasis added)

45. The Ministry originally received a determination letter from the Internal Revenue Service declaring it tax exempt under § 501(c)(3) of the Internal Revenue Code in August of 1994. The Ministry's determination letter is still in full force and effect. Therefore, the Ministry is "registered and in good standing with the IRS."

46. The Ministry is not a private foundation, but rather, is classified as a public charity.

47. The Ministry is not classified as a "supporting organization."

48. The Ministry is located in Fort Lauderdale, Florida, within one of the 50 U.S. states.

49. The Ministry does not engage in, support, encourage, or promote intolerance, hate, terrorism, violence, money laundering, or other illegal activities.

50. As previously stated, in order to be eligible to receive the 0.5% of the purchase price of eligible purchases that AmazonSmile donates to charities selected by its customers, a charity must register with AmazonSmile.

51. On or about January 3, 2017, a Ministry employee acting at the direction of the Ministry's leadership, attempted to register the Ministry in the AmazonSmile program.

52. Despite repeatedly attempting to register the Ministry for the AmazonSmile program, the employee had no success and ultimately contacted AmazonSmile support for assistance.

53. When the Ministry contacted AmazonSmile support it was advised that "the Southern Poverty Law Center lists Coral Ridge Ministries Media, Inc., in an ineligible category." AmazonSmile support identified this as the reason the Ministry was denied eligibility for the AmazonSmile program. Therefore, AmazonSmile relied on SPLC's hate group designation to determine that the Ministry was ineligible for the AmazonSmile program.

54. As the AmazonSmile telephone support explained and AmazonSmile's website, https://org.amazon.com, indicates, AmazonSmile relies on the U.S. Office of Foreign Asset Control and the Southern Poverty Law Center to determine which charities fall into the category of organizations "that engage in, support, encourage, or promote intolerance, hate, terrorism, violence, money laundering, or other illegal activities . . ."

55. The Ministry has never had any difficulty with the U.S. Office of Foreign Asset Control and is not aware that it has ever been investigated by that agency.

56. SPLC, however, has labeled the Ministry as one of AmazonSmile's prohibited types of organizations with the following entry on SPLC's "Hate Map":

"D. James Kennedy Ministries
 (formerly Truth in Action)
 Fort Lauderdale, Florida
 ANTI-LGBT"

57. SPLC Hate Map is located at https://www.splcenter.org/hate-map and the Ministry's entry described above can be located by clicking on the "Sort by" drop-down menu located directly above and to the left of the map, selecting "Anti-LGBT," and then by clicking on the blue circle with the triangle directly above Miami, Florida.

58. The basis for SPLC's declaration that the Ministry is a hate group is that the Ministry espouses and supports biblical morals and principles concerning human sexuality and marriage—the same biblical principles upon which this Nation was founded and built.

59. On its website at https://www.splcenter.org/hate-map, SPLC defines a "hate group" as those groups that "have beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics."

60. The Ministry has never attacked or maligned anyone on the basis of engaging in homosexual conduct.

61. While the Ministry opposes homosexual conduct, the Ministry has nothing but love for people who engage in homosexual conduct. As SPLC itself stated in a court filing, the Ministry "hates the sin, but not the sinner." Thus, SPLC makes it clear that it was aware of the Ministry's position with respect to loving people who engage in homosexual conduct.

62. Nowhere in the purpose, vision, mission, or action of the Ministry is there HATE or any room for HATE.

63. Given the outrageous nature of SPLC's conduct in declaring a Christian ministry to be a hate group, SPLC's conduct, in and of itself, would have created a high degree of awareness of the probable falsity of SPLC's declaration, and would have placed SPLC on notice that it was acting with reckless disregard for the truth.

64. SPLC defines a hate group as a group that has "beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics"—a definition that is intentionally false and deceptive.

65. While SPLC uses this deceptive definition to falsely define what a hate group is, the law defines a hate group as one whose activities include violence and crime. *Virginia v. Black*, 538 U.S. 343, 352-357 (2003); *Capital Square Rev. & Advisory Board v. Pinette*, 515 U.S. 753, 770 (1995); *Powers v. Clark*, No. 3:11CV763-HEH, 2014 WL 6982475 * 3 n.10 (E.D. Va. Dec. 9, 2014); *Doe v. Pittsylvania Cnty.*, 844 F. Supp. 2d 724, 740 (W.D. Va. 2012).

66. The American public also understands that the definition of a hate group includes those groups that engage in violence and crime.

67. SPLC's definition of "hate group" is so far outside of how hate groups are legally and culturally understood that SPLC's definition is simply and patently false, and SPLC knew of the falsity of its definition at the time it designated the Ministry a hate group and distributed the defamation to third parties.

68. The Ministry has never engaged in violence and crime, and SPLC has no evidence that it ever has.

69. For these reasons, SPLC had serious doubts about the truth of its hate group designation of the Ministry or else acted with a high degree of awareness of the probable falsity of the Ministry's designation at the time that designation was published. SPLC thus acted with reckless disregard of the truth at the time it published the Ministry's hate group designation, which constitutes actual malice.

70. By declaring the Ministry to be a hate group and publishing that declaration to third parties, SPLC defamed the Ministry.

71. On its website, https://www.splcenter.org/fighting-hate, SPLC claims to be the "premier U.S. nonprofit organization monitoring the activities of domestic hate groups and other extremists."

72. SPLC has a large donor base, many of whom would have become aware of SPLC's false designation of the Ministry as a hate group.

73. SPLC's goods and services include developing investigative reports about SPLC-branded "domestic hate groups" (the category into which SPLC places the Ministry) as well as conducting law enforcement, military, and other types of training and providing further "intelligence," and "expert" analysis about these groups. Much of this information has been disseminated through the media.

74. On information and belief, SPLC uses the hate group designations for fundraising purposes. SPLC has also integrated the Hate Map and the resulting hate group designations into many of the goods and services that SPLC offers.

75. As a result of SPLC's position as the alleged "premier U.S. nonprofit organization monitoring the activities of domestic hate groups and other extremists," on information and belief, SPLC's Hate Map, hate group-based fundraising materials, and hate group-based goods and services reach a large number of people in every state in the United States and beyond. SPLC's publication of the Hate Map and hate group designations through its fundraising and in its offering of goods and services is vast and reaches a world-wide audience.

76. The information that SPLC disseminated concerning the Ministry is not intended to merely be SPLC's opinion, but rather, is intended to be perceived as factual information. It is SPLC's intent that the individuals and entities in all sectors of society including, but not

limited to, potential donors; government agencies; and the media; will rely on SPLC's information as fact and will base their charitable giving decisions on that information.

77. SPLC's training materials have been used by U.S. law enforcement agencies, including the F.B.I., and by the Department of Defense. On information and belief, because the U.S. federal government has finally come to understand that SPLC's hate group designations are factually inaccurate and are merely a form of reputational terrorism, the Department of Defense and the F.B.I. recently stopped making use of SPLC's Hate Map and hate group-based training materials and services. However, it is believed that the U.S. Department of Homeland Security and other government agencies are still be using these SPLC materials.

78. If the Hate Map and its hate group designations were marketed only as SPLC's opinion, it would be unconscionable for law enforcement, including the F.B.I., Department of Homeland Security, and the Department of Defense, to use that information for training.

79. SPLC is on record as stating: "Sometimes the press will describe us as monitoring hate groups. **<u>I want to say plainly that our aim in life is to destroy these groups-completely destroy them</u>**." Thus, it is SPLC's stated goal to destroy, **"completely destroy,"** the Ministry and other Internal Revenue Code § 501(c)(3) tax-exempt organizations that are listed on the Hate Map.

80. The majority of the actual "hate groups" listed on the Hate Map could never obtain Internal Revenue Code § 501(c)(3) status because their violent and destructive purposes violate public policy.

81. SPLC falsely includes the Ministry in with other actual hate groups that could never obtain § 501(c)(3) status and makes no distinction between these groups.

82. As the U.S. Supreme Court stated in 2015, "Many who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here." Therefore, as a matter of law, religious-based opposition to same-sex marriage and the homosexual agenda is not hate speech, but rather is a position that the U.S. Supreme Court has labeled "decent and honorable." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (U.S. June 26, 2015).

83. Upon information and belief, the defamatory information disseminated to third parties by SPLC originates at SPLC's principal place of business in Montgomery, Alabama.

84. On information and belief, when SPLC transmits SPLC's defamatory information concerning the Ministry and other similar charities to AmazonSmile and other similar end users, the information does not include supporting data that explains the basis of SPLC's decision. The information transmitted does not allow end users to make their own determination regarding whether SPLC's determinations were correct or not. Rather, the information transmitted is binary in nature. It is something upon which a computer program, like AmazonSmile's software, can act. The charity in question is either a hate group or not. The charity is eligible or ineligible. SPLC's determinations are designed to be treated as fact and business decisions are made based on those determinations without further evaluation or consideration.

85. On or about January 3, 2017, AmazonSmile relied on the defamation published by SPLC concerning the Ministry to exclude the Ministry from the AmazonSmile program.

86. As a result of the Ministry's exclusion from the AmazonSmile program, it is not able to receive contributions that it would otherwise be eligible for through that program.

87. Upon information and belief, SPLC received financial compensation for dissemination of its defamatory information about the Ministry, both as a result of donations resulting from fundraising solicitations containing the Hate Map and hate group designation information and through the sales of goods and services containing hate group designation information.

## CAUSES OF ACTION

## COUNT I – DEFAMATION – LIBEL PER SE
### (AGAINST SPLC)

88. The Ministry incorporates paragraphs 1 through 87, as if fully set out herein.

89. In Alabama, the elements of defamation are:

   (1) a false *and* defamatory statement concerning the plaintiff;
   (2) an unprivileged communication of that statement to a third party;
   (3) fault amounting at least to negligence on the part of the defendant; and
   (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

   *McCaig v. Talladega Pub. Co*., 544 So. 2d 875, 877 (Ala. 1989) (emphasis in original).

90. A communication is considered defamatory "if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Harris v. School Annual Publ'g Co.,* 466 So. 2d 963, 964 (Ala. 1985).

91. The Ministry is not a hate group. Rather, the Ministry promotes and advances the Gospel of Jesus Christ, which promotes love of all people, including those who engage in hateful words and actions. Additionally, the Ministry has never engaged in or advocated crime or violence toward or against any group of people. A hate group is legally and commonly understood as one that engages or advocates crime or violence against others based on their characteristics.

92. SPLC, contrary to the legally and generally understood meaning of the term "hate group" in the United States, defines a hate group as a group that has "beliefs or practices that attack or malign an entire class of people . . ."

93. The Ministry has never attacked or maligned anyone on the basis of engaging in homosexual conduct.

94. The Ministry has never attacked or maligned an entire class of people.

95. At the time SPLC published the Ministry's hate group designation, it had serious doubts about the truth of its hate group designation of the Ministry. SPLC's listing of the Ministry on its Hate Map and declaring to be a hate group "tends to harm the reputation of [the Ministry] as to lower [it] in the estimation of the community or to deter third persons from associating or dealing with [it]." In fact, SPLC's very purpose for placing the Ministry on the Hate Map was to harm the reputation of the Ministry as to lower it in the estimation of the community and to deter third persons from associating or dealing with the Ministry. Specifically, SPLC was attempting to dissuade people and organizations from donating to the Ministry and to ultimately destroy the Ministry.

96. SPLC knows that its publication of its claims that the Ministry is a hate group, both in the Hate Map and in SPLC's fundraising and in SPLC's goods and services that are derived from the hate group designations, are false and that these publications defame the Ministry. SPLC intended the Hate Map and the resulting hate group designation of the Ministry to be statements of fact, not statements of opinion.

97. SPLC's publication of its Hate Map and hate group-based fundraising and hate group-based goods and services were not and are not privileged communications to third parties.

98. For the reasons cited above, the inclusion of the Ministry on SPLC's Hate Map and hate group designation in SPLC's hate group-based fundraising, and in SPLC's hate group-based goods and services is actionable as defamation.

99. Both SPLC's Hate Map and hate group-based materials and services were published to third parties. SPLC includes its Hate Map and hate group designations as an element of its fundraising activity. SPLC's dissemination of its hate group designations, on information and belief, includes dissemination on its website, through direct mail, and other fundraising efforts, and is also integrated into SPLC's reports and materials, training programs, and "intelligence," all of which are disseminated to third parties.

100. SPLC acted knowingly, intentionally, and with actual malice in publishing the Hate Map that included the Ministry and in publishing SPLC hate group-based fundraising materials, reports, training programs, and intelligence. SPLC's conduct in making these publications was beyond the reckless disregard for the truth standard required by Alabama law for punitive damages.

101. In Alabama, written language (including Internet postings and electronic transmissions) that includes "language expos[ing] the plaintiff to public ridicule or contempt" is actionable as libel per se.

102. Because these SPLC publications constitute libel per se, the Ministry is entitled to presumed damages.

103. SPLC's publication of its Hate Map and hate group-based materials and services directly tend to prejudice the Plaintiff in the operation of its ministry, i.e. its profession.

104. Because SPLC's Hate Map and hate group-based materials and services identify the Ministry as: "D. James Kennedy Ministries," which is the Ministry's registered fictitious

name and its trademark, there is no doubt that the Hate Map and hate group-based materials and services were published with respect to the Ministry and not some other party.

105. In Alabama, common-law malice may be shown by evidence of hostility, rivalry, the violence of the language, the mode and extent of publication, or by proof of "the recklessness of the publication and prior information regarding its falsity." *Johnson Publishing Co. v. Davis*, 271 Ala. 474, 487 (Ala. 1960).

106. Here, SPLC has publicly stated that its aim is to "completely destroy" the Ministry and other groups that it has designated as hate groups.

107. Because SPLC previously published material that evidenced hostility toward the Ministry, because of the extreme "hate group" language used by SPLC, because of the extensive publication of the Hate Map and hate group-based materials and services, and because SPLC's conduct in making these publications was beyond reckless for the falsity of the information, SPLC's conduct in publishing the Hate Map and hate group-based materials and services constitutes common-law malice.

108. Code of Alabama § 6-5-186 provides: "Vindictive or punitive damages shall not be recovered in any action for libel on account of any publication unless (1) it shall be proved that the publication was made by the defendant with knowledge that the matter published was false, or with reckless disregard of whether it was false or not, and (2) it shall be proved that five days before the commencement of the action the plaintiff shall have made written demand upon the defendant for a public retraction of the charge or matter published; and the defendant shall have failed or refused to publish within five days, in as prominent and public a place or manner as the charge or matter published occupied, a full and fair retraction of such charge or matter."

109. A demand letter was served on SPLC on August 7, 2017, more than five days before the commencement of this action, demanding a public retraction of SPLC's inclusion of the Ministry on the Hate Map and in hate group designation-based materials and services. SPLC has failed to publish such a retraction.

110. SPLC's publication of its Hate Map and hate group designation-based materials and services were vast with respect to the number of publications made and the number of people reached.

111. Because SPLC entertained serious doubts as to the truth of the hate group designation at the time it was published and acted with a high degree of awareness of the probable falsity of the designation, SPLC's publication of the Ministry's hate group designation was committed with actual malice.

112. Because SPLC's publication of its Hate Map and dissemination of hate group-based materials and services were made with knowledge that the matter was false, or with reckless disregard of whether it was false or not, and because SPLC has refused to retract these statements, the Ministry is entitled to punitive damages.

113. On or about January 3, 2017, the Ministry suffered special damages in its exclusion from the AmazonSmile program as a result of SPLC's dissemination of the Hate Map and hate group-based materials and services. Additionally, the Ministry suffered the loss of donors due to these disseminations. The Ministry seeks compensatory damages for these injuries.

114. For the reasons stated above, the Ministry is entitled to damages for the special harms listed above and for damages irrespective of special harms because SPLC's publication of its Hate Map and dissemination of its hate group-based materials and services constitute libel per se. Additionally, the Ministry is entitled to punitive damages because SPLC published

the Hate Map and disseminated the hate group-based materials and services with knowledge that the matter published was false, or with reckless disregard of whether the matter was false or not.

WHEREFORE, Ministry respectfully prays for the relief against SPLC as set forth in its prayer for relief.

## COUNT II – VIOLATION OF 15 U.S.C. § 1125 OF THE LANHAM ACT
### (AGAINST SPLC)

115. The Ministry incorporates paragraphs 1 through 87, as if fully set out herein.

116. The Lanham Act, specifically 15 U.S.C. § 1125, provides, in relevant part:

(a) Civil action.

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C.S § 1125(a)(1)(B).

117. The name "D. JAMES KENNEDY MINISTRIES" is a registered trademark of Coral Ridge Ministries Media, Inc.

118. Specifically, the trademark "D. JAMES KENNEDY MINISTRIES" has been registered by Coral Ridge Ministries Media, Inc. under the following U.S. Patent and Trademark Office registrations: 4771968, 4798384, 4771967, 4771966, and 4771965.

119. SPLC published the trademarked name "D. James Kennedy Ministries" on its Hate Map, listing it as an Anti-LGBT hate group.

120. SPLC has thus published this hate group designation of the Ministry's registered trademark on SPLC's website, www.splcenter.org, in fundraising materials, and in its goods and services.

121. On information and belief, the Hate Map is a fundraising tool used by SPLC to raise money. SPLC integrates the Hate Map and hate group designations into its fundraising activities including its website, direct mail, email, and other fundraising materials. SPLC also integrates the Hate Map and hate group designations into its "investigative reports," training programs (used by U.S. law enforcement, including the F.B.I., Department of Defense, Department of Homeland Security, and private organizations), "key intelligence," and "expert" analysis. These goods and services are disseminated to third-parties. In at least some, if not all instances, a fee is paid for these goods and services.

122. SPLC has misrepresented the Ministry as a hate group.

123. The Ministry is not a hate group. Rather, the Ministry promotes and advances the Gospel of Jesus Christ, which Gospel promotes love for all people, including those who engage in hateful words and actions. Additionally, the Ministry does not engage in or advocate violence or crime against any group, which are commonly and legally understood characteristics of a hate group.

124. The Lanham Act, 15 U.S.C. § 1125(a)(1) provides that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name . . . or misleading description of fact, or false or misleading representation of fact, which . . . (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

connection, or association of such person with another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

125. Here, SPLC, in connection with its goods and services, used words, terms, names, misleading descriptions of fact, and false and misleading representations of fact, all of which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliations, connections, or associations of the Ministry through the use of the Ministry's registered trademark. This use of the Ministry's registered trademark  in combination with words, terms, names, misleading descriptions of fact and false or misleading representations of fact identifying the Ministry as a hate group is likely to cause the public and potential supporters of the Ministry to be confused, mistaken, or deceived into believing that the Ministry is a hate group or is affiliated with, connected with, and/or associated with hate groups, and that the Ministry's registered trademark represents a hate group or is affiliated with, connected with and/or is associated with hate groups as they are commonly and legally understood.

126. SPLC has publicly stated that its aim is to "completely destroy" the groups listed on the Hate Map, including the Ministry. While the law does not require the parties involved in a Lanham Act claim to be in direct competition with each other or to offer the same type of products, there can be no question that SPLC is in competition with the Ministry, as both groups are charitable organizations seeking donations, and SPLC seeks to destroy the Ministry through financial starvation by eliminating its donation sources.

127. The Ministry has the right to control the use of its trademark, "D. James Kennedy Ministries," and to object to SPLC's use of that trademark on SPLC's Hate Map and hate group-based materials and services.

128. The Ministry believes that it has been damaged by SPLC's use of its trademark, "D. James Kennedy Ministries," on SPLC's Hate Map and in SPLC's hate group-based materials and services. This use of the Ministry's trademark and the designation of the Ministry as a "hate group" has resulted in injury to the Ministry's commercial interest in its reputation and may impact the sale of the Ministry's goods and services and its donations.

129. Therefore, SPLC is liable in this civil action to the Ministry, pursuant to 15 U.S.C. § 1125 (a)(1)(A) of the Lanham Act.

130. The Lanham Act, 15 U.S.C. § 1125(a) (1) also provides that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name . . . or misleading description of fact, or false or misleading representation of fact, which . . . (B) in . . . advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of . . . another person's goods [or] services . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

131. The courts have held that statements provided in fundraising letters about the services of a nonprofit organization represent a promotion of those services. This type of promotion is within the scope of commercial advertising and promotion speech pursuant to 15 U.S.C. §1125(a)(1)(B).

132. On information and belief, SPLC has used the Hate Map, and therefore the Ministry's hate group designation, in its fundraising activities, which include SPLC's website, fundraising direct mail, fundraising emails, and other fundraising methods. Additionally, SPLC has integrated the Hate Map, and therefore the Ministry's hate group designation, into its goods and services, which SPLC advertises and promotes. Those goods and services include "investigative reports," training programs (used by U.S. law enforcement, including the

F.B.I., Department of Defense, Department of Homeland Security, and private organizations), "key intelligence," and "expert" analysis.

133. In connection with its fundraising and promotion of its goods and services, as described above, SPLC used and continues to use the Ministry's registered trademark, in combination with words, terms, names, misleading descriptions of fact, and false and misleading representations of fact. These actions have and continue to result in misrepresentations of the nature, characteristics, and quality of the goods and services of the Ministry, which operates under the federally registered trademark, "D. James Kennedy Ministries." This trademark has been registered with the U.S. Patent and Trademark Office, as documented by the registration numbers listed above.

134. SPLC misrepresented the goods and services of the Ministry in SPLC's fundraising and in its promotion of its goods and services by representing that the Ministry is a hate group, when – in reality – the Ministry promotes and advances the Gospel of Jesus Christ, which Gospel promotes love for all people, including those who engage in hateful words and actions. Additionally, the Ministry does not engage in or advocate crime or violence against others. Neither does the Ministry malign or attack others.

135. The goods and services of the Ministry are not the goods and services of a hate group.

136. The Ministry believes that it has been damaged by SPLC's misrepresentation of the Ministry's goods and services as being those of a hate group.

137. SPLC has publicly stated that its aim is to "completely destroy" the groups listed on the Hate Map, including the Ministry. While the law does not require the parties involved in a Lanham Act claim to be in direct competition with each other or to offer the same type of products, there can be no question that SPLC is in competition with the Ministry as both

groups are charitable organizations seeking donations, and SPLC seeks to destroy the Ministry through financial starvation by eliminating its donation sources.

138. The Ministry believes that it has been damaged by SPLC's use of its trademark, "D. James Kennedy Ministries," on SPLC's Hate Map and in its hate group-based materials and services. This use of the Ministry's trademark and the designation of the Ministry as a "hate group" has resulted in injury to the Ministry's commercial interest in its reputation, and may impact the sale of the Ministry's goods and services and its donations.

139. SPLC's purpose in placing the Ministry's trademark, "D. James Kennedy Ministries," on its Hate Map and in SPLC's hate group-based goods and services is to influence the relevant consumers to buy SPLC's goods and services, in advancement of SPLC's publicly stated goal of destroying the Ministry and the other organizations that SPLC has placed on its Hate Map.

140. SPLC uses the Hate Map and hate group-based designations to promote its goods and services, include "investigative reports," training programs (used by U.S. law enforcement, including the F.B.I., Department of Defense, Department of Homeland Security, and private organizations), "key intelligence," and "expert" analysis. Through promotion of the Hate Map and hate group designations, the groups listed on the Map become an object of scorn and disdain for SPLC's audience, which includes individuals and organizations interested in charitable giving. Through the use of the Hate Map and hate group designations, SPLC focuses attention on these groups to convince its audience that these groups must be destroyed. SPLC then markets its Hate Map-infused products to this audience for the purpose of further marginalizing and isolating the listed "hate groups,"

potentially leading to the destruction of the listed organizations, including the Ministry, which is SPLC's ultimate goal.

141.  The Hate Map and hate group designations are the very substance and content of many of SPLC's goods and services. Promotion of the Hate Map and hate group designations is the promotion of SPLC's goods and services and promotion of the purchase of those goods and services by consumers and organizations interested in charitable giving.

142. The relevant purchasing public for advertising or promotion for the purposes of this Lanham Act claim are those people and those organizations that engage in charitable giving to tax-exempt organizations. That is the base from which the Ministry obtains its financial support. There is no requirement that an individual be a Christian if a person desires to financially support the work of the Ministry.

143. SPLC itself claims that it "is the premier U.S. organization monitoring the activities of domestic hate groups and other extremists – including the Ku Klux Klan, white nationalists, the neo-Nazi movement, antigovernment militias, and others." (*See* https://www.splcenter.org/issues/hate-and-extremism.) On this basis, it is believed that SPLC's website receives an extremely large number of views and significant general media exposure. Therefore, the dissemination of the Hate Map, hate group designations, and SPLC's group designation containing goods and services is nothing short of vast. It is believed that tens of millions of people have seen SPLC's designation of the Ministry as a hate group and that there has been significant damage to the Ministry's commercial reputation.

144. On this basis, SPLC is liable in this civil action to the Ministry, pursuant to 15 U.S.C. § 1125 (a)(1)(B) of the Lanham Act.

145. The Lanham Act, specifically 15 U.S.C. § 1117(a), provides, in relevant part, that the Ministry is entitled to recover: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."

WHEREFORE, Ministry respectfully prays for the relief against SPLC, as set forth in its prayer for relief.

## COUNT III – VIOLATION OF TITLE II OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000a (AGAINST AMAZON.COM AND AMAZONSMILE)

146. The Ministry incorporates paragraphs 1 through 87, as if fully set out herein.

147. Amazon.com and AmazonSmile are hereinafter known as the "Amazon Defendants."

148. Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(a), provides:

> Equal access. All persons shall be entitled to the full and equal enjoyment of the goods, **services,** facilities, **privileges, advantages**, and accommodations of any place of **public accommodation**, as defined in this section, **without discrimination** or segregation **on the ground of** race, color, **religion**, or national origin.

> Title 42 U.S.C. § 2000a(a) (emphasis added).

149. Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(b), provides:

> Establishments affecting interstate commerce or supported in their activities by State action as places of public accommodation; lodgings; facilities principally **engaged in selling food for consumption on the premises**; gasoline stations; **places of exhibition or entertainment**; other covered establishments. Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title [42 USCS §§ 2000a-2000a-6] if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

> . . .

> (2) **any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such**

**facility located on the premises of any retail establishment**; or any gasoline station;

**(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment**; and

(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

Title 42 USCS § 2000a(b) (emphasis added).

150. On information and belief, the Amazon Defendants' business includes online video downloads/streaming, MP3 downloads/streaming, audiobook downloads/ streaming, as well as hardcopy book, DVD, and CD sales, some of which are available through Amazon's brick and mortar bookstores. Amazon Defendants are thus public accommodations as places of entertainment and exhibition that affect interstate commerce.

151. Amazon.com's recently acquired subsidiary, Whole Foods, sells food for consumption on its stores' premises, which premises are thus considered public accommodations as "restaurants, cafeterias, lunchrooms, lunch counters, soda fountains."

152. The Ministry was advised by AmazonSmile support that certain categories of organizations are not eligible to participate in AmazonSmile: "We rely on the Southern Poverty Law Center to determine which charities are in ineligible categories."

153. The Ministry was advised by AmazonSmile Support that SPLC's classification of the Ministry was the basis for the denial of the Ministry admission to the AmazonSmile program.

154. SPLC, in its "Hate Map," classified the Ministry as an Anti-LGBT hate group on the basis of the Ministry's position on "LGBT" (Lesbian Gay Bisexual Transgender) issues.

155.  The Ministry's position on LGBT issues is inextricably intertwined and connected to the

Ministry's religious theology, as shown by the following Bible verses:

> [22] **You shall not lie with a male as with a woman. It** *is* **an abomination.**

Leviticus 18:22 (emphasis added).

> [26] For this reason God gave them up to vile passions. For even **their women**
>
> **exchanged the natural use for what is against nature**. [27] **Likewise also**
>
> **the men, leaving the natural use of the woman, burned in their lust for**
>
> **one another, men with men committing what is shameful**, and receiving
>
> in themselves the penalty of their error which was due.

Romans 1:26-27 NKJV (emphasis added).

> [8] But we know that the law *is* good if one uses it lawfully, [9] knowing this:
>
> that the law is not made for a righteous person, but for *the* lawless and
>
> insubordinate, for *the* ungodly and for sinners, for *the* unholy and profane,
>
> for murderers of fathers and murderers of mothers, for manslayers, [10] **for**
>
> **fornicators, for sodomites**, for kidnappers, for liars, for perjurers, and if
>
> there is any other thing that is contrary to sound doctrine . . .

1 Timothy 1:8-11 NKJV (emphasis added).

> [6] But from the beginning of the creation **God made them male and female**.
>
> [7] For this cause shall **a man leave his father and mother,**
>
> **and cleave to his wife**;
>
> [8] And they twain shall be one flesh: so then they are no more twain,
>
>  but one flesh.

Mark 10:6-8 NKJV (emphasis added).

[9] Do you not know that the unrighteous will not inherit the kingdom of God? Do not be deceived. **Neither fornicators, nor idolaters, nor adulterers, nor homosexuals, nor sodomites**, [10] nor thieves, nor covetous, nor drunkards, nor revilers, nor extortioners will inherit the kingdom of God. [11] And such were some of you. But you were washed, but you were sanctified, but you were justified in the name of the Lord Jesus and by the Spirit of our God.

1 Corinthians 6:9-11 (emphasis added).

156. Because the Ministry's position on LGBT issues is inextricably intertwined and connected to the Ministry's religious theology, and because SPLC has declared the Ministry to be a hate group due to the Ministry's stand on LGBT issues, SPLC has discriminated against the Ministry and declared it to be a hate group on the basis of its religious theology and beliefs.

157. AmazonSmile support stated that the Amazon Defendants acted on and relied upon the information provided by SPLC (SPLC's decision to discriminate against the Ministry based on its religion) to deny the Ministry admission to the AmazonSmile program.

158. As a public accommodation, the Amazon Defendants are responsible for their decision to use SPLC's defamatory information as its alleged excuse for allowing it to violate the Ministry's rights pursuant to the Title II of the Civil Rights Act of 1964.

159. Title 42 U.S.C. § 2000a(a) provides that "All persons shall be entitled to the full and equal enjoyment of the . . . **services, … privileges, [and] advantages** . . .of any place of public accommodation . . . **without discrimination** . . . **on the ground of** . . . **religion**."

160. Because Amazon is an entity of public accommodation, the Amazon Defendants have violated 42 U.S.C. § 2000a(a) denying the Ministry the privileges and advantages of the AmazonSmile program on the basis of the Ministry's religion and the beliefs that are inherent to that religion.

161. Title 42 U.S.C. § 2000a-2 provides:

**No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive, any person of any right of privilege secured by** section 201 or 202 [**42 USCS §§ 2000a**, 2000a-1,] or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by section 201 or 202 [42 USCS §§ 2000a, 2000a-1], or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 201 or 202 [42 USCS §§ 2000a, 2000a-1].

Title 42 USCS § 2000a-2 (emphasis added).

162. Here, the Amazon Defendants have denied the Ministry's rights pursuant to 42 USCS §§ 2000a, which establishes a violation of 42 USCS § 2000a-2.

163. Title 42 U.S.C. § 2000a-3(a) provides:

**Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section** 203 [42 USCS **§ 2000a-2**], a civil action for preventive relief, including an **application for a permanent or temporary injunction, restraining order, or other order**, may be instituted by the person aggrieved . . .

Title 42 USCS § 2000a-3

164. Pursuant to 42 U.S.C. § 2000a-3(a), the Ministry is entitled to bring a civil action for preventive relief, including an application for permanent or temporary injunction, restraining order, etc.

165. Title 42 U.S.C. § 2000a-3(b) provides:

"Attorney's fees; liability of United States for costs**. In any action commenced pursuant to this title [42 USCS §§ 2000a-2000a-6]**, the court, in its discretion, may allow the prevailing party, other than the United States, **a reasonable attorney's fee as part of the costs**, and the United States shall be liable for costs the same as a private person.

166. Pursuant to 42 U.S.C. § 2000a-3(b), the Ministry is entitled to attorneys' fees.

WHEREFORE, Ministry respectfully prays for the relief against the Amazon Defendants, as set forth in its prayer for relief.

## COUNT IV – NEGLIGENCE
### (AGAINST AMAZON.COM AND AMAZONSMILE)

167. The Ministry incorporates paragraphs 1 through 87, as if fully set out herein.

168. In Alabama, the elements of negligence are:

(1) an obligation owed by the defendant to the plaintiff,

(2) a breach of the standard of care applicable to that obligation,

(3) causation, and

(4) damage.

*Hilliard v. Huntsville Elec. Util. Bd.*, 599 So.2d 1108, 1110 (Ala. 1992).

169. Title 42 U.S.C. § 2000a(a) provides that "All persons shall be entitled to the full and equal enjoyment of the . . . **services, … privileges, [and] advantages** . . .of any place of public accommodation . . . **without discrimination** . . . **on the ground of** . . . **religion**."

170. AmazonSmile is a service, privilege, and advantage of using Amazon.com's products and services.

171. The Amazon Defendants' businesses include online video downloads/streaming, MP3 downloads/streaming, audiobook downloads/ streaming, as well as hardcopy book, DVD, and CD sales, some of which are available through Amazon's brick and mortar bookstores. The Amazon Defendants are thus entities of public accommodation as places of entertainment and exhibition that affect interstate commerce.

172. Amazon.com's recently acquired subsidiary, Whole Foods, sells food for consumption on its stores' premises, which premises are thus considered an entity of public accommodations as "restaurants, cafeterias, lunchrooms, lunch counters, soda fountains."

173. Amazon.com and AmazonSmile have "an obligation owed by the defendant[s] to the plaintiff," in their public accommodation businesses, not to discriminate against the Ministry in determining its eligibility for the use of the services, privileges, and advantages of the AmazonSmile program on the grounds of religion, pursuant to Title 42 U.S.C. § 2000a(a).

174. SPLC designated the Ministry a hate group based on its religious beliefs regarding lesbian, gay, bisexual, and transgender ("LGBT") sexual conduct.

175. The Ministry's position on LGBT issues is inextricably intertwined and connected to the Ministry's religious theology, as shown by the following Bible verses:

> [22] **You shall not lie with a male as with a woman. It** *is* **an abomination.**

Leviticus 18:22 (emphasis added).

> [26] For this reason God gave them up to vile passions. For even **their women exchanged the natural use for what is against nature**. [27] **Likewise also the men, leaving the natural use of the woman, burned in their lust for one another, men with men committing what is shameful**, and receiving in themselves the penalty of their error which was due.

Romans 1:26-27 NKJV (emphasis added).

> [8] But we know that the law *is* good if one uses it lawfully, [9] knowing this: that the law is not made for a righteous person, but for *the* lawless and insubordinate, for *the* ungodly and for sinners, for *the* unholy and profane,

for murderers of fathers and murderers of mothers, for manslayers, **[10] for**

**fornicators, for sodomites**, for kidnappers, for liars, for perjurers, and if

there is any other thing that is contrary to sound doctrine . . .

1 Timothy 1:8-11 NKJV (emphasis added).

[6] But from the beginning of the creation **God made them male and female**.

[7] For this cause shall **a man leave his father and mother,**

**and cleave to his wife**;

[8] And they twain shall be one flesh: so then they are no more twain,

but one flesh.

Mark 10:6-8 NKJV (emphasis added).

[9] Do you not know that the unrighteous will not inherit the kingdom of God?

Do not be deceived. **Neither fornicators, nor idolaters, nor adulterers,**

**nor homosexuals, nor sodomites**, [10] nor thieves, nor covetous, nor

drunkards, nor revilers, nor extortioners will inherit the kingdom of God.

[11] And such were some of you. But you were washed, but you were

sanctified, but you were justified in the name of the Lord Jesus and by the

Spirit of our God.

1 Corinthians 6:9-11 (emphasis added).

176. Because the Ministry's position on LGBT issues is inextricably intertwined and connected

to the Ministry's religion, and because SPLC has declared the Ministry to be a hate group

because of the Ministry's stand on LGBT issues, SPLC has discriminated against the

Ministry and declared it to be a hate group on the basis of the Ministry's religion.

177. The Amazon Defendants without further review, study, or consideration adopted SPLC's hate group designation of the Ministry as their own and denied the Ministry admission to the AmazonSmile program on the basis of the Ministry's religion.

178. Because SPLC is a participant in the AmazonSmile program, it has an inherent conflict of interest in determining which other charities may be admitted to the program.

179. By using SPLC's hate group designation to deny the Ministry admission to the AmazonSmile program on the basis of its religion, Amazon.com and AmazonSmile "breach[ed] . . . the standard of care applicable to [the Amazon Defendants'] obligation" not to discriminate against the Ministry on the basis of its religion, pursuant to Title II of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000a(a).

180. It is no excuse for their discriminatory conduct against the Ministry that the Amazon Defendants negligently adopted SPLC's hate group designation of the Ministry without further consideration or review.

181. As a direct and proximate result of Amazon.com's and AmazonSmile's breach of their duty not to discriminate against the Ministry on the basis of its religion, the Amazon Defendants caused the Ministry damages.

182. Those damages include denial of access to the AmazonSmile program resulting in lost donations to the Ministry and loss of esteem in the eyes of the Ministry's donors, when over one million charities, schools, and nonprofit organizations are eligible to participate in the program.

WHEREFORE, Ministry respectfully prays for the relief against the Amazon Defendants, as set forth in its prayer for relief.

## PRAYER FOR RELIEF

**WHEREFORE,** Coral Ridge Ministries Media, Inc., d/b/a D. James Kennedy Ministries, respectfully prays that this Court grant relief as follows:

A. That this Court award D. James Kennedy Ministries special harms from SPLC for the Ministry's denial of access to the AmazonSmile program and for the Ministry's loss of donors due to SPLC's publication of its defamatory declaration that D. James Kennedy Ministries is a "hate group";

B. That this Court award the Ministry damages from SPLC, irrespective of special harms, on the basis that SPLC's publication of its "hate group" declaration regarding D. James Kennedy Ministries constitutes libel per se;

C. That the Ministry be awarded punitive damages from SPLC on the basis that SPLC published its "hate group" declaration regarding the Ministry with knowledge that the matter published was false, or with reckless disregard of whether the matter was false;

D. That this Court issue a permanent injunction enjoining SPLC, its officers, agents, servants, employees, and all other persons acting in concert or participation with SPLC from further dissemination of SPLC's defamatory declaration that D. James Kennedy Ministries is a "hate group" and that all references to the Ministry be removed from SPLC's Hate Map and from all hate group designation-based materials ;

E. That this Court declare that SPLC's publication of its defamatory claims that D. James Kennedy Ministries (a registered trademark of Coral Ridge Ministries Media, Inc.) is a "hate group" violates the Lanham Act, 15 U.S.C. § 1125(a) & (b);

F. That this Court award the Ministry, from SPLC, all damages available to the Plaintiff pursuant to 15 U.S.C. § 1117, including SPLC's profits derived from its declaration that the Ministry is

a "hate group," the damages suffered by the Ministry, and all costs of the action, including attorney's fees;

G.  That this Court issue a permanent injunction against the Amazon Defendants, enjoining them from excluding the Ministry from the AmazonSmile program on the basis of its religion;

H.  That this Court award attorneys' fees and costs to the Ministry from the Amazon Defendants pursuant to 42 U.S.C. § 2000a-3(b);

I.  That this Court award damages from the Amazon Defendants for negligence in discriminating against the Ministry on the basis of its religion, which resulted in lost donations and damage to the Ministry's reputation among AmazonSmile's customers; and

J.  That this Court award such other relief as this Court deems equitable and just.


## JURY DEMAND

183.  The Ministry hereby respectfully demands a trial by jury on all issues so triable.


DATED: October 18, 2017


Respectfully submitted,


/s/ David C. Gibbs III
David C. Gibbs III, Esq.
Fla. Bar No. 0992062
The National Center for
Life and Liberty, Inc.
2648 FM 407, Suite 240
Bartonville, TX 76226
Telephone: (727) 362-3700
Facsimile: (727) 398-3907
Email: dgibbs@gibbsfirm.com
(admitted *pro hac vice*)

Charles E. Hall Jr.
Ala. Bar No. HAL080
Attorney for Plaintiff
P.O. Box 7
Dadeville, AL 36853-0007
Telephone (256) 825-5900
Facsimile: (256) 825-2030
Email: chall.law@att.net

**ATTORNEYS FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 18th day of October 2017, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court for the Middle District of Alabama, which

will automatically serve upon all counsel of record a copy thereof.


<u>/s/ David C. Gibbs III</u>
Counsel for Plaintiff