**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **CORAL RIDGE MINISTRIES MEDIA, INC.** ) | |
| **d/b/a D. James Kennedy Ministries** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | **2:17-cv-566-MHT** |
| **AMAZON.COM, INC., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**SOUTHERN POVERTY LAW CENTER, INC.'S MOTION TO
DISMISS AMENDED COMPLAINT AND BRIEF IN SUPPORT THEREOF**</u>

COMES NOW the Southern Poverty Law Center, Inc. (the SPLC) and moves this Court to dismiss the Amended Complaint (Am. Compl.) (Doc. 40) in its entirety pursuant to Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim. The SPLC submits this brief in support of its Motion.

**I.     INTRODUCTION**

The SPLC is a nonprofit civil rights organization that, among other things, monitors various groups and publishes on its website a Hate Map and a list of groups it has designated as hate groups. Coral Ridge Ministries Media, Inc., (CRM Media) doing business as D. James Kennedy Ministries has sued the SPLC for common-law defamation (Count I) and for violation of the Lanham Act, specifically 15 U.S.C. § 1125(a) (Count II). The basis for both claims is the SPLC's designation of D. James Kennedy Ministries as an anti-LGBT hate group. LGBT is an acronym for lesbian, gay, bisexual, and transgender.

Specifically CRM Media alleges that:

The SPLC…has labeled the Ministry…with the following entry on SPLC's "Hate Map":

D. James Kennedy Ministries
(formerly Truth in Action)

Fort Lauderdale, Florida
ANTI-LGBT

Am. Compl. (Doc. 40) ¶ 56.

CRM Media alleges that "[t]he basis for SPLC's declaration that the Ministry is a hate group is that the Ministry espouses and supports biblical morals and principles concerning human sexuality and marriage." Am. Compl. (Doc. 40) ¶ 58. Even more specifically, CRM Media alleges that the designation is based on CRM Media's "beliefs regarding lesbian, gay, bisexual, and transgender ('LGBT') sexual conduct." Am. Compl. (Doc 40) ¶ 174. CRM Media's position is that LGBT persons' sexuality is, among other things "lawless," "vile," and "shameful" and that LGBT persons are ungodly sinners who "will not inherit the kingdom of God." Am. Compl. (Doc. 40) ¶¶ 155, 175. CRM Media opposes the "LGBT agenda" and espouses the position that LGBT persons' sexuality undermines the moral principles on which "this nation was founded and built." Am. Compl. (Doc. 40) ¶¶ 58 (characterizing its anti-LGBT position as biblical principles on which this nation was founded), 155 (setting out those principles), 175 (same).

The basis for the SPLC's hate-group designation is disclosed by the SPLC in its definition of a hate group on the Hate Map page of its website. Am. Compl. (Doc. 40) ¶ 59. As CRM Media acknowledges in its Amended Complaint, the SPLC defines hate groups on the Hate Map as those that "'have beliefs or practices that attack or malign an entire class of people, typically for immutable characteristics.'" Am. Compl. (Doc. 40) ¶ 59, 64.

The SPLC is entitled to dismissal of the defamation claim as a matter of law for at least three reasons: (1) Given that CRM Media's espoused beliefs, as acknowledged in the Amended Complaint, do malign LGBT people, CRM Media has not and cannot show actual malice as a matter of constitutional law, and it certainly has not pled it in a manner that satisfies the *Iqbal/Twombly* pleading standard as required by *Michel v. NYP Holdings,* 816 F.3d 686, 702 (11th

Cir. 2016); (2) the anti-LGBT designation is a constitutionally protected opinion because it cannot be proven false, *see Milkovich v. Lorain Journal Co.,* 479 U.S. 1, 21-22 (1990); and (3) the basis for the SPLC's opinion was disclosed (*i.e.*, that CRM Media is a group that has beliefs that malign an entire class of people) and is not defamatory, making the opinion itself not defamatory as a matter of common law.

CRM Media also alleges that the SPLC violated the Lanham Act, 15 U.S.C. § 1125(a), in connection with its designation of D. James Kennedy Ministries as an anti-LGBT hate group. CRM Media fails to state a Lanham Act claim. First, the First Amendment precludes this claim and no Lanham Act claim can be based on a statement of opinion. Second, the Lanham Act false association claim fails because the SPLC did not use the alleged trademark in any manner that would confuse the public as to the origins of the SPLC's goods and services as must be shown to prevail on a false-association claim. Third, even as described in the Amended Complaint, the designation is not commercial speech, which is required to maintain a Lanham-Act false advertising claim. In addition, CRM Media has not adequately pled the other false advertising elements. Finally, it has failed to adequately plead damages and so lacks standing.

## II.     DEFAMATION

### A.     CRM MEDIA HAS NOT ADEQUATELY PLED ACTUAL MALICE

#### 1.    Actual malice must be shown where public figures are involved.

Under First Amendment precedent, if a court determines that a plaintiff in a defamation action is "a public official, public figure, or limited-purpose public figure," then the plaintiff must establish by clear and convincing evidence "that the defamatory statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard to whether it was false or not." *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 333 (Ala. 2007) (citing *New York Times, Co. v. Sullivan*, 376 U.S. 254, 280 (1964)); *Curtis Publ'g Co. v. Butts*, 388 U.S.

130 (1967); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (some internal quotation marks omitted). A defendant acts with "reckless disregard" if, at the time of publication it "'entertained *serious doubts* as to the truth of [its] publication' or acted 'with a *high degree of awareness* of ... [its] probable falsity.'" *McFarlane v. Sheridan Square Press, Inc.,* 91 F.3d 1501, 1508 (D.C. Cir. 1996) (*quoting St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)).

The test is not an objective one and the beliefs or actions of a reasonable person are irrelevant. *St. Amant,* 390 U.S. at 731. Rather, courts ask whether the defendant, instead of acting in good faith, *actually* entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false. *Id.*; *Silvester v. Am. Broad. Cos. Inc.*, 839 F.2d 1491, 1493 (11th Cir. 1988). Under this standard, even "[t]he most repulsive speech enjoys immunity provided it falls short of" meeting the actual malice standard. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974) (internal quotation marks/citations omitted).

### 2. CRM Media is a public figure.

Determining whether an individual is a public figure – and thus subject to the actual malice standard – is a question of law for the court to decide. *See Brewer v. Memphis Pub. Co., Inc.*, 626 F.2d 1238, 1247 (5th Cir. 1980). A corporation can be a public figure for First Amendment purposes. *See, e.g.*, *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485 (1984) (applying actual malice standard to Bose Corporation's defamation claim). "Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures...." *Gertz*, 418 U.S. at 342.

In its response brief (Doc. 25) in opposition to the SPLC's initial Motion to Dismiss and Brief in Support Thereof (Doc. 15), CRM Media acknowledged that it is a public figure. Doc. 25

at 3. Thus, no further discussion should be necessary. In an abundance of caution, however, the

SPLC sets out the relevant arguments here in the margin.[1]

### 3. CRM Media has failed to allege facts "sufficient to give rise to a reasonable inference of actual malice." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

CRM Media has failed to adequately plead actual malice, and, as a result, its defamation

claim is due to be dismissed. Recently, in *Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir.

---

[1] In describing itself, CRM Media explains that the weekly television program of its founder, D. James Kennedy, was "syndicated on numerous … stations with a peak audience of three million viewers in 200 countries" and that Kennedy had a "daily radio program." Am. Compl. (Doc. 40) ¶ 32. CRM Media states that it is still broadcasting those programs. It further alleges that "'[t]he Corporation seeks to communicate the Gospel … and a biblically informed view of the world, using all available media, throughout all of the Earth….'" Am. Compl. (Doc. 40) ¶ 33 (quoting corporation bylaws). CRM Media likewise acknowledges that its mission is to "proclaim the good news of the Gospel throughout the Earth," and to "help believers understand America's Christian heritage…." Am. Compl. (Doc. 40) ¶ 34(a), (d). In fact, the entity is not only an international ministry by its own account but also a media corporation. Coral Ridge Ministries Media, Inc., is its name. Thus, CRM Media, is the ultimate seeker of "the public's attention." *See Gertz,* 418 U.S. at 323. Moreover, federal courts have held that a charity that "thrust itself into the public eye" through "massive solicitation efforts" is a public figure. *See Nat'l Foundation for Cancer Research v. Council of Better Business Bureaus, Inc.* 705 F.2d 98 101 (4th Cir. 198), *cert. denied,* 464 U.S. 830 (1983). *See* Am. Compl. (Doc. 40) ¶¶ 39-40 (fundraising fundamental to operations)

Even if CRM Media were not a public figure outright (it is) and had not conceded this point, it would be a limited public figure subject to the same actual malice standard for purposes of the anti-LGBT designation. Recently, the Federal District Court of the Southern District of Alabama, applying well-established case law, ruled, in connection with a nonprofit corporation, that "a group that has voluntarily injected itself into a public controversy" becomes a public figure for a "limited range of issues," *i.e.,* those issues about which it has injected itself into the public controversy. *See Southbark, Inc. v. Mobile Cty. Comm'n,* 974 F.Supp. 2d 1372, 1382 (S.D. Ala. 2013).

For many years, there has existed a "public controversy" surrounding LGBT rights. CRM Media has further acknowledged that, as part of its religious teachings, it characterizes any sexuality other than heterosexuality as sinful and an abomination. *See* Am. Compl. (Doc. 40) ¶¶ 155, 175. CRM Media takes the position that "[t]he basis for SPLC's declaration that the Ministry is a hate group is that the Ministry espouses and supports Biblical morals and principles concerning human sexuality." Am. Compl. (Doc. 40) ¶ 58. And clearly it is communicating those views to the world. *See e.g.* Am. Compl. (Doc. 40) ¶ 1. Thus, CRM Media has voluntarily injected itself into the public controversy over LGBT rights, and is, at the very least, a limited public figure for that purpose.

Whether a public figure or limited public figure, CRM Media must prove that it can provide clear and convincing evidence of actual malice (knowledge of falsity or probable falsity) to prevail. *Gertz,* 418 U.S. at 342. It cannot do so.

2016), the Eleventh Circuit held that allegations of actual malice must meet the *Iqbal/Twombly* pleading requirements in defamation lawsuits involving public figures. Pursuant to the *Iqbal/Twombly* pleading requirements, to survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The Eleventh Circuit in the *Michel* case stated:

> [A]fter *Iqbal* and *Twombly,* every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice. *See Biro v. Conde Nast,* 807 F.3d 541, 544–45 (2d Cir. 2015); *McDonald v. Wise,* 769 F.3d 1202, 1220 (10th Cir.2014); *Pippen v. NBCUniversal Media, LLC,* 734 F.3d 610, 614 (7th Cir.2013); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,* 674 F.3d 369, 377 (4th Cir.2012); *Schatz v. Republican State Leadership Comm.,* 669 F.3d 50, 58 (1st Cir.2012). Joining that chorus, we hold that the plausibility pleading standard applies to the actual malice standard in defamation proceedings.

> Moreover, application of the plausibility pleading standard makes particular sense when examining public figure defamation suits. In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the "breathing space" needed to ensure robust reporting on public figures and events. *Sullivan,* 376 U.S. at 271–72, 84 S.Ct. 710. Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. *The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether.* Thus, a public figure bringing a defamation suit must plausibly plead actual malice in accordance with the requirements set forth in *Iqbal* and *Twombly.*

*Michel*, 816 F.3d at 702 (emphasis added). The reasoning set out in *Michel* applies equally here.

CRM Media alleges that the SPLC acted with actual malice because "[t]he Ministry is not a hate group. Rather, the Ministry promotes and advances the Gospel of Jesus Christ, which

promotes love of all people…" Am. Compl. (Doc. 40) ¶ 91. The same position is repeated elsewhere. *See* Am. Compl. (Doc. 40) ¶¶ 49, 62, 91, 123. "While the ministry opposes homosexual conduct, the Ministry has nothing but love for people who engage in homosexual conduct." Am. Compl. (Doc. 40) ¶ 61.

In other words, CRM Media seems to allege that the SPLC got the anti-LGBT hate group designation wrong – and that the SPLC knew that it got the designation wrong (actual malice) – because CRM Media promotes love rather than hate. Such an argument as a basis for constitutional actual malice does not remotely meet the pleading requirements of *Iqbal* or *Twombly*. As the Supreme Court stated in *Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 692 n.37 (1989), "[D]enials, however vehement…are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." 491 U.S. at 692 n.37 (internal quotation marks/citations omitted).

Moreover, CRM Media cannot overcome the fact that "[t]he actual malice standard is *subjective;* the plaintiff must prove that the defendant *actually* entertained a serious doubt." *Smith v. Huntsville Times Co., Inc.*, 888 So. 2d 492, 499-500 (Ala. 2004) (emphasis supplied). And this must be done with clear and convincing evidence. *See, e.g., Cottrell,* 975 So.2d at 333 (citing *Sullivan,* 376 U.S. 254, 780). CRM Media cannot do so here as evidenced by the allegations in the Amended Complaint.

CRM Media acknowledges that the SPLC has declared it to be a hate group due to the Ministry's stand on LGBT issues. Am. Compl. (Doc. 40). Paragraphs 155 and 175 of the Amended Complaint state: "The Ministry's position on LGBT issues is inextricably intertwined and connected to the Ministry's religious theology, as shown by the following Bible verses." The quoted verses equate "sodomites" with "the ungodly" and "sinners" and "the unrighteous." Am.

Compl. (Doc. 40) ¶¶ 155 & 175. The verses quoted speak of "vile passions," which, read in context, is intended to mean any sexuality other than heterosexuality. *Id.* Another quoted verse equates sex between men as "men committing what is shameful, and receiving the penalty of their error which was due." *Id.* The section of quoted verses in Paragraph 175 begins by calling it an "abomination" for a man to "lie with a man as with a woman." Finally, the quoted verses state that neither "homosexuals, nor sodomites … will inherit the kingdom of God." *Id.*

CRM Media clearly reads the verses it quotes in the Amended Complaint as central to its teachings and as condemning the sexuality of LGBT people. *See, e.g., id.* ¶¶ 156, 176. CRM Media acknowledges that the SPLC has declared the Ministry to be a hate group due to the Ministry's stand on LGBT issues. *Id.* ¶¶ 156, 176. CRM Media takes the position that "the biblical morals and principles concerning human sexuality and marriage" which it espouses are the "principles upon which this Nation was founded and built." *Id.* ¶ 58. And CRM Media views its mission as "proclaim[ing] the Gospel upon which this Nation was founded, *id.* ¶ 35. Thus, CRM Media's "opposition to same-sex marriage and the homosexual agenda," *id.* ¶ 82, is at the core of its purpose as an organization.

Assuming, as alleged in the Amended Complaint, that CRM Media's acknowledged positions were the only thing on which the SPLC based its anti-LGBT-hate-group designation[2], the SPLC could not be said to have acted with knowledge that its designation was false or with

_____

[2]For the record, CRM Media is incorrect that the anti-LGBT hate group designation is based solely on its interpretation of the Bible. Rather, the SPLC made its determination based on a wide range of publicly available information in which D. James Kennedy Ministries promoted falsehoods about the LGBT community, which further support the SPLC's opinion that the Ministries' beliefs and practices attack and malign an entire group of people. While the SPLC is entitled to prevail on the defamation claim on First Amendment grounds at this motion-to-dismiss stage based on the allegations made within the four corners of this Complaint, it is worth noting that the SPLC did not list D. James Kennedy Ministries as an anti-LGBT hate group merely because of its espoused religious views in a vacuum.

knowledge of probable falsity. *See Cottrell*, 975 So. 2d at 333. CRM Media's espoused beliefs do malign, or, at the least very much appear to malign, an entire group of people.

### 4. CRM Media's new allegation that the term hate group has a definition recognized by law that differs from the SPLC's published definition also fails as a plausible allegation of actual malice.

CRM Media alleges in its Amended Complaint for the first time that the SPLC acted with actual malice because the "SPLC's definition of 'hate group' is so far outside of how hate groups are legally and culturally understood that SPLC's definition is simply and patently false…." Am. Compl. (Doc. 40) ¶ 67. As discussed earlier, the SPLC's definition of a hate group is "a group that 'has beliefs or practices that attack or malign an entire class of people, typically for immutable characteristics.'" *Id.* ¶ 59, 64 (quoting the SPLC website).

CRM Media alleges that the term hate group is legally defined as one whose activities include violence and crime. *Id.* ¶ 65. It alleges that the SPLC must have known that the anti-LGBT-hate-group designation was wrong because CRM Media has never engaged in violence or crime. *See id.* ¶¶ 67-69.

While not directly attributing its alleged legal definition of hate group as a quote from any specific case or source, CRM Media cites no less than four legal opinions for the proposition that the term hate group is defined by law as a group whose activities include violence and crime. None of the four cases cited remotely supports the proposition that the term has such a legal definition.

Of the four opinions cited, only two even mention the term hate group. None of the opinions attempts to define such a term or anything close to it. *Virginia v. Black*, 538 U.S. 343, 352-357 (2003), and *Capital Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 770 (1995), the two United States Supreme Court cases cited not only fail to define a hate group, *they do not even use the term.*

In one of the two lower court opinions that actually mentions the term hate group, it is used in a letter written by the plaintiff. *See Doe v. Pittsylvania Cnty.,* 844 F.Supp. 2d 724, 740 (W.D. Va. 2012). The letter merely refers to the KKK as a hate group but neither the letter nor the court makes any attempt to define the term. In the only other opinion that mentions the term, it is used in a prison regulation quoted in a footnote. *See Powers v. Clark*, No. 3:11CV763-HEH, 2014 WL 6982475, *3 n.10 (E.D. Va. Dec. 9, 2014). The prison regulation does not define the term and the unreported opinion does not discuss what a hate group is. In short, CRM Media has failed to cite any support for its legal definition of hate group.

In its response to the SPLC's first motion to dismiss (Doc. 25), CRM Media referred to the Anti-Defamation League's definition of a hate group. That definition is contrary to CRM Media's position here. It is "'an organization whose goals and activities are primarily or substantially based on a shared antipathy towards people of one or more other different races, religions, ethnicities/nationalities/national origins, genders, and/or sexual identities …. The group itself must have some hate-based orientation/purpose.'" Doc. 25 at 4 (referring to "Hate Group, Anti-Defamation League, https://www.adl.org/education/resources/glossary-terms/hate-group).

While that definition is arguably slightly different from the SPLC's, no law says that any one organization has a monopoly on the definition of the term, particularly as it is a term used in the political arena. More importantly, the Anti-Defamation League does not define a hate group as one whose activities include "violence and crime," which CRM Media insists is a requirement. Those words are not even mentioned in the Anti-Defamation League's definition.

Next, CRM Media alleges that the "American public also understands that the definition of a hate group includes those groups that engage in violence and crime." Am. Compl. (Doc. 40)

¶ 66. Yet CRM Media cites no basis for this assertion, and its earlier use of the Anti-Defamation League's definition undermines that position entirely.

In short, CRM Media has not and cannot plausibly allege, as required by *Twombly* and *Iqbal,* that there is a legal, or even a common, established definition of hate group or that the SPLC is somehow barred from defining the term. In conclusion, CRM Media has failed to show that the SPLC acted with actual malice merely because its definition of a hate group differs from CRM Media's.

### 5. CRM Media does satisfy the SPLC's definition of a hate group.

Next CRM Media seems to allege that it can show actual malice because it does not satisfy the SPLC's definition of a hate group. Specifically, CRM Media alleges that it "has never attacked or maligned anyone on the basis of engaging in homosexual conduct." Am. Compl. (Doc. 40) ¶ 93. But the SPLC's definition of a hate group is a group that has "beliefs that attack or malign an entire class of people." *Id.* ¶¶ 59, 64. As explained earlier, CRM Media has acknowledged beliefs that do malign LGBT people.

CRM Media's only real response to this point in its opposition to the SPLC's initial motion to dismiss (Doc. 25) was that it has not maligned LGBT people because it speaks in "Biblical truth[s]" and because its position is "the accepted cultural understanding of homosexual behavior for millennia." Doc. 25 at 6. The First Amendment exists in large part so that speakers on matters of public concern may challenge even those positions some groups consider religious truths and positions that may have existed as beliefs for millennia. *See, e.g., Terminiello v. City of Chicago,* 337 U.S. 1, 4 (1949) ("[Free speech] may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.").

CRM Media also cites *Obergefell v. Hodges,* 135 S. Ct. 2584 (2015), for the proposition that CRM Media's position on LGBT people are "many of the same positions that the U.S. Supreme Court has labeled 'decent and honorable.'" Am. Compl. (Doc. 40) ¶ 82. However, the sentences that follow the "decent and honorable" language in *Obergefell* make it clear that these "decent and honorable" beliefs nonetheless result in the demeaning of an entire group of people:

> But when the sincere, personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion *that soon demeans or stigmatizes* those whose own liberty is then denied. Under the Constitution, same-sex couples seek in marriage the same legal treatment as opposite-sex couples, and it would disparage their choices and *diminish their personhood* to deny them this right.

*Obergefell,* 135 S. Ct. at 2602 (emphasis added). One can certainly then conclude that beliefs such as those expressed by CRM Media also malign LGBT people.

In conclusion, First Amendment principles require dismissal of the defamation count for failure by CRM Media to plead facts "sufficient to give rise to a reasonable inference of actual malice." *Michel,* 816 F.3d at 702.

**B. THE ANTI-LGBT DESIGNATION IS NOT DEFAMATORY AS A MATTER OF LAW BECAUSE IT IS AN OPINION PROTECTED BY THE FIRST AMENDMENT.**

**1. Opinions, such as the one at issue in this case, are protected by the First Amendment from being sanctioned as defamation.**

Pursuant to the First Amendment, an opinion such as the one at issue here cannot be the basis for a defamation claim. "The immunity granted to opinions reflects, in part, the First Amendment principle that there can be no false ideas. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-340 (1974)." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 695 (11th Cir. 2016). The protection afforded to ideas, i.e., opinions, is strong:

> "At the heart of the First Amendment is the recognition of the fundamental importance of free flow of ideas and opinions on matters of public interest and

concern. '[T]he freedom to speak one's mind is not only an aspect of individual liberty – and thus a good unto itself – but also is essential to the common quest for truth and the vitality of society as a whole.' *Bose Corp. v. Consumer Union of United States, Inc.*, 466 U.S. 485, 503-504 (1984). We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions…."

*Finebaum v. Coulter*, 854 So. 2d 1120, 1126 (Ala. 2003) (some internal citations omitted).

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21-22 (1990), the United States Supreme Court qualified what may be deemed an opinion subject to First Amendment protection. The Court ruled that an opinion may be actionable as defamation only when the assertion "is sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 479 U.S. at 21-22. In that case, the challenged assertion was that the speaker believed the plaintiff had lied under oath, *i.e.*, committed perjury. The Court concluded that such an assertion could be tested for its veracity in, for example, a perjury action. *Id*. The Court contrasted the "objectively verifiable perjury allegation with a 'subjective assertion.'" *Id*. "Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Id*. at 21-22.

In contrast to an allegation of perjury, the allegedly defamatory statement here, that D. James Kennedy Ministries is an anti-LGBT hate group, in the words of the *Milkovich* Court, "is not sufficiently factual to be susceptible of being proved true or false." *Id.* at 21. Unlike perjury, there is no method by which one could prove that D. James Kennedy Ministries, as a factual matter, is *not* an anti-LGBT hate group. Unlike the allegation of perjury made in *Milkovich*, there are no legally established elements that define what is or is not a hate group. As explained in detail in the early sections of this brief, CRM Media's argument that there is a fixed legal definition of a hate group is wholly without merit.

In short, the hate group designation at issue here is the SPLC's constitutionally protected subjective opinion that D. James Kennedy Ministries' espoused beliefs malign LGBT people.

The subjective nature of the SPLC's designation necessitates constitutional protection because it simply cannot, as an objective matter, be disproven. The SPLC's opinion as to the definition of a hate group is also constitutionally protected.

### 2. The context of the designation indicates it is an opinion.

Some Eleventh Circuit cases suggest that, in determining whether something is defamatory, the Court must "consider the circumstances in which the statements were expressed." *Bennett v. Hendrix*, 325 Fed. App'x 727, 739 (11th Cir. 2009). However, that language appears to relate to whether a statement was non-actionable rhetorical hyperbole; context should not be a factor where the opinion does not state a fact which can be disproven. *See* discussion *supra* (as to constitutionally protected opinions). However, to the extent that the Eleventh Circuit might require an examination of the context here, such an examination, even limited to the allegations in the Amended Complaint, indicates that the anti-LGBT designation is a constitutionally protected opinion.

It is clear that CRM Media's position was espoused, and the anti-LGBT designation made, within a politically and religiously charged national debate regarding human sexuality. In that context, one can expect that each side of the debate is expressing its opinion on these highly controversial matters. "'In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor.'" *Sanders*, 776 So. 2d 67, 74 (Ala. 2000) (*quoting New York Times v. Sullivan*). Those sharp differences in political discourse are constitutionally protected viewpoints, *i.e.*, constitutionally protected opinions. Thus, the context in which the allegedly defamatory statement here was made necessitates the conclusion that the hate group designation is quintessentially a constitutionally protected opinion and that the motion to dismiss is due to be granted.

### 3. CRM Media's attempt to characterize the SPLC designation as "fact" lacks legal support.

CRM Media attempts to characterize the anti-LGBT hate group designation as fact for purposes of its defamation claim by alleging that the "SPLC's determinations are designed to be treated as fact and business decisions are made based on those determinations without further evaluation or consideration." Am. Compl. (Doc. 40) ¶ 84; *see also* ¶ 76 ("not intended to merely be SPLC's opinion, but rather, is intended to be perceived as factual information"). This self-serving characterization does not convert the SPLC's anti-LGBT hate group designation into a fact that is provably false, as required by *Milkovich*. There is no case law of which the undersigned is aware that suggests that an opinion becomes provably false merely because another entity takes some action based on that opinion. In effect, CRM Media is attempting to convert the damages prong of defamation analysis into its definition of defamation itself, *i.e.*, it is defamation if someone acts on the non-defamatory statement. That is not the law. Nor would it be consistent with First Amendment principles.

### C. BECAUSE THE SPLC HAS DISCLOSED THE BASIS FOR ITS OPINION AND THE DISCLOSED BASIS IS NEITHER FALSE NOR DEFAMATORY, CRM MEDIA CANNOT PREVAIL AS A MATTER OF COMMON LAW.

Separate and apart from the requirements of the First Amendment, the Amended Complaint does not state a viable defamation claim under common law. "A simple expression of opinion based on disclosed non-defamatory facts is not itself sufficient for an action of defamation no matter how unjustified the opinion may be or how derogatory it is." Restatement (Second) of Torts § 566 (1977).

The SPLC here disclosed the basis for its hate group designation on its website on the Hate Map itself: "All hate groups have beliefs or practices that attack or malign an entire class of

people, typically for their immutable characteristics." Am. Compl. (Doc. 40) ¶¶ 59, 64 (showing that the definition of hate group located on "hate map" page of website).

While CRM Media denies that it has beliefs that malign LGBT people, as explained previously, that denial is thoroughly contradicted by CRM Media's espoused and widely disseminated positions on LGBT people. *See id*. ¶¶ 155, 175 (describing LGBT people and their sexuality as "shameful," "vile," an "abomination," and "lawless") and discussion *supra* at II.A.3. Therefore, pursuant to Section 566 of the Restatement (Second) of Torts, because the underlying basis for the hate group opinion was disclosed and is itself not defamatory or is, in fact, true, CRM Media cannot prevail in its defamation claim.

### D.    CONCLUSION

The defamation count against the SPLC is due to be dismissed because: (a) the Plaintiff failed to allege actual malice sufficient to survive a *Twombly/Iqbal* challenge; (b) because the alleged defamatory statement is an opinion rather than a statement that implies any provably false fact, and; (c) because the SPLC disclosed the basis for its opinion and it is neither false nor defamatory.

## III.   LANHAM ACT

### A.    Introduction

CRM Media's Lanham claim is a thinly veiled attempt to avoid the First Amendment protections afforded the SPLC in the defamation context. The Supreme Court, however, has made it clear that First Amendment principles may not be evaded merely by pleading a claim other than defamation based on the same facts. *See, e.g., Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56 (1988) (applying actual malice standard to intentional infliction of emotional distress claim). The Lanham Act congressional history also shows that its drafters intended to preserve First

Amendment protections. *See, e.g.,* Cong. Rec. H1216-17 (daily ed. April 13, 1989) (Lanham Act not intended to limit political speech). Thus, the Plaintiff's Lanham Act claim should be barred on the same First Amendment grounds that bar its defamation claim.

In addition, even in a commercial speech context (which this is not—see discussion *infra*), general statements of opinion "cannot form the basis of Lanham Act liability." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 496 (5th Cir. 2000) (*quoted in Osmose, Inc. v. Viance, LLC,* 612 F.3d 1298 (11th Cir. 2010)). To be a statement of fact, for purposes of the Lanham Act, the statement must be capable of being proven false. *See General Cigar Holdings, Inc. v. Altadis, S.A.,* 205 F. Supp. 2d 1335, 1356-57 (S.D. Fla. 2002). This, of course, cannot be done in connection with the hate group designation, as discussed previously.

Even if the actual malice standard and the fact that the statement at issue is an opinion did not bar the Lanham Act claim, Coral Ridge's claim would fail because CRM Media has failed to allege plausible facts in support of elements required to show either a Lanham Act false advertising or false association claim.

## B. CRM MEDIA HAS NOT STATED A FALSE ADVERTISING CLAIM

### 1. The speech at issue is not commercial advertising or promotion.

The Lanham Act at 15 U.S.C. § 1125 (a)(1)(B) prohibits false advertising in connection with "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). The Eleventh Circuit defines "commercial advertising or promotion" for Lanham Act purposes as encompassing four elements:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) the representations ... must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

*Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (internal quotation marks and brackets omitted). The first element, "commercial speech," is a threshold requirement for liability under the Lanham Act false advertising claim. *See Porous Media Corp. v. Pall Corp.,* 173 F.3d 1109, 1120 (8th Cir. 1999).

The concept of commercial speech under the Lanham Act mirrors the commercial speech doctrine under the First Amendment. *See Proctor & Gamble Co. v. Haugen,* 222 F.3d 1262, 1274 (10th Cir. 2000); *see also Osmose, Inc. v. Viance, LLC,* 612 F.3d 1298, 1323 (11th Cir. 2010). The "core notion" of commercial speech encompasses "speech that proposes a commercial transaction." *Edward Lewis Tobinick, MD v. Novella,* 848 F.3d 935, 950 (11th Cir. 2017). "In fact, commercial speech is 'expression related solely to the economic interests of the speaker and its audience.' *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)." *Edward Lewis Tobinick, MD,* 848 F.3d at 950; *see also* Cong. Rec. H1216-17 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier) ("Under this proposed change *only* false or misleading 'advertising or promotion' would be actionable" and indicating that other representations would implicate First Amendment concerns; noting that "section 43(a) should not be read in any way to limit political speech, consumer or editorial comment ….").

CRM Media alleges repeatedly that the SPLC uses the Hate Map as a fundraising tool. Presumably this is a platform from which to argue that the speech at issue constitutes commercial speech for purposes of the Lanham Act. Notwithstanding this allegation, CRM Media has not plausibly alleged (nor can it) that the speech at issue is commercial speech for Lanham Act purposes.

First, the fact that the SPLC conducts fundraising on the website that lists D. James Kennedy Ministries as an anti-LGBT Hate Group does not render the SPLC's speech "commercial speech." The Eleventh Circuit has made it perfectly clear that statements made on websites or in articles, even if people might make contributions or purchases as a result of the content of those articles, are not commercial speech.

> Furthermore, as our sister circuits have recognized, magazines and newspapers often have commercial purposes, but those purposes do not convert the individual articles within these editorial sources into commercial speech subject to Lanham Act liability. *See Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013) (holding that a satirical article about a book in a magazine's online blog was not commercial speech subject to Lanham Act liability even though "writers write and publishers publish ... for commercial purposes"); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir. 2001) ("A printed article meant to draw attention to the for-profit magazine in which it appears, however, does not fall outside of the protection of the First Amendment because it may help to sell copies."). We agree. Even if Dr. Novella receives some profit for his quasi-journalistic endeavors as a scientific skeptic, the articles themselves, which never propose a commercial transaction, are not commercial speech simply because extraneous advertisements and links for memberships may generate revenue. *See Va. State Bd. of Pharmacy*, 425 U.S. at 761, 96 S.Ct. 1817 ("Speech ... is protected ... even though it may involve a solicitation to purchase or otherwise pay or contribute money."); *see also Burstyn v. Wilson*, 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."). Thus, because the articles are not commercial speech, they cannot be subject to Lanham Act liability as commercial advertising or promotion. Accordingly, we need not reach the other elements of a prima facie Lanham Act false advertising action.

*Edward Lewis Tobinick, MD*, 848 F.3d at 952. Thus, the fact that the website content might generate revenue cannot make the Hate Map or the anti-LGBT designation commercial speech.

Second, even if CRM Media has plausibly alleged that the Hate Map was used in fundraising solicitations, such a use does not render the Hate Map, much less the anti-LGBT designation, commercial speech. The United States Supreme Court has on more than one occasion held that the contents of charitable fundraising solicitations are *not* to be treated as commercial speech, and any limitations thereon are therefore subject to strict scrutiny. *See*

*Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, at 967, and n.16, 104 S.Ct. 2839, 2852-63, and n. 16, 81 L.Ed.2d 786 (1984) (applying strict scrutiny to a statute limiting the amount of money a charity could spend on fundraising because it would amount to "a direct restriction on protected First Amendment activity."); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 789, 108 S. Ct. 2667, 2673, 101 L. Ed. 2d 669 (1988) (rejecting restrictions on charitable fundraising; "Our prior cases teach that the solicitation of charitable contributions is protected speech").

The Supreme Court has held that, notwithstanding the economic interests involved, charitable fundraising solicitations are inextricably intertwined with non-commercial, fully-protected content:

> This is the teaching of *Schaumburg* and *Munson,* in which we refused to separate the component parts of charitable solicitations from the fully protected whole. Regulation of a solicitation "must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech ..., and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Schaumburg, supra,* 444 U.S., at 632, 100 S.Ct., at 834, quoted in *Munson,* 467 U.S., at 959–960, 104 S.Ct., at 2848. See also *Meyer v. Grant,* 486 U.S. 414, 422, n. 5, 108 S.Ct. 1886, ——, n. 5, 100 L.Ed.2d 425 (1988); *Thomas v. Collins,* 323 U.S., at 540–541. Thus, where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression.

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796, 108 S. Ct. 2667, 2677, 101 L. Ed. 2d 669 (1988).

While these cases were not defamation or Lanham Act cases (they involved legislative restrictions on nonprofit fundraising) the same reasoning necessarily applies here. Any alleged fundraising solicitations that mentioned the Hate Map would have involved the "flow of…information and advocacy" and the "informative and…persuasive speech" that is fully

protected under *Riley, supra.* Indeed, in *Riley,* and its progeny there was no explicit review of actual fundraising materials. It was the inherent nature of such materials upon which the Court based its holding.

Second, the SPLC anticipates that CRM Media will assert that, merely because the speech of a non-profit has been commercial speech or subject to the Lanham Act's limitations in some situations, the speech at issue in this case should be considered commercial speech. CRM Media cited two cases in its brief in opposition to the SPLC's initial motion to dismiss (Doc. 25) for the proposition that a nonprofit's speech can be commercial, *Gordon & Breach Sci. Publishers S.A., v. American Institute of Physics,* 859 F. Supp. 1521 (S.D.N.Y. 1994), *holding modified by Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48 (2d Cir. 2002) and *Birthright v. Birthright,* 827 F.Supp. 1114 (D.N.J. 1993). Specifically, CRM Media argued in its opposition to the initial motion to dismiss (Doc. 25) that these cases bring "fundraising activities" by a nonprofit within the scope of the Lanham Act's false advertising provision, 15 U.S.C. Sec. 1125(a)(1)(B). Neither of these district court cases is binding on this circuit's courts, and neither stand for the proposition that the persuasive and informative content of fundraising materials may be considered commercial speech.

*Birthright v. Birthright, Inc.* involved a pregnancy counseling services nonprofit that split. The New Jersey District Court did not hold that the persuasive or informative content of the fundraising solicitation at issue there could itself serve as the basis of a Lanham Act claim. Rather, the Court took issue with the fact that the faction that split away was still using the trademarked name of the original organization and thus potentially confusing consumers as to the identity of the organization that would receive their donations. *See* 827 F.Supp. at 1138. That holding has no relevance here.

CRM Media cited the second case, *Gordon & Breach Sci. Publishers S.A.* (*Gordon & Breach*), for the proposition that non-profits can violate the Lanham Act. It is also not on point. In that case, a non-profit science publishing house was accused of false advertising in connection with academic articles that compared its publications with those of for-profit publishers. The opinion, though neither binding nor analogous in its application of the Lanham Act to the nonprofit, is nonetheless helpful in its review of the case law.

The District Court pointed out, for instance, that political speech otherwise protected by the First Amendment falls outside the Lanham Act's protection:

> Congress, in extending the Lanham Act to product disparagement, made clear that this extension should not be interpreted so as to infringe on free speech protected by the First Amendment. As Rep. Kastenmeier explained:
>
>> Under this proposed change *only* false or misleading "advertising or promotion" would be actionable, whether it pertained to the advertiser itself or another party. The change would exclude all other misrepresentations from section 43(a) coverage. These others are *the type which raise free speech concerns, such as a Consumer Report* which reviews and may disparage the quality of ... products, [and] misrepresentations made by interested groups which may arguably disparage a company and its products.... All of these would be judged by first amendment law ... and not section 43(a) law....
>>
>> [T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material.... The section is narrowly drafted to encompass only clearly false and misleading commercial speech.
>
> 135 Cong.Rec. H1216–17 (daily ed. April 13, 1989) (emphasis added). *See also* 134 Cong.Rec. 31,851 (Oct. 19, 1988) (statement of Rep. Kastenmeier) (reach of Section 43(a) "specifically *extends only to false and misleading speech that is encompassed within the 'commercial speech' doctrine* developed by the United States Supreme Court") (emphasis added).

These passages have been repeatedly cited by courts within this circuit in interpreting the meaning of "commercial advertising or promotion" in Section 43(a). *See EventMedia Int'l, Inc. v. Time Inc. Magazine Co.,* 1992 WL 321629, at *3, 1992 U.S. Dist. LEXIS 16385, at *8 (S.D.N.Y.1992)…

*Gordon & Breach*, 859 F. Supp. At 1533–34 (italicized emphasis in original). Clearly the SPLC's designation at issue here is political speech as well as a statement "made by [an] interested group[s]" which, even if it "arguably disparage[s]" CRM Media, must be judged by First Amendment law.

The *Gordon & Breach* Court also reiterated that the content of a fundraising letter disseminated by a nonprofit is protected speech. The opinion discussed *Riley, supra*. As the *Gordon & Breach* court explained, the *Riley* Court concluded that charitable fundraising appeals were fully protected speech unlike the speech in *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66-7 (1983), a for-profit advertisement that included some informative content but which was nevertheless deemed commercial speech by the Supreme Court.

As the *Gordon & Breach* Court held in the context of its Lanham Act analysis:

> Non-profit organizations must be free to participate fully in the marketplace of ideas without fear of sanctions, even if such participation redounds to their financial benefit. To hold otherwise would be to squelch the expression of facts and opinions which might not otherwise find ready expression through commercial media. *See Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 833 (protecting charitable solicitation because "without solicitation the flow of ... information and advocacy [on particular causes and views] would likely cease"); *Munson,* 467 U.S. at 959–60, 104 S.Ct. at 2848–49 (same); *New York Times,* 376 U.S. at 266, 84 S.Ct. at 718 (extending full First Amendment protection to non-profit group's "editorial advertisement" as means of securing "the widest possible dissemination of information from diverse and antagonistic sources").

*Gordon & Breach Sci. Publishers S.A.*, 859 F. Supp. at 1541.

The Court in *Gordon & Breach* very narrowly held that the only actionable use of the academic articles in question were their use by the non-profit entity to promote its journals over those of the plaintiff with librarians, the main consumer of scientific journals. In short, only where the non-profit used the articles for the sole purpose of advertising its goods for sale directly to a consumer to gain an advantage over a competitor were use of the articles deemed commercial

speech. The Court held that doing so was little different than General Motors using a Consumer Reports article in a national television commercial to promote its product. This narrow holding is obviously distinguishable on multiple grounds. First, CRM Media is not a competitor of SPLC's, and so there can be no argument that the Hate Map was used to promote the purchase of the SPLC's goods or services over CRM Media's; second, there is no article here that contrasts the value of CRM Media's services or goods to those of the SPLC's (nor could there be as their services are not in competition); third, there is no plausible allegation that the SPLC is using the specific anti-LGBT designation given to D. James Kennedy ministries to promote any particular product or service. Had the SPLC published an article extolling its hate-group monitoring as superior to CRM Media's (something which would make no sense of course) and used that article to promote its services for pay to law enforcement agencies, CRM Media might have a claim under *Gordon & Breach's* holding and even that holding would not be binding in this Circuit.

This case is more like yet another Lanham Act case cited in *Gordon and Breach.* In that case, *Wojnarowicz v. American Family Ass'n,* 745 F. Supp. 130, 141–42 (S.D.N.Y.1990), the court relied on the Act's legislative history to dismiss the claim. The plaintiff was an artist whose work incorporated sexually explicit and religiously controversial images, which, incidentally, had been funded by the National Endowment for the Arts. Defendant, a non-profit association chartered for the declared purposes of promoting decency and advancing the Judeo–Christian ethic in American society, had reproduced fragments of Wojnarowicz's work in a pamphlet that it distributed in an effort to stop funding by the NEA of art works such as Wojnarowicz's. The court had little difficulty in dismissing Wojnarowicz' Section 43(a) claim on the ground that defendant's pamphlet was political rather than commercial in nature and "was not employed in the 'advertising or promotion' of goods or services." *Id.* at 141–42. *See also Gordon & Breach*, 859 F. Supp. at 1534.

The SPLC, like the Judeo-Christian organization in *Wojnarowicz*, criticized the Plaintiff's positions and work on the political stage. The SPLC's speech is therefore not commercial under the Lanham Act, as a matter of law. Even had the Judeo-Christian organization sought to raise money to advocate that *Wojnarowicz* no longer be funded by the NEA, that speech would also have been protected political speech as evidenced by the broad First Amendment protection afforded charitable fundraising by the Supreme Court as discussed earlier in this brief.

Thus, although CRM Media made good on its threat to amend its Complaint to "plead new information regarding SPLC's fundraising activities that made use of the Hate Map and hate group designations," Doc. 25 at 22, the SPLC is still entitled to prevail on its motion to dismiss even assuming the truth of CRM Media's new allegations. There is no question for a trier of fact to resolve. The speech at issue – the anti-LGBT designation – is core political speech, and as such, is fully protected by the First Amendment, and is not subject to restriction under the Lanham Act.

It should further be noted that there is no plausible allegation that the SPLC used the D. James Kennedy name in any fundraising solicitation. The allegations regarding fundraising merely vaguely reference the "SPLC's Hate Map, hate-based fundraising materials." *See, e.g.,* Am. Compl. (Doc. 40) ¶ 75. Even if the Plaintiff had alleged that a list of hate groups was provided to potential funders (it did not), D. James Kennedy Ministries is one of many hundreds of hate groups and thus could not be described as the focus of such a hypothetical solicitation.

It should be mentioned here that any allegation regarding the use of D. James Kennedy Ministries in connection with any alleged "goods or services" such as training or intelligence reports is equally vague. For instance, there is no plausible allegation that the D. James Kennedy Ministries' anti-LGBT designation was used by the SPLC in advertising or promotion in connection with any such alleged good or service as the Lanham Act would, at the very least,

require.  Even selling the hate group list (something not alleged) would be tantamount to selling a website article and would fall outside the Lanham Act's coverage.  *See Edward Lewis Tobinick, M.D., supra.*  In fact, any possible use of the anti-LGBT designation would fall outside the Lanham Act's protections because the SPLC's criticism of D. James Kennedy Ministries is fully protected political speech as explained previously.

### 2.  Element Three – influencing consumers to buy defendant's good or services.

Element three of the Lanham Act claim requires a showing that the commercial speech be "for the purpose of influencing consumers to buy *defendant's* goods or services." *Edward Lewis Tobinick, MD*, 848 F.3d at 950 (emphasis added).

In an attempt to satisfy this prong of the Lanham Act, CRM Media alleges that the SPLC "integrates the hate group designation into many of its goods and services."  Am. Compl. (Doc. 40), ¶ 21.  Basically, the allegation is that the Hate Map is a good or service ("SPLC trains with, promotes, and markets a list it refers to as its 'Hate Map.'").  Am. Compl. (Doc. 40) ¶ 21.  This vague allegation is repeated throughout the Amended Complaint.  *See, e.g.,* Am. Compl. (Doc. 40) ¶¶ 21, 29, 87.  But the attempt fails for at least two reasons.  First, there is no plausible allegation that the alleged "investigative reports, training services and materials" or "key intelligence" and/or "expert analysis" involve the D. James Kennedy Ministries anti-LGBT designation.  To the extent that the Hate Map itself is the good or service, the argument fails because that is like saying a Consumer Report review or a news article critical of the plaintiff constitutes a "good or service".  As explained previously, reviews and articles criticizing another entities' goods and services clearly fall outside the Lanham Act's protection even if the articles are sold or result in income.  *See, e.g., Edward Lewis Tobinick, M.D.,* 848 F.3d at 952.  And political speech, such as the Hate

Map and the hate-group designations, likewise fall outside Lanham Act coverage. *See* 135 Cong. Rec. H1216-17, *supra.*

### 3. Element Four – dissemination to the relevant purchasing public.

Likewise, other elements of the Lanham Act claim have not been plausibly alleged. For instance, element four requires that the: "the representations ... must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Edward Lewis Tobinick, MD,* 848 F.3d at 950. It is hard to conceive of any allegation in the Amended Complaint that would justify calling the SPLC Hate Map advertising or promotion within CRM Media's industry, *i.e.*, Christian television ministries. In addition, "the plaintiff must allege both (1) who comprises the relevant purchasing public and (2) how many consumers within the relevant purchasing public received the advertisement. *Ameritox, Ltd. v. Millenium Labs, Inc.,* 2012 WL 33155 at *2 (M.D. Fla. Jan. 6, 2012). CRM Media has not done so here, nor could they.

CRM Media seems to imply in its Amended Complaint that its purchasing public is all people and organizations engaged in charitable giving. Am. Compl. (Doc. 40) ¶ 140. At its very broadest, the proper characterization of the "purchasing public" here would be individuals who are interested in supporting conservative Christian broadcasting. Otherwise, the definition suggested by CRM Media would encompass virtually the universe, including people who would never even consider donating to CRM Media. And the mere fact that the website is accessible to anyone who uses the internet cannot alone suffice to satisfy the fourth prong of the commercial advertising and promotion definition. Otherwise, companies would be placing themselves at risk under the Lanham Act by placing any critical content on a website.

**4. Nor does CRM Media satisfy the requirement that the defendant be a competitor – Element Two of a Lanham Act False Advertising claim.**

While it is true that recent Supreme Court precedent holds that to state a Lanham Act false advertising claim one need not be in *direct* competition with the defendant, *see Lexmark Int'al. Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014), it is clear that where the two parties are not even remotely in the same industry no claim is viable. The example of an actionable non-direct competition claim provided in *Lexmark* illustrates this point. A car manufacturer might disparage another manufacturer's air bag provider. This disparagement made in an effort to decrease its competitor's sales and increase its own could also injure the air-bag manufacturer. That airbag manufacturer could therefore state a Lanham Act injury. *Id.* at 1394. While CRM Media argues that it is in competition with the SPLC because both are vying for charitable contributions that does not satisfy the competition prong of the Lanham Act commercial advertising elements. As pointed out above, the mere fact that they are both charities does not mean they are in the same industry or even potentially indirectly in competition with one another. One is a conservative Christian ministry and the other a civil rights organization.

**C. CRM MEDIA HAS NOT ALLEGED A VIABLE LANHAM ACT FALSE ASSOCIATION CLAIM.**

It is hard to comprehend how the facts alleged in the Complaint could even arguably support a Lanham Act false association §1125 (a)(1)(A) claim.

False association requires proof of the following elements:

The elements of a false association trademark claim under the Lanham Act track the elements of a common law trademark infringement claim: a plaintiff must prove that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) (internal quotation marks omitted). Even when those elements are satisfied, relief is limited in scope to where "market penetration is significant enough to pose the real likelihood of confusion among the consumers in that area." *Charles Jacquin Et Cie,*

*Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 472 (3d Cir. 1990) (internal quotation marks omitted).

*Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 230 (3d Cir. 2017).

The Eleventh Circuit has described the elements even more simply: "To establish a prima facie case under § 1125(a)[(1)(A)], a plaintiff must show (1) that the plaintiff has enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it 'such that consumers were likely to confuse the two.'" *Custom Mfg. & Eng'g, Inc. v. Midway Services, Inc.,* 508 F.3d 641, 647 (11th Cir. 2007).

Thus, it is clear that for CRM Media to prevail it must plausibly allege that the SPLC used the trademark at issue in connection with the promotion of the SPLC's goods or services in a way that causes confusion as to the origin of the SPLC's goods and services. CRM Media has made no such allegation, nor could it. CRM Media alleges merely that the hate-group designation might confuse consumers about CRM Media's goods and services. *See* Am. Compl (Doc. 40) ¶ 125 (alleging that the use of the trademark is "likely to cause the public and potential supporters of the Ministry to be confused…into believing that the Ministry is a hate group…").

In addition, as noted earlier, the Lanham Act could not, as a constitutional matter, be used to penalize the SPLC's constitutionally-protected speech.

**D.     CRM MEDIA ALSO LACKS STANDING UNDER THE LANHAM ACT.**

Various courts have held that failure by a Lanham Act plaintiff to plausibly allege facts relative to their alleged injuries is fatal to standing. *See, e.g., I Love Omni, LLC v. Omnitrition Int'l, Inc.,* 2017 WL 3086035 (N.D. Tex. July 20, 2017). CRM Media has failed to allege here in any plausible way that actual potential donors have been confused. *See, e.g.,* Am. Compl. (Doc. 40) at ¶¶ 136, 138. Rather, as in *I Love Omni, LLC*, the allegations are a "mere 'formulaic recitation of the elements' that the Supreme Court cautioned against in *Twombly*." *Id.* at *5.

### E. CONCLUSION AS TO THE LANHAM ACT CLAIMS.

In conclusion, CRM Media has not stated a Lanham Act Claim. Alternatively, the allegations made do not satisfy the pleading requirements set out in *Iqbal/Twombly*.

WHEREFORE, based on the positions set out above, the SPLC moves this Court to grant its Motion to Dismiss and to dismiss the Complaint in full with prejudice.

s/Shannon L. Holliday
Shannon L. Holliday (HOL088)
Robert D. Segall (SEG003)
Copeland Franco Screws & Gill, P.A.
444 South Perry Street (zip 36104)
Post Office Box 347
Montgomery, AL 36101-0347
Phone: (334) 834-1180
Facsimile: (334) 834-3172
Email: holliday@copelandfranco.com
Email: segall@copelandfranco.com
**Attorneys for Southern Poverty Law Center, Inc.**

### CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of November, 2017, I filed the foregoing with the Clerk of the Court using the CM/ECF filing system which will electronically notify the following counsel of record:

Charles E. Hall, Jr.
Post Office Box 7
Dadeville, AL 36853-0007
Email: chall.law@att.net

David C. Gibbs, III
Gibbs Law Firm PA
2648 FM 407, Suite 240
Bartonville, TX 76226
Email: dgibbs@gibbsfirm.com

Harlan I. Prater, IV
R. Ashby Pate
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, AL 35203-3200
Email: hprater@lightfootlaw.com
Email: apate@lightfootlaw.com

s/Shannon L. Holliday
Of counsel