IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

| | | |
|---|---|---|
| CORAL RIDGE MINISTRIES MEDIA, INC., | ) | |
| d/b/a D. James Kennedy Ministries, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:17-cv-566-MHT-DAB |
| | ) | |
| AMAZON.COM, INC., | ) | |
| AMAZONSMILE FOUNDATION, INC., and | ) | |
| SOUTHERN POVERTY LAW CENTER, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS
AMAZON.COM AND AMAZONSMILE'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

**I.   INTRODUCTION**

COMES NOW Coral Ridge Ministries Media, Inc., d/b/a D. James Kennedy Ministries

("Ministry"), pursuant to the Federal Rules of Civil Procedure, with its Response to the Amazon

Defendants' Motion to Dismiss the First Amended Complaint ("Mot. to Dismiss"). The Ministry

files the following Response in support of its opposition to Amazon.com's and AmazonSmile

Foundation's ("AmazonSmile") (collectively, the "Amazon Defendants" or "Amazon") Motion to

Dismiss the Ministry's First Amended Complaint ("FAC"). Amazon seeks dismissal of Count III

of the FAC, alleging a violation of 42 U.S.C. § 2000a (Title II of the Civil Rights Act of 1964),

and Count IV, alleging negligence under Alabama common law.

## II.   PRELIMINARY STATEMENT

In essence, this case is simply about whether Amazon, one of the largest providers of goods and services in the world, is legally permitted to impose the proverbial separate drinking fountain and engage in "back of the bus" discrimination against African-Americans, Christians, Hindus, Muslims, Hispanics, and every other protected class listed in Title II of the Civil Rights Act of 1964. By denying the Ministry access to the AmazonSmile donation program on the basis of its religious beliefs, that is exactly what Amazon is doing, and Amazon believes it is permitted to do so because it conducts most of its business online rather than through brick and mortar establishments. Amazon attempts to hide behind the Southern Poverty Law Center's (SPLC) designation of the Ministry as a "hate group" as justification for this denial, claiming that SPLC's hate group designation is a neutral criterion for establishing AmazonSmile program eligibility, and that Amazon is thus not discriminating on the basis of religion. As will be explained, however, Amazon *chose* SPLC's religiously discriminatory "anti-LGBT hate group" criteria as its eligibility standard, and it is Amazon—not SPLC—that makes the ultimate decision as to who is and who is not allowed to participate in the AmazonSmile program. To argue otherwise is a mere smokescreen that Amazon uses to cloud the issue and shift responsibility for its own actions.

In summary, the Ministry submits that it has met its burden to sufficiently plead facts establishing that the Amazon Defendants are places of public accommodation and that Amazon's actions in denying the Ministry participation in the AmazonSmile program amount to both religious discrimination under 42 U.S.C. § 2000a and negligence under Alabama law. The Ministry further contends that Amazon's actions are not protected by the First Amendment or any other law, ordinance, or rule. For these reasons, the Ministry is respectfully requesting that this Court deny Amazon's Motion to Dismiss in its entirety.

**Legal Standard for Motion to Dismiss**

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2). It is axiomatic that the Court "must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff." *Paradise Divers, Inc. v. Upmal*, 402 F.3d 1087, 1089 (11th Cir. 2005) (internal quotation marks omitted). In reviewing the pleadings, the Court must construe the pleadings broadly and view the allegations of the Complaint "in the light most favorable to the plaintiff." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). The Court should not dismiss a case "unless it appears ***beyond doubt*** that the plaintiff can prove no set of facts in support of his claim." *Beck v. Deloitte & Touche*, 144 F.3d 732, 735-36 (11th Cir. 1998) (emphasis added).

To survive Amazon's Motion to Dismiss and this Court's Rule 12(b)(6) scrutiny, the Complaint must simply "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All that is necessary is for the Ministry to present "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim, and provide "plausible" grounds for recovery. *Twombly*, 550 U.S. at 556. The Ministry's claim should not be dismissed "even if it strikes a savvy judge that actual proof of those facts is improbable." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). This Court has held that in reviewing a motion to dismiss "a court should assume [the allegations'] veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ala. State Conference of the NAACP v. Alabama*, 2:16-CV-731-WKW, 2017 U.S. Dist. LEXIS 140898 at *4 (M.D. Ala. Aug. 31, 2017) (citing *Ashcroft*, 556 U.S. at 679).

Dismissal is ***highly disfavored*** and only appropriate "where it is certain that no relief could be granted under any set of facts that could be proved." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50 (1989). As the Eleventh Circuit has held, "[t]he threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low . . . ." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004). The Eleventh Circuit has articulated its strong preference for allowing a plaintiff an opportunity to fully present its case, including factual and expert testimony, and not have the lawsuit short-circuited at the first stage of the proceedings. Amazon asserts that the Ministry has failed to plead the appropriate standard and/or that its Complaint does not contain sufficient factual allegations, but Amazon has not even come close to meeting its high burden of establishing why this matter should be dismissed. The Ministry's Complaint contains cognizable legal claims, pleads the correct legal standard, and supports these claims with a sufficient factual basis. Therefore, this Honorable Court should permit this case to proceed and deny Amazon's Motion to Dismiss the First Amended Complaint.

### III.  THE MINISTRY HAS PLEADED SUFFICIENT FACTS TO ESTABLISH A RELIGIOUS DISCRIMINATION CLAIM UNDER 42 U.S.C. § 2000a.

Title II of the Civil Rights Act of 1964 states, in pertinent part, "(a) All persons shall be entitled to the full and equal enjoyment of the goods, **services**, facilities, **privileges**, **advantages**, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the basis of race, color, religion or national origin." 42 U.S.C. § 2000a (emphasis added). Amazon contends that the Ministry's claims should be dismissed for the following reasons: (1) the Ministry has not sufficiently alleged a Title II violation (arguing that Amazon is a not a place of public accommodation subject to Title II and that Amazon has not engaged in religious discrimination); (2) the Ministry has not sufficiently alleged Amazon's negligence; and (3)

applying Title II to Amazon would infringe upon Amazon's First Amendment rights. As the following arguments will demonstrate, the Ministry has pleaded facts sufficient to withstand Amazon's Motion to Dismiss.

### A.  The Amazon Defendants Engage in Interstate Commerce.

The operations of an establishment covered by Title 42 U.S.C. § 2000a(b)(2) affect commerce if, *inter alia*, the establishment "customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce. *Id.* at § 2000a(c)(3). Under this standard, virtually every aspect of Amazon's business moves in interstate commerce, just one of which would include the millions of books, DVDs, and CDs (all of which would fall within any generally accepted definition of "sources of entertainment") that Amazon regularly ships to every state in the United States. FAC ¶ 11. This issue has not been raised or contested by Amazon and thus must stand as unopposed. Certainly, even if Amazon had raised such an argument, there is no question this Court would later find, at the summary judgment stage, that Amazon is engaged in interstate commerce. *Codogan v. Fox*, 266 F. Supp. 866, 867 (M.D. Fla. 1967) (determining as a matter of law an entity was subject to 42 U.S.C. § 2000a since "23% to 30% of [its] monthly purchases moved in interstate commerce"). But, at this stage, the Ministry has sufficiently pleaded this element in order to survive Amazon's Motion to Dismiss, and it would be up to the fact finder in this case to determine whether Amazon is indeed engaged in interstate commerce, as recognized in *Brooks v. Charles S. White, P.A.*, No. 8:07-cv-603-T-26MAP, 2008 U.S. Dist. LEXIS 9081 (M.D. Fla. Feb. 7, 2008) (leaving it to the fact finder, since it was disputed between the parties, whether the plaintiff engaged in interstate commerce).

### B.  The Ministry Sufficiently Pleaded That AmazonSmile Is a Service, Privilege, and Advantage of Amazon.com to Which the Ministry Has Been Denied Access.

Title II prohibits places of public accommodation from discriminating on the basis of religion in the provision of (among other things) its services, privileges and advantages. In Amazon's own words, AmazonSmile is "a website operated by Amazon that lets customers enjoy the same [shopping experience] as on Amazon.com" except that when customers shop through AmazonSmile at smile.amazon.com (as opposed to Amazon.com directly), a portion of their purchase price on eligible items will be donated to the customer's selected charity. FAC ¶¶ 42-43. The AmazonSmile program is not available through any other shopping venue except Amazon. And given that shopping through the AmazonSmile website offers the same customer shopping experience as its Amazon.com counterpart, but with added benefits and privileges to eligible nonprofits (to receive donations) as well as the consumer (the ability to have part of the consumer's purchase price donated to their favorite charity), it is abundantly clear that AmazonSmile is a service, privilege, or advantage of Amazon.com to which the Ministry has been denied the right to participate.

Amazon summarily dismissed the Ministry's assertion that AmazonSmile is a service, privilege, and advantage of using Amazon.com with no explanation or legal authority whatsoever. The only mention of this issue is their conclusory argument that AmazonSmile is not a "service" or "advantage" to which Title II refers because (in their view) the Amazon Defendants themselves are not public accommodations and, therefore, they are not prohibited from discriminating on the basis of any protected class in the services or advantages of their business. Mot. to Dismiss at 17-18. Therefore, because Amazon has failed to raise any argument against the specific characterization of AmazonSmile as a "service, privilege, or advantage" of Amazon, this factual assertion stands unopposed. Furthermore, and salient to the Ministry's position, this Court must

accept as true the facts alleged in the Complaint at this stage. Thus, even if Amazon were to have argued against this characterization, this would be an issue for the finder of fact.

### C. The Ministry Sufficiently Pleaded That Amazon Discriminated against the Ministry on the Basis of Religion.

Amazon argues that in order for a Title II claim to stand, the Ministry must prove that Amazon *intended* to discriminate against the Ministry. In support of its professed "intent" requirement, Amazon cites several cases, almost all of which involve a plaintiff who requested and was denied a religious accommodation—a factual distinction from the instant case that changes the analysis entirely and renders these cases non-instructive for the Court. The Ministry never requested any type of religious accommodation—just equal treatment.

Amazon also cites *Smith v. Eike, No. 2:12cv85-MHT (WO)*, 2013 U.S. Dist. LEXIS 23864 (M.D. Ala. Jan. 9, 2013), for the proposition that "intentional discrimination" is a requirement of Title II. However, in that case, which is non-binding on this Court, the magistrate judge recognized, on several occasions, that very little case law exists regarding Title II's burdens of proof. *Id.* at 15, 17. Because of this absence of guiding authority, the court applied a Title VII employment discrimination analysis test from the U.S. Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to the race discrimination claim before it. The *Smith v. Eike* court cited *McDonnell Douglas* for the proposition that a *prima facie* case of discrimination requires intentional discrimination. *Smith*, 2013 U.S. Dist. LEXIS 23854 at *16. However, after a careful review of the *McDonnell Douglas* case, the Ministry contends that the *McDonnell Douglas* decision never stated that intent to discriminate is a requirement of a Title VII claim. In fact, nowhere in the *McDonnell Douglas* decision's discussion of the test to establish a Title VII claim

does the court state that "intent to discriminate" is required.[1] Even though the *McDonnell Douglas* court certainly could have determined that "intent" is required in a Title VII action, it did not do so. It could be that the *Smith v. Eike* court looked at the specific language of Title VII to determine that "intent" was a requirement of Title VII—a very reasonable interpretation, since, very unlike Title II as will be discussed *infra,* Title VII specifically uses active, intentional verbs describing an employer's prohibited conduct (e.g., "it shall be unlawful employment practice for any employer (1) to <u>fail</u> or <u>refuse</u> to hire or to discharge, or otherwise <u>discriminate</u> . . . (2) to <u>limit,</u> <u>segregate,</u> or <u>classify</u> his employees or applicants . . .") 42 U.S.C. § 2000e-2(a)(1) and (2) (emphasis added). However, in *McDonnell Douglas*, the Supreme Court did not even state that "intent" was required to demonstrate a prima facie case of illegal employment discrimination.

Another Court in this Circuit came to the same conclusion that the Ministry is arguing: that claims under Title II do "not require a showing of discriminatory intent." *Robinson v. Pizza Power*, 993 F. Supp. 1462 (M.D. Fla. 1998). Rather, the test is one of "disparate impact," and "a prima facie case is established when the protected class [is] denied a service rendered to those falling outside of the class." *Id.* Here, the Ministry's Complaint quite clearly alleges that the Ministry was denied a service, privilege, and advantage (access to AmazonSmile) on the basis of its protected status (its religious beliefs). FAC ¶¶ 152-156. In addition, the Ministry has alleged that it has been

---

[1] The *McDonnell Douglas* test sets out that the plaintiff in a Title VII employment discrimination claim must first establish a *prima facie* case of discrimination, which is met by showing that the plaintiff (1) belongs to a protected class (in this case, race); (2) applied and was qualified for a job for which the employer was seeking applicants; (3) was rejected for the position despite his qualifications; and (4) that even after being rejected, the position remained open and available to those of the plaintiff's qualifications. Once a *prima facie* case has been established, the burden then shifts to the employer (defendant) to provide a legitimate, nondiscriminatory motive for rejecting the applicant. Once the employer does that, the burden shifts back to the plaintiff-applicant to prove that the reason for rejection was just a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802-804.

denied a service that is available to those falling outside of the class (FAC ¶¶ 44, 152—these sections allege that 501(c)(3)s that fall outside of SPLC's "hate group" category are eligible for participation in AmazonSmile). At the motion to dismiss stage, the facts alleged in the Ministry's Complaint—that Amazon denied the Ministry access to the AmazonSmile program on the basis of its religious beliefs—must be accepted as true; Amazon will have sufficient opportunity to argue any supposed nondiscriminatory reason for its actions at a later date.

Furthermore, the language of Title II itself supports a "strict liability" standard—which is a disparate impact standard—rather than, as Amazon argues, an "intent-to-discriminate" standard. The statute states that "all persons *shall be entitled* to the full and equal enjoyment of the "services, privileges, [and] advantages . . . without discrimination . . ." 42 U.S.C. § 2000a. The passive grammatical structure of the words "shall be entitled" demonstrates that this statute is intended to provide an affirmative right to those in the protected classes, regardless of the intent, motive, or purpose of the discriminatory behavior or outcome. Unlike criminal statutes where some type of *mens rea* is typically required and where punishment follows for violating the statute, this statute does not require any *mens rea* and is not punitive in nature toward places of public accommodation that discriminate. This interpretation is supported by the fact that injunctive relief is the only remedy available for a Title II violation (as opposed to monetary damages); what matters is simply whether or not a person was denied access to the services, privileges, and advantages of a place of public accommodation on the basis of his or her protected status or class. If so, regardless of the discriminatory motive or lack thereof, a Title II claim properly ensues and the Court has authority to issue an injunction to provide that access.

Even if this Court were to take the position that "intent to discriminate" is a requirement for a Title II claim, the factual question would still exist as to whether Amazon did, in fact,

intentionally discriminate. The Ministry's Complaint sets forth several factual allegations supporting the conclusion that Amazon did, in fact, intentionally discriminate: (a) Amazon specifically chose SPLC's on-its-face religiously discriminatory hate group criteria as its eligibility standard (FAC ¶¶ 44, 53-54); (b) SPLC placed the Ministry on the Hate Map because of the Ministry's religious beliefs regarding LGBT issues (FAC ¶¶ 56, 58) (and SPLC admits that it "has declared [the Ministry] to be a hate group due to the Ministry's stand on LGBT issues," SPLC Mot. to Dismiss Am. Compl. at 7); and (c) Amazon (not SPLC) makes the ultimate decision as to who may or may not participate in the AmazonSmile program (FAC ¶¶ 43, 53). Even if Amazon were to argue that there *was* no intent to discriminate prior to this lawsuit being filed, at this point in the litigation, Amazon has been on notice of the issues in this case for months now and could easily have made this case go away by simply permitting the Ministry to be part of the AmazonSmile program. Amazon's continued refusal to do so, especially in light of the expense of defending this litigation, certainly indicates Amazon's intent to continue discriminating.

All of the aforementioned points provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim and provide "plausible" grounds for recovery. *Twombly*, 550 U.S. at 556. In other words, even if this Court were to decide that an "intent" requirement exists in a Title II action, the facts as alleged, when accepted as true, demonstrate that such intent does, in fact, exist. However, "even if it strikes a savvy judge that actual proof of those facts is improbable," the Complaint should not be dismissed, *Id.*, because the ultimate question of whether such intent exists (if the Court determines that intent is a requirement) is a question to be decided by the finder of fact after discovery has been completed and the Ministry has had an opportunity to determine the nature and extent of the relationship between SPLC and

Amazon. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993) (question of intentional discrimination is a question of fact "the trier of fact will be called upon to answer.")

### D.  Amazon and AmazonSmile Are Places of Public Accommodation.

Amazon insists that Title II only applies to physical places and cites as its first authority for that proposition the Webster's Dictionary definition of "place." What Amazon strategically failed to bring to this Court's attention, however, is that Webster's Dictionary does not ***only*** define "place" as physical spaces; its definition of "place" also includes a number of other non-tangible "places" in addition to physical spaces (e.g., 2a: "an indefinite region or expanse"; 5: a relative position in a scale or series;" 6a: "a proper or designated niche or setting"; 6b: an appropriate moment or point."[2]). Our world is changing at a rapid pace, and the meanings of our words are changing right along with it. Technology is forcing us to adapt or be left behind, and the impact of this reality does not evade the courts and our laws; laws that were passed before the internet existed must still address and accommodate this ever-advancing technological and electronic age. Back in 1964 when the Civil Rights Act was passed, there *was* no cyberspace or cyber-"*place.*" But today, consumers and patrons of the types of physical places listed in Title II are far more likely to be instructed to "visit our website" than to "visit our storefront." In the last twenty years, commerce and industry have evolved so dramatically that services and products that were once provided solely through brick and mortar buildings are now going entirely online—in many instances, operating completely without a storefront or a brick and mortar entity of any kind. Thus, the word "place" has a new meaning in today's technologically advanced world; "place" can be a website or an online store because those are the "places" where services and products exist for purchase.

---

[2] Definition of *"Place,"* Merriam-Webster, https://www.merriam-webster.com/dictionary/place, last updated Nov. 22, 2017.

As will be explained later in this brief, the Ministry contends that the online entertainment options provided by Amazon make Amazon a "place of exhibition or entertainment" and thus a "place of public accommodation" under Title II. Although the Ministry argues that Amazon does not require brick and mortar stores in order to be considered a "place of public accommodation," it remains a fact that Amazon is now expanding its web presence to include connections to brick and mortar businesses that operate in market spaces—market-"*places*"— (i.e., "places") expressly listed in Title II of the Civil Rights Act:

- Amazon Go grocery stores: this beta store in Seattle, Washington, is one in which customers simply swipe their Amazon Go app on the way into the store, choose what they want, and then leave the store without ever waiting in line to check out. According to Amazon, this "Just Walk Out Technology automatically detects when products are taken from or returned to the shelves and keeps track of them in a virtual cart. When you're done shopping, you can just leave the store. Shortly after, [Amazon] charges your Amazon account and send[s] you a receipt."[3] FAC ¶ 19. AmazonGo is using this "grab and go" technology to compete with fast food and diner restaurants (which are entities covered by Title II). Recently, Sonic CEO Cliff Hudson confirmed this reality, stating that he is "concerned about Amazon's potential to eat into the fast-food chain's sales."[4] This concern is likely due in part not just to the Amazon Go concept, but also to the next example.

- Amazon Restaurant: This new delivery service is making it easier for customers to stay home and not dine in at physical restaurants (that would otherwise be covered by Title II).

---

[3] *Amazon Go Frequently Asked Questions.* Amazon.com,
https://www.amazon.com/b?node=16008589011 (last visited Nov. 29, 2017)
[4] *Fast-Food CEO Says Amazon Is a Growing Threat to His Industry.* Business Insider (Sept. 26, 2017) http://www.businessinsider.com/sonic-ceo-says-amazon-is-a-threat-to-fast-food-2017-9

Using this system, the customer places a food order with a partner restaurant through either the Amazon.com or the AmazonSmile website, and when the order is ready, Amazon picks it up and delivers it to the customer's home or business, while providing the customer with real-time tracking and status updates.[5] This Amazon-provided service allows customers the option to use the services of a restaurant—a physical place of public accommodation that would be covered by Title II—without ever stepping foot inside the establishment. FAC ¶ 19. Conceivably, under Amazon's theory, Amazon could stop delivering to African-Americans, Hispanics, Caucasians, Muslims, Christians, or any other protected class solely because the service Amazon is providing is not within the four walls of the restaurant building.

- Amazon e-reader devices: Amazon.com and smile.amazon.com boast of access to literally millions of books and provide this ability to access and download without ever stepping foot inside a bookstore, while also opening (to date) thirteen brick and mortar bookstores of its own. It is interesting to note that a number of these physical bookstores—"places"—are located in shopping malls, FAC ¶ 19, entities that have been expressly held to be subject to Title II.[6] At least one court has also found that a bookstore located within a shopping mall is also covered by Title II.[7]

These examples provide just a small sampling of the extent to which Amazon has expanded its business into the types of places and spaces expressly listed in Title II. Of course, Amazon is

---

[5] *See Amazon Restaurants*, Amazon.com, https://www.amazon.com/restaurants (last visited Nov. 29, 2017).
[6] *See e.g., United States v. Three Juveniles*, 886 F. Supp. 934, 946 (D. Mass. 1995)
[7] *Id.*

not alone in its endeavor to do so; it just so happens to be one of the largest and most pervasive example of this e-commerce revolution.

Not only is Amazon expanding into brick and mortar operations, but it is also attempting to replicate, to every extent possible, a brick and mortar shopping experience. Consider the following:

- Amazon.com and smile.amazon.com's websites have a "Shopping Cart" with a symbol designed to look like a shopping cart one would use in a regular store with a message saying "Your shopping cart is empty." If the customer decides to purchase items, those items go "into" the shopping cart with the number of total items appearing in the shopping cart symbol. However, just like in a regular store, the fact that a customer places something in the "shopping cart" does not mean it's been purchased; the customer can decide to "put it back." After the customer is finished shopping, they can "proceed to checkout." Even there, the customer can change his or her mind and remove an item from the shopping cart any time before completing the purchase—just like in a regular store. Before purchasing an item, a customer can also apply "coupons" just as at a regular store. [8]

- Even after a purchase, as in most stores, customers can return items per Amazon's return policy.[9]

- Many of the books available on Amazon provide the customer with the capability to not only see the front cover image of the book, but also to flip through a number of the

---

[8]*Amazon.com* and *smile.amazon.com* websites,  https://www.amazon.com/ and https://smile.amazon.com/ (last visited November 29, 2017)
[9] *Returns Center,*
https://smile.amazon.com/gp/orc/returns/homepage.html/ref=orc_surl_ret_hp?fg=1, (last visited Nov. 29, 2017)

book's pages digitally with Amazon's "Look inside" feature. Similarly, with many of the CD's available for purchase, the customer can go through the songs and listen to some songs or parts of songs.

- Amazon has both reward cards and gift cards, as well as their own Amazon credit card, just like many regular chain stores.[10]

As the new reality of e-commerce has begun to take shape, various courts have begun to grapple with the question of whether an entity that is not entirely brick and mortar can be considered a "place of public accommodation." As discussed at length *infra*, a number of courts, including several Circuit Courts of Appeal as well as district courts, have answered this question in the affirmative, determining that non-physical entities, including websites, policies, and online services, can be places of public accommodation on their own without any connection to a brick and mortar facility. It is the Ministry's position that Amazon and AmazonSmile are such places of public accommodation as "places of exhibition or entertainment" subject to Title II of the Civil Rights Act of 1964.

### 1.  Legal conclusion in a complaint are not harmful to the complaint.

At the outset, Plaintiff concedes that the Title II claim against Amazon assumes the legal conclusion that the Amazon Defendants are places of public accommodation. However, a legal conclusion is not a defect of the Complaint and provides no basis for this Court to grant Defendant's Motion because "legal conclusions can provide the framework of a complaint . . . [as long as] they . . . [are] supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The remaining Title II sections of this brief reference the factual allegations provided in

---

[10] *Amazon Prime Rewards Visa Signature Card*. https://smile.amazon.com/Amazon-Prime-Rewards-Visa-Signature/dp/BT00LN946S/ref=sr_1_1?ie=UTF8&qid=1511987513&sr=8-1&keywords=amazon+credit+card+application (last visited Nov. 29, 2017).

the Ministry's Complaint that support the conclusion that both Amazon Defendants are places of public accommodation.

> **2.  Case law defining the phrase "place of public accommodation" under the ADA is instructive in analyzing that same phrase under Title II of the Civil Rights Act, 42 U.S.C. § 2000a.**

Very little case law exists discussing whether non-physical entities such as websites (whether tethered to a physical location or not) may be considered places of public accommodation in the context of Title II of the Civil Rights Act, 42 U.S.C. § 2000a. Rather, as will be evident from the forthcoming discussion, the vast majority of decisions interpreting the phrase "place of public accommodation" as it pertains to civil liberties have done so within the context of Title III of the Americans with Disabilities Act (the section of the ADA that applies to places of public accommodation). These ADA court decisions are very helpful since both statutes (Title III of the ADA and Title II of the Civil Rights Act) are concerned with protecting civil rights in places of public accommodation and much of the language referencing and defining public accommodations in these statutes is similar.

When the ADA became law in 1990, internet-based businesses were, at most, a conceptual dream, and as such, were not specifically addressed in that statute (and correspondingly, when the Civil Rights Act was passed in 1964, internet-based businesses were not even a fleeting thought). Nevertheless, a number of courts have still held that non-brick-and-mortar entities are places of public accommodations under the ADA even in the absence of specific statutory language stating such. Therefore, since "case law concerning places of public accommodation under the ADA is more abundant than that under Title II [of the Civil Rights Act,] . . . a detour into the parallel ADA cases [discussing the scope of the meaning of 'place of public accommodations'] is instructive . . . ." *Noah v. AOL Time Warner*, 261 F. Supp.2d 532 (E.D. Va. 2003).

**3. Even though the Eleventh Circuit has not squarely addressed the issue of whether or not an online entity is a place of public accommodation under Title II of the Civil Rights Act of 1964, the rationale in various Eleventh Circuit decisions leans toward classifying online entities as places of public accommodation.**

Unlike most of the other circuits, the Eleventh Circuit has not directly addressed the issue of whether websites and online businesses may be considered places of public accommodation. However, the Eleventh Circuit and courts in this jurisdiction have issued opinions that suggest this would be the logical conclusion of the Eleventh Circuit if the question were presented to it. For example, the Eleventh Circuit, in considering an ADA case, determined that discriminatory barriers to access do not have to be "physical" in nature. *Rendon v. Valleycrest Productions, Ltd.,* 294 F.3d 1279, 1283 (11th Cir. 2002) (holding that requirements and policies for game show contestant eligibility are subject to Title III ADA requirements despite the fact that they are not physical impediments to access). In *Rendon*, the Court also explained that discrimination does not have to occur "on-site" of a physical facility to violate the ADA, noting that courts have held that "discrimination perpetuated at a distance" is still subject to both the ADA *and* Title II of the Civil Rights Act. *Id.* at 1285 (internal citations omitted) (citing several Alabama court decisions that have found Title II violations where application screening methods were employed to deny access to a provided good, service, privilege, or advantage of a public accommodation.[11])

The Eleventh Circuit has also concluded that an entity not specifically included in the ADA as a place of public accommodation may nevertheless be subject to the ADA's requirements where "the intent of Congress is clear enough" to include it. *Stevens v. Premier Cruises, Inc.,* 215 F.3d

---

[11] *Rousseve v. Shape Spa for Health & Beauty*, *Inc.,* 516 F.2d 64 (5th Cir. 1975) (Title II was violated where a plaintiff's <u>application</u> was rejected on account of race); *Smith v. Young Men's Christian Ass'n of Montgomery, Inc*., 462 F.2d 634 (5th Cir. 1972) (upholding Title II violation where plaintiff's <u>application</u> to attend summer camp at YMCA was denied because of his race).

1237, 1241 (11th Cir. 2000) (holding that a cruise ship, which is not specifically listed as a type of public accommodation under the ADA, is nevertheless covered because it includes a number of the types of public accommodations that are listed in the statute). The Eleventh Circuit also stated in *Stevens* that the fact "[t]hat Congress might not have specifically envisioned the application of Title III to [this entity] does not compel a different conclusion." *Id.* As will be discussed in the next section, Supreme Court decisions following on the heels of Title II's passage explain that Congress did not intend to strictly limit that statute only to those "places" enumerated in the statute.

Thus, while neither the Eleventh Circuit nor this Court has had the opportunity to precisely address the public accommodations issue before it, the Eleventh Circuit's decisions in *Rendon* and *Stevens* and other Alabama court decisions (*see supra*, note 11) evidence this Circuit's intent that Title II of the Civil Rights Act (as well as the ADA) should be interpreted to include non-physical entities, which would include websites and membership screening methods.

    **4. The online, web-based aspect of Amazon and AmazonSmile's businesses do not shield it from being considered a place of public accommodation, as the First and Seventh Circuits have determined that there is no "physical space" requirement for an entity to be a public accommodation.**

In *Carparts Distrib. Ctr., Inc. v. Auto Wholesaler's Ass'n of New England*, 37 F.3d 12, 19 (1st Cir. 1994) ("*Carparts*"), the First Circuit answered the question "[w]hether establishments of 'public accommodation' are limited to actual physical structures" under the ADA. *Id.* at 19. The Court held that they are "not so limited," explaining that places of public accommodation are not just providers of services that "require a person to physically enter a structure or site but . . . [that public accommodations would also include business] conduct[ed] by telephone or correspondence." *Id.* at 19. The Court explained that "it would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended

such an absurd result." *Id.* This "absurd result" is precisely what Amazon is asking this Court to adopt, namely, that persons who enter a movie theater or restaurant are protected by Title II, but persons who purchase the same goods or services sold at theaters, movie houses, and restaurants (among other places) over the internet at Amazon's websites are not. If this Court were to adopt this position, Amazon (and every other online entity) would have court-sanctioned permission to continue discriminating on the basis of every protected class listed in Title II solely because they conduct the majority of their business online rather than in the types of brick and mortar physical "places" described in Title II.

The *Carparts* court understood that the future of commerce would continue to transition away from brick and mortar physical spaces and that public accommodation antidiscrimination laws would need to advance with these transitions. In reality, the Court could just as easily have been referring to Amazon's online businesses when it stated that

> [m]any goods and services are sold over the telephone or by mail with customers never physically entering the premises of a commercial entity to purchase the goods or services. To exclude this broad category of businesses from the reach of Title III and limit the application of Title III to physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals [in a protected class] fully enjoy the goods, services, privileges, and advantages available [to others].

*Id.* at 20. The District of Massachusetts later extended this *Carparts* "telephone and mail" rationale to the internet, explaining that since we live "[i]n a society in which business is increasingly conducted online," the ADA's definition of "public accommodation" must apply not just to phone transactions, but also "applies with equal force to services purchased over the internet." *Nat'l Assoc. of the Deaf v. Netflix*, Inc. 869 F. Supp. 2d 196, 200 (D. Mass. 2010). Recently, the District of Vermont also held that a website constitutes a place of public accommodation under Title III in *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565 (D. Vt. 2015). In that case, the plaintiff

sued Scribd, Inc., an online digital library that provides reading subscriptions through its website, for violating Title III. The defendant argued precisely what Amazon is arguing here—that Scribd's website is not a place of public accommodation because websites are not listed in Title III. In rejecting that argument and holding that the defendant website is a place of public accommodation, the court explained that "[t]he defendant asks us to interpret 'public accommodation' literally, as denoting a physical site, such as a store or hotel but we have already rejected that interpretation. . . . Accordingly, the site of the sale is irrelevant. All that matters is whether the good or service is offered to the public." *Id*. at 570.

In addition, two cases out of the Seventh Circuit confirm the view that places of public accommodation do not have to be physical structures. Chief Judge Posner first articulated this position in *Doe v. Mutual Omaha Ins. Co.,* 179 F.3d 557, 559 (7th Cir. 1999) and confirmed it in *Morgan v. Joint Admin. Bd. Ret. Plan of the Pillsbury Co. and Am. Fed'n of Grain Millers, AFL-CIO-CLC*, 268 F.3d 456, 459 (7th Cir. 2001). In *Morgan,* Judge Posner flatly rejected the position that the term "public accommodation" be interpreted literally as requiring a physical site, stating that "[a]n insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store." *Id*. at 459. Analogously, Amazon would like to do just that—refuse to sell furniture to a disabled person simply because the furniture is bought online rather than in a brick and mortar store. Amazon is attempting to hide behind the shield of its online presence as a justification for engaging in invidious discrimination on the basis of race, religion, ethnic and national origin—something it has already begun to do by refusing to allow the Ministry access to the AmazonSmile program. The Ministry is simply asking this Court to recognize that times have changed, to remove that

shield, and to hold Amazon to the same standard of behavior that physical places of public accommodation subject to Title II are required to meet.

> **5. Amazon.com and AmazonSmile's online entertainment options meet the criteria for being a "place of exhibition or entertainment" and thus a place of public accommodation.**

Amazon argues that its AmazonSmile program is akin to a membership organization rather than a "place of exhibition or entertainment" and cites cases holding that Title II does not apply to membership organizations for the proposition that Title II should not apply in the instant case. However, it is not the membership aspect of AmazonSmile that the Ministry argues makes Amazon a place of public accommodation; rather, it is Amazon's online video streaming, music streaming, and audiobook downloads, all of which are available on both Amazon.com and smile.amazon.com, that make the Amazon Defendants places of public accommodation. FAC ¶¶ 5, 15, 17, 18. It is those services that create an entertainment experience for the user that can only adequately be described as the modern-day "motion picture house" and "theater" (which are other examples of places of public accommodation listed in 42 U.S.C. § 2000a(3)). Furthermore, at least one federal court has already determined that a website that "displays movies, television programming, and other content" makes that website a "place of exhibition or entertainment" and thus a place of public accommodation. *Nat'l Assoc. of the Deaf v. Netflix*, Inc. 869 F. Supp. 2d 196, 200, 201 (D. Mass. 2010). In that case, the defendant, Netflix, (which offers a very similar type of online movie streaming service as Amazon.com and smile.amazon.com) argued that its website cannot be a place of public accommodation because the online streaming services are accessed in private residences. *Id.* The court rejected that argument, holding that the website was a place of public accommodation and stating that "the ADA covers the services 'of' a public accommodation, not services 'at' or 'in' a public accommodation." *Id.* at 201-202. The language of Title II of the Civil

Rights Act is exactly the same as the ADA in this respect: it covers the "services, privileges, advantages . . . of any place *of* public accommodation. . . ." 42 U.S.C. § 2000a(a) (emphasis added). This position is supported by other district decisions interpreting "public accommodations," such as the *Nat'l Fed'n of the Blind v. Target Corp.,* 452 F. Supp.2d, 946, 953 (N.D. Cal. 2006) ("The statute applies to the services <u>of</u> a place of public accommodation, not services <u>in</u> a place of public accommodation. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute.") (emphasis in original). Thus, "while the home itself is not itself a place of public accommodation, entities that provide services in the home may qualify as places of public accommodation." *Nat'l Assoc. of the Deaf*, 860 F. Supp. 2d at 201.

Amazon's argument that the Ministry would be improperly expanding the definition of "place of public accommodation" or "place of entertainment" beyond the examples given within the text of Title II has already been addressed and rejected by the Supreme Court—shortly after Title II became law. *Daniel v. Paul,* 395 U.S. 298 (1969). In *Daniel*, the Court was asked to determine whether a "recreational area" should be included within the meaning of a "place of entertainment" and thus subject to Title II's anti-discriminatory provisions even though "recreational area" was not particularly listed in the statute as a type of public accommodation. In answering this question in the affirmative, the Court expressly rejected a strict, literal interpretation of "place of entertainment" and concluded that Congress never intended to limit the definition of a "place of entertainment" to be only those examples within the letter of the statute. The Court stated the following, which, despite occurring during a different time and place in our nation's history, quite accurately informs the current discussion:

> Admittedly, most of the discussion in Congress regarding the coverage of Title II focused on places of spectator entertainment rather than recreational areas. . . . But

> it does not follow that the scope of [Title II] should be restricted to the primary objects of Congress' concern when a natural reading of its language would call for broader coverage . . . [i]n light of the overriding purpose of Title II "to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public."

*Daniel,* 395 U.S. at 307-308 (quoting H.R. Rep. No. 914, 88th Cong., 1st Sess., 18).

The Supreme Court in *Daniel* understood that it would have been impossible for Congress to list every single variation of "place of entertainment" that might arise and to which patrons might be subjected to discrimination on the basis of their protected classes. Rather, the Court looked at what Congress clearly *intended* by including "a place of entertainment," which was to "eliminate the inconvenience, unfairness and humiliation" of discrimination. *United States v. Vizena*, 342 F. Supp. 553, 555 (W.D. La. 1972) (citing *Hamm v. Rock Hill*, 379 U.S. 306 (1964) and *Daniel v. Paul,* 395 U.S. 298 (1969)). Thus, it is clear from *Daniel,* a decision issued within just a few short years of Title II's passage, that Congress intended Title II's definition of "place of entertainment or exhibition" to be interpreted more broadly than its text might otherwise require at first reading. The natural, modern-day definition of "a place of entertainment" is precisely those venues that have put the brick and mortar places of entertainment out of business (just ask Blockbuster)—Amazon being one of the primary companies to do so with its online video streaming options. FAC ¶¶ 5, 15.

Times have changed. When Congress debated the need for a law prohibiting discrimination by places of public accommodation on the basis of race, religion, and ethnic and national origin, there was no internet; the vast majority of business and entertainment was conducted through brick-and-mortar storefronts and entertainment venues. However, with the internet came online shopping and online entertainment (along with many other things). In the *Scribd* case, the Vermont federal district court noted this fact in the context of the ADA, explaining that "[t]he fact that the

ADA does not include web-based services as a specific example of a public accommodation is irrelevant because such services did not exist when the ADA was passed. . . ." *Nat'l Fed'n of the Blind*, 97 F. Supp. 3d at 571 (internal citations omitted). The idea that only those "movie houses" and "places of entertainment and exhibition" that operate out of brick-and-mortar buildings are prohibited from discriminating on the basis of race, religion, and ethnic and national origin is an outdated position—one that is not reflective whatsoever of the nature and character of our global, electronically based economic climate and the way in which entertainment is delivered and business is done today.

### Title II Conclusion

In the ubiquitously electronic-based society in which we live, the internet is central to every aspect of the economic and social mainstream. Amazon's online presence as a provider of entertainment is not just filling market needs that have traditionally been met solely by brick and mortar businesses (like Blockbuster), but it is virtually replacing the businesses in these markets and, in some cases, the entire markets in which these businesses have thrived. Because Amazon runs in the same "places" or spaces as these entities, it is inconceivable that Amazon would be exempt from Title II.

The Ministry has no animus against Amazon for its business acumen or its expansion into these markets. The problem the Ministry has is the idea that Amazon, despite its being one of the world's largest retailers and a significant provider of the types of goods and services that are specifically included within the definition of "place of public accommodation" under Title II, could possibly *not* be subject to one of the most fundamental civil rights laws in our nation's history. If massive online organizations like Amazon are permitted to circumvent public accommodation laws, they will have carte blanch permission to confidently and boldly

discriminate against individuals and organizations solely on the basis of their race, color, religion, or national origin. It starts out with being denied access to programs like AmazonSmile—a "service, privilege, and advantage" of Amazon's business that is protected by Title II. But the real question is—where does it end? The slippery slope has no stopping point if the court permits large-scale, online-based businesses like Amazon to circumvent Title II solely because Title II was written at a time when the internet—and the concept of online business—was unheard of and was decades away. This Court's support of Amazon's position would effectively nullify the purpose, spirit, and intent of Title II. This law was written and passed at a time when Congress could never have foreseen or anticipated that many of the types of organizations covered by Title II would morph so drastically and significantly to the point where no brick and mortar presence would be needed even though they provide the same services as brick and mortar businesses. We are no longer just talking about moving African Americans, Hispanics, Christians, and Muslims (etc.) to the back of the bus. We are talking about completely kicking them *off* the bus (i.e., the internet)—effectively silencing their voices and denying them civil rights—solely on the grounds of the color of their skin or their religious beliefs. To do so would essentially reverse the broad range of protections provided by more-than fifty years of civil rights progress in America.

In this case, the Ministry is simply asking that this Court hold Amazon to the same standard as every brick and mortar entity covered by Title II: access to the same "services . . . privileges" and "advantages" that Amazon provides to every other 501(c)(3) nonprofit organization—the privilege to participate in AmazonSmile. For these reasons, the Ministry respectfully asks this Court to deny Amazon's Motion to Dismiss the Ministry's Title II religious discrimination claim.

IV.    **THE MINISTRY HAS SUFFICIENTLY PLEADED A CLAIM FOR NEGLIGENCE**

   A.  **The Ministry Properly Alleged That Amazon Breached Its Duty Not to Violate Title II.**

In Section III. B of the Amazon Defendants' Motion to Dismiss, Amazon argues that "Title II requires intentional discrimination in a place of public accommodation [and that the Ministry] has not alleged the Amazon Defendants intentionally discriminated against it or that the AmazonSmile program is a place of public accommodation." Mot. to Dismiss at 16–17.

With respect to the argument that the Ministry did not allege "that the AmazonSmile program is a place of public accommodation," Amazon is simply wrong. The First Amended Complaint alleges that both Amazon.com, Inc. and the AmazonSmile Foundation program are both places of public accommodation. FAC ¶¶ 17, 25, 150, 158, 171 &17.

Concerning Amazon's argument that Title II requires intentional discrimination, as discussed at length *supra* in Section III.C., the language of Title II contains no intent requirement. Rather, the statute supports a "strict liability" standard, which is equivalent to disparate impact, rather than the intentional discrimination standard that Amazon argues is applicable. The statute states: "all persons *shall be entitled* to the full and equal enjoyment of the "services, privileges, [and] advantages . . . without discrimination. . . ." 42 U.S.C. § 2000a(a). The grammatical structure of the words "shall be entitled" demonstrates that this statute is intended to provide an affirmative right to those in the protected classes, regardless of the intent, motive, or purpose of the discriminatory behavior or outcome.

Additionally, Amazon cites no binding legal support for its claim that Title II requires intentional discrimination in circumstances where no request is made by the plaintiff for a religious accommodation. In support of the alleged "intent" requirement, Amazon cites several cases, almost

all of which involve a plaintiff who requested and was denied a religious accommodation. Here, the Ministry never requested any type of religious accommodation. The Ministry only seeks equal treatment. In *Robinson v. Pizza Power*, the Middle District of Florida applied the U.S. Supreme Court's *McDonnell Douglas Corp.* burden-shifting Title VII test to a Title II race discrimination claim and determined that claims under Title II do "not require a showing of discriminatory intent." 993 F. Supp. 1462, 1465 (M.D. Fla. 1998). Rather, the test is one of "disparate impact," and "a prima facie case is established when the protected class [is] denied a service rendered to those falling outside of the class." *Id.*

Here, the Ministry's Complaint clearly alleges that the Ministry was denied access to the AmazonSmile program on the basis of its protected status (i.e., its religious beliefs). FAC ¶¶ 152-156. In addition, the Ministry also alleged that it has been denied a service that is available to those falling outside of the class. FAC ¶¶ 44, 152. Therefore, even if this Court were to take the position that "intent to discriminate" is a requirement for a Title II claim, the factual question would still exist as to whether Amazon did, in fact, intentionally discriminate. The Ministry's Complaint sets forth several factual allegations supporting the conclusion that Amazon did intentionally discriminate: (a) Amazon specifically chose SPLC's on-its-face religiously discriminatory hate-group criteria as its eligibility standard (FAC ¶¶ 44, 53-54); (b) SPLC placed the Ministry on the Hate Map because of the Ministry's religious beliefs regarding LGBT issues (FAC ¶¶ 56, 58); (c) Amazon (not SPLC) makes the ultimate decision as to who may or may not participate in the AmazonSmile program (FAC ¶ 43, 53.); and (d) despite the fact that Amazon is aware that SPLC placed the Ministry on its Hate Map because of its religious beliefs, Amazon has intentionally continued to deny the Ministry admission to the AmazonSmile program (Amazon did not choose its course in this litigation by accident) and has offered no legitimate explanation regarding why

this conduct is not religious discrimination. All of the aforementioned points provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim and provide "plausible" grounds for recovery. *Twombly,* 550 U.S. at 556. At the motion to dismiss stage, the facts alleged in the Complaint—that Amazon intentionally denied the Ministry access to the AmazonSmile program on the basis of its religious beliefs—must be accepted as true. *Paradise Divers, Inc.*, 402 F.3d at 1089.

Amazon continues on in its Motion to Dismiss by citing a number of cases allegedly in support of its claim that a negligence per se claim was not properly pleaded, but none of the cases cited are binding on this Court, and all of the cases cited are irrelevant for the following reasons:

1. *Scott v. Thomas & King, Inc*., 2010 WL 3603836 (S.D. Ohio Sept 9, 2010) (non-binding Ohio District Court case in which Amazon's analysis is entirely wrong: the case did not even involve a Title II claim; the language quoted by Amazon **does not appear in the decision**; and, contrary to what Amazon states in its discussion of the case, the plaintiff's negligence claim was not dismissed).

2. *Williams v. Ecivres Corp*., 1995 WL 127182 (S.D. Tex. March 23, 1995) (an unpublished, non-binding Title VII employment claim where the plaintiff claimed that it had already dismissed the negligence per se claim from the lawsuit, and the case was based on Texas law, which requires violation of a penal statute, not Alabama law, which is entirely different).

3. *Jackson v. City of Pittsburg*, 2009 WL 1684701 (N.D. Cal. June 12, 2009) (a non-binding California district court decision in which the plaintiff attempted to use a perjury statute requiring an intentional *mens rea* to establish negligence; here, however, Amazon has not shown that Title II requires intentional conduct).

4. *Houston v. Mile High Adventist Acad.*, 846 F. Supp. 1449 (D. Colo. 1994) (a non-binding Colorado District Court decision in which plaintiff attempted to apply an inapplicable Title VII employment claim (not Title II) to a private school student to establish a negligence per se claim).

5. *Finn v. Warren County*, 768 F.3d 441 (6th Cir. 2014) (a non-binding Sixth Circuit decision that held that a Kentucky statute that requires county governments to establish rules for the government, security, safety, and cleanliness of jails for the comfort and treatment of prisoners, and that required intent for finding a violation was not an appropriate basis for a negligence per se claim; here, however, Amazon has not shown that Title II requires intentional conduct).

6. *In re Genetically Modified Rice Lit.,* 666 F. Supp. 2d 1004 (E.D. Mo. 2009) (non-binding Missouri decision finding that two Missouri statutes that prohibit intentionally causing the loss of any crop and related conduct is not a valid basis for a negligence per se claim; here, however, Amazon has not shown that Title II requires intentional conduct).

In summary, Amazon failed to cite any cases that actually support its position that the Ministry's negligence per se claim was not properly pleaded. For this reason, Amazon's Motion to Dismiss fails to meet its burden to prove "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim. *Beck*, 144 F.3d at 735-36.

## B. The Class of People Protected by the Civil Rights Act of 1964, 42 U.S.C. § 2000a, Is Narrower Than the General Public, as Required by Alabama Law for a Per Se Negligence Claim.

Amazon cites *Winberry v. United Collection Bureau, Inc.* to support its argument that the Ministry "has not asserted a claim for negligence per se because it has not alleged that Title II

protects 'a class of persons which is narrower than the general public.'" 697 F. Supp. 2d 1279, 1293 (M.D. Ala. 2010) (citing *Parker Bldg. Servs. Co. v Lightsey ex rel. Lightsey*, 925 So. 2d 927 (Ala. 2005). However, neither *Parker* nor *Winberry* contains a requirement that the plaintiff *plead* that the statute in question "protects 'a class of persons which is narrower than the general public.'" Neither the words "plead" nor "pled," or any form thereof, appear in the Alabama Supreme Court's *Parker* decision. The issue of pleading is not addressed. The Alabama Supreme Court simply held that "the first element requires that the statute have been enacted to protect a class of persons. This Court has stated that a class of persons is to be distinguished from the general public." *Parker*, 925 So. 2d at 931. The non-binding earlier decision of the Middle District of Alabama in *Winberry* held: "The Alabama Supreme Court has explained that to prevail on a claim of negligence per se, a plaintiff must show that the statute allegedly violated protects a class of persons which is narrower than the general public." *Winberry,* 697 F. Supp. 2d at 1293. The *Winberry* decision also did not hold that the narrowness of the statute was a pleading requirement. Rather, the *Winberry* court simply held that the plaintiff must show the required narrowness of the statute to be the case, as is being accomplished here in this Response.

Title II specifically prohibits "**discrimination or segregation on the ground of race, color, religion, or national origin**" in places of public accommodation. 42 U.S.C. § 2000a(a) (emphasis added). The statute does not apply to the general public and offers no protection if an individual decides to exclude the general public from his establishment. If that were to occur, the establishment would also not meet the definition of "place of public accommodation" because it would not be "serv[ing] the public." 42 U.S.C. § 2000a(b). An individual is free to deny the general public entry to his establishment (whether physical or in cyberspace). However, if an individual decides to admit the general public but then denies access to specific classes of people based on

their "race, color, religion, or national origin," then the statute applies to prohibit discrimination **against those classes of people only**. 42 U.S.C. § 2000a. Further, the statute only prohibits discrimination against the classes of people specifically listed. ("[C]lass of persons" as the Alabama Supreme Court said in *Parker*, 925 So. 2d at 931.) The owner of a place of public accommodation would be free to discriminate against left-handed people or on the basis of any other class one could think of, provided the discrimination is not on the basis of one of the **specifically protected classes** listed in the statute. Therefore, 42 U.S.C § 2000a meets Alabama's negligence per se requirement for a statute that protects "a class of person which is narrower than the general public." *Parker,* 925 So. 2d at 931. As shown, Title 42 U.S.C. § 2000a offers no protection to the general public at large.

### C.  The Ministry's Negligence Claim Properly Pleaded a Private Harm.

In its final argument against the Ministry's negligence claim, Count IV, ¶¶ 167–182 of the First Amended Complaint, Amazon argues that "negligence per se is not available when the statute at issue was not intended to protect individuals from private harm." Mot. to Dismiss at 18. In support of this position, Amazon cites *Allen Trucking Co. v. Blakely Peanut Co.,* 340 So. 2d 452 (Ala. 1976) (sic) (Amazon cites this decision as originating from the Alabama Supreme Court, but the case was actually decided by the Alabama Court of Civil Appeals). The issue in *Allen Trucking Co.* was that "plaintiff's scales located at its place of business in Blakely, Georgia, were broke by a truck of greater weight than their capacity being driven over or upon them." *Id.* at 453. In support of its case, Allen Trucking obtained a negligence per se jury instruction concerning Ga. Code Annot., Title 95A, § 959. *Id.* The Court of Civil Appeals held as follows regarding this statute: "Title 95A, Section 959 prohibits trucks being operated upon the public roads from carrying more than designated maximum loads. Section 960 provides that a violation of Section 959 shall be

conclusively presumed to have damaged the public roads and the person operating the excessively loaded truck shall recompense the state for such damage according to a set amount per 1,000 pounds of excess." *Id.* at 454. Therefore, the statute cited as the basis of Allen Trucking's negligence per se claim was only intended to protect the State of Alabama, not Allen Trucking. *Id.* In reaching its decision, the Alabama Court of Civil Appeals also held: "It is the law that the violation of a statute is negligence per se **only as to those for whose benefit or protection it was enacted**. *Id.* at 453-54 (emphasis added).

Amazon continues on in its argument to cite *Newman v. Piggle Park Enters., Inc.* 390 U.S. 400, 401 (1968) for the quote that an action under Title II is "private in form only." However, the Supreme Court specifically stated in *Newman* that "[i]f [a plaintiff] obtains an injunction, he does so not **for himself alone** . . ." *Id.* at 402 (emphasis added.) This statement makes it clear that any injunction a plaintiff obtains under Title II is both **for himself** and for other people who are in the same class against which the defendant discriminated. *Id.* Therefore, *Newman* makes it clear that Title II of the Civil Rights Act of 1964 meets the Alabama negligence per se requirement that the statute used to provide the negligence per se duty be enacted for the benefit and protection of the plaintiff. *Id; Allen Trucking Co.,* 342 So. 2d at 454. Title II was intended to benefit both the Ministry and others in the Ministry's protected class who would benefit from the injunctions that ultimately would be issued under the statute. *Newman*, 390 U.S. at 402. Thus, Title II does permit individuals to be protected from private damages.

The issue in *Newman* was whether a private plaintiff was entitled to reimbursement of his attorney's fees in obtaining a Title II injunction that benefited both himself and others. *Id.* On this issue, the Supreme Court held: "It follows that one who succeeds in obtaining an injunction under that Title should ordinarily recover an attorney's fee unless special circumstances would render

such an award unjust." *Id.* The *Newman* decision does not address the question of whether a negligence per se claim can be brought along with a Title II claim, as Amazon attempts to imply. Amazon again cited the *Newman* case as stating: "When a plaintiff brings an action under that Title, he cannot recover damages." Mot. to Dismiss at 18 (quoting *Newman*, 390 U.S. at 402). Here, the Supreme Court was merely stating the obvious, that the only relief available under Title II (other than the potential payment of attorneys' fees) is an injunction. There is no provision in Title II for monetary damages. It was for this very reason, because monetary damages are not available under Title II, that the Ministry filed its negligence per se claim against Amazon alongside its Title II claim.

If there were any case law that actually held that a negligence per se claim cannot be brought alongside a Title II claim in Alabama, there is little doubt that Amazon would have found it. The fact that they were unable to locate such law, after decades of civil rights ligation under Title II, is a very strong indication that no such law exists, particularly since the burden at the motion to dismiss stage is on Amazon.

The Ministry properly alleged that Amazon.com and the AmazonSmile program are both places of public accommodation. Amazon has failed to show that intentionality is required by Title II. Even if intentionality is a proper element of a Title II claim, there is a question of fact regarding that issue, which is for a jury to decide, after proper discovery. Further, Amazon's argument that Title II is not a proper basis for an Alabama negligence per se claim must also fail, because Title II was enacted for the benefit and protection of successful plaintiffs in Title II claims and similarly situated individuals and entities, as required in *Allen Trucking Co. v. Blakely Peanut Co.,* 342 So. 2d 452 (Ala. Civ. App. 1976). This is a group narrower than the general public. Title II also permits individuals to be protected from private damages, as shown above.

For these reasons, Amazon's Motion to Dismiss fails to meet its burden to prove "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim." *Beck*, 144 F.3d at 735-36. Therefore, the Motion to Dismiss must be denied with respect to the Ministry's negligence per se claim.

## V.   APPLYING TITLE II TO AMAZONSMILE WOULD NOT VIOLATE THE FIRST AMENDMENT BECAUSE IN AMAZONSMILE'S CAPACITY AS A CONDUIT FOR DONATIONS, IT HAS NO FIRST AMENDMENT RIGHTS.

For the final argument in support of its Motion to Dismiss, Amazon cites Supreme Court cases for the following holdings: It is "a bedrock principle that, except in perhaps the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support. *Harris v. Quinn*, 134 S. Ct. 2618, 2644 (2014)." Mot. to Dismiss at 19. Amazon goes on to cite *United States v. United Foods*, *Inc.* for the holding: "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government . . . from compelling certain individuals to pay subsidies for speech to which they object." *United States v. United Foods, Inc.* 533 U.S. 405, 410 (2001); Mot. to Dismiss at 19. However, Amazon has the factual basis of the instant case entirely wrong. Despite how the AmazonSmile Foundation wants it to look, the Foundation is not making contributions to the organizations that are enrolled in the AmazonSmile program. Rather, Amazon's customers, including the Ministry and its supporters, are making these donations. (The Ministry has an account with Amazon.com and purchases items for the Ministry from the Amazon Defendants.[12]) Because the vast majority of the millions of items that are available for purchase through Amazon.com are also available for purchase through AmazonSmile at smile.amazon.com,

---

[12] This is information "of which plaintiff had knowledge and relied on in bringing suit." *Gordon*, 859 F. Supp. at 1528.

Amazon's customers have considerable discretion in determining whether they wish to simply purchase items from the Amazon.com website or through the AmazonSmile program at smile.amazon.com. FAC ¶ 15.

In fact, the AmazonSmile website specifically states: "What is AmazonSmile? AmazonSmile is a website operated by Amazon that **lets customers enjoy the same wide selection of products, low prices, and convenient shipping features as on Amazon.com.** The difference is that **when customers shop on AmazonSmile (smile.amazon.com)**, the AmazonSmile Foundation will donate 0.5% of the price of eligible purchases **to the charitable organizations selected by customers.**" (emphasis added) FAC ¶ 43. Therefore, the Amazon Defendants make it clear that it is the customer's choice to decide whether he or she wants to make a donation by shopping on the AmazonSmile website. Alternatively, the customer can simply choose not to donate, by shopping on the Amazon.com website. Nowhere does Amazon claim that any items that are available on the AmazonSmile website are NOT available on the Amazon.com website. It is the customer's money that is potentially being donated to the charities that are enrolled in the AmazonSmile program, not AmazonSmiles'. It is the customer's decision to which charity the money will be donated, not the Amazon Defendants'. It is only in the rarest of cases, where contributions are made to an organization that has withdrawn from the AmazonSmile program, that the Amazon Defendants decide which charity should receive the money. This is clear from the description of the program contained in the First Amended Complaint. FAC ¶¶ 12, 13, 14 - 17, 23 - 24, 41 - 44, 50, 86, 170, 173, and 177. The Amazon Defendants are nothing but a conduit through which the charitable donations flow. The decision to make a contribution and to whom the contribution will be sent belongs entirely to the customer.

Amazon goes on to cite a number of cases to support the proposition that it has a First Amendment right that will be violated if Amazon's customers (including the Ministry) decide to donate money to the Ministry through the AmazonSmile program. Those cases include:

1. *Harris v. Quinn*, 134 S. Ct. 2618, 2644 (2014) (holding that "[t]he First Amendment prohibits the collection of an agency fee from personal assistants in the Rehabilitation Program who do not want to join or support the union").

2. *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 317 (2012) (which held "that the First Amendment does not permit a union to extract a loan from unwilling nonmembers even if the money is later paid back in full").

3. *Abood v. Detroit Bd. Of Educ.*, 431 U.S. 209, 235-36 (1977) (holding that a union may collect fees for ideological or political activities, but "the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment").

4. *United States v. United Foods, Inc*., 533 U.S. 405, 411 (2001) (holding that the "First Amendment concerns apply here [where a Mushroom Council is collecting fees from mushroom producers to be used for an advertising program to support mushroom sales] because of the requirement that producers subsidize speech with which they disagree").

5. *Summit Med. Ctr. of Ala., Inc. v. Riley,* 274 F. Supp. 2d 1262, 1269-70 (M.D. Ala. 2003) (holding that "a statute that does not require physicians to pay for state-authored informational materials, but only requires physicians to inform a woman about the availability of the materials, and provide these materials to her should she choose to see them, does not violate the First Amendment).

What all of these cases have in common is that they make it clear that **the party that is functioning as a conduit** between the party paying for or requesting the speech and the party on the receiving end that is actually engaging in the speech or service does NOT have First Amendment rights regarding the speech. For example, in *Summit Med. Ctr. Of Ala.*, the Middle District of Alabama found it was the patient who had the First Amendment right to determine whether she wanted to receive pro-life materials provided by and paid for by the state. The doctor, the conduit in the middle, did not have a First Amendment right to refuse to provide the materials. *Summit Med. Ctr. Of Ala.,* 274 F. Supp. 2d 1269-70.

In *United States v. United Foods, Inc.*, the Supreme Court held that it was the mushroom producers who were paying for the speech, and it was the mushroom producers who held the First Amendment right to object to paying for speech with which they disagreed. The Mushroom Council, acting as a conduit, did not have First Amendment rights to arrange for speech with the producers' money, if the producers objected. *United Foods, Inc.*, 535 U.S. at 411.

In *Harris v. Quinn, Abood v. Detroit Bd. Of Educ.,* and *Knox v. Serv. Emps. Int'l Union, Local 1000,* the Supreme Court held that it was the employees who had the right to object to spending their money on union political activities with which they disagreed. The Court did **not** hold that the **employers** (who would have withheld the payments for union political activities from the employee's paychecks—acting as a conduit) had a First Amendment right to object to payment of these union dues. *Harris*, 134 S. Ct. at 2644; *Abood*, 431 U.S. at 235-36; *Knox*, 567 U.S. at 317. In each case the employer was only a conduit through which the dues were passing from the employees to the union, against the employees' will. It was the employees who had the First Amendment right to object to their money being spent on political activities with which they did

not agree, not their employers. *Harris*, 134 S. Ct. at 2644; *Abood*, 431 U.S. at 235-36; *Knox*, 567 U.S. at 317.

Here, AmazonSmile serves as nothing but a conduit for the money donated by Amazon customers to charities that are chosen by Amazon's customers. Just as the court found in every case Amazon cited, the conduit (Amazon Defendants) does not have First Amendment rights regarding the money donated by their customers to a charity of the customer's choice. *United Foods, Inc*., 535 U.S. at 411; *Harris*, 134 S. Ct. at 2644; *Abood*, 431 U.S. at 235-36; *Knox*, 567 U.S. at 317; *Summit Med. Ctr. Of Ala.,* 274 F. Supp. 2d 1269-70. Rather, the First Amendment rights belong to the customers, like the Ministry, who wish to donate to a charity of their choice. By denying the Ministry access to the AmazonSmile program on the basis of the Ministry's religion, Amazon is denying the Ministry a 0.5% discount on every purchase it makes because the Ministry could otherwise receive the 0.5% back from the AmazonSmile program purchase if it selected itself as the charity to receive the donation. FAC ¶ 42. Additionally, the Ministry would be able to receive donations from its supporters. *Id*. It is the First Amendment rights of the Ministry and its donors that are being violated, not the rights of the Amazon conduit in the middle. *United Foods, Inc*., 535 U.S. at 411; *Harris*, 134 S. Ct. at 2644; *Abood*, 431 U.S. at 235-36; *Knox*, 567 U.S. at 317; *Summit Med. Ctr. Of Ala.,* 274 F. Supp. 2d 1269-70.

At the conclusion of its First Amendment section, Amazon raises a political speech argument. Mot. to Dismiss at 21-22. Political speech is properly described as "Discussion of public issues and debate on the qualifications of candidates." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). Neither Amazon nor the Ministry is a candidate for any public office, nor is the Ministry's designation as a hate group by SPLC a public issue. Rather, the Ministry is a private organization that has been defamed by SPLC. The designation of the Ministry as a hate group by SPLC, and

the use of that designation by Amazon, is, therefore, not political speech (and even if there were a legitimate question about this issue, that would be a question for the finder of fact after discovery has been completed).

**CONCLUSION**

Amazon's Motion to Dismiss clearly fails to prove that it is *beyond doubt* that the Ministry can prove no set of facts to support its claims. For this reason, Amazon's Motion to Dismiss must be denied. *Beck*, 144 F.3d at 735-36.

DATED this 29th day of November, 2017

Respectfully submitted,

/s/ David C. Gibbs III
David C. Gibbs III, Esq.
Fla. Bar No. 0992062
The National Center for
Life and Liberty, Inc.
2648 FM 407, Suite 240
Bartonville, TX 76226
Telephone: (727) 362-3700
Facsimile: (727) 398-3907
Email: dgibbs@gibbsfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of November, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing (NEF) to all counsel of record.

/s/ David C. Gibbs III    .
David C. Gibbs III, Esq.
Fla. Bar No. 0992062
The National Center for
Life and Liberty, Inc.
2648 FM 407, Suite 240
Bartonville, TX 76226
Telephone: (727) 362-3700
Facsimile: (727) 398-3907
Email: dgibbs@gibbsfirm.com