**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CORAL RIDGE MINISTRIES MEDIA, INC.** | ) | |
| **d/b/a D. James Kennedy Ministries** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:17-cv-566-MHT-DAB** |
| **AMAZON.COM, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**REPLY BRIEF OF THE SOUTHERN POVERTY LAW CENTER, INC.,
IN SUPPORT OF ITS MOTION TO DISMISS**</u>

**I.      INTRODUCTION**

Comes now the Southern Poverty Law Center, Inc., (SPLC) and replies to Coral Ridge

Ministries Media, Inc.'s, (CRM Media's) Response Brief (Doc. 51) in opposition to the SPLC's

Motion to Dismiss Amended Complaint and Brief in Support Thereof (Doc. 42).

At the outset, it should be noted that throughout its brief CRM Media takes the position

that the motion-to-dismiss standard that predated the Supreme Court's decisions in *Bell Atlantic

v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v Iqbal*, 556 U.S. 662 (2009), should apply to this

case.  Citing a 1988 case, CRM Media argues that it should prevail "'unless it appears ***beyond

doubt*** that the plaintiff can prove no set of facts in support of [its] claim.'"  Doc. 51 at 2

(emphasis in original).   CRM Media then cites a 1989 case for the proposition that dismissal is

"only appropriate 'where it is certain that no relief could be granted under any set of facts that

could be proved.'" Doc. 51 at 2.  Based on these outdated standards, CRM Media takes the

position that it is entitled to obtain discovery. *See, e.g.,* Doc. 51 at 37.

This epitomizes CRM Media's approach in this case. It appears to be employing litigation

1

strategies targeted not toward stating truly viable claims but toward increasing the costs and burdens the SPLC will incur in defending nonviable causes of action. To permit CRM Media's claims to survive the Motion to Dismiss would undermine the First Amendment protections that are at stake and would have a profound chilling effect on the speech of public interest groups. It would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964).

Likewise, CRM Media should not be allowed to make use of these claims "to gain access to court-sanctioned discovery unless [it has] made a prima facie showing that speech which appears fully protected is in fact undeserving of full First Amendment protection. Allowing such suits to proceed without such a showing could cast a substantial chill" on freedom of speech and the "robust exchange of ideas." *Gordon & Breach Science Publishers, S.A., STBS, Ltd. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1543 (S.D.N.Y. 1994) (noting that a different decision in that case would have had a chilling effect in an academic and nonprofit context).

## II.  DEFAMATION

### A.  CRM Media has failed to adequately plead actual malice.

#### 1.  The SPLC's definition of hate group does not show actual malice.

As explained in its initial briefing, the SPLC is entitled to prevail on its Motion to Dismiss because CRM Media has not satisfied the requirements to plausibly allege actual malice. *See Twombly, Iqbal, & Michel v. NYP Holdings, Inc.,* 816 F.3d 686 (11th Cir. 2016). To quote *Iqbal*, this requires "well-pleaded facts" (not conclusory statements or "naked assertions devoid of further factual enhancement") that permit the court to infer more than "the mere possibility of misconduct" but that show "that the pleader is entitled to relief." *Iqbal, supra* at 678-79 (internal

quotation marks omitted).  To prevail on a defamation claim, a plaintiff that is a public figure like CRM Media must allege facts that would establish actual malice by clear and convincing evidence, which CRM Media has failed to do. *See Michel, supra* (pleading requirement)*; Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 333 (Ala. 2007) (for clear and convincing evidence requirement).

In its attempt to show that it has alleged actual malice, CRM Media makes several wrong turns.  First, it argues that actual malice exists by taking the position that there is a legal and/or commonly-accepted definition of the term "hate group" and that the SPLC acted with actual malice in defining the term itself rather than using the allegedly commonly accepted definition.

CRM Media begins this argument by asking the Court to take judicial notice of the definition of "hate group" in an FBI manual.[1]  The FBI manual's definition is not the result of legislation nor the result of a public survey to determine any commonly-held understanding of the term.  Rather, the FBI manual makes it clear that the agency needed to create a definition so that individuals collecting certain data for FBI purposes would be collecting common data: "To ensure uniformity in reporting nationwide, the FBI Uniform Crime Reporting (UCR) Program has adopted the following definitions for use in hate crime reporting."  Federal Bureau of Investigations,  https://ucr.fbi.gov/hate-crime-data-collection-guidelines-and-training-manual.pdf at 9.  No such definition would have been necessary had there existed a legal or commonly accepted definition of the term.  The FBI manual defines the term as follows: **"Hate Group**–An organization whose primary purpose is to promote animosity, hostility, and malice against persons of or with a race, religion, disability, sexual orientation, ethnicity, gender, or gender

---

[1]Judicial notice may only be taken as to the existence of the definition in the manual at issue, not as to its accuracy or that it is legally binding or controlling in this case.

identity which differs from that of the members or the organization, e.g., the Ku Klux Klan, American Nazi Party." Doc. 51 at 5.

Next CRM Media cites the definition given by the Anti-Defamation League (ADL). The ADL Definition (which CRM Media did not quote in its entirety) is: "An organization whose goals and activities are primarily or substantially based on a shared antipathy towards people of one or more other different races, religions, ethnicities/nationalities/national origins, genders, and/or sexual identities. The mere presence of bigoted members in a group or organization is typically not enough to qualify it as a hate group; the group itself must have some hate-based orientation/purpose." Doc. 51 at 5 & n.1.

The SPLC definition of a hate group is not far removed from the FBI and ADL definitions. As acknowledged by CRM Media, it is: "All hate groups have beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics." Doc. 40 (First Amendment Complaint (FAC)) at Par. 59. The main difference appears to be that the FBI definition states that the primary purpose of the group must be antipathy toward other groups, whereas the ADL states that goals and activities of the group must be substantially based on antipathy towards other groups, while the SPLC's definition requires that beliefs or practices of the group attack or malign other groups.

CRM Media itself proposed a fourth definition of hate group in its First Amended Complaint: "[T]he law defines a hate group as one whose activities include violence and crime." Doc. 40 at Par. 65. The total absence of any mention of this definition in its response brief indicates that CRM Media could find no citation in statutes, case law, administrative materials, or the public interest arena that would support its alleged definition. And, it should be noted that

none of the other three definitions (FBI, ADL, SPLC) requires that the group be violent or criminal.

Each of the four definitions expresses each entity's subjective opinion as to what constitutes a hate group.  As a matter of free speech and the free exchange of ideas, the SPLC has a right to define hate group as a group that has beliefs or practices that attack or malign another group, even if the group with such beliefs or practices claims to have other purposes or goals, and even if the group commits no crimes or acts of violence, whether CRM Media likes that definition or not.  *See U.S. v. Schwimmer*, 279 U.S. 644, 654-55 (1929) (free speech includes and requires freedom for the thought "that we hate") (Holmes, J.)   Indeed, such groups may wreak just as much damage, albeit perhaps in different forms, as the Ku Klux Klan or the American Nazi Party because they are clothed in seemingly mainstream attire.

Having failed to establish some commonly held definition of hate group, CRM Media next argues that several cases stand for the proposition that "[c]ase law goes even further than the FBI's definition of 'hate group,' generally recognizing and describing specific hate groups as committing violent acts and seeking to intimidate people with illegal activities, violence and crime."  Doc. 51 at 5.  First, as noted above, neither the FBI nor the ADL define a hate group as one that commits "violent acts," "illegal activities" or "crime."   But more importantly, as explained in the SPLC's principle brief (Doc. 42 at 9-10), the cases cited by CRM Media do not define the term hate group, and the Supreme Court cases cited, *Virginia v. Black,* 538 U.S. 343, 352-57 (2003), and *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 770 (1995), do not even mention the term.  The other two cases mention the term only in passing without any

analysis as to the meaning of the term, as explained in the SPLC's main brief.[2]   It is hard to believe that CRM Media would continue to characterize these cases as creating a legal or even generally accepted definition of the term hate group.

In fact, CRM Media seems to acknowledge that there is no "controlling legal definition." Doc. 51 at 6.  CRM Media retreats to the position that "what really matters is what the normal reader or hearer would think is meant" by the term.  Doc. 51 at 6.  At this point, CRM Media falls back on the FBI and ADL definitions of hate groups and takes the position that these definitions show that hate groups are commonly understood as having the "singular – primary – purpose of hatred toward a specific group of people and that the natural outgrowth of such hatred is the lawlessness and violence that so often accompanies these groups' behaviors."  Doc. 51 at 7.  Interestingly, in making this very statement, CRM Media has articulated yet another (and different) definition for hate group, *i.e.*, one with a singular purpose of hatred and one in connection with which the natural outgrowth is lawlessness and violence.  Neither the FBI nor ADL define hate groups this way.  As noted earlier, the different definitions of hate groups presented in the First Amended Complaint and the briefing in this case alone indicate there is no standard or generally accepted definition of hate group.

The bottom line is that CRM Media cannot show that the SPLC acted with actual malice merely because it defines a hate group as one that has beliefs or practices that attack or malign an entire class of people.   The SPLC is not required to adopt any other entity's hate group definition. Moreover, as discussed below, the SPLC discloses its definition along with the hate

---

[2]For instance, in one opinion the court simply cites to a letter written by the plaintiff referring to the KKK as a hate group.  This does not even remotely establish the existence of a standard definition of the term, and certainly not something that could give rise to a finding of actual malice under the allegations in this case.

group designation such that a reader is able to discern from the Hate Map materials the definition used.

### 2. That CRM Media's anti-LGBT positions are allegedly based on biblical language or a moral stance[3] does not show actual malice.

CRM Media argues that under the SPLC's definition every organization in the world that "takes the view that homosexuality and same-sex unions are morally wrong (whether because they believe in traditional values or whether their belief is based on the Bible) is a 'hate group.'" Doc. 51 at 8. That is simply not the case. Only those groups whose beliefs or practices then lead them to attack or malign other groups will meet the SPLC's definition of a hate group. Even taking only the facts as alleged in the Complaint as true (even though SPLC relied on other information), CRM Media can be distinguished from other religious organizations that do not see opposition to the "homosexual agenda" as central to their missions and do not take a public position that LGBT peoples' rights are undermining the moral framework on which this country was built. CRM Media not only makes these facts plain in its First Amended Complaint (as explained in the Motion to Dismiss). Nor does CRM Media try to back away from these positions in its brief: "Yes, the Ministry has been vocal about its position on homosexuality because it believes the Bible speaks clearly about God's intent for marriage and sexuality, and

---

[3]Next CRM Media argues that the SPLC admits twice that the (sole) basis for CRM Media's designation as a hate group is CRM Media's (D. James Kennedy Ministry's) stance on LGBT issues. Doc. 51 at 8. This is misleading at best. CRM Media repeatedly alleges that the basis for the SPLC's designation was the Ministry's stance on LGBT issues. *See, e.g.,* Doc. 40 at Par. 156. The SPLC never admitted that it relied solely on the Ministry's stated position on LGBT issues, but argued that, even if it had relied solely on the positions CRM Media admitted in the First Amended Complaint (its stance on LGBT issues, is opposition to the "homosexual agenda," its goal of spreading those positions internationally, its position that LGBT rights undermine the moral basis on which the country was built, and the centrality of those positions to its mission[3]), the SPLC would be entitled to prevail here.

speaking out on these issues is necessary to fulfill the Ministry's stated purpose... ."  Doc. 51 at 10.

### 3. CRM Media's self-described purposes do not show actual malice on the SPLC's part.

CRM Media's reliance on its own bylaws is not relevant to the actual malice inquiry, and its argument that it cannot be deemed a hate group because "nowhere in the purpose or action of the Ministry is there hate or any room for hate" is unavailing.  Doc. 51 at 12. The mere fact that CRM Media does not state in its bylaws that a purpose of its organization is to attack or malign LGBT people does not amount to a plausible allegation of actual malice.[4]  Denials by plaintiffs are not sufficient to support a finding of actual malice.  *See, e.g. Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 692 n.37 (1989) ("denials, however vehement...are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.") (internal quotation marks and citations omitted).  And no proposed definition of a hate group mandates that the organizations' bylaws set out that hate be a primary purpose of the organization.

In addition, whether CRM Media considers itself as having "no room for hate" is not a basis for finding actual malice.  The SPLC's position is substantiated by the facts CRM Media itself alleges – CRM Media's broadly disseminated teachings about LGBT people, its "vocal"

---

[4]Incredibly, CRM Media takes the SPLC's argument in an earlier brief (now moot due to the Amended Complaint) completely out of context at page 12 of Document 51.  CRM Media states that the SPLC acknowledged that the "Ministry advances the Gospel of Jesus Christ, and encourages Christians to love all people, including homosexuals."  Doc. 51 at 12.  The SPLC never acknowledged that CRM Media loves homosexuals, but that, instead, it expected CRM Media would make that argument and that such an argument was a mere self-serving denial which is never sufficient to overcome actual malice. *See Harte-Hanks Commc'ns, Inc., supra.* Moreover, the self-serving denial is not consistent with CRM Media's position as to LGBT people and their "vile" sexual orientations.

opposition[5] to the "homosexual agenda," the centrality of this position to its mission, and its professed concern that said agenda is undermining the moral framework on which this nation was built does attack or malign an entire class of people.[6]

### 4. That governments previously denied LGBT people equal rights does not show actual malice on the SPLC's part.

CRM Media also argues in its attempt to show actual malice that, until recently, some of its views toward LGBT people were the majority view and in line with state legislatures and former Supreme Court opinions.  This is further evidence that the issue here – the anti-LGBT-hate group designation – is at the center of differing and changing opinions relative to the rights of LGBT people making it all the more a matter of public concern and First Amendment protections. Moreover, political and religious positions that were common in the early 1900s and which led to Jim Crow and anti-miscegenation laws would today be considered "beliefs or practices that attack or malign an entire class of people … for their immutable characteristics." And, as explained in the SPLC's earlier brief, the First Amendment exists so that groups like the SPLC (and CRM Media) can state their views, seek change, or attempt to block it.  None of these arguments suggests that the SPLC acted with actual malice.  CRM Media clearly has beliefs that attack or malign LGBT people based on their sexual orientation.  In fact, it is central to their very mission to publish and promote positions that attack or malign LGBT people.  And, contrary to CRM Media's arguments, the fact that such beliefs were once widely accepted does not mean that the SPLC acted with actual malice in concluding that CRM Media is an anti-LGBT hate group.

---

[5] *See* Doc. 51 at 10.

[6] *See, e.g.,* Doc. 40, Pars. 38 (mission to proclaim the gospel on which this nation was founded), 58 (D. James Kennedy Ministries was declared hate group for espousing principles on sexuality on which this nation was founded), 82 (reference to opposition to "homosexual agenda"), 155 (anti-LGBT beliefs), 156 (anti-LGBT beliefs intertwined with Ministry's theology), 174, 175.

### 5. That the SPLC is a public interest group with an "agenda" does not show actual malice.

CRM Media also accuses the SPLC of having an "agenda" in connection with its definition of a hate group.  Doc. 51 at 9-10.  While the word agenda implies a negative connotation, it is a fact that the SPLC has a purpose or cause, *inter alia*, to report on and expose hate and extremism in all its forms. First Amendment case law makes it clear that public interest organizations have a right to promote their agendas and that their ability to do so is central to American freedom and democracy.  *See, e.g., Village of Schaumberg v. Citizens for Better Env't*, 444 U.S. 620, 632 (1980) (charities' speech is protected as it involves "propagation of views and ideas, and the advocacy of causes.")  In a similar vein, the constant references in the CRM Media brief and the First Amended Complaint to monetary interests and the SPLC's success in raising funds to support its work are made in bad faith.  That the SPLC has been successful in raising funds in connection with its public interest work does not undermine its right to the protection of the First Amendment.[7]

### 6. Allegations about mode and extent of publication do not show actual malice.

Next, CRM Media argues that it has established constitutional actual malice by making allegations about the mode and extent of publication of the Hate Map.  CRM Media cites *Sanders v. Smitherman*, 776 So. 2d 68, 73 (Ala. 2000), for this proposition.  *Sanders* held:

> "Actual malice '... may be shown by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of publication, and the like.'" *Willis v. Demopolis Nursing Home, Inc., 336 So. 2d 1117, 1120 (Ala. 1976).* However, proof of actual malice in the context of

---

[7]CRM Media's child-abusing-organization analogy (Doc. 51 at 11) is also not apt.  The SPLC disclosed the basis/definition of a hate group when it published the hate-group designation.  If in CRM Media's hypothetical a concurrent disclosure of its definition of child abuse had been made, there would unquestionably be no basis for finding actual malice.

> claims against public figures also requires a showing that the statements were made with actual knowledge of their falsity or with reckless disregard for their truth or falsity. *New York Times Co. v. Sullivan, 376 U.S. at 279-80.*

*Sanders*, 776 So. 2d at 73 (emphasis added).   In other words, as a matter of constitutional law, a plaintiff simply does not get to the issue of "the mode and extent of publication" unless and until he proves that he has plausibly pled, in a manner that satisfies *Iqbal/Twombly* and *Michel*, that the statement at issue was made "with actual knowledge of [its] falsity or reckless disregard for [its] truth or falsity."   *Sanders, supra*.   And reckless disregard is defined as knowledge of the statement's probable falsity.   *See, e.g., St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).   Thus, proving the extent of publication does not satisfy CRM Media's burden here.

In conclusion, CRM Media has not alleged well-pleaded facts that could show by clear and convincing evidence the existence of actual malice in connection with the SPLC's designation of it as a hate group.   This failure requires dismissal of its defamation claim independent of the other issues raised in the Motion to Dismiss.

### B.   The Anti-LGBT-hate-group designation is an opinion protected by the First Amendment and not provably false.

CRM Media next argues that the anti-LGBT-hate-group designation is a fact capable of being proven false rather than an opinion subject to full constitutional protection.   This Court need not reach this issue because CRM Media's failure to allege actual malice ends the inquiry. However, even if CRM Media had adequately alleged actual malice, the defamation count is still due to be dismissed.

First, CRM Media contends again that the SPLC's opinion is invalid because there is a standard by which the term hate group is defined and understood.   Doc. 51 at 15.   Basically, CRM Media argues that its primary purpose is not hate or promoting acts of violence.   As

explained earlier, the cases it cites are of no help or relevance in establishing a legal or commonly accepted definition of a hate group.

Next CRM Media seems to argue that it cannot be a hate group because its position as to LGBT people derives from Bible verses.  The mere fact that CRM Media takes the position that its anti-LGBT stance derives from Bible verses is not relevant to whether the SPLC's designation can be proven false.  Religious texts can be (and have been) used as the basis for hate toward various classes of people across history.  CRM Media is not a hate group based on the derivation of its beliefs—it is a hate group because, in the opinion of the SPLC, CRM Media's practices or beliefs have led it to attack or malign LGBT people.  Either way, the designation is not provable as false.[8]

CRM Media also argues that the hate group designation cannot be an opinion because the SPLC allegedly trains law enforcement officers and offers intelligence to law enforcement.  Doc. 51 at 16-17.[9]  This argument misses the point.  The constitutional issue is whether it can be disproven that CRM Media is a hate group as the term is defined by the SPLC, not to whom the opinion might have been communicated.

In a similar vein, CRM Media takes the position that because AmazonSmile relied on the SPLC's designation of D. James Kennedy Ministries as a hate group, the designation is not a subjective opinion.  People rely on entity's subjective opinions in the form of reviews and

---

[8]While CRM Media is correct in noting that the seminal case on this issue, *Milkovich* v. *Lorain Journal Co,* 497 U.S. 1, 20 (1990), speaks about "connotations" as in a "provably false factual connotation," the bottom line in the case is that the "a statement on matters of public concern must be provable as false before there can be liability." *Id*. at 19-20.  Thus, "provable as false" is the ultimate standard.

[9]CRM Media also takes the position that the use of the word "Intelligence Report" by the SPLC is evidence that the anti-LGBT hate group designation was not an opinion.  However, no such report was mentioned in the Complaint, and it should not be a basis on which to rule against the SPLC, nor would it undermine the SPLC's position here had it been.

designations in many circumstances.  And, as stated in the initial brief (Doc. 42 at 15), the fact that another organization relies on such an opinion does not make it actionable in defamation. To accept this position would be to convert the damages element of the defamation cause of action into part of the First Amendment analysis.  Nor does CRM Media cite any precedent for such a position.[10]

CRM Media also argues that SPLC's so-called "agenda" somehow renders its analysis as to whether CRM Media is a hate group a provably false fact instead of an opinion.  CRM Media places special emphasis on one comment from an SPLC employee over ten years ago regarding shutting hate groups down as evidence that the "the differences between the SPLC and the Ministry are not simply differences of opinion."  Doc. 51 at 18.

However, even if this were the SPLC's position as to all entities it designates as hate groups, the passion with which people seek change does not render their ideas any less protected by the First Amendment.  Expressions of differences of opinion on matters of public concern are very often passionate, but are nonetheless fully protected by the First Amendment and, in fact, the passion with which people hold their views is all the more reason to protect their right to express them.  *See, e.g., Terminiello v. City of Chicago*, 337 U.S. 1 (1949) (speech serves its "highest purpose" when it "induces a condition of unrest … or stirs people to anger."); *Cantwell v. Connecticut,* 310 U.S. 296, 310 (1940) (even "vilification" of men is protected speech.)

---

[10]Moreover, the First Amended Complaint notes that AmazonSmile rejects groups that "engage in, support, encourage, or promote … hate."  Doc. 51 at 17-18. Even if AmazonSmile had relied on the SPLC's hate group designation, as such, as CRM Media argues, it clearly understood hate group to mean a group that supports, encourages, or engages in hate.  AmazonSmile did not conclude that the hate group designation meant that the group's stated primary purpose must be to promote hate or that the group had to be violent. So the defamatory meaning attributed by CRM Media to the term hate group (a group that is violent and lawless with its primary stated purpose being antipathy toward another group) was not the meaning AmazonSmile attributed to the term.

The last argument that CRM Media makes in an effort to overcome the protection afforded to the SPLC's opinion is that the hate group designation is not political speech, an argument repeated in the Lanham Act section of its brief.   CRM Media argues that only discussion about a candidate's qualification is political speech.   Doc. 51 at 19.   While the term political speech is defined in some contexts that way, the issue here is really whether the SPLC hate group designations are matters of public concern.   "[S]peech on 'matters of public concern' ... is 'at the heart of the First Amendment's protection.' "  *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011).

The hate group designation, CRM Media seems to argue, is not made within the context of any "public debate"[11] and is somehow therefore not a matter of public concern but is used, according to CRM Media, merely to destroy organizations "while making money from the process."   Doc. 51 at 19.   It is difficult to understand any context in which the SPLC's hate group designations would *not* be a matter of public concern fully protected by the First Amendment.   History is full of examples of groups with racist, xenophobic, and homophobic beliefs taking actions that had disastrous results for their fellow citizens. Speaking out about intolerance and hatred is at the heart of that speech which is most protected by the First Amendment. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers,* 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

---

[11]Contrary to CRM Media's argument, the fact that CRM Media was not invited to a public debate regarding whether it should be considered a hate group (Doc. 51 at 20) does not make the SPLC's position any less speech in connection with a matter of public concern afforded full First Amendment protection.

CRM Media has failed to show that the hate-group designation is anything other than an opinion on a matter of public concern that is fully protected under the First Amendment. Thus, the defamation count is due to be dismissed on this independent ground.

### C. SPLC's common-law argument also requires dismissal of the defamation claim.

CRM Media takes issue with the SPLC's reliance on the Restatement (Second) of Torts which holds as a matter of common law that an opinion based on disclosed, non-defamatory facts cannot be defamatory.   Again, this Court need not reach this issue because CRM Media failed to allege facts that would show actual malice or that the hate group designation is not a provably false fact or connotation, both of which are independent and adequate bases upon which to dismiss the defamation claim. CRM Media argues that the hate group designation indicates to the common man that D. James Kennedy Ministries' primary purpose is promoting hatred toward another group and that it is lawless and violent.  Even if there were a commonly held definition of a hate group (there is not), the SPLC would still be entitled to prevail because it stated in conjunction with the designation that the designation was based on the SPLC's assessment that D. James Kennedy Ministries has "beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics" and that LGBT people were the class at issue in the D. James Kennedy Ministries designation.  Doc. 40, Pars. 56 & 64 (showing that the information at issue was provided together on the Hate Map website).

As explained earlier, given the facts alleged in the First Amended Complaint, CRM Media cannot show that this disclosed basis for SPLC's position is itself defamatory.  As the Alabama Supreme Court explained in *Sanders v. Smitherman:*

> [T]he underlying facts, which are the basis for [the defendant's] opinion, are the relevant area of inquiry and, as previously indicated, they have not been refuted. This case presents a classic example of statements of opinion relating to matters

of public concern. One cannot recover in a defamation action because of another's expression of an opinion based upon disclosed, nondefamatory facts, no matter how derogatory the expression may be. *Restatement (Second) of Torts § 566 cmt. c* (1977). This is so because the recipient of the information is free to accept or reject the opinion, based on his or her independent evaluation of the disclosed, nondefamatory facts.

While it is true that on the Hate Map the SPLC did not disclose every underlying fact upon which it based its opinion that D. James Kennedy Ministries was a hate group, it did disclose the basis for that conclusion, *i.e.*, that the group had "beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics" and that the "class of people" at issue were LGBT people.  Because CRM Media's own allegations show that it is central to its mission that it publicly and internationally espouse beliefs that malign LGBT people as discussed in more detail previously in this brief and in more depth in the motion to dismiss, CRM Media cannot show that the underlying basis for the SPLC's hate group opinion is defamatory. Thus, under the Restatement and the common-law set out in *Sanders*, the SPLC is entitled to prevail.

CRM Media also contends that the underlying basis for the hate group opinion was not necessarily disclosed to "AmazonSmile and other similar users." Doc. 51 at 22 (quoting FAC, Doc. 40, Par. 45).  This allegation is simply not plausible and does not meet the *Twombly* or *Iqbal* test.  First, the First Amended Complaint makes it clear that the Hate Map itself contains the definition of a hate group and the anti-LGBT designation.  Doc. 40, Pars. 56 & 59. Even if, as CRM Media puts it, "the [hate group] information transmitted [to AmazonSmile] is binary in nature and is something upon which a computer program, like AmazonSmile's software, can act," Doc. 51 at 22, that would not, even if true, suggest or imply that the decision makers at Amazon and AmazonSmile lacked the hate group definition or the anti-LGBT designation when they made the decision to exclude those groups.  Indeed, clearly AmazonSmile's management

understood perfectly well the parameters of the SPLC's hate group definition. This is evidenced by the allegations in the First Amended Complaint. *See* Doc. 40 at Pars. 44 & 54 (citing language from AmazonSmile's own explanation as to which groups are excluded. *i.e.*, groups that promote or support hate, and not describing the excluded organizations as those that were lawless and violent or with a primary stated purpose of animosity toward other groups). In short, there is no plausible allegation that the SPLC has published the D. James Kennedy Ministries hate group designation without simultaneously publishing its non-defamatory basis for that opinion.

In short, the defamation claim is due to be dismissed on three independent grounds.

## III.    LANHAM ACT CLAIMS

### A. The speech at issue is not commercial speech, is subject to full constitutional protection, and cannot be the basis for a Lanham Act claim.

#### 1. Introduction

As the SPLC established in the initial brief, to prevail in its Lanham Act false advertising claim, CRM Media must, as a threshold matter, satisfy the first element of the Lanham Act cause of action. It must show that the hate-group designation at issue here was "commercial speech." Commercial speech, as the SPLC pointed out in its initial brief, "is 'expression related solely to the economic interests of the speaker and its audience.' *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)." *Edward Lewis Tobinick, MD,* 848 F.3d at 950. While CRM Media has conceded that the Hate Map is not commercial speech merely because it is located on a website (Doc. 51 at 32), it attempts to convert the Hate Map into commercial speech for Lanham-Act purposes by vague references to its use in fundraising and promotion of services. *See* Doc. 51 at 26. But, even before reaching those issues (which do not support a Lanham-Act claim here), CRM Media

17

argues that the Hate Map itself is not subject to First-Amendment protection in the first instance. This is not a well-founded argument either, and it actually calls attention to the Lanham Act history which is replete with references that make it clear that speech fully protected by the First Amendment (i.e., on matters of public concern and not commercial speech) cannot be made the subject of a Lanham Act claim.

"Congress, in extending the Lanham Act to product disparagement, made clear that this extension should not be interpreted so as to infringe on free speech protected by the First Amendment." *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1533 (S.D.N.Y. 1994), *holding modified by Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002).

As the congressional history makes clear: "'The [amendment to the Lanham Act] excluded all other misrepresentations from section 43(a) coverage. These others are the type which raise free speech concerns, such as a Consumer Report which reviews and may disparage the quality of ... products, [and] misrepresentations made by interested groups which may arguably disparage a company and its products.... All of these would be judged by first amendment law ... and not section 43(a) law....'" *Gordon & Breach, supra* at 1533 (quoting the Lanham Act legislative history).

There simply is no question that the SPLC is an "interested group" that criticized D. James Kennedy Ministries, and that, as such, its speech is fully protected and cannot be made the subject of a Lanham-Act claim.  For CRM Media to have taken issue with whether the designation itself is commercial speech (as opposed to whether it might be converted into commercial speech through some specific use) seems a waste of this Court's time.  Nevertheless, CRM Media does so, and the SPLC responds to those arguments below

### 2. CRM Media's arguments that the Hate Map is not constitutionally-protected speech is not well-founded

As CRM Media did in connection with the defamation claim, it again argues, incorrectly, that the SPLC's Hate Map and hate group designation is not constitutionally protected speech. In support of this position, CRM Media takes issue with the wording of the definition of a hate group and concludes that the SPLC itself should be deemed a hate group. Doc. 51 at 25.  This argument—that in CRM Media's view the SPLC's opinion on a public figure and a matter of public concern is badly reasoned—does not render the SPLC's position subject to any less constitutional protection.  Nor could it, therefore, as CRM Media contends, create a factual issue in connection with any Lanham Act claim.

In the same vein, CRM Media also argues that the Hate Map lacks content that would add anything to "any social debate" and is therefore not worthy of First Amendment protection.  Doc. 51 at 25-26.  ("The Hate Map is not scholarly argument or reasoned analysis or anything but a list of organizations that SPLC wants its followers to hate…")  This argument is without merit, and CRM Media has cited to no such requirement in First-Amendment law or elsewhere. If every entity that was critical of another person's speech were to be able to overcome First Amendment protections and get to a jury by simply alleging the speech lacked adequate scholarship or analysis, speech in this country would be chilled to the core.  In situations such as this, it is inevitable that one party will take issue with the analysis or scholarship behind the other parties' ideas.  Similarly, CRM Media's argument that the SPLC applies its own hate group definition inaccurately or too narrowly also cannot render the designation outside the realm of protected speech under the First Amendment. Such arguments are merely criticisms of the protected speech itself.

CRM Media's attempted analogy between the Hate Map and the pornographic film at issue in the *Dallas Cowboy Cheerleaders, Inc., v. Pussycat Cinemas, Ltd*, 467 F. Supp. 366, 376 (S.D.N.Y.), *aff'd*, 604 F.2d 200 (2d Cir. 1979), is inapposite. The issue in *Dallas Cowboy Cheerleaders* was not whether the speech regarding a matter of public concern was sufficiently scholarly. *See* Doc. 5 at 26 (Hate Map not a scholarly argument or reasoned analysis). The question was whether there was any attempt at all to comment on a matter of public concern. While the defendant attempted to argue that the film was a parody or satire which made some sort of commentary on the Dallas Cowboy Cheerleader organization, the Court found no such content (*i.e.,* no attempt to address a matter of public concern) and concluded instead that the film was merely a series of sex acts. Here, the Hate Map is speech regarding a matter of public concern and is entitled to First Amendment protection.

CRM Media argues again here that the hate group designation is presumably not protected by the First Amendment because it is not "political speech" because political speech involves only elections and candidates. Doc. 51 at 28-29. And, admittedly, the SPLC, may have used the phrase "political speech" interchangeably with "speech on a matter of public concern" which is the larger category of protected speech. *See, e.g., Connick v. Myers*, 461 U.S. 138, 146 (1983) (defining "matter of public concern" as relating to "any matter of political, social, or other concern to the community") (internal quotation marks omitted). Even if the hate group designation were not political speech, that is not the only kind of speech excluded from Lanham Act coverage. Also excluded from coverage are editorial comment, consumer reviews, parody, satire and all other "constitutionally protected speech." *See* 135 Cong. Rec. H1216-17 (daily ed.

April 13, 1989), as cited in *Gordon & Breach,* 859 F. Supp. at 1533.[12]   So, even assuming "political speech" were as narrowly defined as CRM Media argues (it is not in all contexts), the speech at issue here is otherwise constitutionally protected such that there can be no question but that the First Amendment precludes the Lanham Act claim.

> ### 3. CRM Media has not shown that the hate group designations which were fully protected First Amendment speech were converted into commercial speech merely because they were allegedly used in fundraising or promotional materials.

Finally, CRM argues that use of the Hate Map (presumably even if it is protected speech) in any so-called promotional materials renders it commercial speech for Lanham Act purposes. Doc. 51 at 29.  It should be noted that while CRM Media has mentioned fundraising and the like multiple times in its Amended Complaint, it has made no factually specific allegations about any particular promotional materials as is required by *Iqbal*.  Nevertheless, CRM Media relies on *Gordon & Breach* for the proposition that use of protected speech in promotional materials converts it to commercial speech subject to Lanham Act coverage.  Nothing in *Gordon & Breach* so held.  Rather, *Gordon and Breach* concluded that the plaintiff could not bring a Lanham Act claim where the defendant used a consumer-reports-type article ranking the defendant's own goods and services above their competitors' even though the articles themselves were, in fact, promotional materials. The Court concluded that the articles in question were, nevertheless, not

---

[12]While CRM Media seems to take the position that political speech can only be speech about a candidate, that is clearly not how the term was used in the congressional history, as evidenced, by one of the cases CRM Media itself argues is a leading case in this area.  In *Gordon & Breach*, the court noted that efforts to take a stance against funding of an artist with views offensive to a religious group was political speech.   *Gordon & Breach*, 859 F.Supp. at 1534 (discussing *Wojnarowicz v. American Family Ass'n*, 754 F. Supp. 130 (S.D.N.Y. 1990)).  The term "political speech" is often used interchangeably with speech on matters of public concern.  For example, speech outside the context of candidates or elections has been deemed political speech by the Eleventh Circuit in other contexts. *See Wright v. City of St. Petersburg, Florida*, 833 F.3d 1291, 1293–94 (11th Cir. 2016) (concluding that an ordained minister's advocacy for the poor and homeless was protected "political speech").

commercial speech and were instead subject to full First Amendment protection. *See, e.g., Gordon & Breach*, 859 F. Supp. at 1540. The Court concluded that only when the articles were used in a secondary way, as discussed below, could they be deemed commercial speech.

While fundraising materials per se were not at issue in *Gordon and Breach*, the court's opinion makes clear that fundraising materials by a non-profit that speak to matters of public concern should be protected from Lanham Act claims. *Id.* at 1541 ("Non-profit organizations must be free to participate fully in the marketplace of ideas without fear of sanctions, even if such participation redounds to their financial benefit.") The court in *Gordon & Breach* specifically relied on Supreme Court case law holding that full First Amendment protection is afforded charitable solicitation because it is "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes … or views." *Id.* at 1540 (citing and quoting *Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620 (1980)).

The Supreme Court's opinions in *Riley v. National Federation of the Blind,* 487 U.S. 781 (1988) and *Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620 (1980), by the way, are the very Supreme Court case law that CRM Media contends should not be relied on in the Lanham Act context. The *Gordon & Breach* Court cited both and obviously considered these cases relevant to determining what should be deemed commercial speech in the Lanham Act context. Thus, as explained in more detail in the SPLC's initial brief, CRM Media's argument that use of the Hate Map in fundraising converts the Hate Map itself into commercial speech is simply without merit.

CRM Media tries to overcome this problem by citing *Tobinick v. Novella*, 848 F.3d 935, 951 (11th Cir. 2017), for the proposition that fundraising somehow transforms noncommercial speech into commercial speech. However, the Eleventh Circuit in *Tobinick* did not hold that

22

noncommercial speech is or could be converted into commercial speech merely because it is mentioned in fundraising materials.  In *Tobinick*, the Eleventh Circuit merely distinguished the facts of *Tobinick* from a 2001 Southern District of New York case without endorsing that case's holding.[13]

Instead, the *Tobinick* Court, in its holding, indicated that fundraising solicitations do not convert protected speech into commercial speech for Lanham-Act purposes.  This is evidenced by the fact that, in concluding that the defendant's articles were not commercial speech, the court relied on *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976), and characterized its holding as follows: "'<u>Speech ... is protected ... even though it may involve a solicitation</u> to purchase or otherwise pay <u>or contribute money</u>.'" *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 952 (11th Cir.), *cert. denied sub nom. Tobinick v. Novella*, No. 17-344, 2017 WL 3922903 (U.S. Nov. 13, 2017) (emphasis added).

The quote CRM Media then uses from *Gordon & Breach* indicating that misrepresentations by non-profits can be the basis for Lanham Act claims (Doc. 51 at 32) also cannot be read to hold that speech on matters of public concern provided in fundraising solicitations may be made the basis for a Lanham Act claim.  Doc. 51 at 32.  *Gordon & Breach* spoke to that issue very explicitly in the negative, as explained in the SPLC's initial brief.  *See* Doc. 42 at 23.  At most, *Gordon & Breach* acknowledged that misrepresentations in fundraising letters about where funds raised by a nonprofit would end up could support a Lanham Act claim. The case which *Gordon & Breach* cited in making the statement on which CRM Media relies, *Birthright v. Birthright, Inc.*, 827 F.Supp. 1114 (D.N.J. 1993), involved an alleged representation

---

[13]Even if the Southern District of New York case's shaky reasoning had been adopted by the Eleventh Circuit, its holding could be distinguished from this case, where the only allegation is a conclusory claim that the Hate Map was used in fundraising.

about actual services offered and whether funds raised would go to those services and/or whether they would even go to the trademarked organization itself. *See* 827 F. Supp. at 1138. The defendant in that case (a spin-off organization) was in direct competition with the plaintiff but was continuing to use its trademark.[14]

Perhaps if the SPLC had made representations to donors that their contributions were going to fund services provided by CRM Media, CRM Media would have a Lanham Act false advertising claim under the *Birthright* holding. But CRM Media does not have a claim merely because it disagrees with the SPLC's speech on a matter of public concern. Such speech (that CRM Media and other groups have been designated hate groups due to their beliefs or practices) is not commercial in nature even if used in fundraising. It is the "informative and perhaps persuasive speech" intertwined with other aspects of charitable solicitations described as fully protected speech in the Supreme Court case law cited in *Gordon and Breach,* 859 F. Supp. at 1540. This is necessarily the case even if, as CRM Media alleges, the designation is used, or can

---

[14]In connection with the SPLC's discussion of *Birthright*, CRM Media takes issue with the proposition that it was the confusion regarding which organization would have use of the funds that was the ultimate basis for the court's false-advertising holding. CRM Media argues that the holding was based on confusion merely as to the use to which the contributions themselves would be made. CRM Media is simply incorrect about the ultimate holding. In the false-advertising discussion, it is clear that confusion over the recipient of the funds was the dispositive issue, as misleading statements about the use of the funds had preceded the split between the two entities: "After January 15, 1992, the fundraising letters confused or were likely to confuse a potential donor as to the use of a contribution to Birthright Inc., and this confusion was material in that the potential donor may not have wished to contribute to an entity no longer connected to the Birthright movement. Accordingly, plaintiff has satisfied the third element of its Section 43(a)(1)(B) claim." *Birthright*, 827 F. Supp. at 1138. "Finally, plaintiff has shown that the post-January 1992 letters resulted or were likely to result in donors sending money to the disaffiliated Birthright Inc. who would otherwise only send donations to a Birthright entity." *Id.* at 1139. But whichever of these holdings one ascribes to *Birthright,* that case does not stand for the proposition that positions made in connection with matters of public concern involving a public figure are commercial speech merely because they are mentioned in a fundraising appeal.

be linked, in some vague and indirect way to alleged undefined "services" that the SPLC provides to law enforcement.

CRM Media also mischaracterizes the holding of *Gordon and Breach* itself when it tries to argue that the Hate Map is not protected speech because it somehow lacks sufficient analysis or content. *See* Doc. 51 at 35. As noted above, the articles at issue in the *Gordon & Breach* case were deemed fully protected noncommercial speech, just as the SPLC's hate group designations must be. Only a narrow secondary use of the articles at issue in that case (referred in the opinion interchangeably as articles and survey results) to promote the academic journals to librarians was deemed commercial speech. Read as a whole, it is clear that no holding was based on a distinction between whether raw survey materials were conveyed to potential purchasers (librarians) instead of articles. As explained elsewhere in this brief, the *Gordon & Breach* holding deems noncommercial speech commercial speech in the highly unusual context presented in that case. But the *Gordon & Breach* holding does not support, in any way, a finding that an alleged use of the Hate Map in fundraising by the SPLC or in connection with some vaguely alleged goods or services converted its hate group designations into commercial speech.

Moreover, it is worth noting that, as CRM Media points out, *Gordon and Breach* is relied upon by the Eleventh Circuit in *Tobinick*, *supra.* That is important because *Gordon & Breach* recognized that, as a threshold matter, the Lanham Act cannot be applied in circumstances such as these – where an entity, not in competition with the plaintiff, publishes something critical:

> [Section 43(a)] has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service.... Every instance of the Lanham Act's far-reaching application has been to practices commercial in nature, involving imitation, misrepresentation, or misappropriation in connection with the sale of goods or services by the defendant.

> *Wojnarowicz* [*v. American Family Ass'n,* 745 F.Supp. 130, 141-142
> [(S.D.N.Y.1990)], (citing cases) (emphasis added).

*Gordon & Breach*, *supra* at 1534.

In an attempt to distinguish the *Wojnarowicz* case on which the SPLC relied in its initial brief, CRM Media again argues that the case involved what it defines as "political speech" and thus not speech that would fall within the purview of the Lanham Act because it "'communicated discussion of political issues and debate.'" Doc. 51 at 38. CRM Media argues that the SPLC's designation of hate groups is not political speech on a matter of public concern protected by the First Amendment because it is not "discussion of public issues and debate on the qualifications of candidates." Doc. 51 at 38. As noted elsewhere in this brief, the issue is whether the speech is protected by the First Amendment generally, and the Hate Map is speech that involves matters of public concern that are protected even if not falling within a narrow definition of one type of protected speech – "political speech" – put forward by CRM Media.

In short, use of the Hate Map in fundraising or other so-called promotional materials does not convert it into commercial speech under the facts alleged in the Amended Complaint or the cases cited in the brief.

### 4. CRM's apparent attempt to argue that the Hate Map into commercial speech by claiming that the SPLC is a for-profit institution is unavailing.

In what must be an implicit recognition of the First Amendment protection afforded public interest groups that speak on matters of public concern and their fundraising materials, the first argument that CRM Media made in support of its Lanham Act claims is that the "SPLC's status as a legitimate 'nonprofit' organization is in question." Doc. 51 at 24. The allegations that follow about off-shore bank accounts are spun into conclusions that "[t]he seemingly obvious purpose for housing this money in off-shore accounts, out of reach of the Internal

Revenue Service and other government regulators, is to provide SPLC's leadership with a 'golden parachute' in the event that the organization's Hate Map scheme ever collapses." Doc. 51 at 24. CRM argues that "[b]ecause SPLC is generating profits and hiding those profits offshore, where they could be used as a private investment for its leadership, … SPLC should not be treated as a nonprofit organization" before a jury hears CRM Media's alleged evidence. Doc. 51 at 25.

For all of the above assertions made in its brief, CRM Media relies solely on Par. 25 of its First Amended Complaint:

> Recently, reports from numerous media outlets indicated that SPLC raises millions of dollars through the use of its hate group designations. Additionally, it is reported that this nonprofit organization is sheltering millions of dollars in off-shore bank accounts. It is negligent for AmazonSmile to rely on a nonprofit organization that engages in questionable financial dealings of this type as a primary source of information for its public accommodation activities.

This Paragraph clearly states no plausible allegation that the leadership of the SPLC, a well-known and long-existing nonprofit subject to constant public scrutiny, has plans to turn the nonprofit's funds into a private investment for themselves. There is no allegation that the SPLC's tax returns failed to report its income fully, or that the accounts at issue were or are actually hidden from federal scrutiny, nor could there be. These unfounded allegations appear to have been made in bad faith and are relied on here in an effort to overcome some of the very serious problems plaguing CRM Media's Lanham Act claims.

**B.  CRM Media has failed to satisfy the other Lanham-Act elements.**

**1.  Vague references to "hate-map infused goods and services" do not adequately allege the third element of a Lanham Act false advertising claim.**

While the first element of a false-advertising claim is proof that the speech at issue is commercial speech, which cannot be shown here, CRM Media's claims are also due to be

dismissed on other grounds.  For instance, CRM Media has also clearly failed sufficiently to allege the third element of a Lanham-Act false advertising claim.  That element requires that the promotional materials at issue be used to influence consumers to buy *the defendant's goods or services* as explained in the initial brief.  Of course, because the speech at issue is fully protected speech and not commercial in nature, this Court need not reach this element.  But, even if the speech were deemed to be commercial for any reason, CRM Media's Lanham Act claim would also fail because CRM Media has not alleged sufficient facts to satisfy this element.

CRM Media argues that the hate map designations are used to influence consumers to buy the SPLC's goods and services.  In support of this position, CRM Media alleges that the SPLC designated the Ministry a hate group and that investigative reports, training services and materials, key intelligence, and expert analysis (which it calls SPLC's goods and services) all involve SPLC's "hate-group designation of the Ministry."  Doc. 51 at 41-43.   First, these allegations, though numerous, are so vague that they do not plausibly allege any use of the hate group designation – particularly the CRM Media hate group designation which is the only designation that could possibly be at issue in this lawsuit –to influence customers to buy intelligence analysis or training services.

And even CRM Media appears to recognize that if the hate group list is like "a Consumer Report review or a news article," even if it were sold outright, it could not satisfy element three's requirement that the alleged false advertising be used to promote the defendant's goods or services. *See* Doc. 51 at 42.  This is evidenced by the legislative history and the reasoning and analysis in both *Tobinick* and *Gordon & Breach* which indicate that articles and consumer reviews, even if sold, do not support Lanham Act claims.  Therefore, CRM Media attempts to distinguish the Hate Map from that category of materials.   CRM Media contends it should

prevail by restating its position that the speech at issue – the hate group list – did not provide enough information.  Thus, according to CRM Media, the Hate Map is not analogous to a Consumer Reports review or news article.  Doc. 51 at 42.  As its only support for this point, CRM Media cites *Gordon & Breach's* alleged holding that "survey" materials (as opposed to articles based on the survey materials) were found to be speech subject to Lanham Act coverage. Again, this is simply a misreading of the facts and holding as explained previously. Like the articles in *Gordon & Breach*, the Hate Map here falls outside the reach of the Lanham Act. CRM Media has failed to adequately allege this element of the Lanham Act false advertising claim.

### 2.   Element Four – Dissemination to the relevant purchasing public.

CRM Media's Lanham Act claim is also due to be dismissed for failure to satisfy the fourth element of the Lanham Act false advertising claim. (Again, the Court need not reach this issue because the Hate Map is not commercial speech.) That element requires showing that the allegedly false advertising was disseminated to the relevant purchasing public. *See, e.g., Edward Lewis Tobinick, MD, supra,* at 950.   In response to the SPLC's argument that the SPLC is not distributing the hate group designations within the Christian television industry or its patrons, which would be necessary to satisfy the dissemination requirement, CRM Media argues that it also engages in publishing in addition to its Christian television programming.  Even taking this as true, CRM Media has still failed to allege dissemination by SPLC of its hate group designation to either purchasing public. CRM Media's ultimate position is that the relevant group for purposes of satisfying the dissemination requirement is anyone interested in charitable giving.  Certainly, as a matter of law, that is too broad, and reliance on that position is tantamount to saying the relevant purchasing public is anyone in the entire world.  This would render the dissemination element of a false advertising claim virtually meaningless.

CRM Media has simply failed to allege with any plausibility that the SPLC disseminated the hate group designation to CRM Media's purchasing public, or even to those individuals who might be interested in providing charitable contributions to CRM Media. For that reason they have failed to satisfy all of the elements necessary to state a claim for violation of the Lanham Act.

### 3. Satisfaction of *Lexmark*'s broadened prudential standing/competition requirement.

The Eleventh Circuit has historically required as the second element of the false-advertising claim that the plaintiff and defendant be in competition. *See Edward Lewis Tobinick, MD*, 848 F.3d at 950. Various courts appear to have concluded that *Lexmark International, Inc., v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014), has narrowed the competition requirement. The SPLC stands on its prior briefing relative to whether CRM Media has adequately pled the competition element or, as re-characterized in *Lexmark,* allegations sufficient to support prudential standing. In short, there is no question but that prudential standing has not been satisfied because the injury alleged does not meet the zone of interest test described in *Lexmark.* It cannot, as explained in the SPLC's motion to dismiss brief, because the plaintiff and defendant are not even remotely in the same industry. As the Lexmark Court explained, and as discussed in more detail in the SPLC's initial brief, two parties need not be in direct competition with one another for a Lanham Act claim to exist. Nevertheless, the Supreme Court, as explained in the SPLC's initial brief, made it perfectly clear, by providing specific examples, what would satisfy the prudential standing requirement. Pursuant to *Lexmark*, a Lanham Act plaintiff must be in the same general industry as the defendant, *e.g.*, an automobile airbag manufacturer and an auto manufacturer. *Id.* at 1394. Nothing in the case suggests that a public

interest group's criticism of another entity could ever satisfy this prudential standing requirement applicable in Lanham Act cases.

## IV.     THE LANHAM ACT FALSE ASSOCIATION CLAIM

Finally, CRM Media argues that it has pled a viable false association claim, stating that the SPLC's alleged goal to destroy hate groups (based on one statement of one employee in a speech) somehow permits it to bring a previously unknown kind of false association claim.  Doc. 51 at 48.  The case law CRM Media cites does not support its position.

The gist of CRM Media's claim is that "any false representation regarding the origin of a plaintiff's registered … trademark is politically actionable, including allegations that a party's goods and services originate from a hate group." Doc. 51 at 46.  For this proposition, CRM Media relies on *Geisel v. Poynter Products Inc.*, 283 F.Supp. 261, 267 (S.D.N.Y. 1968).  *Geisel* does not stand for the proposition that criticism of, or commentary about, a product's "originator" gives rise to a false association claim.  CRM Media takes *Geisel* grossly out of context.

The court in *Geisel* simply said that Lanham Act false association claims are not limited to misrepresentations regarding the geographic origin of a product.  In the *Geisel* case, the misrepresentation as to origin involved the marking of products to make them appear to be endorsed by Theodore Geisel aka Dr. Seuss.  That is the same general fact pattern found in the *Dallas Cowboy Cheerleaders Inc.,* case discussed earlier, the other case on which CRM Media relies for the proposition that it can bring a heretofore unknown kind of false association claim. The appellate court in that case ultimately held that the pornographic movie at issue could have been falsely associated by its viewers with the Dallas Cowboy Cheerleader organization due to use of the cheerleading uniform in the movie and other similar references, resulting in the

31

misleading impression that the cheerleading organization sanctioned or sponsored the pornography. *See Dallas Cowboy Cheerleaders, Inc., v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir. 1975) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.").

Unlike the defendants in either of the cases CRM Media cited, the SPLC did not attempt to pass off any product or service of its own as having been sponsored by, endorsed by, or having originated with the plaintiff here, CRM Media. The cases cited by CRM Media are therefore inapposite and do not create any novel false association claim that would permit CRM Media to overcome the SPLC's motion to dismiss.

## V.       STANDING

Finally, CRM Media fails to overcome its standing problem. To show standing, CRM Media had to have alleged more than a formulaic recitation of damages resulting from the hate group designation. *See, e.g., I Love Omni, LLC v. Omnitron Int'l, Inc.,* 2017 WL 3086035 *5 (N.D. Tex. July 20, 2017) ("In the amended complaint, the plaintiffs allege that Omnitron's misrepresentations caused them 'damage in confusion to customers …and lost sales, which damage was proximately caused by defendant's misrepresentations. … These allegations constitute a mere 'formulaic recitation of the elements' that the Supreme Court cautioned against in *Twombly*.")

CRM Media now seems to contend that it has alleged standing, *i.e.*, that is has alleged specific facts related to injury, because CRM Media itself would have taken advantage of AmazonSmile's program. But CRM Media appears to have failed to plead in the Amended Complaint that it would have donated to itself through AmazonSmile or that it even did business with Amazon. The only other injury mentioned in the brief (one supporter calling about the

hate-group designation) is also not pled in the Amended Complaint.  Thus, both Lanham Act claims are due to be dismissed for failure to allege facts to support standing in the Amended Complaint.

## CONCLUSION

All claims in the First Amended Complaint are due to be dismissed with prejudice.

s/Shannon L. Holliday
Shannon L. Holliday (HOL088)
Robert D. Segall (SEG003)
Copeland Franco Screws & Gill, P.A.
444 South Perry Street (zip 36104)
Post Office Box 347
Montgomery, AL  36101-0347
Phone: (334) 834-1180
Facsimile:  (334) 834-3172
Email: holliday@copelandfranco.com
Email: segall@copelandfranco.com
**Attorneys for Southern Poverty Law Center, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this 13th day of December, 2017, I filed the foregoing with the Clerk of the Court using the CM/ECF filing system which will electronically notify the following counsel of record:

Charles E. Hall, Jr.
Post Office Box 7
Dadeville, AL  36853-0007
Email:  chall.law@att.net

David C. Gibbs, III
Gibbs Law Firm PA
2648 FM 407, Suite 240
Bartonville, TX  76226
Email: dgibbs@gibbsfirm.com

Harlan I. Prater, IV
R. Ashby Pate
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, AL  35203-3200
Email:  hprater@lightfootlaw.com
Email:  apate@lightfootlaw.com

                  s/Shannon L. Holliday
                  Of counsel