IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
CORAL RIDGE MINISTRIES    )
MEDIA, INC., d/b/a D.      )
James Kennedy Ministries,  )
                          )
     Plaintiff,           )
                          )     CIVIL ACTION NO.
     v.                   )      2:17cv566-MHT
                          )         (WO)
AMAZON.COM, INC., et al., )
                          )
     Defendants.          )
```

OPINION

Plaintiff Coral Ridge Ministries Media, Inc. ("Coral Ridge") filed this lawsuit against three defendants: the Southern Poverty Law Center, Inc. ("SPLC"), Amazon.com, Inc. ("Amazon"), and the AmazonSmile Foundation ("AmazonSmile").  The lawsuit is based largely on Coral Ridge's allegations that, because of its religious opposition to homosexual conduct, SPLC has designated it as a "hate group" and that, because of this designation, Amazon and AmazonSmile have excluded it from receiving donations through the AmazonSmile charitable-giving program.

Coral Ridge has three claims against SPLC: a state claim that its "hate group" designation is defamatory and federal claims for false association and false advertising under the Lanham Act, 15 U.S.C. § 1125. Coral Ridge has a single claim against the Amazon defendants: a federal claim that they excluded it from the AmazonSmile charitable-giving program based on religion, in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*[1]

This lawsuit is before the court on the United States Magistrate Judge's recommendation to grant SPLC's and the Amazon defendants' motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules on Civil Procedure.  After an independent and de novo review of the record, and for reasons that follow, the

---

1. Coral Ridge also asserts a state claim of negligence against the Amazon defendants.  However, as Coral Ridge concedes, *see* Objection to R&R (doc. no. 58) at 6, the negligence claim hinges on the Title II claim, given that the alleged duty breached is Title II's anti-discrimination obligation, *see* Am. Compl. (doc. no. 40) at ¶ 179.  Because the court finds no violation of Title II, the negligence claim fails by extension and is not discussed separately.

2

court overrules Coral Ridge's objections to the recommendation and adopts the recommendation that this case should be dismissed in its entirety, albeit for reasons, in some instances, different from the magistrate judge's.

## I.   JURISDICTION

The court has jurisdiction over Coral Ridge's federal claims pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 2000a-6(a) (Title II), and 15 U.S.C. § 1121(a) (Lanham Act); and over its state claim pursuant to 28 U.S.C. § 1367 (supplemental) and 28 U.S.C. § 1332 (diversity).

## II.   MOTION-TO-DISMISS STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff."  *Michel*, 816 F.3d at 694.

Crucially, however, the court need not accept as true "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Oxford Asset Mgmt., Ltd., v. Jaharis*, 297 F.3d. 1182, 1188 (11th Cir. 2002); *see also Roberts v. Ala. Dept. of Youth Servs.*, 2013 WL 4046383, at *2 (M.D. Ala. Aug. 9, 2013) (Thompson, J.) ("[G]eneralizations, conclusory allegations, blanket statements, and implications will not" allow the complaint to survive a motion to dismiss).  Conclusory allegations are those that express "a factual inference without stating the

**4**

underlying facts on which the inference is based."
*Conclusory*, Black's Law Dictionary (11th ed. 2019).

As recognized by the Eleventh Circuit Court of Appeals, the "application of the plausibility pleading standard makes particular sense when examining public figure defamation suits" such as this one, given that "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel*, 816 F.3d at 702.

### III.  BACKGROUND FACTS

The allegations of the complaint, taken in the light most favorable to Coral Ridge, establish the following facts.  Coral Ridge is a Christian ministry whose main activities include broadcasting via television, and otherwise spreading, the "Gospel of Jesus Christ," as well as fundraising.  Am. Compl. (doc. no. 40) at ¶¶ 32-39.  In addition to being a Christian ministry, it is, by its own account, a media

corporation, *see id.*, as is also evident from its name, Coral Ridge Ministries Media, Inc. Its vision statement, included in its bylaws, is "to communicate the Gospel ... and a biblically informed view of the world, using all available media." *Id.* at ¶ 33. Its "mission" includes "proclaim[ing] the Gospel upon which this Nation was founded." *Id.* at ¶ 38.

Coral Ridge was founded in 1974 by David James Kennedy, an American pastor, evangelist, and broadcaster, and it produced a weekly television program, "The Coral Ridge Hour" (now called "Truths that Transform"), which "was carried on television networks and syndicated on numerous other stations with a peak audience of three million viewers in 200 countries." Id. at ¶ 31-32. Kennedy also had a daily radio show that ran from 1984 to 2012. *Id.* at ¶ 32.

Coral Ridge continues to broadcast Kennedy's "Truths that Transform" on television. *Id.* at ¶¶ 35, 39. It espouses "biblical morals and principles" on homosexuality and marriage. *Id.* at ¶ 58. It also

opposes same-sex marriage and the "homosexual agenda" based on its religious beliefs. *Id.* at ¶ 82.

Coral Ridge alleges that it "opposes homosexual conduct," but "has nothing but love for people who engage in homosexual conduct." *Id.* at ¶ 61. It says that its "position on LGBT issues is inextricably intertwined and connected to the [its] religious theology." *Id.* at ¶ 155. It views homosexual conduct as "lawless," "an abomination," "vile," and "shameful." *Id.* at ¶¶ 155, 175 (citing and quoting Bible verses). Coral Ridge not only admits that "the Ministry has been vocal about its position on homosexuality because it believes the Bible speaks clearly about God's intent for marriage and sexuality," it also argues that "speaking out on these issues is necessary to fulfill the Ministry's stated purpose of 'lovingly engag[ing] the culture with the heart and mind of Christ.'" Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 10 (quoting Am. Compl. (doc. no. 40) at ¶ 34(d)).

SPLC is a nonprofit organization that, among a range of activities, disseminates a "Hate Map" that lists groups that it designates as "hate groups," including Coral Ridge. *Id.* at ¶¶ 20-21. SPLC's Hate Map is located on its website, and defines "hate groups" as groups that "have beliefs or practices that malign or attack an entire class of people, typically for their immutable characteristics." *Id.* at ¶ 59. SPLC has disseminated the Hate Map in fundraising efforts and in its reports, training programs, and other informational services. *Id.* at ¶¶ 120, 121, 132.

SPLC designated Coral Ridge as a hate group because of its espousal of biblical views concerning human sexuality and marriage--that is, because of its religious beliefs on those topics. *Id.* at ¶¶ 57-61; *see also id.* at ¶¶ 154-55.

Amazon is the largest internet-based retailer in the world by total sales and market capitalization. *See id.* at ¶ 5. AmazonSmile is a tax-exempt corporation affiliated with Amazon. *See id.* at ¶¶ 14,

41.   Amazon  and  AmazonSmile  operate  the  AmazonSmile program,  whereby  they  donate  0.5 %  of  the  price  of  a purchase  made  on  smile.amazon.com  to  an  eligible charitable  organization  selected  by  the  customer.   *See id.*  at  ¶¶ 42-43.   The  vast  majority  of  the  items available  for  purchase  through  Amazon  are  also available  for  purchase  through  the  AmazonSmile  program at  smile.amazon.com.   *See id.*  at  ¶ 15.

To  be  selected  by  a  customer  to  receive  donations through  the  AmazonSmile  program,  an  entity  must  satisfy the  program's  eligibility  requirements.   *See  id.*  at ¶ 44.   These  requirements  include,  among  others,  that the  entity  is  "a  [26  U.S.C.]  § 501(c)(3)  ...  public charitable  organization"  located  in  the  United  States. *Id.*   Furthermore,  the  organization  cannot  "engage  in, support,  encourage,  or  promote  intolerance,  hate, terrorism,  violence,  money  laundering,  or  other  illegal activities."   *Id.*   Notably,  "[e]ntities  that  are designated  by  [the]  SPLC  as  hate  groups  are

automatically ineligible" to receive donations through the AmazonSmile program. *Id.* at ¶ 23.

Coral Ridge alleges that it attempted to register to receive donations through the AmazonSmile program, *see id.* at ¶ 51, but that it was prohibited from doing so because SPLC had designated it as a "hate group," *id.* at ¶ 24, 53.

## IV.   DISCUSSION

### A. Defamation Claim Against SPLC

Coral Ridge alleges that SPLC defamed it by designating it as a "hate group."[2]

-----

2. Coral Ridge alleges defamation "pursuant to Alabama common law." Am. Compl. (doc. no. 40) at 1. Alabama's *lex loci delicti* choice-of-law approach might actually dictate the application of Florida defamation law to this multi-state defamation action, given that Coral Ridge is a Florida corporation with its principal place of business there. *See, e.g.*, *Hatfill v. Foster*, 415 F. Supp. 2d 353, 364-65 (S.D.N.Y. 2006) (McMahon, J.).   Nevertheless, SPLC does not challenge the application of Alabama law.   Therefore, "[b]ecause no party has challenged the choice of" Alabama "libel law, all are deemed to have consented to its application." *Michel*, 816 F.3d at 695 (internal quotation marks omitted).   In any event, even if Florida law applied, the outcome here would be the same, for, as explained

Because "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on *matters of public interest and concern*," *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503-504 (1984), a 'public figure' asserting a defamation claim must plausibly allege that the purported defamatory statement--here, the "Anti-LGBT hate group" designation[3]--was (1) provable as false and (2) actually

---

below, the defamation claim fails on federal constitutional grounds.

3. In its response to the motion to dismiss, Coral Ridge argues that the defamatory nature of the "Anti-LGBT" designation is not before the court: only SPLC's "hate group" designation is the focus on the defamation claim. *See* Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 4-5. While Coral Ridge has chosen not to contest the "Anti-LGBT" part of the "hate group" designation, this does mean that court should ignore it in assessing whether SPLC's statements were defamatory. The allegations of the amended complaint make clear that the "Anti-LGBT" designation is an inseparable part of SPLC's application of the "hate group" label to Coral Ridge. *See* Am. Compl. at ¶ 119 ("SPLC published [Coral Ridge's] trademarked name 'D. James Kennedy Ministries' on its Hate Map, listing it as an Anti LGBT hate group."); *id*. at ¶ 56 ("SPLC ... has labelled [Coral Ridge] as one of AmazonSmiles' prohibited types of organizations with the following

false, and (3) that SPLC made the statement with "actual malice," that is, "with knowledge that it was false or with reckless disregard of whether it was false or not."[4]   *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964). Whether this heightened legal standard applies here depends on whether Coral Ridge is a public figure--and not just any one.

A public figure is defined by the "notoriety of ... [its] achievements or the vigor and success with

---

entry on SPLC's 'Hate Map': D. James Kennedy Ministries (formerly Truth in Action) Fort Lauderdale, Florida ANTI LGBT."); *id*. at ¶ 57 (alleging that Coral Ridge's entry on the Hate Map can be located by sorting for "Anti LGBT" organizations, then clicking on a symbol over Miami, Florida). SPLC has made clear that it views Coral Ridge as a "hate group" with respect to gay people--not, for example, black people or Muslims. Thus, the court rejects Coral Ridge's argument that it should ignore the "Anti-LGBT" part of the "hate group" designation in assessing the legal claims.

4. The Supreme Court has explicitly held that the plaintiff bears the burden of proving falsity. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768-69, 775 (1986). By implication, the burden as to the provable-as-false requirement must also be on the plaintiff, given that being provable as false is a necessary condition for meeting the burden of proving falsity.

which ... [it] seek[s] the public's attention." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). "[P]ublic figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.* at 323. Public figures thrust themselves and their views into the public controversy in an effort to influence others. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979) (finding scientist was not a public figure in part because he "did not thrust himself or his views into public controversy to influence others").

Coral Ridge concedes it is a public figure, and this concession makes sense, given its focus on broadcasting its viewpoints through the media and the global reach of its television program. *See* Am. Compl. (doc. no. 40) at 32-33, 35, 39. Consequently, to

succeed on this defamation claim against SPLC, it must satisfy the First Amendment heightened standard.[5]

To decide whether Coral Ridge plausibly pleads these three constitutional requirements for its defamation claim, the court must first determine the meaning (or meaning*s*) of the term "hate group." For, without determining the meaning of "hate group," it is impossible to assess whether SPLC's labeling of Coral Ridge as "Anti-LGBT hate group" was provable as false, actually false, and made with actual malice. Thus, the court will turn to Coral Ridge's amended complaint to determine--under the motion-to-dismiss standard--the meaning of the term "hate group" for an average reader. *See St. Surin v. Virgin Islands Daily News, Inc.*, 21

---

5. Thus, of course, this standard likely would not apply if SPLC had called an ordinary church or ministry a "hate group." Because, unlike the average church, Coral Ridge is, as stated, a public, figure, a media corporation that has successfully sought public influence and broadcast its views to millions through its weekly television program. *Compare Hustler Magazine v. Falwell*, 485 U.S. 46, 47 (1988) (applying *New York Times* standard to Jerry Falwell, "a nationally known minister who has been active as a commentator on politics and public affairs," and thus a public figure).

F.3d 1309, 1317 (3d Cir. 1994) ("In defamation actions, words should be construed as they would be understood by the average reader.").

### 1. Meaning of "Hate Group"

As stated above, the tenet that a court must accept as true the allegations in a complaint does not apply to conclusory statements. *See Iqbal*, 556 U.S. at 678. Therefore, in pleading the meaning of "hate group," Coral Ridge cannot rely on allegations that express "a factual inference without stating the underlying facts on which the inference is based." *Conclusory*, Black's Law Dictionary (11th ed. 2019). As detailed below, Coral Ridge did just that.

### i. Coral Ridge's Alleged Meaning of "Hate Group"

The amended complaint asserts that, "A hate group is legally and commonly understood as one that engages [in] or advocates crime or violence against others based on their characteristics." Am. Compl. (doc. no.

40) at ¶ 91; *see also id.* at ¶ 66.   The alleged
definitional requirement that hate groups "engage[]
[in] or advocate[] crime or violence" is central to
Coral Ridge's claim, since Coral Ridge contends that
its "hate group" designation is false because it "does
not engage in or advocate violence or crime against any
group."   *Id.* at ¶ 123; *see also id.* at ¶¶ 66-69.   In
other words, Coral Ridge's main falsity argument--and
thus defamation claim--hinges on its allegation that a
required trait of "hate groups" is engaging in or
advocating crime or violence.[6]

_____

6.   That the characteristic of engaging in or
advocating crime or violence is a *requirement* of Coral
Ridge's alleged "hate group" definition reflects a
plain reading of its pleaded definition.   The amended
complaint says that a hate group is commonly understood
as "one that engages [in] or advocates crime or
violence," Am. Compl. (doc. no. 40) at ¶ 91; this
categorical formulation expresses that a group must
have that characteristic to qualify.   Moreover,
interpreting the characteristic as a requirement reads
the allegations in the light most favorable to Coral
Ridge.   If the court were to read the alleged
definition as being inclusive of--but *not restricted* to
groups with that characteristic--then Coral Ridge's
contention that its designation as a "hate group" is
false because it does not engage in or advocate crime
or violence would automatically fail.   Put differently,

The court need not accept Coral Ridge's alleged definition of "hate group" because it is a conclusory allegation. Critically, Coral Ridge fails to plead any facts to support its "generaliz[ed]," "blanket statement[]" about the commonly understood meaning of "hate group." *Roberts*, 2013 WL 4046383, at *2. It does not, for example, plead that "hate group" is anywhere defined--whether in a dictionary, or by any other source or entity--to require engaging in or advocating violence or crime. Coral Ridge thus asserts "a factual inference"--the commonly understood meaning of "hate group"--"without stating the underlying facts on which the inference is based." *Conclusory*, Black's Law Dictionary (11th ed. 2019). The court will not accept Coral Ridge's "naked assertion[s] devoid of further factual enhancement." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 708 (11th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

---

Coral Ridge's alleged lack of that characteristic can be the basis of falsity only if the "hate group" definition *requires* that characteristic.

17

If courts considering motions to dismiss were obligated to accept as true plaintiffs' factually unsupported definitions of words, concepts, and terms, it would make a mockery of Federal Rule of Civil Procedure 12(b)(6)'s pleading standard.[7] Requiring courts to accept as true plaintiffs' pleaded definitions of words would be particularly inappropriate in public-figure defamation suits such as this one, where "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel*, 816 F.3d at 702.

Not only is Coral Ridge's conclusorily asserted definition of "hate group" unsupported by any other factual allegations; worse yet, it is *contradicted* by more specific alleged facts that Coral Ridge pleads,

---

7. For example, if a plaintiff buyer alleging that a defendant seller fraudulently misrepresented the number of apples in a delivery could successfully plead any definition he wanted of "apples"--such as requiring that they have seeds made of 24-karat gold--then even the most frivolous claim could survive a motion to dismiss.

cites in its briefing, and asserts to be subject to judicial notice.[8] This court's "duty to accept the facts in the complaint as true does not require [it] to ignore specific factual details of the pleading in favor of general or conclusory allegations." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06, 1210 (11th Cir. 2007) (reversing denial of motions to dismiss where "the facts in [plaintiff's] own complaint plainly contradict the conclusory allegation" in the complaint); *see also Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (stating that the court need not "accept as true allegations that contradict matters properly subject to judicial notice"). Here, Coral Ridge's conclusorily alleged and factually unsupported

---

8. "[I]n ruling on a motion to dismiss courts may supplement the allegations in a complaint with facts contained in judicially noticed materials," without converting the motion into a summary-judgement motion. *K.T. v. Royal Caribbean Cruises*, Ltd., 931 F.3d 1041, 2019 WL 3312530, at *5 (11th Cir. July 24, 2019) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *cf. Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

definition does not trump the concretely sourced, specific definitions of "hate group" that it cites.

In its amended complaint and briefing, Coral Ridge cites three sources--other than itself and SPLC--of definitions of a "hate group": (1) judicial opinions, (2) the Federal Bureau of Investigation (FBI), and (3) the Anti-Defamation League (ADL). The definitions--or, in the case of the judicial opinions, lack of a definition--of the term "hate group" provided by all of these sources directly contradict Coral Ridge's allegation that a "hate group is legally and commonly understood as one that engages [in] or advocates crime or violence against others." Am. Compl. (doc. no. 40) at ¶ 91.

To start, the amended complaint cites four judicial opinions to support its assertion that "the law defines a hate group as one whose activities include violence and crime." *Id.* at ¶ 65. None of the cited opinions defines the term "hate group," and two do not even mention the term: *Virginia v. Black*, 538 U.S. 343

(2003) (nowhere mentioning term); *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) (nowhere mentioning term); *Powers v. Clark*, 2014 WL 6982475, at *3 n.10 (E.D. Va. Dec. 9, 2014) (Hudson, J.) (not defining term); *Doe v. Pittsylvania Cnty.*, 844 F. Supp. 2d 724, 740 (W.D. Va. 2012) (Urbanski, J.) (not defining term). The amended complaint's blanket assertion that "hate group" is legally defined in a particular way is therefore contradicted by the more specific fact that none of the cases cited by Coral Ridge defines the term.

Furthermore, unlike Coral Ridge's definition, the FBI's and ADL's definitions of a "hate group" do *not* include a requirement that the group engage in or advocate crime or violence. According to Coral Ridge, the FBI defines "hate group" as, "An organization whose primary purpose is to promote animosity, hostility, and malice against persons of or with a race, religion, disability, sexual orientation, ethnicity, gender, or gender identity which differs from that of the members

or the organization, e.g., the Ku Klux Klan, American Nazi Party." Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 5 (quoting FBI, *Hate Crime Data Collection Guidelines And Training Manual*, at 9 (2015), https://ucr.fbi.gov/hate-crime-data-collection-guidelines-and-training-manual.pdf).[9]  The ADL defines a "hate group" as "an organization whose goals and activities are primarily or substantially based on a shared antipathy towards people of one or more different races, religions, ethnicities/nationalities/national origins, genders, and/or sexual identities. ... [T]he group itself must have some hate-based orientation/purpose." *Id.* at 5-6 (quoting *Hate Group*, ADL, https://www.adl.org/resources/glossary-terms/hate-

---

9. Coral Ridge contends--and SPLC and this court agree--that the definition contained in the FBI manual is subject to judicial notice. This court takes notice of--and considers for purposes of this motion to dismiss--only the fact that an FBI manual with this definition exists, but of course takes no notice as to the veracity of the definition. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811-12, 811 n.4 (11th Cir. 2015).

group).[10]          Again, neither of these definitions

contains the crime or violence requirement.[11]

In addition to conflicting with the FBI and ADL

definitions, Coral Ridge's alleged definition of "hate

group" is inconsistent with this court's "common sense"

understanding of the words "hate" and "group." *Iqbal*,

556 U.S. at 679 (explaining that courts must draw on

their "common sense" in determining whether plaintiffs

---

10.  The court takes judicial notice of the
existence of this ADL definition, which Coral Ridge
cites in its brief.

11. For its part, SPLC defines "hate groups" as
those groups that "have beliefs or practices that
attack or malign an entire class of people, typically
for their immutable characteristics."  Am. Compl. (doc.
no. 40) at ¶ 59.    SPLC's definition especially
undermines Coral Ridge's conclusory allegation
concerning how "hate group" is "commonly understood,"
given that Coral Ridge also pleads that, "[a]s a result
of SPLC's position as the alleged 'premier U.S.
nonprofit organization monitoring the activities of
domestic hate groups and other extremists,' ... SPLC's
Hate Map [and other 'hate group' materials, goods, and
services] reach a large number of people in every state
in the United States and beyond."  Am. Compl. (doc. no.
40) at ¶ 75.   The term "hate group" is less likely to
be "commonly understood" to necessarily involve
violence or crime if the widely viewed Hate Map
produced by a "premier" organization monitoring "hate
groups" does not define such groups as necessarily
engaging in or advocating violence or crime.

meet the plausibility pleading standard).  While the word "hate" is sometimes associated with violence and crime, it does not *necessarily* connote the two. Plainly, the word "group" carries no such connotation.

In sum, the court need not accept Coral Ridge's blanket contention that a "hate group" is "legally and commonly understood as one that engages [in] or advocates crime or violence against others," Am. Compl. (doc. no. 40) at ¶ 91, given that it is not only factually unsupported, but also contradicted by the FBI and ADL definitions that Coral Ridge cites, as well as by the court's common-sense understanding of the words "hate" and "group."

Beyond belying the alleged crime or violence element of the "hate group" definition, the FBI and ADL definitions also show that the term does not have a single, "commonly understood" meaning.  This is because the definitions contain important differences from one another.  For example, unlike the FBI definition, the ADL definition does not require that the group

"promote" animosity, hostility, malice, antipathy, or the like; under the ADL's definition, a white supremacist organization is still a "hate group" even if it keeps to itself. *See* Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 5-6.  Further, the FBI definition requires that a group's "primary purpose" be the promotion of its bigoted ideas, while the ADL definition is broader, including those whose "goals and activities" are "substantially based" on a shared antipathy towards people of a certain group.

The conclusion that the term "hate group" has no single, commonly understood meaning is reinforced by the lack of a definition for the term in dictionaries, of which the court takes judicial notice. *See Veney*, 293 F.3d at 730 ("Nor must we accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.)".  Neither Black's Law Dictionary (11th ed. 2019), Merriam-Webster Unabridged

(online ed.), nor the Oxford English Dictionary (online ed.), defines the term "hate group."[12]

_____

12. Black's Law Dictionary defines the distinct term of "hate speech" as follows: "Speech whose sole purpose is to demean people on the basis of race, ethnicity, gender, religion, age, disability, or some other similar ground, esp. when the communication is likely to provoke violence." *Hate Speech*, Black's Law Dictionary (11th ed. 2019).   Strikingly, this definition undercuts Coral Ridge's definition of "hate group" as requiring that the group engage in or advocate crime or violence.   To explain: the key verb in the definition--"to demean"--does not necessarily entail engaging in or advocating crime or violence. Furthermore, the word "especially" in the clause "especially when the communication is likely to provoke violence," shows that hate speech may *sometimes* be likely to provoke violence, but it is not *always* likely to provoke violence.   Thus, according to the definition, "hate speech" does not necessarily provoke, promote, or advocate crime or violence.   Therefore, if the court were to accept Coral Ridge's asserted definition of "hate group" as requiring engaging in or advocating crime or violence, it would mean that there could be a group exclusively and zealously dedicated to engaging in "hate speech"--as defined by Black's Law Dictionary--that would not qualify under Coral Ridge's definition of a "hate group," because it did not engage in or advocate crime or violence.   This would be absurd.

### ii. Court's Conclusion as to Meaning of "Hate Group"

Accepting as true the well-pleaded facts--but not the conclusory allegations--and construing them in the light most favorable to Coral Ridge, the court concludes that there is no single, commonly understood meaning of the term "hate group."  Rather, as shown by the conflicting definitions cited by Coral Ridge--and dictionaries' lack of a definition--the term does not have one precise definition, and instead may be ascribed multiple different meanings by "the average reader."  *St. Surin*, 21 F.3d at 1317.[13]

---

13. Interestingly, there appears to be no uniform definition of "hate group" in Canada either.  The Canadian Anti-Hate Network defines a hate group as "a group which, as demonstrated by statements by its leaders or its activities, is overtly hateful towards, or creates an environment of overt hatred towards, an identifiable group ... ."  https://www.antihate.ca/what_is_a_hate_group  (last accessed on September 6, 2019).  Meanwhile, Queens University's Human Rights Office defines "hate groups" as "organizations which: spread lies intended to incite hatred toward certain groups of people; advocate violence against certain groups on the basis of sexual orientation, race, colour, religion etc.; claim that their identity (racial, religious etc.) is 'superior' to that of other people; do not value the human rights

With this determination as to the meaning of "hate group" in mind, the court will now assess whether Coral Ridge has plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.[14]

## 2. Constitutional Requirements for Defamation

As previously mentioned, the First Amendment imposes three requirements on Coral Ridge:  It must plausibly allege that the "hate group" designation is provable as false and actually false, and that SPLC made the designation with "actual malice."  While Coral

of other people."    *See* http://www.queensu.ca/humanrights/initiatives/end-hate-project/what-hate/what-hate-group (last accessed on September 6, 2019).

14. As the "actual malice" subsection below explains, an alternative holding in this case is that, even if the court were to accept as true Coral Ridge's allegation that "hate group" is commonly understood to require engaging in or advocating crime or violence, Coral Ridge still would not plausibly plead actual malice, and therefore its amended complaint would still be dismissed.

Ridge must meet all three requirements, it cannot, for the reasons outlined below, satisfy any of them.

### i. Provable as False

Under the First Amendment, the "hate group" designation is not actionable unless it is "provable as false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990).[15]   Statements are provable as false when

_____

15. *Milkovich* stated that the "provable as false" requirement for allegedly defamatory statements on matters of public concern applied "at least in situations, like the present, where a media defendant is involved," thus reserving the question whether it applied with a nonmedia defendant. *Id.* at 19-20, n.6. However, this court agrees with other courts that subsequently concluded that the requirement applies regardless of whether the defendant is characterized as belonging to the media. *See Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) (agreeing with "every other circuit to consider the issue," which have "held that the First Amendment defamation rules in [*New York Times v.*] *Sullivan* and its progeny apply equally to the institutional press and individual speakers"); *Snyder v. Phelps*, 580 F.3d 206, 219 n.13 (4th Cir. 2009) ("[W]e believe that the First Amendment protects nonmedia speech on matters of public concern that does not contain provably false factual assertions."); *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 149 (2d Cir. 2000) ("[A] distinction drawn according to whether the defendant is a member of the media or not is untenable."); *Piccone v. Bartels*, 40 F. Supp. 3d 198,

207 (D. Mass. 2014) (Wolf, J.) (agreeing with collected cases in holding that "the constitutional limitations on speech that can support liability for defamation apply in cases involving non-media defendants"); *see also In re IBP Confidential Bus. Documents Litig.*, 797 F.2d 632, 642 (8th Cir. 1986); *Garcia v. Bd. Of Educ. Of Socorro Consol. Sch. Dist.*, 777 F.2d 1403, 1411 (10th Cir. 1985).

Concluding that the media-nonmedia distinction is irrelevant comports with Eleventh Circuit decisions that have applied the "actual malice" standard to nonmedia defamation defendants. *See Echols v. Lawton*, 913 F.3d 1313, 1321 (11th Cir. 2019); *Morgan v. Tice*, 862 F.2d 1495, 1500 (11th Cir. 1989). Indeed, providing less constitutional protection to nonmedia defendants would conflict with *Turner v. Wells*, where the Eleventh Circuit rejected the defamation plaintiff's argument that "a different set of rules" applied to the allegedly defamatory report because it was not published by a media organization. 879 F.3d 1254, 1270-71 (11th Cir. 2018). The court reasoned: "The First Amendment protects both media ('freedom ... of the press') and non-media ('freedom of speech') defendants." *Id.* at 1271.

Finally, giving less protection to nonmedia defendants would be at odds with the Supreme Court's statement in *Citizens United v. Fed. Election Comm'n*: "We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." 558 U.S. 310, 352 (2010); *cf.* at 326 ("Substantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored.").

To summarize, because the constitutional limits on defamation actions apply equally to media and nonmedia defendants, this court need not decide on which side of

their truth or falsity can be determined based on "a core of objective evidence." *Id.* at 21. Put differently, the requirement is satisfied if the statement is "subject to empirical verification." *Michel*, 816 F.3d at 697.

An alleged defamatory statement is generally not provable as false when it labels the plaintiff with a term that has an imprecise and debatable meaning. *See, e.g.*, *Buckley v. Littell*, 539 F.2d 882, 893-94 (2d Cir. 1976). In *Buckley*, the author and commentator William F. Buckley, Jr. sued author and Holocaust scholar Franklin H. Littell for libel because Littell's book characterized Buckley as a "fellow traveler" of "fascism" or the "radical right." *Id.* at 890, 893. The Second Circuit Court of Appeals held that those terms were "concepts whose content is so debatable, loose and varying, that they are insusceptible to proof

---

the "blurred" media-nonmedia line SPLC falls. *Id.* at 352 ("With the advent of the Internet and the decline of print and broadcast media ... the line between the media and others who wish to comment on political and social issues becomes far more blurred.").

of truth or falsity." *Id.* at 894.  As the court emphasized, the ambiguous labels contrasted sharply with accusations of being a member or legislative representative of a concrete political party, which are allegations that are "susceptible to proof or disproof of falsity." *Id.*  That the plaintiff and defendant defined "fascism" differently was but one example of the "imprecision of the meaning and usage of the[] term[] in the realm of political debate." *Id.* at 890, 893.

Subsequently, in *Ollman v. Evans*, the D.C. Circuit Court of Appeals elaborated on and applied the principles set forth in *Buckley*.  *See* 750 F.2d 970, 979-87 (D.C. Cir. 1984) (en banc).[16]  The court held to

_____

16. Both *Buckley* and *Ollman* analyzed whether the defamatory statements had a precise meaning and were provable as false to determine whether the statements were of fact or "opinion."  The fact-versus-opinion distinction was relevant because those courts--and others--considered opinions to be protected by the First Amendment.  In fact, *Ollman* set forth an influential four-factor test for distinguishing fact from constitutionally protected opinion.  *See* 750 F.2d at 979.  The first factor was "whether the statement has a precise core of meaning for which a consensus of

understanding exists or, conversely, whether the statement is indefinite and ambiguous." *Id.* The second factor was "the statement's verifiability--is the statement capable of being objectively characterized as true or false?" *Id.; see also id.* at 981 ("[I]s the statement objectively capable of proof or disproof?"). These two factors were essentially the driving considerations in *Buckley* and *Ollman*, which both reasoned that certain alleged defamatory statements were constitutionally protected opinion because their meaning was highly ambiguous and not provable as false.

Later, in *Milkovich*, the Supreme Court clarified that there is no independent constitutional protection for "opinion" that is separate from the requirement that the defamatory statement be provable as false. 497 U.S. at 19-21. However, *Milkovich*'s rejection of the fact-versus-"opinion" dichotomy was largely semantic, as the Court recognized the "provable as false" requirement that drove the "opinion"-versus-fact analyses in *Buckley* and *Ollman*. Therefore, *Buckley*'s and *Ollman*'s analyses of whether the statements were provable as false are still most instructive and directly pertinent to assessing the still-valid constitutional requirement that a defamatory statement be provable as false, even though the provable-as-false analyses in those cases were technically to determine whether the statements qualified as "opinion"--a term that *Milkovich* deemed constitutionally irrelevant. Or, as one commentator put it: "The Court in *Milkovich* was primarily rejecting only the *terminology* of 'fact v. opinion.' The Court actually *endorsed* rather than rejected the essential substance of the previously existing constitutional protection for opinion. ... [S]tatements not subject to objective proof ... are still immune from liability under the First Amendment. ... [T]he rich body of jurisprudence developed by lower courts ... under the rubric of the

be "obviously unverifiable" the alleged defamatory statement that the plaintiff academic was an "outspoken proponent of political Marxism." *Id.* at 987. It highlighted that the characterization was "much akin to" the "fascist" label in *Buckley*, in that it was a "loosely definable, variously interpretable statement" made in the context of "political, social or philosophical debate." *Id.* The D.C. Circuit contrasted, on the one hand, the political Marxist and fascist designations with, on the other, an accusation of a crime, which is a "classic example of a statement with a well-defined meaning." *Id.* at 980. Even though accusations of crimes are "not records of sense perceptions," they depend for their meaning on social norms that "are so commonly understood that the statements are seen by the reasonable reader or hearer as implying highly damaging facts." *Id.*

---

'opinion' doctrine remains alive and well." 1 Rodney A. Smolla, *Law of Defamation* § 6:21 (2d ed. May 2019 update).

The *Ollman* court explained why demanding that defamatory statements be "objectively capable of proof or disproof" safeguards important free speech interests: "[I]nsofar as a statement is unverifiable, the First Amendment is endangered when attempts are made to prove the statement true or false." *Id.* at 981. This is because without "a clear method of verification with which to evaluate a statement--such as labelling a well-known American author a 'fascist'--the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Id.* (internal citations omitted). "An obvious potential for quashing or muting First Amendment activity looms large when juries attempt to assess the truth of a statement that admits of no method of verification." *Id.* at 981-82.

So, with these cases in mind, is the statement that Coral Ridge is a "hate group" provable as false? No, it is not. Like in *Ollman* and *Buckley,* the meaning of

the term "hate group" is so "debatable, loose and varying," that labeling Coral Ridge as one is "insusceptible to proof of truth or falsity." *Buckley*, 539 F.2d at 894. Similar to the terms "fascism," "radical right," and "political Marxist," the term "hate group" also suffers from a "tremendous imprecision of the meaning and usage ... in the realm of political debate." *Id.* at 893. This imprecision is reflected in the conflicting definitions of the term espoused by Coral Ridge and SPLC, as well as by the ADL, and FBI. Unlike the accusation of a crime, the accusation of being a hate group does not derive its meaning from "commonly understood" social norms. *Ollman*, 750 F.2d at 980. A "hate group" designation is also a far cry from the objectively verifiable allegation of having a "well-defined political affiliation," such as being "a legislative representative of the Communist Party." *Buckley*, 539 F.2d at 894.

In sum, because "hate group" has a highly debatable and ambiguous meaning, Coral Ridge's designation as such is not "provable as false." *Milkovich*, 497 U.S. at 19.[17]   Therefore, the First Amendment protects the statement.

### ii. False

In addition to requiring that a defamatory statement be provable as false, the First Amendment also requires that "a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation." *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986); *see also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52

---

17. The court does not go so far as to hold that a "hate group" label can *never* be provable as false.  The court need not address whether it would be possible for a factual situation to arise in which the designation would be provable as false because no plausible construction of the ambiguous term would fit the plaintiff, such as might be the case if the term were applied to a middle-school chess team with no views on anything other than chess strategy.  That is not the case here, given that Coral Ridge is a public figure that espouses its opposition to homosexual conduct.

(1988). Coral Ridge cannot prove the falsity of the "hate group" designation, given that, as the court has found, the designation is not provable as false. Logically speaking, a plaintiff cannot prove what is not provable. *Cf. Milkovich*, 497 U.S. at 16, 19 (inferring the provable-as-false requirement from *Hepps*'s requirement to prove falsity).

This court's holdings that Coral Ridge does not plausibly plead that the "hate group" designation was (1) provable as false or (2) false are each independently sufficient to dismiss the defamation claim. Nevertheless, the court will now discuss Coral Ridge's failure to plead, plausibly, actual malice, which is an alternative ground for dismissing the claim.


### iii. Actual Malice

The third and final First Amendment hurdle for Coral Ridge is that it must plausibly allege that SPLC made the "hate group" designation with "actual malice,"

that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280. "Actual malice" requires falsity. *See Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) ("One could in principle construe the language of the actual malice standard to cover true statements made recklessly. But we have long held, to the contrary, that actual malice entails falsity."). Therefore, Coral Ridge's failure to plead plausibly that the "hate group" designation is provable as false or false necessarily means that it cannot plausibly allege "actual malice."

Nonetheless, for the following reasons, even if the court were to conclude that the "hate group" label was both provable as false and actually false, Coral Ridge still would not plausibly allege actual malice.

The test for actual malice "is not an objective one and the beliefs or actions of a reasonable person are irrelevant." *Michel*, 816 F.3d at 702-03 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Rather,

the plaintiff must plead enough facts to allow the court to draw the reasonable inference that the defendant, "instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Id.* Coral Ridge does not satisfy this test.

Coral Ridge's basic contention regarding actual malice is that the "hate group" definition that SPLC used in designating it as such is so far removed from the commonly understood meaning of the term that SPLC must have known--or at least recklessly disregarded-- the falsity of the designation. *See, e.g.*, Am. Compl. (doc. no. 40) at ¶ 67 ("SPLC's definition of 'hate group' is so far outside of how hate groups are legally and culturally understood that ... SPLC knew of the falsity of its definition at the time it designated the Ministry a hate group ... ."); *id.* at ¶ 67, 69. In other words, according to Coral Ridge, SPLC's actual malice should be inferred from the gaping disparity

between, on the one hand, the common understanding that all hate groups engage in or advocate crime or violence, and, on the other, SPLC's broader definition of "hate group" and its application of that definition to Coral Ridge for "oppos[ing] homosexual conduct." *Id.* at ¶ 61.

Fatal to Coral Ridge's contention is the reality that "hate group" has no single, commonly understood meaning. Without a commonly understood meaning, there can be no chasm between the commonly understood meaning and SPLC's definition.

Furthermore, Coral Ridge still would not plausibly allege actual malice even if this court were to accept as true its allegation that the single, commonly understood meaning of "hate group" requires that the group engage in or advocate crime or violence. Granted, if that were the case, there would be a significant discrepancy between the commonly understood meaning of a hate group and SPLC's definition, given that the latter lacks a violence or crime requirement.

And, admittedly, a substantial disparity between the commonly understood meaning of a term and the definition relied on by an alleged defamatory speaker might, *in certain circumstances*, lead to a reasonable inference of knowledge or recklessness as to falsity. *Cf. Michel*, 816 F.3d at 703 (noting that the Supreme Court has stated that actual malice "can be inferred in certain circumstances," such as when allegations are "so inherently improbable that only a reckless man would have put them in circulation"). Nevertheless, those circumstances are not present under the facts pleaded here.

Specifically, Coral Ridge pleads that SPLC, holding itself out to the public as a "premier" U.S. monitor of "hate groups," publicly disseminates its own definition of "hate groups" to a "vast" audience of people and media across the country. Am. Compl. (doc. no. 40) at ¶¶ 71, 143.[18]   Coral Ridge does not plead any facts

---

18. SPLC puts its definition of a "hate group" on its website at https://www.splcenter.org/hate-map. *See* Am. Compl. (doc. no. 40) at ¶ 59. On its website, SPLC

indicating that SPLC subjectively doubts or disbelieves the validity or accuracy of the definition that it so widely promotes under the banner of being a premier "hate group" monitor.   Consequently, even if the court accepted Coral Ridge's asserted commonly understood meaning of "hate group," the pleaded facts, read in the light most favorable to Coral Ridge, would support the reasonable inference that SPLC promotes its own sincerely held view of the meaning of "hate group," despite the difference between its view and the commonly understood meaning that a "hate group" engages in or advocates crime or violence.[19]      Setting aside

---

claims to be the "premier U.S. nonprofit organization monitoring the activities of domestic hate groups and other extremists."  *Id.* at ¶ 71.  SPLC "disseminates, distributes and promotes the Hate Map and resulting hate group designations on its website."  *Id.* ¶ 21. The dissemination of the Hate Map and hate group designations "is nothing short of vast," as the "SPLC's website receives an extremely large number of views and significant general media exposure."  *Id.* at ¶ 143. The Hate Map reaches "a large number of people in every state in the United States and beyond." *Id.* at ¶ 75.

19. The same would be true if the court were to accept the FBI's or ADL's definitions of a hate group

the above-discredited allegations claiming a common definition of "hate group," the pleaded facts do *not* lead to a reasonable inference that "instead of acting in good faith," SPLC "actually entertained serious doubts as to the veracity" of its "hate group" definition and application to Coral Ridge, or was "highly aware" that the definition and designation was "probably false." *Michel*, 816 F.3d at 702-03.[20]  The bottom line is that, regardless of the commonly understood meaning of "hate group," Coral Ridge does

---

as providing the single, commonly understood meaning of the term.

20. Still operating under the counterfactual situation in which the court credited Coral Ridge's definition of "hate group" as the single, commonly understood meaning of the term, the court might have reached a different conclusion as to actual malice if SPLC did not publish and widely disseminate its own definition; or if its definition were ridiculously outlandish.  It also might have been a different case if the allegedly defamatory term SPLC defined on its website was not so germane to its mission, such as if SPLC started to publish a list of purported "substance abusers"--a topic far removed from its mission to monitor hate groups--and then provided a highly unconventional definition of the term.  Circumstances such as these might indicate that SPLC was acting in bad faith.  Of course, they do not exist here.

not plausibly allege that SPLC's subjective state of mind was sufficiently culpable.

To find actual malice just because SPLC publicized a meaning of "hate group" that conflicted with the common understanding of the term would severely undermine debate and free speech about a matter of public concern. This is because, even if the term had achieved a commonly understood meaning, that meaning would not be fixed forever, but rather could evolve through public debate. To sanction a speaker for promoting a genuinely held dissenting view of the meaning of "hate group" would be akin to punishing a speaker for advocating new conceptions of terms like "terrorist," "extremist," "sexist," "racist," "radical left wing," "radical right wing," "liberal," or "conservative." Punishing speakers to preserve status quo ideas would be anathema to the First Amendment.

***

If Coral Ridge disagrees with the "hate group" designation, its hope for a remedy lies in the

45

"marketplace of ideas," not a defamation action. *Milkovich*, 497 U.S. at 18 (citing *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("[T]he ultimate good desired is better reached by free trade in ideas-- ... the best test of truth is the power of the thought to get itself accepted in the competition of the market."). As a public figure, with a national, if not international audience, and a figure that has already "been vocal about its position on homosexuality" and maintains that "speaking out on these issues is necessary," Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 10, Coral Ridge is free publicly to engage SPLC; to criticize SPLC's definition of a "hate group"; and, in particular, to challenge Coral Ridge's designation as such. This engagement should be in the court of public opinion, not a federal court. The defamation claim will be dismissed with prejudice.

## B. Lanham Act Claims Against SPLC

Coral Ridge seeks to hold SPLC liable for its designation of Coral Ridge as a "hate group" under Section 43(a) of the Lanham Act, which is codified at 15 U.S.C. § 1125(a).  This provision establishes "two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). Coral Ridge brings both types of claims.

Coral Ridge claims that SPLC engaged in false advertising by falsely designating it a "hate group" on its Hate Map, disseminating the Map and "hate group" designation in connection with reports and trainings, and engaging in fundraising focused on the Hate Map and "hate group" designations.  *See* 15 U.S.C. § 1125(a)(1)(B) (establishing claim for use "in connection with goods and services" of "a false or misleading description of fact ... in commercial advertising or promotion").

**47**

Coral Ridge's false-association claim rests on many of the same allegations, but focuses on SPLC's use of Coral Ridge's trademarked name.  Coral Ridge contends that the use of its trademarked name on the Hate Map is likely to cause confusion as to Coral Ridge's "association" with other hate groups on the Map, such as the Ku Klux Klan and the American Nazi Party.  *See* 15 U.S.C. § 1125(a)(1)(A) (establishing claim for use of a trademark "in connection with goods and services" that "is likely to cause confusion ... as to ... association").

Because Coral Ridge's claims cannot, as an initial matter, withstand the rigorous protections of the First Amendment, and because it has not pleaded viable claims under the statute, the claims fail.

### 1. First Amendment

As the Supreme Court has made clear, even when they do not bring a defamation claim, 'public figures' who seek to sue others who criticize them may still be

subject to *New York Times v. Sullivan*'s heightened requirements for liability. 376 U.S. 254 (1964).

In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), Jerry Falwell, a nationally known minister and commentator on politics, had successfully sued Hustler Magazine, a nationally circulated magazine, to recover damages for 'intentional infliction of emotional distress' arising from the publication of an advertisement "parody" which, among other things, portrayed Falwell as having engaged in a drunken incestuous rendezvous with his mother in an outhouse. In overturning the lower-court jury verdict, the Supreme Court, while recognizing that the publication was "gross and repugnant in the eyes of most," 485 U.S. at 50, found that, because Falwell was concededly a public figure, he was subject to the *New York Times*'s twin obligations of showing that the publication contains "a false statement of fact" and that the statement "was made with 'actual malice.'" *Id.* at 56.

In explaining why the Supreme Court found as it did, this court must, as did the Supreme Court in *Falwell*, revisit certain well-founded principles, albeit only briefly.  These principles, as summarized in *Falwell,* are as follows: "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on *matters of public interest and concern*. '[T]he freedom to speak one's mind is not only an aspect of individual liberty--and thus a good unto itself--but also is essential to the common quest for truth and the vitality of society as a whole.'  *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503–504 (1984). We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions.  The First Amendment recognizes no such thing as a 'false' idea.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).  As Justice Holmes wrote, 'when men have realized that time has upset many fighting faiths, they

may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas-- that the best test of truth is the power of the thought to get itself accepted in the competition of the market ... .' *Abrams v. United States*, 250 U.S. 616, 630 (1919) (dissenting opinion)." *Falwell*, 485 U.S. at 50-51 (emphasis added).

The *Falwell* Court went on to state that: "The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are 'intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.' *Associated Press v. Walker*, decided with *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164 (1967) (Warren, C.J., concurring in result). Justice Frankfurter put it succinctly in *Baumgartner v. United States*, 322 U.S. 665, 673-674 (1944), when he said that

'[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures.' Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to 'vehement, caustic, and sometimes unpleasantly sharp attacks,' *New York Times*, *supra*, 376 U.S., at 270." *Falwell*, 485 U.S. at 51.

Falwell argued that, despite these First Amendment principles, a different standard should apply in this case because the government sought to prevent "not reputational damage, but the severe emotional distress suffered by the person who is the subject of an offensive publication." *Falwell*, 485 U.S. at 52.  .

The Court rejected this argument, reasoning  that: "[I]n the world of *debate about public affairs*, many things done with motives that are less than admirable are protected by the First Amendment ... . [E]ven when a speaker or writer is motivated by hatred or illwill his expression was protected by the First Amendment: '*Debate on public issues* will not be uninhibited if the

speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth.' [*Garrison v. Louisiana*, 379 U.S. 64, 73 (1964)]." *Falwell*, 485 U.S. at 53 (emphasis added).

Critical to Court was not the "label" placed on the cause of action, *New York Times*, 376 U.S. at 269 ("In deciding the question now, we are compelled by neither precedent nor policy to give any more weight to the epithet 'libel' than we have to other 'mere labels' of state law."), but rather whether the concern raised by *New York Times* and reiterated in later cases was at issue: that "debate on public issues should be uninhibited, robust, and wide-open ... ." *Id.*, 376 U.S. at 270. As the *Falwell* Court emphasized: "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on *matters of public interest and concern*." 485 U.S. at 50 (emphasis added).

The *Falwell* Court then concluded: "This is not merely a 'blind application' of the *New York Times* standard ... , it reflects our considered judgment that such a standard is necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Id.* at 56.

Here, as discussed above, Coral Ridge has conceded that it is a 'public figure.' Public figures, as stated, are defined by "the notoriety of their achievements or the vigor and success with which they seek the public's attention," *Gertz*, 418 U.S. at 342; they "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy," *id.* at 323; and they "thrust themselves and their views into the public controversy in an effort to influence others, *see Hutchinson v. Broxmire*, 443 U.S. 111, 135-36 (1979).

Coral Ridge admits that it is a public figure, with quite significant "access to the channels of communication" through its television and other media efforts. *Id*. at 323. It freely chose to take a public stance on an issue of broad, pressing national debate and public concern: homosexuality, and more specifically the morality of "homosexual conduct" and the legal right to same-sex marriage. *See* Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 10 (Coral Ridge not only admits that "the Ministry has been vocal about its position on homosexuality," it also argues that "speaking out on these issues is necessary).

It has further conceded that the dispute between it and SPLC arises out of SPLC's labelling of it as an "Anti-LGBT hate group" for its stance on this debate. *See* Am. Compl. (doc. no. 40) at ¶ 154. At issue here, therefore, is nothing less than a public figure's engagement in an out-and-out "public debate" on one of the matters of "highest public interest and concern" in

this country.  *New York Times*, 376 U.S. at 266.  That being so, "adequate 'breathing space,'" *Falwell*, 485 U.S. at 56, in the form of the protections provided in *New York Times v. Sullivan* must be given.

Coral Ridge argues that it is not a hate group; that, while it "opposes homosexual conduct," it "has nothing but love for people who engage in homosexual conduct," Am. Compl. (doc. no. 40) at ¶ 61; and that its views on "same-sex marriage" and the "homosexual agenda" are "decent and honorable," id. at ¶ 82 (*quoting Obergefell v. Hodges*, 135 U.S. 2584, 2602 (2015)).  It further argues that, because SPLC's labeling, in response to its stand, is "in connection" with "goods and services," it should be able to recover damages under the Lanham Act.  *Id.* at ¶¶ 125, 145. But, when Coral Ridge, as a public figure, entered the public debate about gay rights, it took on the risk that it and its goods and services would be adversely affected.  A public figure cannot enter the fray of debate halfway.  As the Supreme Court cautioned in the

*Falwell* case: The public figure that "vaunts [its] spotless record and sterling integrity cannot convincingly cry 'Foul!' when an opponent or an industrious reporter attempts to demonstrate the contrary." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 274 (1971).

Moreover, there is nothing in *New York Times v. Sullivan* and its progeny that suggests that, simply because a public figure that has entered the fray of public debate sells goods or services, it should when verbally attacked escape the heightened requirements for establishing liability under the First Amendment and should enjoy an uneven playing field, that is, an advantage over those public figures that do not sell goods and services. Coral Ridge joined many other public figures around the country in the national discussion about the rights of gay people. When it did this it opened itself up to criticisms about its views. For all the 'public figure' participants, name-calling--"purveyor of sin and indecency" or

"purveyor of hate"--comes with the turf.   Coral Ridge has joined in that public debate and must now abide by the same rules all other public figures do.

Having found that, in asserting Lanham Act claims, Coral Ridge is subject to the heightened standard of the First Amendment, the court further concludes that, to recover from SPLC, Coral Ridge must show that what SPLC said about it was provable as false and false, and was said with actual malice.   For the reasons given above, in the discussion of Coral Ridge's defamation claim, Coral Ridge's complaint fails to assert adequate allegations to this effect.

Nevertheless, Coral Ridge argues that public debate on gay rights is not the sole concern presented here. It contends that SPLC also uses the Hate Map and "hate group" designations to promote Hate-Map-related "goods and services"--its reports, trainings, and other informational services--and, indeed, argues that it makes money from the sale of those "goods and services" as a result of its "hate group" designations.   However,

SPLC, like a magazine or a newspaper, is in the business of communicating information and viewpoints on issues of public concern and debate. "[M]agazines and newspapers often have commercial purposes, but those purposes do not convert the individual articles within these editorial sources into commercial speech subject to Lanham Act liability. *See Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013) (holding that a satirical article about a book in a magazine's online blog was not commercial speech subject to Lanham Act liability even though 'writers write and publishers publish ... for commercial purposes'); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir. 2001) ('A printed article meant to draw attention to the for-profit magazine in which it appears, however, does not fall outside of the protection of the First Amendment because it may help to sell copies.')." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 952 (11th Cir. 2017). See also *Burstyn v. Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines

are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."). The fact that SPLC may, as alleged, earn money in connection with these communicative activities on an issue of public concern does not reduce the protection it receives under the First Amendment, and does not convert its speech into the basis for a viable Lanham Act claim. Likewise, the fact that the Hate Map may be used to attract attention to and increase sales of SPLC's Hate-Map-related trainings and informational services does not convert the Map and "hate group" designations into purely commercial speech subject to a lower level of constitutional protection. *See Hoffman*, 255 F.3d at 1186.

Similarly, the allegation that SPLC may use the Hate Map and "hate group" designations in fundraising does not mean that it should receive a lesser level of First Amendment protection. As the Supreme Court explained in *Virginia State Board of Pharmacy v.*

*Virginia Citizens Consumer Council, Inc.*, where it struck down a restriction on the advertising of prescription drug prices: "Speech ... is protected ... even though it may involve a solicitation to purchase or otherwise pay or contribute money." 425 U.S. 748, 761 (1976).  Furthermore, in cases involving fundraising by charitable organizations, the court has treated that speech as deserving of the highest level of protection, based on "the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech ..., and ... that without solicitation the flow of such information and advocacy would likely cease." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988); *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984); *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980).  Thus, the allegations about the use of Hate Map in fundraising do not reduce the constitutional protections for SPLC's speech.

Finally, the legislative history of the Lanham Act is consistent with the court's conclusion. When the Act was revised in 1989, requirements were added that false advertising occur in the context of "commercial advertising and promotion," and that a false or misleading description or representation be one "of fact." 5 McCarthy on Trademarks and Unfair Competition § 27:96 (5th ed.). With regard to these changes, Representative Kastenmeier, who carried the bill in the House of Representatives, explained that both additions were drafted in order to avoid conflicts with the First Amendment. *See* Remarks of Rep. Kastenmeier on S. 1883, 134 Cong. Rec. 31851 (Oct. 19, 1988) ("To avoid legitimate constitutional challenge, it was necessary to carefully limit the reach of the subsection. Because section 43(a) will now [*sic*.] provide a kind of commercial defamation action, the reach of the section specifically extends only to false and misleading speech that is encompassed within the "commercial speech" doctrine developed by the United States Supreme

Court. *See, e.g., Central Hudson Gas & Electric Corp. v. Public Service Comm'n of N.Y.*, 447 U.S. 557 (1980); *Va. State Bd. of Pharmacy v. Va. Citizens Consumers Council, Inc.*, 425 U.S. 748 (1976). In addition, subsection (a) will extend only to false and misleading statements of *fact*. *Gertz v. Robert Welch*, *Inc.*, 418 U.S. 323, 339–40 (1974)." (emphasis in original)).

Although the above legislative history is admittedly sparse, a leading commentator has observed that the added "fact" requirement appears to have been "a conscious and intentional limitation imposed by Congress to exclude from the prohibitions of § 43(a) allegedly false or misleading representations of *opinion*" in light of the *Gertz* decision, which indicated that the First Amendment prohibited defamation liability for statements of opinion.[21]

---

21. As stated earlier, *see* supra n. 16, the Supreme Court later clarified its view that the proper test for First Amendment purposes is not whether an allegedly false statement is of "fact" or "opinion," but whether it is provably false. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).

5 McCarthy on Trademarks and Unfair Competition § 27:96
(emphasis in original); *see Gertz*, 418 U.S. at 339-40.

As for the added requirement of "commercial advertising or promotion," Representative Kastenmeier offered more explanation, quoting at length a noted trademark commentator, who explained that the "advertising or promotion" requirement would exclude statements raising free speech concerns from coverage of the Act. Remarks of Rep. Kastenmeier on S. 1883, 134 Cong. Rec. 31852 (Oct. 19, 1988). He explained that the categories of speech excluded from the coverage of the Act "are the type which raise free speech concerns, such as a Consumer Report which reviews and may disparage the quality of stereo speakers or other products, misrepresentations made by interested groups which may arguably disparage a company and its products because of the company's failure to divest its South African holdings, and disparaging statements made by commentators concerning corporate product liability and injuries to the public

64

(*e.g.*, A.H. Robins and the Dalkon shield cases, or the Manville Corporation asbestos cases).   All of these would be judged by first amendment law (including *New York Times v. Sullivan*) and not section 43(a) law ... ." *Id.  See also id*. ("As Mr. Gilson correctly notes, the proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material.... The section is narrowly drafted to encompass only clearly false and misleading commercial speech.").

While not conclusive, this legislative history is consistent with this court's analysis: it suggests Congress anticipated that a conflict would arise between the First Amendment and the Lanham Act if it were applied to speech on matters of public concern, and that, were a claim brought under the Lanham Act for such speech, the claim would be subject to the standard set forth in *New York Times v. Sullivan*, not those of the Lanham Act.

### 2. Application of the Lanham Act

Constitutional concerns aside, Coral Ridge has failed to plausibly plead its false-association and false-advertising claims.  The court will first address the false-advertising claim, and will then turn to the false-association claim.

### a. False-Advertising Claim

Section 1125(a)(1)(B) establishes a cause of action for false advertising against any person or entity "who, on or in connection with any goods or services, ... uses in commerce  ... any  ... false or misleading description of fact, or false or misleading representation of fact, which  ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B); *see also Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693

F.3d 1338, 1348 (11th Cir. 2012).  Even if for purposes
of this discussion Coral Ridge has sufficiently alleged
that SPLC made its "hate group" designation in
connection with goods and services, Coral Ridge's
false-advertising claim must nevertheless be dismissed
because it has not plausibly pled that the "hate group"
designation was a description or representation of
fact, and or that that it made the challenged statement
in "commercial advertising and promotion."

As discussed above, prior to the 1989 revision,
Section 43(a) of the Lanham Act applied to false or
misleading "representations" or "descriptions."  The
1989 revision added the clarification that such
representations or descriptions must be "of fact."  As
discussed above, Congress apparently added this phrase
to ensure that liability would not be imposed under the
Lanham Act for statements of opinion, which the Supreme
Court in *Gertz* suggested were protected from liability
under the First Amendment.  *See Gertz*, 418 U.S. at
339-40 ("Under the First Amendment there is no such

thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."). The Supreme Court later clarified its view that the proper test under the First Amendment is not whether an allegedly false statement is of "fact" or "opinion," but whether it is "provably false." *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).[22]

In support of its false-advertising claim, Coral Ridge alleges in the complaint that SPLC misrepresented the nature, characteristics, and quality of Coral Ridge's goods and services by labelling the organization a 'hate group.' For the reasons discussed in the defamation section, the designation of Coral Ridge as a "hate group" is not provable as false; there is no commonly accepted definition of the term "hate group." Thus, the representation or description that

---

22. As discussed earlier, *see supra* n. 16, this distinction appears largely semantic, because opinions are not provable as false.

Coral Ridge challenges is not one "of fact," and the false-advertising claim must be dismissed.

Coral Ridge's claim also must be dismissed because it has not plausibly pleaded that SPLC used the hate group designation in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). The test for "commercial advertising or promotion" is: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) the representations ... must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."[23] *Edward Lewis Tobinick, MD*, 848

---

23. It is unclear whether the second part of the test for "commercial advertising or promotion"--that the speech must have been "by a defendant who is in commercial competition with [the] plaintiff", *Edward Lewis Tobinick, MD*, 848 F.3d at 950--is still good law after the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). There, in determining the requirements for statutory standing under 15 U.S.C. § 1125(a)(2), the Court explained "when a party claims reputational injury from disparagement, competition is not required

F.3d at 950 (*quoting Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (*quoting Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994) (Sand., J.))).

### i. Commercial Speech

With the facts alleged in the complaint considered in the light most favorable to the plaintiff, SPLC's use of the Hate Map does not constitute 'commercial speech.'

To assess whether Coral Ridge has sufficiently alleged that SPLC engaged in commercial speech, the court looks to the First Amendment commercial speech doctrine. *See Edward Lewis Tobinick, MD*, 848 F.3d at 950 (applying First Amendment commercial speech jurisprudence to determine whether plaintiff met the

_____

for proximate cause." *Id*. at 138. Because the allegations of the complaint do not establish the other factors in the four-part test, the court need not resolve the continuing validity of the second part of the test, and does not apply it here.

'commercial speech' element of commercial advertising or promotion under § 1125(a)(1)(B)).[24]

Under the commercial speech doctrine, commercial speech receives a lower level of constitutional protection than do other forms of speech more central to the concerns of the First Amendment, such as expressive, scientific, and political speech, and speech on matters of public concern. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980). The "core notion" of

---

24. This is so for two reasons. First, as discussed earlier, seeking to avoid conflict with the First Amendment, Congress reportedly drafted § 1125(a) "to extend only to false and misleading speech that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court." *Gordon & Breach Sci. Publishers S.A.,* 859 F. Supp. at 1536. Second, under the doctrine of constitutional avoidance, the Lanham Act should be read in a way that avoids conflict with the First Amendment. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) ("In other words, when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail."). If the Lanham Act were read to impose civil liability for noncommercial speech receiving the highest level of constitutional protection under the First Amendment, it would likely be unconstitutional.

commercial speech is speech proposing a commercial transaction, such as a run-of-the-mill advertisement for a product or service. *Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (*quoting Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S., at 762, *quoting Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385 (1973)). *See also City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 423 (1993) (*citing Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989)) (referring to speech that "propose[s] a commercial transaction" as "*the test* for identifying commercial speech") (italics added and citations omitted)). The Supreme Court has also defined commercial speech as "'expression related solely to the economic interests of the speaker and its audience.'" *Edward Lewis Tobinick, MD*, 848 F.3d at 950 (*quoting Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561).

SPLC's Hate Map and "hate group" designations do not meet the definition of commercial speech under

either of these tests.  Based on the allegations in the complaint, neither the Hate Map nor the "hate group" designations propose a commercial transaction.  Nor does the complaint plausibly allege that SPLC's Hate Map and its "hate group" designations are "expression related *solely* to the economic interest of the speaker and its audience."  While describing SPLC's Hate Map as a "fundraising tool," the complaint does not allege that SPLC's interest in the Hate Map is solely economic.  On the contrary, the complaint alleges that SPLC wants to shut "hate groups" down.  Nor does the Hate Map constitute expression related solely to the economic interests of SPLC's audience.  As alleged in the complaint, the audience for the Hate Map includes government agencies that seek information about "hate groups;" presumably these agencies' interest in the Hate Map is not solely or even primarily economic, but instead is an interest in law enforcement. Furthermore, the complaint alleges that SPLC has placed the Hate Map on its public website, where the audience

presumably includes individuals who are concerned about or interested in "hate groups" for non-economic reasons. Thus, the Hate Map does not constitute core commercial speech.

Coral Ridge argues that the Hate Map and "hate group" designations are commercial speech because (1) they are used to promote SPLC's 'goods and services'; and (2) because SPLC uses the Hate Map and related designations as a tool in fundraising appeals, and has raised millions of dollars as a result. Based on these allegations, the court will assume that SPLC's Hate Map has an economic element. But that does not resolve the issue.

In looking at speech advancing a mix of economic and other important societal interests, the Supreme Court's approach has varied based on "the essential nature of the speech in question." *Gordon & Breach Sci. Publishers S.A.*, 859 F. Supp. at 1540. In *Bolger v. Youngs Drug Prod. Corp.*, the defendant contraceptive company mailed informational pamphlets about

contraceptives   and   venereal   disease   directly   to consumers;   these   pamphlets   mentioned   the   defendant's products while discussing the broader issues.   463 U.S. 60   (1983).     The   defendant   company   conceded   that   the pamphlets   were   advertisements   for   its   products,   but argued that the pamphlets were nonetheless entitled to the   highest   level   of   protection   under   the   First Amendment   because   they   addressed   the   public   debate about contraception.   However, the Court held that the pamphlets     were     commercial     speech,     because "[a]dvertisers   should   not   be   permitted   to   immunize false or misleading product information from government regulation   simply   by   including   references   to   public issues."   *Id*. at 68.

In   contrast,   in   a   series   of   cases,   the   Court   has applied the highest level of First Amendment protection to   charitable   fundraising,   because   such   solicitations are   ordinarily   intertwined   with   speech   on   matters   of public   concern.     In   *Village   of   Schaumburg   v.   Citizens for   a   Better   Environment*,   444   U.S.   620   (1980),   the

Court invalidated a local ordinance prohibiting door-to-door solicitation of contributions by charitable organizations that do not use a certain percentage of their receipts for charitable, as opposed to administrative, purposes. The municipality argued that the law did not violate the First Amendment because such charitable solicitation constitutes merely commercial speech. The Court rejected this argument, finding that solicitations "involve a variety of speech interests ... that are within the protection of the First Amendment," and therefore have not been dealt with as "purely commercial speech." *Id.* at 632. Because the ordinance would potentially ban solicitation by "organizations that are primarily engaged in research, advocacy, or public education and that use their own paid staff to carry out these functions as well as to solicit financial support," *id.* at 636-637, the Court applied exacting scrutiny and struck down the ordinance as overbroad. *See id.* at 637 (noting that the statute must be "narrowly drawn" to

serve village's interests and cannot "unnecessarily interfer[e] with First Amendment freedoms"). *See also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) (applying exacting First Amendment scrutiny in striking down a statute regulating fundraising by charitable organizations because it was not narrowly tailored to advance the municipality's interests); *id*. at 967, and n. 16 (referring to "the law as 'a direct restriction on the amount of money a charity can spend on fundraising activity," and "a direct restriction on protected First Amendment activity").

The Court again struck down a law regulating solicitation by charitable organizations in *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988). The law at issue defined reasonable fees for professional fundraisers, prohibited them from soliciting without a license, and required them to disclose the amount they turned over to charities in the previous year. There, the Court again rejected the idea that charitable solicitations--even when conducted

by a professional fundraiser--should be subjected to a reduced level of scrutiny as commercial speech. The Court reasoned that "solicitation is characteristically intertwined with informative and perhaps persuasive speech ..., and ... that without solicitation the flow of such information and advocacy would likely cease." *Id*. at 796 (quoting *Munson*, 467 U.S. at 959–960 (quoting *Schaumburg*, 444 U.S. at 632). The Court held that arguably commercial speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech. ... Where ... the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression." *Id*.

The speech alleged in this case is clearly more akin to the speech deemed fully protected expression in the charitable fundraising cases than to the disguised

commercial advertising by a pharmaceutical company at issue in *Bolger*. Although the alleged fundraising and fee generating aspects of SPLC's use of the "hate group" designations reflect economic interests, based on the allegations of the complaint, this economically motivated speech is "inextricably intertwined" with informative and persuasive speech on matters of public concern, and therefore is entitled to the highest level of protection under the First Amendment, not the lower level of protection assigned to commercial speech.

In addition to its alleged use in fundraising, Coral Ridge alleges that SPLC uses the Hate Map to promote its trainings, for which Coral Ridge alleges government agencies pay a fee, and that SPLC has sold the Hate Map and associated "hate group" designations to AmazonSmile and Guidestar USA. This does not change the court's conclusion that SPLC's use of the Hate Map and "hate group" designation is not commercial speech. Assuming the truth of the allegations that SPLC

generates fees from trainings and has sold the contents of the Hate Map to other organizations, SPLC's receipt of fees does not convert the Hate Map into commercial speech under the Lanham Act. "The fact that expressive materials are sold does not diminish the degree of protection to which they are entitled under the First Amendment." *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 924–25 (6th Cir. 2003) (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n. 5 (1988)). In this sense, the SPLC Hate Map is no different than an article in a magazine or newspaper, or a product review in Consumer Reports. As noted earlier, "magazines and newspapers often have commercial purposes, but those purposes do not convert the individual articles within these editorial sources into commercial speech subject to Lanham Act liability." *Edward Lewis Tobinick, MD*, 848 F.3d at 952 (*citing Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir. 2001)). Furthermore, the

fact that SPLC has used the Hate Map to promote its Hate-Map-based trainings and informational services does not convert it into commercial speech. *See Hoffman*, 255 F.3d at 1186. The allegation that SPLC generates fees from trainings of government agencies based on the contents of the Hate Map and the fact that organizations may have paid for the content does not convert the Map into commercial speech.

### ii. Speech for the purpose of influencing consumers to buy defendant's goods or services

The third requirement of "commercial advertising or promotion" is showing the defendant engaged in the challenged speech with "the purpose of influencing consumers to buy defendant's goods or services." *Edward Lewis Tobinick, MD*, 848 F.3d at 950. Coral Ridge has failed to plausibly plead this element of the test.

The allegations of the amended complaint do not support Coral Ridge's argument that SPLC designated it as a "hate group" with the purpose of influencing

consumers to buy SPLC's produce.  The amended complaint clearly alleges that SPLC's "very purpose for placing the Ministry on the Hate Map was to harm the reputation of the Ministry as to lower it in the estimation of the community and to deter third persons from associating or dealing with the Ministry. Specifically, SPLC was attempting to dissuade people and organizations from donating to the Ministry and to ultimately destroy the Ministry."  Am. Compl. (doc. no. 40) at ¶ 95; see also *id*. at ¶¶ 79, 106 (alleging that "SPLC" has publicly stated that its aim is to destroy those organizations it labels at "hate groups").

In the Lanham Act section of the complaint, Coral Ridge changes this allegation somewhat by stating that "SPLC's purpose in placing the Ministry's trademark ... on its Hate Map and in SPLC's hate group-based goods and services is to influence the relevant consumers to buy SPLC's goods and services, *in advancement of SPLC's publicly stated goal of destroying the Ministry and the other organizations that SPLC has placed on its Hate*

**82**

*Map.*" *Id.* at ¶ 139 (emphasis added).  The allegation
that SPLC placed Coral Ridge's trademark on the Hate
Map "to influence the relevant consumers to buy SPLC's
goods and services" does nothing more than state a
legal conclusion and an element of the Lanham Act
claim; the court will not credit this conclusory
allegation without supporting facts.  In addition, the
allegation makes clear that SPLC's ultimate goal is
destroying those it considers "hate groups," not
commercial gain.  In the next sentence of the amended
complaint, Coral Ridge goes on to explain the basis for
that statement:

> "SPLC uses the Hate Map and hate group based
> designations to promote its goods and services,
> include [sic] 'investigative reports,' training
> programs (used by U.S. law enforcement ... and
> private organizations), 'key intelligence,' and
> 'expert' analysis.  Through promotion of the
> Hate Map and hate group designations, the
> groups listed on the Map becomes an object of
> scorn and disdain for SPLC's audience, which
> includes individuals and organizations
> interested in charitable giving.  Through the
> use of the Hate Map and hate group
> designations, SPLC focuses attention on these
> groups to convince its audience that these
> groups must be destroyed.  SPLC then markets
> its Hate Map-infused produces to this audience

> for the purpose of further marginalizing and
> isolating the listed 'hate groups,' potentially
> leading to the destruction of the listed
> organizations,  ... which is SPLC's ultimate
> goal."

*Id*. at ¶ 140.  With the initial allegation taken

together with the explanatory paragraph that follows,

the clear import is that SPLC's goal in designating

Coral Ridge as a "hate group" is shutting it down--not

selling goods and services to relevant consumers.


### iii. Dissemination to the
### Relevant Purchasing Public

The final part of the test is that "the

representations ... must be disseminated sufficiently

to the relevant purchasing public to constitute

'advertising' or 'promotion' within that industry."

*Edward Lewis Tobinick, MD*, 848 F.3d at 950.  The

allegations of the complaint are insufficient to

establish this element of commercial advertising and

promotion.

Applying this factor, "breadth of dissemination,

although important, is not dispositive.  Rather, the

**84**

primary focus is the degree to which the representations in question explicitly target relevant consumers." *Gordon and Breach Sci. Publishers. S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 182 (S.D.N.Y. 1995).To apply this test to the allegations of the complaint, the court must first define the relevant purchasing public and industry. Coral Ridge attempts to define the "relevant purchasing public" as "those people and those organizations that engage in charitable giving to tax-exempt organizations." Am. Compl. (doc. no. 40) at ¶ 142; Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 44. As for the relevant industry, Coral Ridge takes issue with SPLC's argument that the relevant industry is Christian television ministries, arguing that it also engages in "publishing and other activities related to its mission," Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 44, but it does not specify its industry. Instead, it implies that the relevant industry is

comprised of tax exempt organizations. *See id*. at 43-44.

If the relevant purchasing public and industry could be defined at such a high level of generality, the test would be meaningless. The world of non-profit organizations is almost, if not just, as varied as the world of for-profit organizations: it ranges from publishers of scientific journals, to health-care providers, to vocational-training providers, religious organizations, atheist organizations, and organizations that promote the arts. It would make no sense to consider the relevant purchasing public for all these organizations to be the same simply because they are all non-profits, just as it would make no sense to consider the relevant purchasing public the same for a subway-car manufacturer and a health-food store simply because they are both for-profit organizations. While there may be some minor overlap in the purchasing public for each, that makes little difference to the determination of "the degree to which the

representations in question explicitly target relevant consumers." *Gordon and Breach Sci. Publishers*, 905 F. Supp. at 182.

Based on the allegations of the complaint, the court considers Coral Ridge's industry to be Christian television and media.  While Coral Ridge has alleged that SPLC has broadly disseminated the Hate Map through its website, fundraising efforts, and promotion of its training for government agencies, Coral Ridge has failed to allege any specific facts showing that SPLC has disseminated its Hate Map, and more specifically, its designation of D. James Kennedy Ministries as a "hate group," within the relevant purchasing public for Christian television and media.[25]   Nor is there any

---

25. It bears noting that Coral Ridge has not alleged a decline in sales or donations that could suggest dissemination to the relevant purchasing public. *See Lexmark Int'l, Inc.*, 572 U.S. at 133 ("[A] plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers *causes them to withhold trade* from the plaintiff.") (emphasis added).  However, as § 1125(a) authorizes relief for

allegation that the dissemination of the "hate group" designation "explicitly target[s] relevant consumers." *Gordon and Breach Sci. Publishers S.A.*, 905 F. Supp. at 182. Based on the allegations, it appears that some of Coral Ridge's target consumers may incidentally come across the Hate Map and "hate group" designation, but there is no indication that SPLC's methods of dissemination are targeted towards consumers of Christian television and media. As a result, Coral Ridge has failed to plead that SPLC used the Hate Map and "hate group" designation in commercial advertising and promotion.

Because it failed to allege that SPLC made a representation or description of "fact" and that it made such a statement in "commercial advertising and promotion," Coral Ridge has not plausibly pled that SPLC a viable claim for false advertising under the Lanham Act.

---

solely anticipated injury, the lack of such an allegation is not fatal to its claim.

### b. False-Association Claim

Coral Ridge also brings a claim for false association pursuant to 15 U.S.C. § 1125(a)(1)(A). In connection with this claim, Coral Ridge alleges that SPLC published its trademarked name, "D. James Kennedy Ministries," on the Hate Map, designating it as an Anti-LGBT hate group," and that SPLC published this "hate group" designation on its website, in fundraising materials, and in its reports, trainings, informational materials, intelligence, and analysis. Am. Compl. at ¶¶ 117, 121. Coral Ridge argues that SPLC's use of its trademark on the Hate Map falsely associates its trademark "with the Neo-Nazi's, skin heads, and the other actual terrorist organizations that are listed on the map." Pl.'s Resp. to SPLC's Mot. to Dismiss (doc. no. 51) at 50-51. For the reasons discussed below, this claim must be dismissed.

To prevail on a false-association claim under § 1125(a)(1)(A), a plaintiff must establish that the defendant, "in connection with goods and services ...

used in commerce any word, term, name, symbol, or
device, or any combination thereof, or any false
designation of origin, false or misleading description
of fact, or false or misleading representation of fact,
which ... is likely to cause confusion, or to cause
mistake, or to deceive as to the affiliation,
connection, or association of such person with another
person, or as to the origin, sponsorship, or approval
of his or her goods, services, or commercial activities
by another person." 15 U.S.C. § 1125(a)(1)(A). The
court assumes for the purposes of discussion that Coral
Ridge has adequately pleaded that SPLC used Coral
Ridge's trademark in commerce in connection with goods
and services.

To survive the motion to dismiss, Coral Ridge must
plausibly plead that the use of its trademark created a
"likelihood of confusion" in consumers.[26] As noted

_____

26. In the ordinary false-association case, in
which in the plaintiff contends that the defendant used
plaintiff's trademark to sell its own products, courts
apply a multi-factor test to determine the likelihood
of confusion, which weighs factors such as the

above, Coral Ridge contends that, by designating its trademarked name as a "hate group" on the Hate Map, SPLC created a likelihood of confusion in the public as to Coral Ridge's "association" with the other groups listed on the Map.  Thus, the court begins its analysis by determining the meaning of the phrase "likelihood of confusion as to the ... association" in the statute.

As discussed at length above, SPLC used Coral Ridge's trademark to criticize its stance on homosexuality; by doing so, it engaged in speech on a matter of public concern--a core focusof the First Amendment's protections.  The Lanham Act must be construed narrowly to avoid impinging on speech protected by the First Amendment.  *Univ. of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1277 (11th Cir. 2012).  As a result, courts applying the

---

similarity of the plaintiff's mark and the mark used by the defendant. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514 (11th Cir. 1984).  Because there is no allegation here that SPLC used Coral Ridge's trademark in an effort to pass its goods and services off as those of Coral Ridge, this test is of little assistance.

Lanham Act must carefully "weigh the public interest in free expression against the public interest in avoiding consumer confusion." *Id.* (*quoting Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 494 (2d Cir. 1989) (internal quotations omitted). Ordinary applications of trademark law--such as where a seller uses another's trademark to trick consumers into buying his own goods--do not risk the suppression of highly protected speech. However, when trademark law is used "to obstruct the conveyance of ideas, criticism, comparison, and social commentary," the risk of such suppression is great. *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 321–22 (4th Cir. 2015). Conflict with the First Amendment is avoided "so long as [interpretation of] the Act hews faithfully to the purposes for which it was enacted." *Id.* at 322 (citing *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002)).

The trademark protections in § 1125(a) "exist to protect consumers from confusion in the marketplace."

*Radiance Found.,* 786 F.3d 316 at 321. "Trademark infringement laws limit the ability of others to use trademarks or their colorable imitations in commerce, so that consumers may rely on the marks to make purchasing decisions." *Id.* Congress "did not intend for trademark laws to impinge the First Amendment rights of critics and commentators." *Id.* at 321 (*quoting Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005)). Furthermore, § 1125(a)(1)(A) "is not designed to protect mark holders from consumer confusion about their positions on political or social issues." *Radiance Found.*, 786 F.3d at 327. "Actual confusion as to a non-profit's mission, tenets, and beliefs is commonplace, but that does not transform the Lanham Act into an instrument for chilling or silencing the speech of those who disagree with or misunderstand a mark holder's positions or views." *Id.* at 327-28 (*citing Rogers v. Grimaldi*, 875 F.2d 994, 1001 (2d Cir. 1989)).

Mindful of these principles and purposes, the court finds that § 1525(a)(1)(A)'s requirement of likelihood of confusion as to the "association of a person with another" means confusion as to whether the seller or the trademark holder is associated with another person or organization by virtue of a legal or other relationship--not whether the trademark holder belongs in the same category as, or might be associated in some other vague sense with, another person or organization. This reading is consistent with the intent of Congress: It would cover the use of a trademark that falsely insinuates that a seller has a relationship with the trademark holder in order to sell products. Furthermore, if "association" were defined to mean any type of mental association between the trademark holder and another person or organization, its potential applications could be limitless and far afield of the purpose of the Act. For example, if "association" were so broadly defined, a health food producer could sue for false association because a supermarket advertised

the health food company's products next to those of a company that produces junk food on the theory that consumers might falsely "associate" the junk food with the health food company's trademark.  Furthermore, such a broad interpretation of "association" could be applied to a wide range of protected speech, and would allow companies to shield themselves from valid criticism, while doing nothing to advance the purposes of the Lanham Act.  *See CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 462 (4th Cir. 2000) (quoting *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 307 (9th Cir. 1992)) ("'Much useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark.'").

Applying the proper definition of "association," the court holds that Coral Ridge has not alleged a likelihood of confusion as to its "association" with the Ku Klux Klan and other criminal and violent hate

groups.   Nothing  in  the  complaint  suggests  that  the
public  is  likely  to  be  confused  into  believing,  based
on  SPLC's  use  of  Coral  Ridge's  trademark  on  the  Hate
Map  and  in  its  "hate  group"  designation,  that  Coral
Ridge  has  an  actual  relationship  any  other  group  on  the
Map,  let  alone  the  criminal  and  violent  ones.[27]

In  sum,  Coral  Ridge  has  failed  to  allege  the
"likelihood   of   confusion"   requirement   for   its
false-association  claim.   The  claim  must  be  dismissed.


### C. Title II Discrimination Claim Against the Amazon Defendants

Coral  Ridge  claims  that,  by  denying  it  access  to
the  AmazonSmile  charitable-giving  program,  Amazon  and
AmazonSmile   violated   the   ban   on   religious
discrimination  in  places  of  public  accommodation  that
is  codified  in  Title  II  of  the  Civil  Rights  Act  of
1964.   Title  II  provides:  "All  persons  shall  be

---

27. For  example,  there  are  no  allegations  that  SPLC
represents  that  the  groups  on  the  Map  work  with  each
other.

entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

Applying the alleged facts to Title II, Coral Ridge asserts that its theory of liability is as follows: the Amazon defendants are places of public accommodation subject to Title II. *See* Am. Compl. (doc. no. 40) at ¶ 150. One of the "service[s]," "privilege[s]," and "advantage[s]" that the Amazon defendants provide as places of public accommodation is the ability to receive charitable donations through the AmazonSmile program. *Id.* at ¶¶ 14, 160. The Amazon defendants excluded Coral Ridge from accessing that service, privilege, and advantage--that is, from receiving donations through the AmazonSmile program--because SPLC classified Coral Ridge as a "hate group." *Id.* at ¶¶ 23-24. The "hate group" designation by SPLC is

based on Coral Ridge "oppos[ing] homosexual conduct."
*Id.* at ¶¶ 61, 154. Coral Ridge's opposition to
homosexual conduct, in turn, is based on its religious
beliefs. *Id.* at ¶ 155.

In sum, Coral Ridge's theory is that, by excluding
it from receiving charitable donations due to its "hate
group" designation--which SPLC based on Coral Ridge's
religious opposition to homosexual conduct--the Amazon
defendants discriminated against Coral Ridge based on
its religion, in violation of Title II.

To prevail, Coral Ridge must overcome three
successive hurdles. First, it must plausibly allege
that the Amazon defendants operate as a "place of
public accommodation" within the meaning of Title II.
42 U.S.C. § 2000a(a). Second, it must plausibly allege
that its exclusion from receiving donations through the
AmazonSmile program constituted the denial of
"services," "privileges," or "advantages," etc., of the
Amazon defendants as places of public accommodation.
*Id.* Third, it must plausibly allege that the denial of

such services, privileges, advantages, etc. amounted to "discrimination ... on the ground of ... religion." *Id.*

As explained below, Coral Ridge's claim fails. Even if it were assumed that the Amazon defendants are places of public accommodation subject to Title II, seeking to receive donations through the AmazonSmile program does not qualify as a service, privilege, or advantage, etc. protected by the statute's anti-discrimination prohibition. This is because the Amazon defendants limit the ability to receive such donations exclusively to 26 U.S.C. § 501(c)(3) organizations and therefore do not make that ability open to the public. Moreover, an alternative ground for dismissing the claim is that Coral Ridge has not plausibly alleged that the Amazon defendants discriminated against it *based on religion*.

## 1. Public Accommodation

The parties dispute whether the Amazon defendants are "place[s] of public accommodation" under Title II and are thus subject to the statute's requirements. 42 U.S.C. § 2000a(a)-(b). Although Title II does not define a "place of public accommodation," it lists certain establishments that qualify as such. Specifically, § 2000a(b) provides that "[e]ach of the following establishments which serves the public is a place of public accommodation ... if its operations affect commerce ...":

> "(1) [A]ny inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;
>
> "(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

"(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

"(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment."

The scope of what constitutes a place of public accommodation "is to be liberally construed and broadly read" with "open minds attuned to the clear and strong purpose of" Title II. *Miller v. Amusement Enters., Inc.*, 394 F.2d 342, 349 (5th Cir. 1968).[28] The "overriding purpose" of Title II is to eliminate "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969).

---

28. In *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981.

The Amazon defendants contend that their websites are not places of public accommodation within the meaning of Title II because the statute applies to only physical facilities.  By contrast, Coral Ridge alleges that the Amazon defendants are places of public accommodation because they fall under the category of places of "exhibition or entertainment."  42 U.S.C. § 2000a(b)(3).  Coral Ridge further points out that the Amazon defendants are "encroaching on entire industries in which brick and mortar businesses have thrived, including businesses traditionally covered by the provisions of Title II."  Am. Compl. (doc. no. 40) at ¶ 18.  Because Amazon has replaced traditional brick and mortar establishments covered by Title II with a primarily virtual, rather than physical, marketplace, and because Amazon's services are not entirely virtual, but include physical stores and operations, Coral Ridge argues that the Amazon defendants should also be covered by Title II.[29]

---

29. Coral Ridge alternatively argues that, even if

Whether internet-based businesses--or the Amazon defendants in particular--are precluded from being places of public accommodation under Title II is an issue of first impression. It is a difficult one, at that. On the one hand, the statute's use of the term "place" and references to "facilit[ies]," physical structures, and "physically located" establishments suggest that "places of public accommodation" might be limited to "actual, physical places and structures." *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 540-43 (E.D. Va. 2003) (Ellis, J.) (concluding that "AOL's chat rooms and other online services do not constitute a 'place of public accommodation' under Title II" because they do not "consist of, or have a clear connection to, actual physical facilities or structures"). On the other hand, the need to construe Title II broadly, in light of its purpose, *see Daniel*,

---

AmazonSmile is not considered a place of public accommodation, the AmazonSmile program is still covered as a "service," "privilege," and "advantage" of Amazon, which is a place of public accommodation. *See* Pl.'s Resp. to Amazon Defs.' Mot. to Dismiss (doc. no. 52) at 5-6.

395 U.S. at 307, suggests that denying access to even an entirely virtual marketplace based on a protected characteristic might result in the "the daily affront and humiliation" that the drafters of Title II sought to prevent, *id.* at 307-308*.*

Ultimately, the court need not resolve whether the Amazon defendants are places of public accommodation within the meaning of Title II.  Even if it were assumed that, as Coral Ridge alleges, they are covered by the statute as places of "exhibition or entertainment," the Title II claim would still fail for two independently sufficient reasons discussed below.


2. Denial of Services, Privileges, or Advantages
Assuming, without deciding, that the Amazon defendants are places of public accommodation, the court turns next to the question whether Coral Ridge plausibly alleges that it has been denied "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, [or] accommodations" of the Amazon defendants as places of public accommodation.

§ 2000a(a). Coral Ridge argues that the Amazon defendants have denied it the "service," "privilege," or "advantage" of receiving money donations through the AmazonSmile program.[30] So, the issue to resolve here is whether Title II's protection of the "enjoyment of ... services," "privileges," and "advantages" of a place of public accommodation encompasses the ability to receive such donations. In other words, is Coral Ridge within the class of plaintiffs that Title II is designed to protect?

The court begins its analysis with two premises. First, Title II is "not limited to proscribing discrimination only as to the enjoyment" of the goods, services, privileges, etc. that "make the establishment a place of public accommodation." *United States v. DeRosier*, 473 F.2d 749, 752 (5th Cir. 1973). In *DeRosier*, the court held that Title II not only protected access to the juke box, shuffle board, and

_____

30. Coral Ridge does not allege that it was prevented from *making* donations to organizations that are eligible to participate in the AmazonSmile program.

105

pool table that converted the bar into a "place of entertainment"; rather, it protected the enjoyment of all the bar's goods, services, etc. *See id.* at 751-52. Applying this principle here, the court concludes that Title II's ban on discrimination extends beyond the enjoyment of the video, audio, and book selling, downloading, and streaming activities that Coral Ridge asserts--and this court assumes, *arguendo*--makes the Amazon defendants public accommodations as "place[s] of exhibition or entertainment." § 2000a(b)(3).

The second premise is that "it is the traditional understanding of public-accommodation laws that they provide rights for *customers*," rather than, say, the providers of goods or services. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 692 (2001) (Scalia, J., dissenting) (citing *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 571 (1995) and *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)). As the Supreme Court pointed out in *Hurley*, the history of

public-accommodation laws can be traced to the "common law, [under which] innkeepers, smiths, and others who 'made profession of a public employment,' were prohibited from refusing, without good reason, to serve a *customer*." 515 U.S. at 571. (emphasis added). Moreover, in *Heart of Atlanta*, a 1964 decision upholding the constitutionality of Title II, the Supreme Court found that the "[b]asis of Congressional [a]ction" to pass Title II was the evidence before Congress of discrimination against potential black *customers* of hotels. *See* 379 U.S. at 252. This Congressional testimony included that "Negroes in particular have been the subject of discrimination in transient accommodations, having to travel great distances [to] secure the same; that often they have been unable to obtain accommodations and have had to call upon friends to put them up overnight; and that these conditions had become so acute as to require the listing of available lodging for Negroes in a special guidebook which was itself dramatic testimony to the

difficulties Negroes encounter in travel." *Id.* at 252-53 (internal citations and quotation marks omitted). Since Title II's enactment and upholding by the Supreme Court in 1964, the heartland, run-of-the-mill Title II cases involve establishments that refuse to provide their goods, services, etc., to potential *customers*. *See, e.g.*, *Stout v. YMCA of Bessemer, Ala.*, 404 F.2d 687, 688-89 (5th Cir. 1968) (holding that the YMCA violated Title II by refusing to rent rooms to two black plaintiffs).

Combining these two premises, the court concludes that it is clear that, while a viable Title II plaintiff need not be denied the good, service, or privilege, etc. that makes the defendant establishment a place of public accommodation, *see DeRosier*, 473 F.2d at 752, in the typical Title II case, consistent with the traditional understanding of public-accommodations laws, he is denied enjoyment of some good, service, or privilege, etc. in his capacity as a *customer*. Consequently, Coral Ridge's claim does not fail just

because the activity at issue--receiving donations--is different from the activities that Coral Ridge alleges makes the Amazon defendants places of public accommodation (book, music, and video sales, streaming, etc.). Nevertheless, what remains unclear is whether Title II's protections extend to a plaintiff, such as Coral Ridge, who is seeking to receive donations from a place of public accommodation, and thus not acting as a potential "customer" in any ordinary sense of the word.

### i.   Caselaw

It is an open question whether Title II covers the "enjoyment of" goods, services, privileges, etc. by a plaintiff other than a potential customer of a public accommodation. Some lower courts have held that federal public-accommodation laws protect exhibitors at a safari convention, *see Impala African Safaris, LLC v. Dall. Safari Club, Inc.*, 2014 WL 4555659, at *6 (N.D. Tex. Sept. 9, 2014) (Fish, J.) (Title II), or physicians seeking medical-staff privileges at a

hospital, *see Hetz v. Aurora Med. Ctr. of Manitowoc Cnty.*, 2007 WL 1753428, at *11-12 (E.D. Wis. June 18, 2007) (Callahan, Jr., M.J.) (Title III of the Americans with Disabilities Act of 1990); *see also Menkowitz v. Pottstown Memorial Med. Ctr.*, 154 F.3d 113, 122 (3d Cir. 1998) (Title III).   Conversely, other courts have held that a public-accommodation law protects only customers or patrons of a public accommodation, not camp counselors, *see Bauer v. Muscular Dystrophy Ass'n, Inc.*, 268 F. Supp. 2d 1281, 1291-92 (D. Kan. 2003) (Brown, J.) (Title III), and that Title II does not protect taxicab services seeking to "'provide' services at, not merely enjoy the benefits of access to," a mall transit station, *Gold Star Taxi and Transp. Serv. v. Mall of Am. Co.*, 987 F. Supp. 741, 752-53 (D. Minn. 1997) (Magnuson, J.).   None of these decisions is directly on point, or for that matter, binding.

Of all the existing caselaw on the issue, the Supreme Court decision, *PGA Tour, Inc. v. Martin*, is the most instructive as to whether Title II extends

beyond customers.  532 U.S. at 679-81.  Critically, as elaborated below, *Martin* teaches that, regardless of whether Coral Ridge constitutes a customer in any ordinary sense of the word, it is not protected by Title II, because the ability to receive donations through the AmazonSmile program is not a service, privilege, etc. that is *open to the public*.

In *Martin*, the Court confronted--without deciding--the question whether the Americans with Disabilities Act's analogous prohibition on discrimination in public accommodations (Title III of the act) applies to only "clients or customers" of public accommodations.  *Id.* at 679.  Although Title III of the Americans with Disabilities Act and Title II of the Civil Rights Act of 1964 have their differences, the texts of the two statutes are quite similar. Mirroring the language of Title II, Title III provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation ... ." 42 U.S.C. § 12182(a). Title III enumerates a similar, yet more extensive, list of entities that qualify as "public accommodations," § 12181(7), and that, like Title II, should be "construed liberally," *Martin*, 532 U.S. at 676. As described below, the *Martin* Court's holding interpreting Title III explicitly relied on its own precedent interpreting Title II, which further shows why courts'--especially the highest court's--interpretations of each statute are mutually relevant and instructive.

The plaintiff in *Martin* was Casey Martin, a professional golfer with a disability that limited his ability to walk. He alleged that the PGA Tour violated Title III of the Americans with Disabilities Act by prohibiting him from using a golf cart while participating in its golf tournaments. The PGA Tour conceded that its golf tournaments were conducted at places of public accommodation. *See id.* at 677.

Nonetheless, it argued that Title III did not protect Martin because he was a competing golfer, rather than a spectator consuming the entertainment. *See id.* at 678. More specifically, the PGA Tour contended that Title III "is concerned with discrimination against clients and customers seeking to obtain goods and services at places of public accommodation," not a professional golfer such as Martin, who "is a provider rather than a consumer of the entertainment that [the PGA Tour] sells to the public." *Id.* (internal quotation marks omitted).

The *Martin* Court did not decide whether Title III was limited to "clients and customers" of public accommodations, because it determined that Martin qualified as a client or customer of the PGA Tour. *Id.* at 679-80. The Court explained that the golf tournaments offered "at least two 'privileges' to the public--that of watching the golf competition and that of competing in it." *Id.* at 680. In other words, during its tournaments, the PGA Tour "may not

discriminate against either spectators or competitors on the basis of disability." *Id.* at 681.

The Court offered four interrelated reasons why *Martin* was a client or customer and thus protected by Title III. First, it highlighted that Martin paid a $ 3,000 entry fee for a chance to compete in the tournament. *See id.* at 679. Second and most importantly, the Court stressed that competing in the PGA Tour tournaments was a privilege "available to members of the general public." *Id.* at 680. As the Court explained, Martin had sought to gain entry into the PGA Tour tournament by successfully competing in a three-stage tournament known as the "Q-School." *Id.* at 669. "Any member of the public may enter the Q-School by paying a $ 3,000 entry fee and submitting two letters of reference ... ." *Id.* at 665. Through three stages of the Q-School, the thousands of contestants are whittled down to the PGA-Tour participants. Third, the Court emphasized that its "conclusion is consistent with case law in the

analogous context of Title II of the Civil Rights Act of 1964." *Id.* at 681. For example, in *Daniel v. Paul*, the Court had held that the "definition of a 'place of exhibition or entertainment,' as a public accommodation, covered participants 'in some sport or activity' as well as 'spectators or listeners.'" *Id.* (quoting 395 U.S. at 306). Fourth and finally, the court cited Title III's "expansive purpose." *Id.* at 680.[31]

*Martin's* reasoning shows that Title II does not cover Coral Ridge's attempt to receive donations through the AmazonSmile program. Crucially, unlike in *Martin*, the ability to receive donations through the AmazonSmile program is not "a privilege that [the Amazon defendants] make[] available to members of the general public." *Id.* To register to receive donations through the AmazonSmile program, the entity must, among

---

[31]. The *Martin* Court limited its holding by clarifying that a "customer" does not encompass "everyone who seeks a job at a public accommodation, through an open tryout or otherwise." 532 U.S. at 680 n.33 (internal quotation marks omitted).

other eligibility requirements, be a § 501(c)(3) organization that is located in the United States and in good standing in the IRS. *See* Am. Compl. (doc. no. 40) at ¶ 44. Sure, *Martin* embraced a broad conception of being open to members of the general public by recognizing the PGA Tour as such. *See Martin*, 532 U.S. at 696 (Scalia, J., dissenting) (criticizing that competing in the Q-School qualifying tournament is "no more a 'privilege' offered for the general public's 'enjoyment' than is the California Bar Exam" or an "open casting for a movie or stage production"). Still, the fact that the AmazonSmile program is limited to certain § 501(c)(3) organizations--and *thus completely excludes all natural persons*--removes the program from even *Martin*'s broad conception of being "available to members of the general public." *Id.* at 680; *see also Gold Star Taxi*, 987 F. Supp. at 752-53 (holding that Title II did not cover taxicab services' access to mall transit station because municipal regulations restricted the right to provide such

services in the city, and only a limited number of qualifying persons and companies were legally able to provide services to the mall). The bottom line is that any good, service, or privilege, etc. that is available to only a specific type of legal entity--and not directly to human beings--is not open to the public for Title II purposes.

Additionally, this case is distinguishable from the *Daniel* decision on which *Martin* relied. Receiving money donations through the AmazonSmile program is nothing like participating in a sport or other activity while visiting an *open-to-the-public* "232-acre amusement park with swimming, boating, sun bathing, picnicking, miniature golf, dancing facilities, and a snack bar." *Daniel*, 395 U.S. at 301.[32] And because, as noted above, the program is limited to § 501(c)(3)

---

32. This case also differs from *Martin* because there is no allegation that Coral Ridge would need to pay any fee to participate in the AmazonSmile program. However, this distinction is not dispositive to the court's ruling here, because making a payment is not a requirement for being protected by public accommodation laws.

organizations and thus not open to the public, protecting Coral Ridge here would not further the "overriding purpose of Title II" recognized in *Daniel*: to remove "the daily affront and humiliation involved in discriminatory denials of access to facilities *ostensibly open to the general public*." *Id.* at 307-08 (emphasis added).

To summarize, the *Martin* Court refused to foreclose the possibility of a federal public-accommodations law protecting noncustomers, and embraced a capacious conception of a protected "customer" that extends beyond the everyday meaning of the word, such that it encompasses competitors in a professional golf tournament. *See Martin*, 532 U.S. at 695 (Scalia, J., dissenting) ("[N]o one in his right mind would think that [professional baseball players] are *customers* of the American League or of Yankee Stadium."). The *Martin* Court also embraced a liberal understanding of what qualifies as available to the general public. *See id.* at 697. Nevertheless, as expansive as the Court's

reading of Title III of the Americans with Disabilities Act was, *Martin* still supports concluding that Coral Ridge is not covered here by the similarly worded Title II of the Civil Rights Act of 1964, because the ability to receive donations through the AmazonSmile program is simply not "available to members of the general public." *Id.* at 680.

### ii.  Text and Structure of Title II

The text and structure of Title II reinforce the above-stated conclusion: The statute does not protect the ability to receive donations through the AmazonSmile program, given that this ability is not open to the public.  Specifically, the statute provides that an establishment qualifies as a place of public accommodation governed by Title II only if it "serves the public."  42 U.S.C. § 2000a(b); *see also Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1269 (7th Cir. 1993). Subsection (e) further provides that Title II's ban on discrimination does not apply "to a private club or other establishment not in fact open to the public,

except to the extent that the facilities of such establishment *are made available to the customers or patrons of an establishment*" that qualifies as a place of public accommodation under subsection (b). § 2000a(e) (emphasis added). Combining these two subsections, the court concludes that Title II applies to an entity only if it "serves the public" or is made available to the "customers or patrons" of a public accommodation (which, by definition, "serves the public"). True, these two provisions relate to the types of entities covered by the statute, not what qualifies as a good, service, or privilege, etc. Nevertheless, because the provisions limit the statute's coverage to entities that serve the public or are available to entities that serve the public, and because, by definition, entities that serve the public provide goods, services, etc. that are open to the public, the provisions suggest that Congress designed Title II to address the evil of discrimination with respect to goods, services, etc. that are open to the

public.  Moreover, the fact that opening an entity up to "customers or patrons" triggers the application of Title II to an otherwise exempt establishment strongly suggests that at least a primary concern of Congress was discrimination against "customers and patrons." Given that Coral Ridge seeks to receive donations through a program that is not open to the public, and that Coral Ridge is not acting as a customer or patron in seeking the donations, it is not the type of plaintiff envisioned by Title II.

### iii. Avoiding First Amendment Problems

Finally, even if one could conceivably read Title II to protect Coral Ridge here--which this court strongly doubts--the canon of constitutional avoidance would preclude such a reading.  This longstanding principle of statutory interpretation holds: "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly

possible, [courts] are obligated to construe the statute to avoid such problems." *I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (internal citations and quotation marks omitted); *see also Clark v. Martinez*, 543 U.S. 371, 381 (2005) (explaining that the canon of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

Here, interpreting Title II to require the Amazon defendants to include Coral Ridge in the AmazonSmile program would raise serious First Amendment problems. Such an interpretation would essentially compel the Amazon defendants to donate money to Coral Ridge, and thus subsidize its "mission ... to proclaim the Gospel upon which this Nation was founded." Am. Compl. (doc. no. 40) at ¶ 38. This outcome would seriously risk violating the "bedrock" First Amendment "principle that, except perhaps in the rarest of circumstances, no

person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Harris v. Quinn*, 573 U.S. 616, 656 (2014); *see also NAACP v. Hunt*, 891 F.2d 1555, 1566 (11th Cir. 1990) ("[T]he government may not compel persons to support candidates, parties, ideologies or causes that they are against.") (internal quotation marks omitted). As the AmazonSmile eligibility requirements make clear, the Amazon defendants do not want to donate money to organizations that SPLC classifies as "hate groups." *See* Am. Compl. (doc. no. 40) at ¶¶ 23, 44. SPLC classified Coral Ridge as a "hate group." Therefore, Coral Ridge is a "third party that" the Amazon defendants do "not wish to support." *Harris*, 573 U.S. at 656. Yet, if this Court adopted Coral Ridge's reading of Title II, the Amazon defendants would be forced to donate money to Coral Ridge, despite their wish not to, and thus be compelled to subsidize Coral Ridge's mission to broadcast its religious views,

including its opposition to homosexual conduct that resulted in SPLC's labeling it a "hate group."

Coral Ridge argues that applying Title II here would not violate the Amazon defendants' First Amendment rights, because it is the customers, rather than the defendants, who make the donations through the AmazonSmile program.  This argument is belied by Coral Ridge's amended complaint, which quotes the program's website as stating that "*AmazonSmile Foundation will donate* 0.5% of the price of eligible purchases to the charitable organizations selected by customers."  Am Compl. (doc. no. 40) at ¶ 43.  Sure, the Amazon customers initiate the purchase and choose the organization to which they donate.  But, importantly, the customers can donate to only the restricted universe of entities that meet the AmazonSmile program's eligibility requirements.  In other words, the Amazon defendants choose which groups can receive donations, and the Amazon defendants donate 0.5 % of their revenue from each purchase.  It is therefore the

Amazon defendants who would be compelled to donate to a group that they did not want to--namely, Coral Ridge.

By way of comparison, assume that a closely held fast-food restaurant chain, whose owners are Christian and object to homosexuality based on their religious beliefs, initiates a "charity match" program.  Under the program, consumers who purchase a certain number of sandwiches may donate up to $ 5.00 to the charity of their choice, subject to certain restrictions, and the corporation will match the donation.  According to Coral Ridge's interpretation of Title II, the fast-food chain could be compelled--over their objection--to match donations to, for example, a church whose central mission is promoting the Christian acceptance of homosexuality; the Church of Satan; or any number of religious organizations whose purpose and activities run directly contrary to the business's deeply held convictions.  Even though the consumer initiated the transaction that would ultimately lead to the business donating money, it is still the business's money being

donated, and the business retains its say as to where it goes.[33]

So, even if Coral Ridge's reading of the statute to cover its claim were plausible, such an interpretation would raise serious constitutional problems under the First Amendment. Because "an alternative interpretation of the statute is fairly possible"--indeed, in the court's view, is the correct interpretation of Title II--this court is "obligated to construe the statute to avoid such problems." *St. Cyr*, 533 U.S. at 300.

---

26. In addition to likely forcing establishments to subsidize speech with which they disagree, extending Title II to charitable monetary giving more broadly runs the danger of restricting speech by diluting donations to organizations to whom establishments *want* to give. For instance, assume a business decided to donate a portion of its proceeds to a particular religious or nationality-based organization--perhaps a Korean restaurant donating to a church that the owners attend, or to a Korean neighborhood association. Applying Title II as Coral Ridge suggests might allow other groups to come and demand a share of the donations, which would in turn reduce the owners' contributions to the group of their choice--potentially ad infinitum. This possibility further supports the conclusion that Coral Ridge's construction of Title II would likely be unconstitutional.

In conclusion, the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation" does not encompass the ability to receive donations through the AmazonSmile program. This conclusion stems from the reasoning of *Martin* and text and structure of Title II--given that receiving donations through the program is not open to the public--as well as the traditional understanding of public-accommodations laws, and the canon of constitutional avoidance.[34]   Accordingly, the Title II claim is due to be dismissed with prejudice.


### 3. Discrimination Based on Religion

Even if Title II's ban on discrimination applied to Coral Ridge's ability to receive donations through the AmazonSmile program, it has not plausibly alleged that

---

34. The court expresses no opinion as to whether Title II would cover the ability to receive donations if the AmazonSmile program had no--or significantly less restrictive--eligibility requirements for donation recipients.

the Amazon defendants discriminated against it based on religion.

### i.   Disparate Impact

Coral Ridge asserts a disparate-impact theory of discrimination. *See* Pl.'s Resp. to Amazon Defs.' Mot. to Dismiss (doc. no. 52) at 8-9.  "In contrast to a disparate-treatment case, where a plaintiff must establish that the defendant had a discriminatory intent or motive, a plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on [a protected group] and are otherwise unjustified by a legitimate rationale." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc*., 135 S. Ct. 2507, 2513 (2015) (internal quotation marks omitted).  The Amazon defendants, on the other hand, argue that Title II requires intentional discrimination and does not embrace disparate-impact claims.

Neither the Supreme Court nor Eleventh Circuit has determined whether Title II recognizes disparate-impact claims. Several lower courts have concluded that it does. *See, e.g.*, *Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1340-41 (2d Cir. 1974); *Robinson v. Power Pizza, Inc.*, 993 F. Supp. 1462, 1464-66 (M.D. Fla. 1998) (Schlesinger, J.). Others have held that it does not. *See, e.g.*, *Akiyama v. U.S. Judo Inc.*, 181 F. Supp. 2d 1179, 1187 (W.D. Wash. 2002) (Lasnik, J.); *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1370 n.2 (S.D. Fla. 1999) (Seitz, J.).

This court need not resolve the open question, for Coral Ridge has not plausibly plead a prima-facie case of disparate-impact discrimination.

To make out a prima-facie case under a disparate-impact theory, a plaintiff must show that the defendant's challenged policy or practice has a "significantly disparate impact" on members of a protected group. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657-58 (1989), *superseded by statute on other*

grounds, 42 U.S.C. § 2000e-2(k); *Stephen v. PGA Sheraton Resort, Ltd.*, 873 F.2d 276, 279 (11th Cir. 1989) (requiring showing a "significant discriminatory effect"). As the Supreme Court has clarified, the prima-facie case of disparate-impact liability is "essentially[] a threshold showing of a significant statistical disparity." *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009); *see also Powers v. Ala. Dep't of Educ.*, 854 F.2d 1285, 1293 (11th Cir. 1988) (explaining that a prima-facie case requires plaintiffs to show a "statistically significant disparity" between promotions of black people and similarly situated white people). The Supreme Court has instructed courts to "examine with care whether a plaintiff has made out a prima facie case of disparate impact" and cautioned that "prompt resolution of these cases is important." *Inclusive Cmtys.*, 135 S. Ct. at 2523.

Still, at this motion-to-dismiss stage, Coral Ridge must plausibly allege--not prove--only a prima-facie case of disparate impact. A plaintiff "should be

afforded the opportunity of discovery before he is required to present detailed statistics to the court." *Forsyth v. Univ. of Ala. Bd. of Trs.*, 2018 WL 4517592, at *6 (N.D. Ala. Sept. 20, 2018) (Proctor, J.). Accordingly, all Coral Ridge must do is allege "*some statistical disparity, however elementary.*" *Brady v. Livingood*, 360 F. Supp. 2d 94, 100 (D.D.C. 2004) (Leon, J.).

Coral Ridge does not meet its burden because it does not allege even an elementary statistical disparity; indeed, its amended complaint makes no factual allegations whatsoever of any "disproportionately adverse effect" on religious or Christian groups. *Inclusive Cmtys.*, 135 S. Ct. at 2513.[35] The Amazon defendants' challenged policy or practice is their eligibility requirement for the AmazonSmile program that excludes any organization that SPLC classifies as a "hate group." *See* Am. Compl.

---

35. Of course, the court does not credit Coral Ridge's conclusory allegations of disparate impact that are unsupported by any well-pleaded underlying factual allegations.

(doc. no. 40) at ¶¶ 23-24, 44.  Coral Ridge, a "Christian ministry," *id.* at ¶ 63, has not alleged any facts indicating that this eligibility requirement results in the disproportionate exclusion of Christian or religious organizations, as compared to non-Christian or non-religious organizations seeking to participate in the program.[36]  That is, Coral Ridge does

---

36. Disparate-impact claims require evaluating the impact of a policy or practice on members of a protected class as compared to persons outside the protected class.  The court reads the relevant protected class alleged here to be a Christian or religious organization, *not* a Christian organization whose religious views oppose homosexual conduct.  If a plaintiff could narrowly define its class based on its particular religious belief, rather than the broader religious faith or group to which it belongs, then disparate-impact claims would have a nearly limitless reach.  This is because any policy impacting a plaintiff's specific religious belief would generally impact 100 % of the members of a class defined by that belief, which would virtually always amount to a disproportionate impact as compared to those falling outside the class.  *Cf. Akiyama*, 181 F. Supp. 2d. at 1186.  For example, a Jewish man impacted by a policy affecting a belief rooted in his idiosyncratic, personalized interpretation of Judaism could claim disparate impact even though no other Jewish people hold that belief.

Such a broad interpretation of religion-based disparate-impact claims would conflict with the Supreme

Court's admonition that policies "are not contrary to
the disparate-impact requirement unless they are
artificial, arbitrary, and unnecessary barriers."
*Inclusive Cmtys.*, 135 S. Ct. at 2512 (internal
quotation marks omitted). Furthermore, such an
interpretation would be contrary to the text of Title
II, which prohibits discrimination "on the ground of
race, color, religion, or national origin."
§ 2000a(a). First, the statute refers to "religion,"
not religious beliefs. *Id.; compare with* 42 U.S.C.
§§ 2000bb-1(a)-(b) & 2000cc-5(7) (establishing the
Religious Freedom Restoration Act of 1993's much
broader protection for religious freedom, which
mandates, in much more expansive language, that the
"Government shall not substantially burden a person's
exercise of religion even if the burden results from a
rule of general applicability" unless the Government
makes certain showings; and defining "religious
exercise" as "any exercise of religion, whether or not
compelled by, or central to, a system of religious
belief"). Second, all the other protected
grounds--race, color, and national origin--refer to
broad categories of people. Reading "religion" in
light of those surrounding categories, it makes little
sense to allow a plaintiff to narrowly define his
protected class for disparate-impact purposes based on
one specific belief related to their religious faith.
*See United States v. Williams*, 553 U.S. 285, 294 (2008)
(explaining the "commonsense canon of *noscitur a
sociis*--which counsels that a word is given more
precise content by the neighboring words with which it
is associated").

Granted, a plaintiff might be able to define his
class as members of a particular branch, strand,
denomination, sect, etc. of a religion, such as Sufi
Muslims, Orthodox Jews, or Lutheran Christians.
However, even if the court construed Coral Ridge's
complaint to identify its protected class as

not allege any facts that would lead to a reasonable inference that Christian or religious organizations are more likely than other § 501(c)(3) organizations falling outside those categories to be designated by SPLC as "hate groups" and thus excluded.  For example, its amended complaint makes no factual allegations reasonably suggesting that Christian organizations are more likely than other organizations to--or have in fact been more frequently deemed to--qualify under SPLC's definition of a "hate group."  Nor does Coral Ridge allege any facts indicating that Christian or religious organizations are more likely than other similarly situated groups to "oppose homosexual conduct."  *Cf. Obergefell v. Hodges*, 135 S. Ct. 2584,

---

*evangelical* Christian organizations, it still does not make the factual allegations that evangelical Christian organizations are disproportionately deemed--or likely to be deemed--"hate groups" and thus excluded from the AmazonSmile program.  *See* Am. Compl. (doc. no. 40) at ¶ 31 (describing Coral Ridge's founder as an "evangelist").  The bottom line is that, even is assumed that Title II recognizes disparate-impact claims, the protected class in such a claim should be defined along the lines of a religion or religious *group*, not a particular belief within that group.

2602 (2015) ("Many who deem same-sex marriage to be wrong" do so based on "religious *or philosophical* premises") (emphasis added).

Despite these pleading defects, Coral Ridge maintains that there is a disparate impact because it was excluded from the AmazonSmile program based on its religious beliefs, whereas § 501(c)(3) organizations "that fall outside of SPLC's 'hate group' category" are eligible to participate.  Pl.'s Resp. to Amazon Defs.' Mot. to Dismiss (doc. no. 52) at 8-9.  This argument misses the mark.  Alleging disparate impact by comparing its eligibility to that of organizations "that fall outside of SPLC's 'hate group' category" would make sense only if Coral Ridge were alleging discrimination based on its trait of being deemed a 'hate group' by SPLC.  *Id.*  Of course, being deemed a 'hate group' by SPLC is not one of the traits protected by Title II.

In sum, Coral Ridge's allegation that its religious beliefs caused it to be deemed a hate group and thus

135

excluded from AmazonSmile, without any allegations
indicating that Christian or religious organizations
are disproportionately deemed--or likely to be
deemed--hate groups and thus excluded, is not enough to
allege plausibly a prima-face case of disparate impact.


ii. Intentional Discrimination

Coral Ridge further argues that, even if Title II
requires *intentional* discrimination, it plausibly
alleges such intent.  Specifically, it contends that
the following factual allegations support a reasonable
inference of intentional discrimination based on
religion.  First, "Amazon specifically chose SPLC's
on-its-face religiously discriminatory hate group
criteria as its eligibility standard."  Pl.'s Resp. to
Amazon Defs.' Mot. to Dismiss (doc. no. 52) at 10
(citing Am. Compl. (doc. no. 40) at ¶¶ 44, 53-54).  The
court rejects this allegation, given that it is
contradicted by Coral Ridge's more specific allegation
that SPLC defines a "hate group" as one that has

"beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics." Am. Compl. (doc. no. 40) at ¶ 64. This definition, which does not reference religion, is not "on-its-face religiously discriminatory."

Second, Coral Ridge argues that an inference of intentional discrimination is supported by its allegation that the "SPLC placed [Coral Ridge] on the Hate Map because of [Coral Ridge's] religious beliefs regarding LGBT issues." Pl.'s Resp. to Amazon Defs.' Mot. to Dismiss (doc. no. 52) at 10 (citing Am. Compl. (doc. no. 40) at ¶¶ 56-58). The court accepts as true that SPLC designated Coral Ridge as a "hate group" because of its beliefs about LGBT issues, and that these are religious beliefs for Coral Ridge. Yet, the fact that Coral Ridge's opposition to homosexual conduct happens to be rooted in its religious beliefs does not mean that SPLC targeted Coral Ridge because of its *religious* beliefs, as opposed to its belief, full stop, regardless of whether that belief is religiously

137

rooted.   Moreover,   Coral   Ridge's   allegation   that   the
designation   was   *because   of   its   religious*   beliefs   need
not   be   accepted,   because   it   is   tantamount   to   the   legal
conclusion       of       intentional       religion-based
discrimination.   *See   Oxford   Asset   Mgmt.,   Ltd.*,   *v.
Jaharis*,   297   F.3d.   1182,   1188   (11th   Cir.   2002)
(explaining   that,   at   the   motion   to   dismiss   stage,   the
court   need   not   accept   as   true   "legal   conclusions
masquerading   as   facts").

Third,   Coral   Ridge   alleges   that   "Amazon   (not   SPLC)
makes   the   ultimate   decision   as   to   who   may   or   may   not
participate   in   the   AmazonSmile   program."   Pl.'s   Resp.
to   Amazon   Defs.'   Mot.   to   Dismiss   (doc.   no.   52)   at   10
(citing   Am.   Compl.   (doc.   no.   40)   at   ¶¶   43,   53).   This
allegation,   alone   or   in   combination   with   the   other
allegations,   does   not   lead   to   a   reasonable   inference   of
intentional   discrimination.

Finally,   Coral   Ridge   contends   that:   "Even   if   Amazon
were   to   argue   that   there   *was*   no   intent   to   discriminate
prior   to   this   lawsuit   being   filed,   at   this   point   in   the

litigation, Amazon has been on notice of the issues in this case for months now and could easily have made this case go away by simply permitting [Coral Ridge] to be part of the AmazonSmile program.  Amazon's continued refusal to do so, especially in light of the expense of defending this litigation, certainly indicates Amazon's intent to continue discriminating." *Id.*  Coral Ridge is basically arguing that the Amazon defendants' refusal to acquiesce to its litigation demands somehow converts its exclusion from the AmazonSmile program into intentional discrimination.  This argument lacks merit.

Accordingly, Coral Ridge does not plausibly allege intentional discrimination based on religion.

**\*\*\***

While Title II "is to be liberally construed and broadly read," *Miller*, 394 F.2d at 349, Coral Ridge wants to stretch the statute beyond its breaking point. Perhaps Title II extends beyond physical "place[s]," § 2000a(b), to the internet.  Perhaps it protects more

than just potential *customers* seeking goods, services, etc. Perhaps it even recognizes disparate-impact claims. But it does not protect the ability to receive money donations, where such an ability is limited exclusively to § 501(c)(3) organizations and thus not open to the public. And Title II certainly does not entitle to relief a plaintiff who does not plausibly alleged any discrimination whatsoever, whether intentional or by disparate impact.

Coral Ridge cannot force the Amazon defendants to donate money to it. Its Title II claim is due to be dismissed with prejudice.[37]

## V. CONCLUSION

The court should not be understood as even suggesting that Coral Ridge is or is not a "hate group." It has merely held that SPLC's labeling of the

---

37. The court reaches the same conclusion, for the same reasons, regardless of whether Coral Ridge characterizes its claim as seeking to be able to receive money through the AmazonSmile program based on purchases by other customers, or based on purchases that Coral Ridge itself makes.

group as such is protected by the First Amendment and that the Amazon defendants' exclusion of the group from receiving donations through the AmazonSmile charitable-giving program does not violate Title II of the Civil Rights Act of 1964. The court will, therefore, enter a judgment adopting the recommendation of the magistrate judge (albeit for different reasons in some respects); granting SPLC's and the Amazon defendants' motions to dismiss; and dismissing this case in its entirety.

DONE, this the 19th day of September, 2019.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE